# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AVEION CASON
27451 Cedar Park Court
Wesley Chapel, Florida 33544

and

DONALD VINCENT MAJKOWSKI,
6138 Narcissa Pl
Johns Creek GA 30097,

in their individual capacity and on
behalf of others similarly situated,

     *Plaintiffs*

     v.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,

THE BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN BOARD,

THE NFL PLAYER DISABILITY AND
NEUROCOGNITIVE BENEFIT PLAN
BOARD, and

NATIONAL FOOTBAL LEAGUE
MANAGEMENT COUNCIL

     *Defendants*

No. _____

**CLASS ACTION
COMPLAINT**

Plaintiffs, Aveion Cason and Donald Vincent Majkowski, by their counsel, on behalf of themselves and all other similarly situated, allege the following facts related to their claims based on personal knowledge and all other facts based on investigation of counsel:

## NATURE OF THE ACTION

1.     Plaintiffs, totally and permanently ("T&P") disabled former National Football League ("NFL") football players, bring this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C § 185, on behalf of a Class of T&P disabled former NFL players, who are participants in the Bert Bell/Pete Rozelle NFL Player Retirement Plan, Amended and Restated as of April 1, 2014 ("the Retirement Plan"), and the NFL Player Disability and Neurocognitive Benefit Plan, Amended and Restated as of April 1, 2019 ("the Disability Plan") (collectively "the Plans").

2.     This action is brought against the fiduciaries of the Plans to enjoin and declare unlawful contractual violations of the Retirement Plan and the Disability Plan; to enjoin and declare fiduciary misrepresentations to Plan participants through plan communications about disability benefit amendments; to cure breaches of the 2020 NFL/National Football League Players Association ("NFLPA" or "Players Association") Collective Bargaining Agreement ("2020 CBA"); and to obtain appropriate equitable relief to redress such violations.

3.      Defendants are the plan sponsors, administrators, and fiduciaries of a disability program for NFL players. As a result of the 2020 CBA between the National Football League Management Council (the "Management Council") and the Players Association, both as presented to players in proposal form for a vote, and later secretly modified after approval, T&P disabled former NFL players will lose substantial vested T&P disability benefits.

4.     As fiduciaries of the Retirement Plan and the Disability Plan, Defendants have an obligation, characterized as the highest known to law, to fairly administer the Retirement Plan and the Disability Plan for players in the Class and to act with a duty of loyalty and duty of care in

providing them T&P disability benefits under these Plans.  Defendants have violated the language of the Retirement Plan and the Disability Plan and by violated their fiduciary duties under ERISA by failing to disclose and inform all members of the Class of the substantially negative consequences that these amendments to the Plans would have in the future for them and thereby impede Class members' ability to mobilize to influence the vote against the 2020 CBA.

5.     As a result of these substantial reductions in vested benefits, after Class members were already in paid status, and failure to disclose the adverse impact of the 2020 CBA Amendments to T&P disabled former NFL players, Defendants have violated the terms of the Plans and breached their fiduciary duties under ERISA.  Plaintiffs, on behalf of the Class, seek to reform the 2020 CBA to undo these amendments, seek equitable relief to redress the fiduciaries' violations, and enjoin any actions that would diminish the Class' vested disability benefits in a manner inconsistent with the conditions under which these disability benefits were first granted and became vested under the Plans.

6.     Defendants Players Association and Management Council have also breached the 2020 CBA by impermissibly and significantly changing disability language from the time the players voted on the March 5, 2020 version of the 2020 CBA, to when the approved 2020 CBA was posted on the Players Association website on March 15, 2020, all in violation of Section 301 of the LMRA, 29 U.S.C § 185.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this suit arises under the laws of the United States, pursuant to 29 U.S.C. §1132(e)(1), which provide for federal jurisdiction of actions brought under Title I of ERISA, and

under Section 301 of the LMRA, 29 U.S.C § 185, which grants federal courts jurisdiction to resolve disputes between employers and labor unions about collective-bargaining agreements.

8.    This Court has personal jurisdiction over Defendants because Defendants transact business in and have significant contacts with the District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e), 29 U.S.C. § 1132(e)(2).

9.    Venue is proper in this District pursuant to ERISA § 502(e), 29 U.S.C. § 1132(e)(2). and 28 U.S.C. § 1391(b) and (c), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and at least one of the Defendants may be found in this District.

## THE PARTIES

**Plaintiffs**

10.    Plaintiff Aveion Cason is a retired professional football player with the NFL within the meaning of Article 1.30 of the 2019 Disability Plan. He began his NFL career in 2001 and played 56 games during his nine-year NFL career.  Cason split his career between the Detroit Lions and the St. Louis Rams from 2001- 2008. Cason is a "participant" in the Disability Plan, as defined under 29 U.S.C. § 1002(7), and a "Vested Inactive Player" as defined in Article 1.35 of the 2019 Disability Plan. He started received T& P disability benefits on February 1, 2016.

11.    Plaintiff Donald Vincent Majkowski is a former professional football player with the NFL within the meaning of Article 1.35 of the 2014 Retirement Plan and Article 1.30 of the 2019 Disability Plan. He began his NFL career in 1987 playing for the Green Bay Packers. Majkowski played 90 games over 10 seasons in the NFL.  He played six years for the Packers, two years for the Colts, and two years for the Detroit Lions. Majkowski retired after the 1996 season. Majkowski is a "participant" in both the Retirement and Disability Plans, as defined under 29

U.S.C. § 1002(7), and a "Vested Inactive Player" as defined in 1.46 of the 2014 Retirement Plan

and a "Vested Inactive Player" as defined in 1.35 of the 2019 Disability Plan. Plaintiff Majkowski

started received T& P disability benefits on March 27, 2013, with an effective date of November

1, 2011.

**Defendants**

      12.    Defendant National Football League Players Association ("Players Association" or

"NFLPA") is located at 63 Gene Upshaw Place, 1133 20th Street, NW, Washington, D.C., and is

the labor organization representing both former and current professional American football players

in the NFL.  Pursuant to Article 8.1 of the 2014 Retirement Plan Document and Article 9.1 of the

2019 Disability Plan Document, the Players Association has the authority to appoint three voting

members of the Retirement Board and the Disability Board and also to remove and appoint a

replacement for any member of the Retirement Board or Disability Board that the NFL Management

Council has appointed. By virtue of these powers to appoint and remove other fiduciaries, Defendant

Players Association is a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A), and had the fiduciary responsibility to take actions only in the best interests of

participants and remedy any fiduciary violations.

      13.    Defendant National Football League Management Council ("Management

Council") is located at 345 Park Ave, Floor 8, New York, New York and is a non-profit association

of clubs of the NFL.  Pursuant to Article 8.1 of the 2014 Retirement Plan Document and Article

9.1 of the 2019 Disability Plan, the NFL Management Council has the authority to appoint three

voting members of the Retirement Board and the Disability Board and also to remove and appoint a

replacement for any member of the Retirement Board or Disability Board that the NFL Players

Association has appointed. By virtue of these powers to appoint and remove other fiduciaries,

Defendant NFL Management Council was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and had the fiduciary responsibility to take actions only in the best interests of participants and remedy any fiduciary violations.

14.     Defendant Bert Bell/Pete Rozelle NFL Retirement Plan Board ("Retirement Board") is located at 200 St. Paul Street, Suite 2420, Baltimore, Maryland, and is identified in Article 1.3 of the 2014 Plan Document as the designated Plan Administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a named fiduciary of the Plan within the meaning of ERISA § 402, 29 U.S.C. § 1102.  The Retirement Board is and has been a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or discretionary control respecting management of the Retirement Plan, and/or had discretionary authority or discretionary responsibility in the administration of the Retirement Plan.

15.     Specifically, under Article 8.2 of the Retirement Plan, Defendant Retirement Board was responsible for, *inter alia*, the following: defining the terms of the Retirement Plan and Trust; construing the Retirement Plan and Trust; reconciling any inconsistencies in the definition or interpretation of the Retirement Plan and Trust; deciding claims for benefits; paying all reasonable and necessary expenses of the Retirement Plan; adopting procedures, rules, and forms; delegating authority as necessary in the administration of the Plan; selecting Trustees and setting forth terms of the Trust; commencing or defending suits or legal proceedings involving the Retirement Plan and the Trust; and settling, compromise, or submitting to arbitration claims, debts, or damages due or owing to or from the Retirement Plan or Trust. Pursuant to the Retirement Plan's Summary Plan Description, the Retirement Board is composed of six voting members, three of whom are selected by the NFLPA and three of whom are selected by the Management Council.

16.     Defendant NFL Player Disability and Neurocognitive Benefit Board ("Disability Board") is located at 200 St, Paul Street, Suite 2420, Baltimore, Maryland, and is identified in Article 1.2 of the 2019 Plan Document as the designated Plan Administrator of the Disability Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a named fiduciary of the Disability Plan within the meaning of ERISA § 402, 29 U.S.C. § 1102.  The Disability Board is and has been a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or discretionary control respecting management of the Disability Plan, and/or had discretionary authority or discretionary responsibility in the administration of the Disability Plan.

17.     Specifically, under Article 9.2 of the 2019 Disability Plan, Defendant Disability Board was responsible for, *inter alia*, the following: defining the terms of the Disability Plan and Trust; construing the Disability Plan and Trust; reconciling any inconsistencies in the definition or interpretation of the Disability Plan and Trust; deciding claims for benefits; paying all reasonable and necessary expenses of the Plan; adopting procedures, rules, and forms; delegating authority as necessary in the administration of the Disability Plan; selecting Trustees and setting forth terms of the Trust; commencing or defending suits or legal proceedings involving the Disability Plan and the Trust; and settling, compromise, or submitting to arbitration claims, debts, or damages due or owing to or from the Disability Plan or Trust.  Pursuant to the Disability Plan Summary Plan Description, the Disability Board is composed of six voting members, three of whom are selected by the NFLPA and three of whom are selected by the Management Council.

## FACTUAL ALLEGATIONS

### The Retirement Plan and The Disability Plan

18.     The Bert Bell/Peter Rozelle NFL Player Retirement Plan ("Retirement Plan") is an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). However, the disability provisions of the Retirement Plan are an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1).

19.     The relevant written instrument of the Plan within the meaning of ERISA § 402(a) is the Bert Bell/Pete Rozelle NFL Player Retirement Plan Amended and Restated as of April 1, 2014. Since at least 1994, the Retirement Plan has provided retirement, disability, and related benefits to eligible professional football players.   Although there is a separate NFL Player Disability and Neurocognitive Benefit Plan ("Disability Plan"), that plan only applies to disability benefits payable, and claims for benefits made, on or after January 1, 2015.  The Retirement Plan continues to pay part of the T&P disability benefits for claims filed prior to January 1, 2015.

20.     The Disability Plan is an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1). The relevant written instrument of the Disability Plan within the meaning of ERISA § 402(a) is the NFL Player Disability and Neurocognitive Benefit Plan Amended and Restated as of April 1, 2019. Since January 1, 2015, the Disability Plan has provided disability and related benefits to eligible professional football players. Although there is a separate Retirement Plan, that Plan only applies to disability benefits payable, and claims for benefits made, before January 1, 2015.  The Disability Plan pays T&P disability benefits for claims filed both before and after January 1, 2015.

21.     Article 5 of the 2014 Retirement Plan addresses Total and Permanent Disability ("T&P") benefits. Article 5.1 defines "Eligibility" as follows: "An Eligible Player whose

application for total and permanent disability ("T&P") benefits is received before January 1, 2015, who is determined by the Retirement Board or the Disability Initial Claims Committee to be totally and permanently disabled in accordance with Section 5.2, and who satisfies the other requirements of this Article 5, will receive a monthly T&P benefit from this Plan in the amount described in Section 5.5 for the months described in Sections 5.8 and 5.9. For purposes of this Article, "an Eligible Player is a Vested Inactive Player. . . or an Active Player."

22.     Article 1.46 of the Retirement Plan defines "Inactive Vested Player" as "a Vested Player who is not an Active Player."  Article 1.47 of the Plan defines "Vested Player" as a player who "earns five Credited Seasons; (b) earns four Credited Seasons, including a Credited Season after the 1973 Plan Year; (c) earned three Credited Seasons, including a Credited Season after the 1992 Plan Year . . . ." Article 2 address eligibility under the Retirement Plan noting that "[a]ll Players participate in the Plan."

23.     Article 5.2(b) of the 2014 Retirement Plan provides eligibility for T&P disability benefits through Social Security disability awards as follows: "An Eligible Player who is not receiving monthly pension benefits under Article 4 or 4A, who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income Program, and who is still receiving such benefits at the time he applies, will be deemed to be totally and permanently disabled . . . ."

24.     Article 5.3 of the 2014 Retirement Plan also provide four categories of T&P benefits, of which one is relevant: "(c) Inactive A.  . . . "a Player will qualify for benefits in this category if a written application for T&P benefits or similar letter that the administrative process that resulted in the award of T&P benefits was received within fifteen (15) year after the end of the Player's last Credited Season. This category does not require that the disability arise out of

League football activities."  Under Article 5.5(b), the minimum amount of monthly T&P Payments for Inactive A former Players under the Retirement Plan is $4000 per month through April 1, 2021.

25.     Section 5.9, on Duration of T&P Benefits states: "All benefits provided by this Article will be payable until the earlier of (a) the cessation of the Player's total and permanent disability, (b) the termination of benefits under Section 5.6, or (c) the Player's Death."  Thus, if the Player is total and permanently disabled for his entire life, and submits to periodic examination under Article 5.6, he receives the T&P disability benefits in the specified amount for life by express terms of the Retirement Plan.

26.     There is no language in the 2014 Retirement Plan which requires the amount of benefit available to Inactive A Players to be offset by the amount of Social Security benefit received.

27.     Not only does the Retirement Plan not have a reservation of rights clause, but it expressly states in Article 10.1(c): "The Retirement Board . . . may not: (c) Reduce, as a direct result of an amendment, the value of any benefit already earned and otherwise payable under the Plan."  Furthermore, Article 10.3 states: "No amendment of the Plan may operate to deprive a Player or beneficiary of any rights or benefits irrevocably vested in him under the Plan."

28.     With regard to the T&P provisions of the 2019 Disability Plan, Article 3 addresses benefits for those who receive T&P disability benefits under the Disability Plan on and after January 1, 2015.  In pertinent part, Article 3.1 states: "An Article 3 Eligible Player will receive monthly Plan total and permanent disability benefits ("Plan T&P benefits") in the amount described in Section 3.6, for the months described in Sections 3.10 and 3.11 . . . ."

29.     Under Article 3.2(a) of the 2019 Plan, "[a]n Article 3 Eligible Player who is not receiving monthly pension benefits under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan, who

has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, and who is still receiving such benefits at the time he applies, will receive Plan T&P benefits in the amount described in Section 3.6, for the months described in Sections 3.10 and 3.11 . . . ." Article 1.35 of the 2019 Disability Plan defines "Vested Inactive Player" has "the same meaning as defined in the Bert Bell/Pete Rozelle Plan." Article 2 address eligibility under the Retirement Plan noting that "[a]ll Players participate in the Plan."

30.     In the table in Article 3.6 of the 2019 Disability Plan, Inactive A former players receive $10,000 per month of T&P disability benefits effective September 1, 2011, $11,250 effective January 1, 2016, and $0 effective April 1, 2021. Consequently, Inactive A players who applied for T&P benefits after January 1, 2015, are receiving Disability Plan payments of $11,250 per month from the Disability Plan (or a total of $135,000/year), with no offset for any Social Security benefit received.

31.     Article 4 of the 2019 Disability is identical to Article 3, except it applies to T&P disability benefits resulting from applications received before January 1, 2015. Such Article 4 players are eligible for disability benefits under both the Retirement Plan and the Disability Plan, but receive in total no more than $11,250 per month. Under Article 4.2, an Inactive A player who applied for T&P disability benefits prior to January 1, 2015, receives $4,000 per month from the Retirement Plan and $7250 per month from the Disability Plan, for a total of $11,250 per month or $135,000 per year.

32.     There is no language in the 2019 Disability Plan which requires the amount of benefit available to Inactive A players, under either Article 3 or Article 4, to be offset by the amount of Social Security benefit received.

33.     Under Articles 3.11 and 4.5, players are vested for life in the entire T&P disability amount "until the earliest of (a) the cessation of the Player's total and permanent disability, (b) the termination of his benefits under Section 3.8 [dealing with periodic recertification of disability], or (c) the Player's death."  Thus, if the player is total and permanently disabled for his entire life, and submits to periodic examination, he receives the T&P disability benefits in the specified amount for life by express terms of the Disability Plan.

34.     There is no reservation of rights clause in the Disability Plan by which the Disability Board is able to unilaterally amend the Disability Plan.  Article 10.1 states in pertinent part: "This Plan may only be amended . . . by joint action of the NFLPA and the Management Council while there is a Collective Bargaining Agreement in effect . . . ."  That being said, the Plan cannot be amended in a way that violates ERISA.

35.     During the Class Period, and as recently as June 22, 2020, Plaintiffs and Class members have received numerous Income Verification statements from Defendants Retirement Board and Disability Board which state that players who applied for benefits prior to 2015, "receive a benefit from the Bert Bell/Pete Rozelle NFL Retirement Plan, as well as a benefit from the NFL Player Disability & Neurocognitive Benefit Plan."

36.     These Income Verification statements confirm that the maximum amount an Inactive A player who started receiving their T&P disability prior to 2015 was $4,000 per month from the Retirement Plan, $7250 per month from the Disability Plan, for a total of $11,250 per month or $135,000 per year.

37.     Similarly, Income Verifications statements confirm that the maximum amount an Inactive A player who started receiving their T&P disability after January 1, 2015, is $11,250 per month from the Disability Plan, for a total of $135,000 per year.

38.     Importantly, in either case, the Income Verification statements sent to the Class state unequivocally:

> The participant is collecting a monthly Total and Permanent Disability Benefit . . . in the amount of $11,250. The benefit is payable for life or cessation of the disablement.

39.     T&P disability benefits for both post-2015 and pre-2015 eligible players are "<u>payable for life</u>" and the Plans, along with the Income Verification statements, create a vested right to lifetime T&P disability benefits for former NFL players, their surviving spouses, and their dependents.

**The 2020 NFL-NFLPA Collective Bargaining Agreement**

40.     Starting on or around March 5, 2020, during the beginning of the global pandemic, the NFLPA conducted a rushed, sporadic, and ad hoc voting process that left players disenfranchised and misled. NFL players were presented with a 456-page proposed Collective Bargaining Agreement (2020 CBA) between Defendant Management Council and Defendant Players Association and given nine days to digest the Agreement and vote on it.  The March 5th version of the 2020 CBA can be found here: https://nflpaweb.blob.core.windows.net/media/Default/NFLPA/CBA2020/NFLNFLPA_CBA_March_5_2020.pdf.

41.     Current NFL player Eric Reid and his attorneys published a Fact Sheet on March 9, 2020, critical of the CBA which reached wide circulation.  The March 9th Fact Sheet sought to guide both current and former NFL players on their employment rights more generally in light of problematic language in the 2020 CBA.

42.     Specifically, T&P disability benefits for Plaintiffs and members of the Class were impacted in two ways by T&P disability amendments according to the Fact Sheet: (1) through a

new social security offset; and (2) through requiring reevaluation of those already in paid status under the "whole person" evaluation process.

**The Social Security Offset**

43.     First, a new offset was enacted for Inactive A players who also received Social Security disability benefits.  Under this Social Security offset, starting on January 1, 2021, Inactive A players would see their lifetime vested disability benefits diminished by the amount of Social Security benefits they received.  In practice, this means Plaintiffs and members of the Class will receive somewhere between $2000 to $3000 less a month or lose approximately 20% of their fixed income.

44.     Initially, under the March 5th version of the 2020 CBA on which players voted, only players who received disability benefits from the Disability Plan after January 1, 2015 ("Article 3 Players") saw their monthly Disability Plan T&P reduced by the amount they received from Social Security.

45.     Importantly, the March 5th version of the 2020 CBA voted upon by players did not apply the new Social Security offset to those Inactive A players who commenced receiving T&P disability benefits initially prior to January 1, 2015 ("Article 4 Players").

46.     Without explanation, the approved March 15th version of the 2020 CBA applied the Social Security offset to these Article 4 Players for the first time.  The March 15th version of the 2020 CBA on the NFLPA website can be found here: https://nflpaweb.blob.core.windows.net/media/Default/PDFs/Agents/NFLNFLPA%20CBA%20 March%205,%202020.pdf.

47.     In the March 5th CBA, Article 60, Section 4 states Article 3.6 of the Disability Plan is amended to permit Social Security offsets, thus resulting in lower monthly benefits for the T&P disabled retired players who are governed by Article 3 of the Disability Plan.

48.     With regard to Article 3 Players, these amendments impermissibly changed the conditions under which these players had been receiving T&P disability benefits and impermissibly reduced their lifetime vested rights to these disability benefits.

49.     If active employees do not like the terms of the changed benefit, they have the option to reject the terms by seek other employment with better benefits elsewhere. But this choice is not one that a disabled employee can make. Nor does a disabled employee generally enjoy the retiree's advantage of being able to select, or at least predict, his or her date of separation from the company, and plan accordingly.

50.     The nature of T&P disability benefits strongly suggests that the parties did not intend or expect that Defendants could unilaterally change the terms of T&P disability benefits after Class members had already started receiving benefits, absent an explicit provision to that effect. T&P Disabilities commencing prior to the effective date of these Plan disability amendments should be provided for under the terms of the Plans in effect at the time those disabilities commenced.

**The 2020 CBA Switcheroo**

51.     On March 15, 2020, additional language was secretly added to the 2020 CBA by Defendants Players Association and Management Council in the newly formed subparagraph (a), and an entirely new subparagraph (b), of Article 60, Section 4.  The new language of subsection (b) states that Article 4 of the Disability Plan will be amended to apply a Social Security offset to players who have been receiving T&P disability since before 2015.

52.     This change to the language of Article 60, Section 4 of the 2020 CBA was done surreptitiously without player knowledge, without following procedures for modifications of CBAs, and without an additional player vote.

53.     When confronted with these secretive changes to the 2020 CBA language, Defendant NFLPA replied that such changes were not substantive and did not require a vote.

54.     These March 15th changes to the 2020 CBA, by Defendant NFLPA's own admission, impacted 400-900 former NFL players on T&P disability benefits.  Clearly, such a change was a substantive change to the 2020 CBA, should have been bargained transparently, and voted upon by players.

55.     With regard to Article 4 Players, these amendments impermissibly changed the terms under which these Players had been receiving T&P disability benefits and impermissibly reduced their lifetime vested rights to these T&P disability benefits.

56.     Pursuant to Article 67, Section 9 of the 2020 CBA: "Th[e] Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties." There is no such written agreement signed between authorized representatives  of the Players Association and the Management Council.

57.     Section 6.05 of the NFLPA Constitution sets out the procedure for when there is an amendment to a ratified CBA: "If it is proposed to amend a Collective Bargaining Agreement during the period of its agreed duration, any such proposal shall be submitted to the Board of Representatives upon recommendation from the Executive Committee." The new language in Article 60, Section 4 was never submitted to the NFLPA Executive Committee or Board of Representatives.

58.     Section 6.05 continues by stating: "Any such proposed amendment to the Collective Bargaining Agreement which is agreed to by majority vote of the Board of Player Representatives and agreed to by the owner representatives shall not be binding on the NFLPA until one of the following requirements has been satisfied: 1. The Board of Representatives determines by a two-thirds (2/3) vote that the proposed amendment is not of such substance as to call for ratification by the members; or 2. The Board of Representatives determines by a two-thirds (2/3) vote that the proposed amendment is of such substance as to call for ratification by the members, and the proposed amendment is ratified by a majority of the members voting for ratification or rejection."

59.     The changes made on March 15th to Article 60, Section 4 of the 2020 CBA are not binding because the Board of Representatives never determined, let alone by 2/3 votes, that the proposed amendment was not of substance, nor was the proposed amendment subject to a ratification vote by the majority of the voting NFLPA members.

**Reenactment of the Whole-Person Evaluation Process**

60.     In addition to the Social Security offset disability amendment, the 2020 CBA also rescinds the automatic Social Security approval for T&P disability benefits for the Disability Plan starting on April 1, 2024.

61.     Currently, players can be deemed disabled based on being found disabled by the Social Security Administration (SSA) under SSDI or SSI.  This provision was put into place after Congressional Hearings on the NFL's reluctance to find their players disabled using "neutral" physicians and the whole-person evaluation process.

62.     More specifically, in 2007, Congressional hearings were held before the U.S. House and Senate because there were hundreds of obviously disabled former NFL players who qualified

for Social Security disability benefits but were being denied benefits by the Retirement Plan. Then, as now, both the NFL and NFLPA boasted of their generous benefits while former players became homeless after their benefits were denied.   Legislators, including then-Senator John Kerry, threatened to intervene if the NFL did not "get its act together."

63.    Representative Maxine Waters testified at the Senate Hearing. She shared her experiences in trying to help a former NFL player in dire need of obtaining T&P disability benefits:

> Jim Shorter died a broke man, stripped of his dignity and his silver years by an unfair and unyielding NFL disabilities program. This program, which is built like the rest of the functions of the NFL, from the blood, sweat, and tears of men like Jim Shorter, was designed, in my belief, to refuse benefits for the very players that needed them most.

64.    Daryl "Moose" Johnson, who played eleven years for the Dallas Cowboys, testified his career ended prematurely because of a neck injury, and he knew first-hand the frustration of trying to obtain T&P disability benefits from the NFL disability program under the whole-person evaluation process:

> The initial doctor that filed my claim, and the doctor who heard my appeal, are designated as neutral physicians, but, in reality, are handpicked doctors by the NFL Players Association. The Board that denied my claim is selected by NFL ownership and the NFL Players Association. Obviously, this is a system that is, by design, not interested in assisting the retired player.

65.    Notably, NFL Commissioner Roger Goodell was present and testified at the Senate Hearing.  There, he stated:

> I begin from a premise which I think no one seriously disputes: the men who played professional football decades ago deserve our respect and recognition, and their contributions to our game must never be overlooked. I honor them, and **neither I, nor the NFL clubs, will turn our backs on them**. And this is not Gene Upshaw's problem alone, nor is it the NFL's. The responsibility for helping retired players belongs to all of us—NFL owners, the union, current and retired players, and me, as Commissioner. I must be compassionate, creative, and responsible." (emphasis added)

66.     Commissioner Goodell promised in his written statement to the Senate in 2007:

We also recently agreed to expand the standards for determining Total & Permanent disability by incorporating the medical findings of the Social Security Administration. **If a player has been determined to be eligible for disability benefits by Social Security, no separate medical assessments will be needed. Instead, the determination of the Social Security Administration will govern the former player's medical eligibility for NFL disability benefits**." (emphasis added)

67.     Since 2007, Defendants NFLPA and NFL Management Council have turned their backs on former disabled players.  As just one example, Attorney Gene Egdorf had a conversation with DeMaurice Smith, the Executive Director of the NFLPA, during Super Bowl Week in February 2020.  In a Twitter discussion, Mr. Egdorf related what Mr. Smith said to him regarding his view on retired players:



68.     Even more stunning and egregious, not only will future players who apply for T&P disability benefits have to be certified disabled by "neutral" physicians selected by the Disability Plan, but Plaintiffs and members of the Class will also have to be reevaluated under this more difficult-to-meet, T&P disability benefits standard.

69.     Plaintiffs' and members of the Class' vested, lifetime T&P disability benefits are also threatened by the reenactment of the whole-person evaluation process.  Such a system impermissibly changes the terms under which T&P disabilities had been received by those already

in paid status prior to enactment of this provision by requiring that their disability status be "reevaluated" starting on April 1, 2026.

70.     Section 6 of Article 60 of the 2020 CBA states: "The parties shall amend Section 3.2 of the Disability Plan by adding a subsection 3.2(c) to state that as of April 1, 2024, a Social Security determination of disability does not establish a player's eligibility for benefits under this Disability Plan . . . . On or before April 1, 2026, players receiving benefits under the Disability Plan based on a Social Security determination submitted to the Disability Plan prior to April 1, 2024, shall be re-evaluated under the whole-person evaluation process to determine if they continue to meet the Disability Plan's eligibility requirements for T&P benefits. Players determined to no longer meet the Disability Plan's eligibility requirements for T&P benefits shall have their benefits terminated." (emphasis added)

71.     Given the Retirement Board's inglorious and well-documented history under this harder-to-meet, whole-person evaluation process, it is likely that that Plaintiffs and members of the Class will lose their vested lifetime T&P disability benefits under both the Retirement Plan and the Disability Plan starting in 2026.

**Misleading and Inaccurate Plan Communications**

72.     In addition to these obvious and illegal substantive and material changes to the 2020 CBA to the terms of T&P disability program for those already in paid status and in violation of the vested lifetime T&P disability benefit promises made to Plaintiffs and Class members, Defendant Players Association, through its directors and officers, sent plan communications to current and former players both before the 2020 CBA ratification vote and after the vote that were misleading because they omitted material information.

73.     These statements, which omitted material information, harmed Plaintiffs and members of the Class in two ways: (1) by improperly influencing active players to vote in favor of the disability amendments; and (2) by impeding the ability of Plaintiffs and members of the Class from mobilizing to influence the vote by the active players against the proposed 2020 CBA. Had the truth about these T&P disability benefit changes been known, the vote for ratification would not have been secured improperly, the ratification vote might have failed, and former players might have mobilized effectively against ratification of the 2020 CBA.

74.     Defendant Players Association's "CBA Proposal Fact Sheet," posted on its website prior to the vote, touts benefit increases to former players.  But this statement is misleadingly because there is no mention of potential benefit decreases. The reduction of T&P disability benefits to hundreds of former disabled players is not mentioned anywhere.

75.     In a communication entitled "Highlights of the Proposed CBA (As of February 27, 2020)," the Players Association discussed "[s]ignificant increases for _current_ players," and [s]ignificant increases for _retired_ players in a variety of benefits, including Pension, HRA, Neurocognitive Benefit." At the end of this retired players section, there is a bullet point on "T&P disability."  But there is no language about a significant decrease in benefits and no mention that current, automatically qualified SSA disabled player will be forced to go through a reevaluation using the whole-person evaluation process to keep their T&P disability benefits.

76.     Also before the ratification vote, in the Players Association's "CBA Side by Side," communication, the NFLPA nowhere mentions the future reevaluation of currently disabled players under the more arduous whole-person evaluation process and the fact that T&P disability benefits could be lost by these former players currently in paid status.

77.     In response to the March 9, 2020 Fact Sheet produced by NFL Player Eric Reid and his attorneys, the NFLPA published, "Response to CBA Inaccuracies."  In point #11, the Players Association falsely states: "Players understand the potential impact [the changes to Social Security qualification and offset to Total & Permanent disability] <u>may</u> have on a subset of our former players."

78.     The "Response to CBA Inaccuracies" document is false for three reasons. First, as contemporaneous Tweets from current and former players illustrate, there was no such understanding by the players generally.  Second, the impact <u>will</u> happen, be unlawful, and be devastating to Plaintiffs and members of the Class.  Third, the statement about the whole-person evaluation process in this document is also misleading as it does not explain that currently disabled players will have to be reevaluated under the whole-person evaluation process and that many of them will lose their T&P disability benefits.

79.     As an example of former players and their families not understanding the T&P disability benefit changes in the proposed 2020 CBA, Plaintiff Majkowski's spouse, Kelly Majkowski, along with families of numerous other members of the Class, had specific questions regarding the impact of the proposed CBA on their T&P disability benefits.

80.     In violation of its duty to inform, and every conceivable sense of fairness, Defendant NFLPA uniformly stonewalled on direct and simple questions. Instead of providing answers, the NFLPA, through Senior Director Nolan Harrison III, gave various vague answers to desperate pleas for help and in many cases, he flat out ignored information requests:

       a.     In response to questions about the impact of the proposed 2020 CBA would have on Article 4 players rights to T&P disability benefit without social security offset:

      i.      "It is still so new. I will let you know when I have something." (March 4th Email from Nolan Harrison to Kelly Majkowski, spouse of Plaintiff Don Majkowski)

      ii.     "I am not equipped to answer that question [about your husband's T&P disability benefits]." (March 11th Email from Nolan Harrison to Kelly Majkowski)

    b.    There were at least four non-responses to Kelly Majkowski's emails to Director Harrison seeking clarification of proposed changes to T&P disability benefits.

81.    As a further example of withholding accurate and timely information from disabled player families, the NFLPA's Director of Benefits, Bethany Marshall, flatly admits the NFLPA's strategy and mission of withholding relevant information until after the proposed CBA was ratified: "I have to reiterate what Nolan had previously said, that as of now the CBA is still in the voting stage (as you mentioned) and until that vote is completed there isn't much that can be said until Monday." (March 13th Email from Bethany Marshall to Kelly Majkowski)

82.    In all, Plaintiff Majkowski's spouse had sent more than eighteen email pleas for information from March 4-17, 2020 to the NFLPA's officers and directors, each of who were acting in a fiduciary capacity in discussing plan benefits with Plan participants. Defendant NFLPA understood clearly that the answers to Plaintiffs and class Member's questions were relevant information that actually could impact the CBA ratification vote on the proposed 2020 CBA.

83.    In yet another example of misinformation by Defendant Players Association, one of its Vice-Presidents, Sam Acho, repeatedly tweeted information regarding the "positives" of the

CBA, and with regard to the T&P disability benefits specifically, but failed to disclose material negative information, which omissions made the statements false and misleading.

84.     Acho regularly used his personal Twitter account to publicly communicate information on behalf of the NFLPA to interested parties and Players Association members. Acho, in a public dialogue with a player on March 11, 2020, knowing other players would see it, publicly tweeted: "Players can still get both T&P AND social Security disability.  Players used to go through SS if T&P was denied.  Then once SS was accepted, they automatically got T&P. Now players will need to go through T&P first THEN SS if they want both."  He also stated in a tweet, "You can go get T&P first then go get SS – with no offset.  So if a player wanted both he could still get it."  Acho's statements were inaccurate, false, and misled Plaintiffs and members of the Class because they omitted material information about the T&P disability amendments to the 2020 CBA and the retroactive effect that they would have on player benefits.  By doing so, he made it less likely that Plaintiffs, members of the Class, or active Players would oppose ratification of the 2020 CBA.

85.     After the 2020 CBA ratification vote, the NFLPA published a "FAQ on 2020 CBA and Disability Benefits" on their website.  Although the FAQ mentions that active players applying for T&P disability benefits starting April 1, 2024, will have to qualify under the whole-person evaluation process, this FAQ omits that lifetime and vested former disabled players will be required to be reevaluated under this new whole-person evaluation process and may lose their lifetime vested disability benefits as a result.

86.     In response to wide-spread dissatisfaction from current and former NFL players, the NFLPA issued a "2020 CBA Former Player Benefit Improvements" bullet point memo after the vote, which was sent class-wide as recently as June 12, 2020.  Again, the Players Association

mislead players in the labeling, headings, and presentation of this document that should have been a simple, straightforward and fair explanation of the terms of the CBA by omitting material information. Specifically, this memo again omits any reference to the devastating new T&P disability qualification process that will lead to many current T&P disability beneficiaries wrongly losing their benefits under the historically-biased and arduous whole-person evaluation process.

87.    In all, the NFLPA, through its directors and officers, have made numerous statements that omitted material information about the 2020 CBA T&P disability amendments that have harmed Plaintiffs and members of the Class.  By omitting material information from these statements, the misrepresentations both improperly influenced active players to vote in favor of the disability amendments and interfered with the ability of Plaintiffs and members of the Class to mobilize to influence the vote by the active players against the proposed 2020 CBA.

## CLASS ACTION ALLEGATIONS

88.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following persons:

*All participants qualified to receive total and permanent disability benefits at the time of the disability amendments to the 2020 Collective Bargaining Agreement between the NFLPA and NFL Management Council, excluding the Defendants or any participant/beneficiary who is a fiduciary of the plan.*

89.    This proposed class is divided into the following two subclasses pursuant to Rule 23(c)(5) of the Rules of Civil Procedure.

90.    The "Article 4 Subclass":

*All participants qualified to receive total and permanent disability benefits at the time of the disability amendments to the 2020 Collective Bargaining Agreement between the NFLPA and NFL Management Council, and who commenced receiving these benefits prior to January 1, 2015.*

91.    The "Article 3 Subclass" :

*All participants qualified to receive total and permanent disability benefits at the time of the disability amendments to the 2020 Collective Bargaining Agreement between the NFLPA and NFL Management Council, and who commenced receiving these benefits January 1, 2015 or after.*

**Impracticability of Joinder**

92.    The members of the Class and each individual subclass are so numerous and geographically dispersed that joinder of all members is impracticable. The number of class members in the proposed class, based on Defendants' own numbers, is between 400 and 900 former disabled NFL players.  The number of Article 4 Subclass members is between 200 and 500 former disabled NFL players and the number of Article 3 Subclass members is between 200 and 400 former disabled NFL players.   These numbers are conservative, but consistent with the Disability Plan's most recent Form 5500, which reports that 2,034 retired or separated participants were actively receiving disability benefits.

**Commonality**

93.    The issues of liability are common to all members of the Class and subclasses and are capable of common answers as those issues include:

a.     Whether the Defendants breached their fiduciary duties to Plaintiffs and members of the Class, and subclasses, by impermissibly reducing vested lifetime T&P disability benefits, under the NFL Retirement Plan and NFL Disability Plan, in light of the  Social Security Offset amendment and the reintroduction of the whole-person evaluation process in the 2020 CBA;

b.     Whether the Defendants breached their fiduciary duties to Plaintiffs and members of the Class, and subclasses, by impermissibly changing the terms of the T&P disability benefits after Plaintiffs and members of the Class, and subclasses, were already receiving these benefits in paid status, in light of the Social Security Offset amendment and the reintroduction of the whole-person evaluation process in the

2020 CBA;

c.      Whether Defendants breached their fiduciary duties to Plaintiffs, and members of the Class by failing to disclose and inform them about accurate and relevant disability benefit information related to the ratification of the 2020 CBA, in light of the Social Security Offset amendment and the reintroduction of the whole-person evaluation process in the 2020 CBA;

d.      Whether the March 15th version of the 2020 CBA is invalid, and should be reformed as to the T&P disability benefit modification added after the ratification vote; and

e.      Whether Plaintiffs and the Class, and Subclasses, are entitled to other appropriate equitable remedies and relief for Defendants' violations and breaches.

**Typicality**

94.      Plaintiffs' claims are typical of the claims of other members of the Class, Plaintiff Majkowski's claims are typical of the claims of the Article 4 Subclass, and Plaintiff Cason's claims are typical of the Article 3 Subclass, because their claims arise from the same event, practice and/or course of conduct. Specifically, Plaintiffs, on behalf of the Class, and subclasses, allege that Defendants breached their fiduciary duties or otherwise violated ERISA by reducing vested lifetime T&P disability benefits through the ratification of the 2020 CBA process in light of the Social Security Offset amendment and the reintroduction of the whole person evaluation process in the 2020 CBA.  Plaintiffs' claims are also typical of the claims of the Class, and subclasses, because they generally seek recovery and relief that will result in a declaration, injunction, and appropriate equitable relief for the Class and subclasses.

**Adequacy**

95.      Plaintiffs will fairly and adequately represent and protect the interests of the Class

and subclasses. Plaintiff Majkowski is a member of the Article 4 Subclass and the Class. Plaintiff Cason is a member of the Article 3 Subclass and the Class. Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class or subclasses.  Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class or subclasses.

96.     Plaintiffs are represented by counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

**Rule 23(b)(1)**

97.     The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied as to the Class and each of the Subclasses. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the plan and their participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA with respect to disclosures that affected all Class Members uniformly and amendments to the Disability Plan that uniformly affected the members of the Article 4 Subclass and Article 3 Subclass. Similarly, parties to a collective bargaining have a duty not to breach the collective bargaining agreement and treat all members of the union fairly under the LMRA. As a result, prosecution of separate claims by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the CBA, Retirement Plan, and Disability Plan.

98.     The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied as to the Class and each of the Subclasses. Administration of both an ERISA-covered plan and a LMRA-covered CBA require that all similarly situated participants to be treated the same. Resolving whether the amendments to the Disability Plan contemplated by the 2020 CBA are enforceable as to Plaintiffs

Majkowski and Cason would, as a practical matter, be dispositive of the interests of the other members of the Class and the Subclasses. Likewise, resolving whether Defendants breached the CBA as to Plaintiffs would, as a practical matter, be dispositive of the interests of the other members of the Class even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class and Subclasses.

**Rule 23(b)(2)**

99.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class and Subclasses because Defendants have acted and/or failed to act on grounds generally applicable to the Class and Subclasses, making declaratory and injunctive appropriate with respect to the Class and Subclasses as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA or the LMRA as to the Class and Subclasses as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties or engaged in other violations of ERISA and LMRA, and of injunctive and equitable relief. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

**Rule 23(b)(3)**

100.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied as to the Class and each of the Subclasses. The common questions of law and fact concern whether Defendants breached their fiduciary duties or violated ERISA or the LMRA.  As the members of the Class and Subclasses were participants in the Plans, their rights and benefits were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any

individual questions precisely because Defendants' duties and obligations were uniform to all participants in the Retirement Plan and the Disability Plan and therefore to all members of the Class and Subclasses. As relief and any recovery will be on behalf of the Plaintiffs and members of the Class and Subclasses covered under the CBA and associated Plan documents, common questions as to remedies will likewise predominate over any individual issues.

101.    A class action is a superior method to other available methods of the fair and efficient adjudication of this action as to both the claims of the Class and the Subclasses. Resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for all Class and Subclass members under the 2020 CBA and associated Plan documents. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to Plaintiffs and members of the Class and Subclasses under the 2020 CBA and associated Plan documents.

102.    The following factors set forth in Rule 23(b)(3) also support certification:

a.    The members of the Class and Subclasses have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.    No other litigation concerning this controversy has been filed by any other members of the Class.

c.    This District is the most desirable location for concentrating this litigation because the National Football League Players Association is headquartered in this District, the Defendants have significant contacts in this District, and at least some of the

breaches took place in this District.

d.  As the relief sought is primarily class-wide declaratory, injunctive, and equitable relief, there are no management issues that present difficulties to manage this case as a class action.

### FIRST CLAIM FOR RELIEF – VIOLATION OF VESTED LIFETIME T&P DISABILITY BENEFIT RIGHTS (Plaintiff Majkowski and Article 4 Subclass Against All Defendants)

103.  Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

104.  Provisions in retirement and disability plans and associated plan documents should ordinarily be enforced as written especially when enforcing an ERISA welfare benefit plan. Collective bargaining agreements, including those establishing ERISA plans, should be enforced according to ordinary principles of contract law. Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.

105.  Here, Plaintiff Majkowski and members of the Article 4 Subclass are Inactive A Players who were promised in clear and unambiguous terms, in Article 5.5(b) of the Retirement Plan and Articles 3.6 and 4.2 of the 2019 Disability Plan, and Income Verification statements, a defined amount of T&P disability benefits for life. Under Article 5.9 of the Retirement Plan and Articles 3.11 and 4.5 of the 2019 Disability Plan, those defined amounts of benefits would be payable until the player's death (in other words, for life), unless the disablement ceased at some point.

106.  Nothing in the relevant CBAs, 2014 Retirement Plan, 2019 Disability Plan, or the Income Verification Statements suggest that Defendants had the unilateral ability to alter vested lifetime benefits by adding a Social Security offset. Nor is there any suggestion that Plaintiffs or

Class Members could lose their T&P disability benefits completely by a subsequent change to the eligibility conditions or evaluation process after already in paid status.

107.    As a result of these violations, Plaintiffs and the other members of the Class had their vested lifetime rights to T&P disability benefits impermissibly reduced or eliminated.

108.    ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

109.    Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) is not adequate because the terms of the Disability and Retirement Plan, as reflected in the 2020 CBA, do now or will include the terms of the amendments. Therefore, a claim challenging the validity of the amendments is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

110.    As a result, Plaintiff Majkowski and the Article 4 Subclass are entitled to have the Social Security offset and whole-person evaluation process provisions of the amendments to the Disability and Retirement Plan contemplated by the 2020 CBA declared invalid as to them, to a declaration that their rights and benefits will not be reduced by operation of either provision, and, as necessary, Plaintiff Majkowski and the Article 4 Subclass are entitled to have the Disability and Retirement Plan reformed accordingly and/or to an injunction prohibiting enforcement of either provision against them.

**SECOND CLAIM FOR RELIEF – VIOLATION OF VESTED LIFETIME
T&P DISABILITY BENEFIT RIGHTS
(Plaintiff Cason and Article 3 Subclass Against Defendants Disability Board, Management
Council, and NFLPA)**

111.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

112.    Provisions in retirement and disability plans and associated plan documents should ordinarily be enforced as written especially when enforcing an ERISA welfare benefit plan. Collective bargaining agreements, including those establishing ERISA plans, should be enforced according to ordinary principles of contract law. Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.

113.    Here, Plaintiff Cason and members of the Article 3 Subclass are Inactive A Players who were promised in clear and unambiguous terms, in Articles 3.6 and 4.2 of the 2019 Disability Plan and Income Verification statements, a defined amount of T&P disability benefits for life. Under Articles 3.11 and 4.5 of the 2019 Disability Plan, those defined amount of benefits would be payable until the player's death (in other words, for life), unless the disablement ceased at some point.

114.    Nothing in the relevant CBAs, 2019 Disability Plan, or the Income Verification Statements suggest that Defendants had the unilateral ability to alter vested lifetime benefits by adding a Social Security offset. Nor is there any suggestion that Plaintiffs or Class Members could be divested of their T&P disability benefits completely by changing the eligibility conditions and subjecting these players to the whole-person evaluation process after already in paid status.

115.    As a result of the amendments to the Disability Plan, Plaintiffs and the other members of the Class had their vested lifetime rights to T&P disability benefits impermissibly reduced or eliminated.

116.     ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

117.     Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) is not adequate because the terms of the Disability Plan, as reflected in the 2020 CBA, do now or will include the terms of the amendments. Therefore, a claim challenging the validity of the amendments is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

118.     As a result, Plaintiff Cason and the Article 3 Subclass are entitled to have the Social Security offset and whole-person evaluation process provisions of the amendments to the Disability Plan contemplated by the 2020 CBA declared invalid as to them, to a declaration that their rights and benefits will not be reduced by operation of either provision, and, as necessary, Plaintiff Cason and the Article 3 Subclass are entitled to have the Disability Plan reformed accordingly and/or to an injunction prohibiting enforcement of either provision against them.

**THIRD CLAIM FOR RELIEF – VIOLATION FOR CHANGING TERMS OF T&P DISABILITY BENEFITS FOR THOSE ALREADY IN PAID STATUS**
**(Plaintiffs and Article 4 Subclass Against All Defendants)**

119.     Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

120.     As a matter of both federal common law and the common law of contract, which apply to ERISA plans, the terms of the Disability Plan and Retirement Plan are fixed at the time of acceptance by the participant, which is completed by performance. At the latest, once a participant qualifies for benefits and begins receiving those benefits under the terms of the

Retirement Plan, the terms that govern the benefits owed to and to be paid to the participant are fixed.

121.    As a matter of contract law, the amendments to the Retirement Plan and Disability Plan contemplated by the 2020 CBA are and will be invalid to the extent they apply to participants in the Retirement Plan or Disability Plan who qualified for benefits and commenced receiving benefits under the Retirement Plan or Disability Plan prior to those amendments.

122.    Plaintiff Majkowski and members of the Article 4 Subclass have qualified for and already have begun receiving T&P disability benefits under both the Retirement Plan and the Disability Plan.

123.    The welfare plan amendments to the Retirement Plan and the Disability Plan implemented by the 2020 CBA are being applied in a manner that affects the rights to T&P disability benefits for Plaintiff Majkowski and members of the Article 4 Subclass under the Retirement Plan and Disability Plan who had qualified for benefits prior to the Social Security offset and the whole-person reevaluation process amendments.

124.    ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

125.    Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) is not adequate because the terms of the Retirement Plan and Disability Plan, as reflected in the 2020 CBA, do now or will include the terms of the amendments. Therefore, a claim challenging the validity of the amendments is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

126.   As a result, Plaintiff Majkowski and the Article 4 Subclass are entitled to have the amendments contemplated by the 2020 CBA declared invalid as to them, to a declaration that their rights and benefits are and will be determined under the Retirement Plan and Disability Plan in effect when they qualified for benefits, and, as necessary, Plaintiff Majkowski and the Article 4 Subclass are entitled to have the Retirement Plan and Disability Plan reformed accordingly and/or to an injunction requiring administration of the Retirement Plan and Disability Plan in a manner consistent with the terms of the Retirement Plan in existence at the time of their qualification for benefits.

### FOURTH CLAIM FOR RELIEF – VIOLATION FOR CHANGING TERMS OF T&P DISABILITY BENEFITS FOR THOSE ALREADY IN PAID STATUS
### (Plaintiff Cason and Article 3 Subclass against Defendants Disability Board, Management Council, and NFLPA)

127.   Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

128.   As a matter of both federal common law and the common law of contract, which apply to ERISA plans, the terms of the Disability Plan are fixed at the time of acceptance by the participant, which is completed by performance. At the latest, once a participant qualifies for benefits and begins receiving those benefits under the terms of the Disability Plan, the terms that govern the benefits owed to and to be paid to the participant are fixed.

129.   As a matter of contract law, the amendments to the Disability Plan contemplated by the 2020 CBA are and will be invalid to the extent they apply to participants in the Disability Plan who qualified for benefits and commenced receiving benefits under the Retirement Plan prior to those amendments.

130.   Plaintiff Cason and members of the Article 3 Subclass have qualified for and already have begun receiving T&P disability benefits under the Disability Plan.

131.    The welfare plan amendments to the Disability Plan implemented by the 2020 CBA are being applied in a manner that affects the rights to T&P disability benefits for Plaintiff Cason and members of the Article 3 Subclass under the Disability Plan who had qualified for benefits prior to the Social Security offset and the whole-person reevaluation process amendments.

132.    ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

133.    Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) is not adequate because the terms of the Retirement Plan, as reflected in the 2020 CBA, do now or will include the terms of the amendments. Therefore, a claim challenging the validity of the amendments is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

134.    As a result, Plaintiff Cason and the Article 3 Subclass are entitled to have the amendments contemplated by the 2020 CBA declared invalid as to them, to a declaration that their rights and benefits are and will be determined under the Disability Plan in effect when they qualified for benefits, and, as necessary, Plaintiff Cason and the Article 3 Subclass are entitled to have the Disability Plan reformed accordingly and/or to an injunction requiring administration of the Disability Plan in a manner consistent with the terms of the Disability Plan in existence at the time of their qualification for benefits.

**FIFTH CLAIM FOR RELIEF - BREACH OF FIDUCIARY DUTY FOR FAILURE TO
DISCLOSE MATERIAL INFORMATION ABOUT T&P DISABILITY BENEFITS
(Plaintiffs and Class Against Defendants Players Association,
Retirement Board, and Disability Board)**

135.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs
as if fully set forth herein.

136.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge
his or her duties with respect to a plan solely in the interest of the participants and beneficiaries
and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries;
and …. (B) with "care, skill, prudence, and diligence."

137.    An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A)
and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary
comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to
misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence
might be harmful, and (c) a duty to convey complete and accurate information material to the
circumstances of the participants and beneficiaries.

138.    The Defendants had an affirmative duty to accurately disclose the impact of the
Social Security offset and the reevaluation process under the whole-person evaluation process on
Plaintiffs and members of the Class under the Retirement and Disability Plans.

139.    The NFLPA, Retirement Board, and Disability Board, breached their fiduciary
duties by: (1) omitting material information about the changes to players and their beneficiaries
through class-wide Tweets and emails ; (2) ignored requests by participants and their beneficiaries
for clarification of their disability benefits by email; (3) sent out written plan communication
leading up to, and after, the vote on the 2020 CBA that omitted material information; and (4)
omitted material information in written communications that those currently receiving T&P

disability benefits could lose their disability benefits based on a reevaluation under the whole-person evaluation process..

140.   These material omissions harmed Plaintiffs and members of the Class in two ways: (1) by improperly influencing active players to vote in favor of the disability amendments in the 2020 CBA; and (2) by impeding the ability of Plaintiffs and members of the Class from mobilizing to influence the vote by the active players against the proposed 2020 CBA.

141.   Had the truth about these T&P disability benefit changes been disclosed, the vote for ratification would not have been secured improperly, the ratification vote would have likely failed, and former players would  have been able to mobilize effectively against ratification of the 2020 CBA.

142.   By failing to communicate this necessary and relevant information and otherwise omitting material information about how eligibility for T&P disability benefits would be determined, and how the amount of T&P disability benefits available would be offset for disabled former players, the Defendants, acting in their fiduciary capacities, violated ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B), by not acting in the best interests of, or with the duty of care towards, Plaintiffs and members of the Class.

143.   As a result of these breaches, Plaintiffs and the Class are entitled under ERISA § 502(a)(3) to appropriate equitable relief, including injunctive and declaratory relief reforming the Plan to invalidate the amendments, and if appropriate, a surcharge against Defendants as result of the implementation of these amendments to the 2020 CBA, and/or  an order establishing a constructive trust and/or disgorging any profits.

**SIXTH CLAIM FOR RELIEF - BREACH OF THE COLLECTIVE BARGAINING
AGREEMENT FOR IMPERMISSIBLY ADDING T&P DISABILITY PROVISIONS
(Plaintiff Majkowski and Article 4 Subclass Against Defendants NFLPA
and Management Council)**

144.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

145.    LMRA § 301 provides for relief for breach of a collective bargaining agreement.
Defendants Management Council and Players Association impermissibly changed Article 60,
Section 4 of the 2020 CBA after it had already been voted upon by adding a never-before-seen
provision applying a Social Security offset to T&P disabled former players who applied for
benefits prior to January 1, 2015 (Subclass A or Article 4 Players).

146.    Although when confronted the Players Association said it was "a non-substantive
change," approximately 200-500 former disabled NFL Players lost approximately 20% of their
disability benefit income by operation of the Social Security offset and could lose more if
reevaluated under the whole-person evaluation process.

147.    Because the union owes no duty of fair representation to retired players, retired
employees are not required to exhaust contractual remedies before bringing a Section 301 suit
against its former employer, the NFL Management Council and its union, the NFLPA.

148.    Section 6.05 of the NFLPA Constitution sets out the procedure for when there is an
amendment to a ratified CBA: "If it is proposed to amend a Collective Bargaining Agreement
during the period of its agreed duration, any such proposal shall be submitted to the Board of
Representatives upon recommendation from the Executive Committee."

149.    The new language in Article 60, Section 4 was never submitted to the NFLPA
Executive Committee or Board of Representatives.

150.    Section 6.05 continues by stating: "Any such proposed amendment to the
Collective Bargaining Agreement which is agreed to by majority vote of the Board of Player

Representatives and agreed to by the owner representatives shall not be binding on the NFLPA until one of the following requirements has been satisfied: 1. The Board of Representatives determines by a two-thirds (2/3) vote that the proposed amendment is not of such substance as to call for ratification by the members; or 2. The Board of Representatives determines by a two-thirds (2/3) vote that the proposed amendment is of such substance as to call for ratification by the members, and the proposed amendment is ratified by a majority of the members voting for ratification or rejection."

151.     The changes made to Article 60, Section 4 are not binding on Plaintiff Majkowski or other members of the Article 4 Subclass because the Board of Representatives never determined, let alone by 2/3 votes, that the proposed amendment was not of substance.

152.     By breaching the 2020 CBA by adding provisions that were never voted upon, the Defendants Player Association and Management Council are liable to the Article 4 Subclass members for injunctive and declaratory relief to enjoin the enforcement of this Social Security offset disability amendment to the 2020 CBA.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A.     A Declaration that Defendants violated the terms of the Retirement and Disability Plans by reducing vested lifetime T&P disability benefits to Plaintiffs and members of the Class through the Social Security offset;

B.     A Declaration that Defendants violated the terms of the Retirement and Disability Plans by forcing Plaintiffs and members of the Class to be reevaluated under the whole-person evaluation process standard;

C.      A Declaration that Defendants violated the terms of the Retirement and Disability Plans by enacting Plan amendments that affected the rights of Plaintiffs and members of the Class under the plan who had already qualified for benefits prior to the amendments and were in paid status;

D.      A Declaration that Defendants NFLPA and Management Council violated the Collective Bargaining Agreement by adding disability language not in the version of the 2020 CBA voted upon, in violation of Section 301 of the LMRA;

E.      An Order requiring Defendants Management Council and Players Association to jointly reform the 2020 CBA and the Retirement and Disability Plans to eliminate the unlawful T&P disability benefit amendments;

F.      An Order that the NFL Retirement and Disability Boards continue to pay Plaintiffs and all Class Members accrued vested lifetime disability benefits without Social Security offset;

G.      An Order that the NFL Retirement and Disability Boards continue to maintain the disability eligibility of all Class members who were deemed eligible for disability benefits under the Social Security Administration qualification standard;

H.      Imposition of a surcharge against the breaching fiduciaries in the amount of benefits lost by reason of the Social Security offset or by reason of being reevaluated under the whole-person evaluation process standard;

I.      Imposition of a surcharge against the breaching fiduciaries in the amount of benefits lost by reason of providing false, misleading, and inaccurate plan disclosures,  in connection with the unlawful Social Security offset and the reimplementation of the whole-person evaluation standard;

J.     An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

K.     An Order that Defendants not engage in any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

L.     An Order to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of the Plans' fiduciaries deemed to have breached their fiduciary duties;

M.     Award any such other relief that the Court determines that Plaintiffs and the Class are entitled to pursuant to ERISA §502(a) and LMRA § 301;

N.     An award of pre-judgment interest;

O.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g), and/or ordering the payment of reasonable fees and expenses of this action to Plaintiffs' Counsel on the basis of the common benefit and/or common fund doctrine (and/or other applicable law) out of any money or benefit recovered for the Class and Subclasses in this action.

P.     Any other relief that Plaintiffs, the Class or the Subclass is entitled to pursuant to ERISA § 502(a)(3), or Rule 54(c) of the Federal Rules of Civil Procedure.

Dated July 10, 2020.                    */s/ R. Joseph Barton*
                                   R. Joseph Barton (D.C. Bar No. 476510)
                                   Colin M. Downes (D.C. Bar No. 1048761)
                                   BLOCK & LEVITON LLP
                                   1735 20th Street NW
                                   Washington, DC 20009
                                   Telephone: (202) 734-7046
                                   Email: jbarton@blockesq.com
                                   Email: colin@blockesq.com

                                   Ray Genco
                                   *Pro hac vice application to be filed*
                                   GENCO LAW FIRM
                                   177 Huntington Ave
                                   Boston, MA 02115
                                   Telephone: (561) 614-4256
                                   Email: ray@gencolaw.com

                                   James A. Walcheske
                                   Scott S. Luzi
                                   Paul M. Secunda
                                   *Pro hac vice applications to be filed*
                                   WALCHESKE & LUZI, LLC
                                   15850 W. Bluemound Rd., Suite 304
                                   Brookfield, Wisconsin 53005
                                   Telephone: (262) 780-1953
                                   Fax: (262) 565-6469
                                   E-Mail: jwalcheske@walcheskeluzi.com
                                   E-Mail: sluzi@walcheskeluzi.com
                                   E-Mail: psecunda@walcheskeluzi.com

                                   *Class Counsel for Plaintiffs*