**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AVEION CASON<br><br>and<br><br>DONALD VINCENT MAJKOWSKI,<br><br>in their individual capacity and on<br>behalf of others similarly situated,<br><br>                    Plaintiffs,<br><br>    v.<br><br>NATIONAL FOOTBALL LEAGUE<br>PLAYERS ASSOCIATION,<br><br>THE BERT BELL/PETE ROZELLE NFL<br>PLAYER RETIREMENT PLAN BOARD,<br><br>THE NFL PLAYER DISABILITY AND<br>NEUROCOGNITIVE BENEFIT PLAN<br>BOARD,<br><br>and<br><br>NATIONAL FOOTBALL LEAGUE<br>MANAGEMENT COUNCIL,<br><br>                    Defendants. | No. 1:20-cv-01875-TNM |

**DEFENDANT NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

       Defendant National Football League Management Council respectfully submits this

memorandum of law in support of its motion pursuant to Rules 12(b)(1) and 12(b)(6) of the

Federal Rules of Civil Procedure to dismiss the claims of Plaintiffs Aveion Cason and Donald

Vincent Majkowski.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES --------------------------------------------------------------------- iii

I.     INTRODUCTION ..................................................................... 1

II.    BACKGROUND ...................................................................... 3

    A.    The Retirement Plan and the Disability Plan ........................................... 3

    B.    T&P Benefits Under the Disability Plan ................................................. 5

    C.    Amendments To The Disability Plan Under The 2020 CBA ................................. 7

    D.    Plaintiffs' Disability Benefits ............................................................ 8

    E.    Plaintiffs' Complaint ...................................................................... 10

III.    ARGUMENT ........................................................................... 10

    A.    Plaintiffs' ERISA Claims Should Be Dismissed Pursuant To Rule 12(b)(1)
For Lack Of Subject Matter Jurisdiction. ............................................. 10

        1.    Plaintiffs Lack Standing to Assert Their Claims in Counts I-IV
Because They Have Not Suffered Any Injury In Fact. ............................ 11

            a.    Plaintiffs Pled No Facts Demonstrating That They Will
Personally Suffer Any Injury By The Social Security Offset. ....... 12

            b.    Plaintiffs' Allegations of a Possible Future Injury Under
The Whole-Person Evaluation Process Are Insufficient
to Demonstrate an Injury in Fact. ................................. 14

        2.    Plaintiffs' ERISA Claims Based On The Whole-Person Evaluation
Process Are Also Not Ripe For Adjudication. .......................... 16

    B.    Plaintiffs Fail To State Any Claims For Relief Against NFLMC. ...................... 18

        1.    Plaintiffs Fail To State An ERISA Claim In Counts I Through IV
Of The Complaint Because The Retirement Plan Did Not Change
And The Plain Language Of The CBA and Disability Plan Are Clear
That Disability Plan Benefits Are Not For Life. ....................... 19

i

a.    The Disability Plan Specifically Limits the Duration of Disability Benefits and Authorizes the NFLMC and NFLPA to Amend Them.................................................. 19

b.    Plaintiffs Are Not Entitled to "Lifetime Benefits" When the Plan Includes Durational and Reservation of Rights Clauses. ....................................................................... 22

2.    Plaintiffs Fail To State A Section 301 LMRA Claim In Count VI Of The Complaint ...................................................................... 26

a.    Plaintiffs Do Not Allege That The NFLMC Breached Any Labor Agreement. ................................................. 26

b.    Plaintiffs Fail To Adequately Allege That They Exhausted Their Internal Union Remedies.................................... 30

IV.    CONCLUSION............................................................................................. 31

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)................................................................................................16

*Abbruscato v. Empire Blue Cross & Blue Shield*,
    274 F.3d 90 (2d Cir. 2001)......................................................................................23

*\*Abdelmesih v. Waldorf-Astoria*,
    No. 93 CIV 4921 CSH, 1998 WL 740940 (S.D.N.Y. Oct. 21, 1998) .....................29

*\*Abernethy v. EmblemHealth, Inc.*,
    790 F. App'x 250 (2d Cir. 2019) .............................................................................21

*Ackley v. W. Conference of Teamsters*,
    958 F.2d 1463 (9th Cir. 1992) ...........................................................................28, 29

*In re Aiken Cty.*,
    645 F.3d 428 (D.C. Cir. 2011) ................................................................................17

*Alday v. Container Corp. of Am.*,
    906 F.2d 660 (11th Cir. 1990) ................................................................................23

*\*Allied Chem. & Alkali Workers, Local I v. Pittsburgh Plate & Glass Co.*,
    404 U.S. 157 (1971)................................................................................................28

*Allis-Chalmers Corp. v. Lueck*,
    471 U.S. 202 (1985)................................................................................................29

*Am. Petroleum Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012) ................................................................................17

*\*Am. Postal Workers Union Local v. Am. Postal Workers Union*,
    665 F.2d 1096 (D.C. Cir. 1981) ..............................................................................29

*\*Am. Postal Workers Union v. U.S. Postal Serv.*,
    940 F.2d 704 (D.C. Cir. 1991) ................................................................................25

*Anderson v. Holder*,
    691 F. Supp. 2d 57 (D.D.C. 2010), *aff'd*, 647 F.3d 1165 (D.C. Cir. 2011).......18, 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................18

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986)..................................................................................................29

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015) ...............................................................................3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................18

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).....................................20

*\*Blankenship v. Dominion Energy Transmission, Inc.*,
818 F. App'x 121 (3d Cir. 2020) .......................................................................21, 24

*Border v. Nat'l Real Estate Advisors, LLC*,
No. 19-974, 2020 WL 1536187 (D.D.C. Mar. 31, 2020) ........................................19

*Brown v. Medtronic, Inc.*,
628 F.3d 451 (8th Cir. 2010) ...................................................................................13

*\*Campbell v. PMI Food Equip. Grp., Inc.*,
509 F.3d 776 (6th Cir. 2007) ...................................................................................26

*Cefarrati v. JBG Props., Inc.*,
75 F. Supp. 3d 58 (D.D.C. 2014) .........................................................................3, 18

*\*Cephas v. MVM, Inc.*,
520 F.3d 480 (D.C. Cir. 2008) .................................................................................26

*Chappell v. Comm'cns Workers of Am.*,
993 F.2d 1536, 1993 WL 185635 (4th Cir. 1993) (per curiam) .............................31

*Chiles v. Ceridian Corp.*,
95 F.3d 1505 (10th Cir. 1996), *abrogated on other grounds by Tomlinson v.
El Paso Corp.*, 653 F.3d 1281 (10th Cir. 2011)......................................................23

*\*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...............................................................................................2, 14

*\*CNH Indus., N.V. v. Reese*,
138 S. Ct. 761 (2018).................................................................................2, 20, 21, 24

*\*Confederated Indep. Unions v. Rockwell-Standard Co.*,
465 F.2d 1137 (3d Cir. 1972)....................................................................................28

*Copeland v. Penske Logistics LLC*,
675 F.3d 1040 (7th Cir. 2012) ..................................................................................29

*Coriale v. Xerox Corp.*,
    490 F. App'x 387 (2d Cir. 2012) ........................................................................23

*Curtiss-Wright Corp. v. Schoonejongen*,
    514 U.S. 73 (1995) .........................................................................................4, 20

*Davis v. Liberty Mut. Ins. Co.*,
    871 F.2d 1134 (D.C. Cir. 1989) .........................................................................14

*Fox v. McCormick*,
    20 F. Supp. 3d 133 (D.D.C. 2013) .....................................................................11

*Fulk v. United Transp. Union*,
    108 F.3d 113 (7th Cir. 1997) .............................................................................30

*Gable v. Sweetheart Cup Co., Inc.*,
    35 F.3d 851 (4th Cir. 1994) ...............................................................................23

*Grand Lodge of Fraternal Order of Police v. Ashcroft*,
    185 F. Supp. 2d 9 (D.D.C. 2001) ................................................................ *passim*

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ...........................................................................................27

*Hall v. Dep't of Labor*,
    289 F. Supp. 3d 93 (D.D.C. 2018), *aff'd*, No. 18-5100, 2018 WL 5919255
    (D.C. Cir. Nov. 1, 2018) ...............................................................................10, 11

*Hall v. Nat'l R.R. Passenger Corp.*,
    559 F. Supp. 2d 38 (D.D.C. 2008) .......................................................................3

*Heimeshoff v. Hartford Life & Accident Ins., Co.*,
    571 U.S. 99 (2013) .............................................................................................20

*Int'l Bhd. of Teamsters, Local No. 310 v. NLRB*,
    587 F.2d 1176 (D.C. Cir. 1978) .........................................................................28

*IUE-CWA v. Gen. Elec. Co.*,
    745 F. App'x 583 (6th Cir. 2018) ..................................................................23, 24

*Jackson v. Volvo Trucks N. Am., Inc.*,
    462 F.3d 1234 (10th Cir. 2006) .........................................................................13

*Knapp Med. Ctr. v. Hargan*,
    875 F.3d 1125 (D.C. Cir. 2017) .........................................................................10

*Llanos v. Brookdale Univ. Hosp. & Med. Ctr.*,
    No. 10-CV-1726 (DLI)(RML), 2011 WL 809615 (E.D.N.Y. Mar. 2, 2011) .........................26

v

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983).................................................................................16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)...................................11

**M&G Polymers USA, LLC v. Tackett*,
    574 U.S. 427 (2015)......................................................3, 20, 24, 25

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995)................................................................................24

*Mays v. N. Am. Truck Platforms Flint Assembly*,
    No. 94-75229, 1995 WL 871013 (E.D. Mich. Sept. 20, 1995)..............31

**Molina v. Ocwen Loan Servicing*,
    545 F. App'x 1 (D.C. Cir. 2013) (per curiam)............................12, 13

**Nat'l Star Route Mail Contractors Ass'n v. U.S. Postal Serv.*,
    223 F. Supp. 3d 14 (D.D.C. 2016).........................................11, 15, 16, 17

*Newspaper Guild of Salem v. Ottaway Newspapers, Inc.*,
    79 F.3d 1273 (1st Cir. 1996)..............................................................29

**Pearson v. UAW*,
    694 F. App'x 401 (6th Cir. 2017)......................................................30

*Price v. Unite Here Local 25*,
    883 F. Supp. 2d 146 (D.D.C. 2012)..................................................27

*Prof'l Emps. Int'l Union, Local 2 v. Wash. Metro. Area Transit Auth.*,
    724 F.2d 133 (D.C. Cir. 1983)..........................................................29

*Robinson v. Sheet Metal Workers' Nat'l Pension Fund*,
    515 F.3d 93 (2d Cir. 2008)..........................................................19, 23

**Schwarz v. UAW Union*,
    837 F. Supp. 530 (W.D.N.Y. 1993)..................................................30

**Spellacy v. Airline Pilots Ass'n-Int'l*,
    156 F.3d 120 (2d Cir. 1998)..............................................................28

*Spicer v. Ford Motor Co.*,
    491 F. App'x 543 (6th Cir. 2012)......................................................30

*Strumsky v. Wash. Post Co.*,
    842 F. Supp. 2d 215 (D.D.C. 2012)....................................................3

**Sys. Council EM-3 v. AT&T*,
    972 F. Supp. 21 (D.D.C. 1997), *aff'd*, 159 F.3d 1376 (D.C. Cir. 1998).........................*passim*

*Taylor v. KeyCorp.*,
  680 F.3d 609 (6th Cir. 2012) ...............................................................................13

*Thole v. U.S. Bank N.A.*,
  140 S. Ct. 1615 (2020) ........................................................................................11

*Thomas v. Union Carbide Agric. Prods. Co.*,
  473 U.S. 568 (1985) ............................................................................................16

*Thomas v. United Mine Workers of Am.*,
  422 F. Supp. 1111 (D.D.C. 1976) .......................................................................28

*UAW v. Rockford Powertrain, Inc.*,
  350 F.3d 698 (7th Cir. 2003) ..............................................................................23

*In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*,
  58 F.3d 896 (3d Cir. 1995) ..................................................................................23

*Wagner v. Gen. Dynamics*,
  905 F.2d 126 (6th Cir. 1990) (per curiam) .........................................................30

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................12

*Wilcox v. Georgetown Univ.*,
  No. 18-422 (RMC), 2019 WL 132281 (D.D.C. Jan. 8, 2019) ....................12, 13, 18

*Wilkes-Barre Hosp. Co. v. NLRB*,
  857 F.3d 364 (D.C. Cir. 2017) ............................................................................20

*Williams v. Lew*,
  819 F.3d 466 (D.C. Cir. 2016) ............................................................................16

*Windstream Corp. v. Da Gragnano*,
  757 F.3d 798 (8th Cir. 2014) ..............................................................................22

*Wozniak v. Int'l Union, UAW*,
  842 F.2d 633 (2d Cir. 1988) ...............................................................................30

*Young v. Int'l Union, UAW*,
  148 F. Supp. 3d 602 (E.D. Mich. 2015), *aff'd*, 686 F. App'x 304 (6th Cir.
  2017) .............................................................................................................26, 30

## STATUTES

26 U.S.C. § 411(d)(6) ..................................................................................................3

29 U.S.C. § 152(5) ....................................................................................................27

29 U.S.C. § 185(a) ...........................................................................................................27

29 U.S.C. § 1002(1) ................................................................................................3, 4, 19

29 U.S.C. § 1002(2) .......................................................................................................3, 4

29 U.S.C. § 1051 ................................................................................................................4

29 U.S.C. § 1051(a)(1) .....................................................................................................19

29 U.S.C. § 1054(g) ...........................................................................................................3

ERISA §§ 3(2), 201(a)(1) ................................................................................................19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(1).................................................................................................1, 10

Fed. R. Civ. P. 12(b)(6).................................................................................................1, 18

Fed. R. Civ. P. 12(h)(3)......................................................................................................11

## I.     INTRODUCTION

Former NFL players Aveion Cason and Donald Vincent Majkowski ("Plaintiffs") bring claims under the Employment Retirement Income Security Act ("ERISA") and Section 301 of the Labor Management Relations Act ("LMRA") based on proposed amendments to a NFL player disability benefits plan negotiated by the NFL Management Council ("NFLMC"), on behalf of the NFL clubs, and the NFL Players Association ("NFLPA"), on behalf of the NFL players.  In particular, Plaintiffs challenge two amendments to the NFL Player Disability and Neurocognitive Plan (the "Disability Plan") agreed to in the parties' 2020 Collective Bargaining Agreement ("CBA"):  (1) an amendment providing for an offset of any Social Security benefits received against the $135,000 annual disability benefit paid to players receiving benefits under the Disability Plan; and (2) an amendment revising the process for determining whether players are eligible to receive disability benefits through the use of a new "whole-person" evaluation to be negotiated and implemented no earlier than 2024.  Plaintiffs contend that these amendments impermissibly reduce their disability benefits in violation of ERISA and that, by negotiating these amendments, the NFLMC and NFLPA breached the prior CBA in violation of the LMRA. Each of these claims fail as a matter of law and should be dismissed in their entirety pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

First, Plaintiffs lack standing to assert their ERISA claims.  Neither Plaintiff alleges that they are receiving Social Security benefits, or that they would otherwise personally suffer an injury by the offset provision negotiated by the parties.  Nor are Plaintiffs' claims related to the whole-person evaluation process sufficient to confer standing because neither Plaintiff knows whether he will be damaged by such a process.  Plaintiffs' continuing eligibility for benefits will not be assessed under the new whole-person standard until 2024.  Even then, whether Plaintiffs' benefits will be affected is wholly speculative and contingent on a future determination by the

Disability Board.  It is well-settled that this kind of possible, future injury is not sufficient to confer Article III standing on a plaintiff.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  For the same reasons, Plaintiffs' claims are not ripe for adjudication.  Accordingly, the ERISA claims should be dismissed for lack of subject matter jurisdiction.

Second, Plaintiffs' claims against the NFLMC fail on the merits.  Plaintiffs assert claims based on both the Disability Plan and another NFL player benefit plan, the Bert Bell/Pete Rozelle Retirement Plan (the "Retirement Plan").  But the 2020 CBA does not make any modifications to disability benefits provided through the *Retirement* Plan.  As to the *Disability* Plan, Plaintiffs' allegations in the Complaint that their benefits are "vested for life" contradict the plain and unambiguous terms of the CBAs that created the benefits and the Disability Plan that implemented them.  These documents limit the duration of benefits under the Disability Plan and expressly state that the Plan can be amended or modified any time by the NFLPA and NFLMC.  As the Supreme Court has repeatedly made clear, *see, e.g.*, *CNH Industrial, N.V. v. Reese*, 138 S. Ct. 761, 766 (2018), employers and unions are free to modify these benefits where, as here, they are subject to durational and reservation-of-rights clauses.

Finally, Plaintiffs fail to state a claim under Section 301 of the LMRA because they do not plead any facts showing that the NFLMC or the NFLPA breached a provision of any CBA.  Plaintiffs' allegations that the NFLMC and NFLPA "secretly" added a provision to the 2020 CBA after the players voted in violation of the NFLPA Constitution do not suffice.  There is nothing in the CBA that requires ratification by the players, and the NFLPA Constitution is not a labor contract.  In short, Plaintiffs offer no allegations that could support a claim that the NFLMC breached a provision of its CBA with the NFLPA, because the language of the CBAs

expressly permit the NFLMC and NFLPA to do what they did here—jointly modify the terms of the Disability Plan.  Plaintiffs' claims accordingly must be dismissed in their entirety.

## II.     BACKGROUND[1]

### A.     The Retirement Plan and the Disability Plan

Plaintiffs' Complaint alleges violations of ERISA related to two benefit plans negotiated by the NFLMC and NFLPA: the Retirement Plan and the Disability Plan.  *See* Class Action Complaint ("Compl."), Dkt. No. 1, ¶¶ 1-4.

"When collective-bargaining agreements create pension or welfare benefit plans, those plans are subject to rules established in ERISA."  *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 434 (2015).  However, "ERISA treats these two types of plans differently."  *Id.*  A pension plan is an employee plan, fund or program providing former employees retirement income earned during their employment but deferred until their retirement.  29 U.S.C. § 1002(2).  Once vested, ERISA generally prohibits the reduction or termination of a pension benefit.[2]  26 U.S.C. § 411(d)(6), 29 U.S.C. § 1054(g).  Conversely, an employee welfare plan is a plan, fund or program that provides participants with "additional benefits, such as life insurance and disability coverage."  *Tackett*, 574 U.S. at 434; 29 U.S.C. § 1002(1).  Welfare benefits do not vest under ERISA, and an employer is "generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare plans," even for employees and former employees currently

---

[1] The Court may "[i]ncorporat[e] by reference . . . where the document is not attached by the plaintiff, but is 'referred to in the complaint and [ ] integral to [the plaintiff's] claim.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015); *see Cefarrati v. JBG Props., Inc.*, 75 F. Supp. 3d 58, 61 n.1 (D.D.C. 2014) (considering collective bargaining agreement not attached to plaintiff's complaint for purposes of deciding motion to dismiss Section 301 claim); *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 217-18 (D.D.C. 2012) (considering plan documents not attached to plaintiff's complaint for purposes of deciding motion to dismiss ERISA claims).

[2] This is colloquially known as the "anti-cutback rule."  *See, e.g.*, *Hall v. Nat'l R.R. Passenger Corp.*, 559 F. Supp. 2d 38, 52 (D.D.C. 2008).

receiving such benefits.  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); 29 U.S.C. § 1051.

The NFLMC and NFLPA maintain both a pension plan and a welfare plan for the retired players.  The Retirement Plan is a pension plan under ERISA § 3(2), 29 U.S.C. § 1002(2) established and maintained to provide retirement benefits.  Compl. ¶ 18.  The Retirement Plan also includes ancillary welfare benefits, including certain benefits to certain players who become totally and permanently disabled ("T&P benefits").  Compl. ¶¶ 18-19.  Eligible players receive T&P benefits under the Retirement Plan in one of four categories, depending on the retired player's facts and circumstances: (a) Active Football; (b) Active Nonfootball; (c) Inactive A; or (d) Inactive B.  Ex. A, 2014 Retirement Plan Document, art. 5.3.  The minimum amount of monthly T&P benefit payments for "Inactive A" participants (the relevant category for purposes of this litigation) is $4,000 per month under the Retirement Plan.  *Id.*, art. 5.5(b); Compl. ¶ 24.

In 2011, the NFLMC and the NFLPA agreed to establish the Disability Plan, a welfare plan under ERISA § 3(1), 29 U.S.C. § 1002(1), for the purpose of creating a single employee welfare benefit plan that would provide all disability benefits negotiated under the 2011 CBA.  Ex. C, 2011 CBA, art. 61; Compl. ¶ 20.[3]  The 2011 CBA also increased the overall amount of players' disability benefits.  Ex. C, 2011 CBA, art. 61, § 3.  To effectuate these purposes, the bargaining parties amended the Retirement Plan: (1) to continue the T&P benefits provided under the Retirement Plan to otherwise eligible players who applied for T&P benefits before January 1, 2015 and were totally and permanently disabled as defined under the Retirement Plan; and (2) to cease providing T&P benefits to players who apply for T&P benefits after January 1, 2015.  Ex. A, 2014 Retirement Plan Document, Introduction & art. 5; Compl. ¶¶ 19-20.

---

[3] The Disability Plan replaces the predecessor NFL Supplemental Disability Plan that provided disability benefits above those provided by the Retirement Plan.

**B.      T&P Benefits Under the Disability Plan**

Following the 2011 CBA, the parties established the Disability Plan to be the sole plan providing disability benefits to otherwise eligible players who applied for benefits and are determined to be totally and permanently disabled.   *See* Ex. B, 2019 Disability Plan, Introduction.   Under the Disability Plan, eligible players who were receiving payments from the Social Security Disability Insurance program or the Social Security Income program at the time they applied for benefits are automatically deemed totally and permanently disabled ("Social Security Eligible").   Ex. B, 2019 Disability Plan, arts. 3.2, 4.1; Compl. ¶ 29.

Payments under the Disability Plan are separated into two groups of players.   The first group, referred to as "Article 3 Players," are those whose applications are received on and after January 1, 2015.   *See* Ex. B, 2019 Disability Plan, art. 3.   These players receive all of their T&P benefits from the Disability Plan, at a minimum of $11,250 per month.   *Id.*   The second group, referred to as "Article 4 Players," are those whose applications were received before January 1, 2015.   *See* Ex. B, 2019 Disability Plan, art. 4.   These players continue to receive a T&P benefit (generally, a minimum of $4,000 per month) from the Retirement Plan, and an additional T&P benefit (a minimum of $11,250 per month less the T&P benefit received under the Retirement Plan) from the Disability Plan.   *Id.*, art. 4; Ex. A, 2014 Retirement Plan Document, art. 5.3; *see also* Compl. ¶¶ 29, 31.[4]

---

[4] As with the Retirement Plan, eligible players who applied for T&P benefits on and after January 1, 2015 receive benefits under the Disability Plan in one of four categories, depending on the player's facts and circumstances: (a) Active Football; (b) Active Nonfootball; (c) Inactive A; or (d) Inactive B.  Ex. B, 2019 Disability Plan, art. 3.4.  Eligible players who applied for T&P benefits prior to January 1, 2015 receive benefits under the Disability Plan in one of three categories, depending on the player's facts and circumstances: (a) Active Football; (b) Active Nonfootball; or (c) Inactive A.  *Id.*, art. 4.2.  Both of the Plaintiffs in this litigation receive "Inactive A" benefits.  Compl. ¶¶ 29, 31.

Under Article 61 of the 2011 CBA, the parties agreed that except for T&P benefits that would have previously been provided under the Retirement Plan, the benefits under the Disability Plan would be continued and maintained only during the term of the 2011 CBA.  *See* Ex. C, 2011 CBA, art. 61, §§ 1, 4.  Article 10.1 of the Disability Plan similarly provides that the Disability Plan may be "amended or terminated by joint action of the NFLPA and the [NFLMC] while there is a Collective Bargaining Agreement in effect."  *See* Ex. B, 2019 Disability Plan, art. 10.1; Compl. ¶ 34.  If the CBA expires or is otherwise not in effect, the Disability Board has the authority to amend the Plan or, if the CBA has not been in effect for more than a year, terminate it.  *See* Ex. B, 2019 Disability Plan, art. 10.1.

Consistent with these provisions, under the terms of the Disability Plan, absent an amendment by the parties, disability benefits will be reduced substantially following the term of the 2011 CBA.  Specifically, effective April 1, 2021, an eligible Article 3 Player's Inactive A benefit will be reduced from $11,250 to $4,000 a month.  Ex. B, 2019 Disability Plan, art. 3.6.[5] An eligible Article 4 Player's Inactive A benefit under the Disability Plan will be reduced to $0 a month (with their Retirement Plan T&P benefit continuing).  *Id.*, arts. 4.2, 4.8.  In other words, absent an agreement by the NFLMC and the NFLPA, all players receiving Inactive A benefits would have their benefits reduced to $4,000 per month pursuant to the terms of the Disability Plan beginning April 1, 2021.

---

[5] Note that the Complaint mistakenly states that the monthly payment will decrease to $0 effective April 1, 2021 under Article 3.6 of the 2019 Disability Plan.  *Compare* Compl. ¶ 30 *with* Ex. B, 2019 Disability Plan, art. 3.6.

**C.       Amendments To The Disability Plan Under The 2020 CBA**

On March 15, 2020, the NFLPA and NFLMC executed the new 2020 CBA terminating and replacing the 2011 CBA that would have otherwise expired in March of 2021.  Ex. C, 2011 CBA, art. 69; Ex. D, 2020 CBA.

The 2020 CBA makes no changes to any provision of the Retirement Plan related to T&P benefits.  *See generally* Ex. D, 2020 CBA, art. 53 (referring to the negotiated changes to Retirement Plan, all unrelated to disability benefits), and art. 60 (referring only to amendments to the "Disability Plan").  Article 60 of the 2020 CBA continues the T&P benefits under the Disability Plan at the benefit amounts in effect immediately before April 1, 2021, except as otherwise stated in Article 60.  Ex. D, 2020 CBA, art. 60.  Article 60 includes three conditions for the continuation of T&P benefits: (1) effective January 1, 2021, the amount of a player's monthly Inactive A benefit would be reduced by the amount of the player's monthly Social Security Disability Insurance benefit (the "Social Security offset"), if any; (2) effective for applications received on or after April 1, 2024, a Social Security determination of total and permanent disability would not automatically cause a player to be deemed totally and permanently disabled for purposes of the Disability Plan, rather a player would instead be evaluated under a "whole-person" evaluation process to be developed by April 1, 2023; and (3) notwithstanding any other provision in the Disability Plan, players previously determined to be Social Security Eligible will be reevaluated on or after April 1, 2024 and before April 1, 2026, under the whole-person evaluation to determine if the player remains totally and permanently disabled.  *Id.*; Compl. ¶¶ 43, 60, 70.

On March 5, 2020, members of the NFLPA discussed, reviewed, and ratified a proposed version of the 2020 CBA.  *See* Compl. ¶ 40.  Article 60 of the version of the 2020 CBA originally ratified by members of the NFLPA was ambiguous as to whether the Disability Plan

amendments applied to only Article 3 Players or to both Article 3 Players and Article 4 Players, as no reference to Article 4 Players was included in the original version of Article 60.[6]  Compl. ¶¶ 44-45.  This ambiguity had significant implications for Article 4 players, because these players would have seen their Disability Plan benefits expire and reduced to $0 if the new Plan amendments did not apply to them.  *See* Ex. C, 2011 CBA, art. 61; Ex. B, 2019 Disability Plan, art. 10.1.  The 2020 CBA executed on March 15, 2020 clarifies that Article 4 Players benefits would also continue at the same benefit amounts in effect immediately prior to April 1, 2021, by including as a condition of continuation the Social Security offset for Inactive A Benefits.  Ex. D, 2020 CBA, art. 60, § 4; Compl. ¶ 51.  Prior to executing the 2020 CBA, representatives from the NFLMC and NFLPA agreed to this clarification.  *See* Compl. ¶ 51.

### D.      Plaintiffs' Disability Benefits

Plaintiff Aveion Cason is an Article 3 Player currently receiving an Inactive A benefit of $11,250 per month from the Disability Plan; absent a plan amendment pursuant to Article 10.1 of the Disability Plan, Plaintiff Cason's benefit will decrease to $4,000 a month on April 1, 2021. Compl. ¶ 10; Ex. B, 2019 Disability Plan, art. 3.6.  If the Disability Plan is amended as negotiated in the 2020 CBA, the Disability Plan will continue to pay Cason $11,250 per month (less any Social Security offset beginning January 1, 2021), through the duration of the 2030 League Year—subject to amendment by the bargaining parties under Article 10.1 of the Disability Plan—if he remains totally and permanently disabled and otherwise eligible for the Inactive A benefit.  Ex. D, 2020 CBA, art. 60.

---

[6] Section 4(b) of Article 60 in the 2020 CBA executed on March 15, 2020 was inadvertently omitted from the version of the 2020 CBA ratified by the players.  Without Section 4(b), Article 60 would be silent on the continuation of Article 4 benefits under the Disability Plan.

Plaintiff Donald Vincent Majkowski is an Article 4 Player currently receiving an Inactive A benefit of $11,250 per month from the Disability Plan (less benefits he receives from the Retirement Plan under Article 5.5 of the Retirement Plan).  Compl. ¶ 11; Ex. B, 2019 Disability Plan, art. 4.2.  Absent a plan amendment pursuant to Article 10.1 of the Disability Plan, Plaintiff Majkowski's Disability Plan benefit will decrease to $0 a month on April 1, 2021; he will continue to receive from the Retirement Plan his benefit under Article 5.5 of the Retirement Plan. Ex. A, 2014 Retirement Plan Document, art. 5.5; Ex. B, 2019 Disability Plan, art. 4.2.  If the Disability Plan is amended as negotiated in the 2020 CBA, the Disability Plan will continue to pay Majkowski $11,250 per month (less his payments from the Retirement Plan under Article 5.5 of the Retirement Plan and, beginning January 1, 2021, less any Social Security offset), through the duration of the 2030 League Year—subject to plan amendment by the bargaining parties under Article 10.1 of the Disability Plan—if he remains totally and permanently disabled and otherwise eligible for the Inactive A benefit.  Ex. A, 2014 Retirement Plan Document, art. 5.5; Ex. B, 2019 Disability Plan, art. 4.2.

Notwithstanding Plaintiffs' claims that the Defendants impermissibly reduced the disability benefits of the Plaintiffs, Article 60 of the Disability Plan increases—even with the Social Security offset—the Disability Plan benefit that both Plaintiffs would receive if the 2020 CBA provided for no amendments to the Disability Plan.  Ex. B, 2019 Disability Plan, arts. 3.6, 4.2, 4.8; Ex. D, 2020 CBA, art. 60; *see also* Compl. ¶ 43 (alleging that the Social Security offset will result in a $2,000-$3,000 decrease, which is less than the decrease of $7,250 for Article 3 Players and $11,250 for Article 4 Players that would occur under the Disability Plan absent amendment).

E.     **Plaintiffs' Complaint**

Plaintiffs bring a six-count class action complaint (the "Complaint") against several defendants, including the NFLMC, based on the amendments to T&P disability benefits contemplated in the 2020 CBA.  In the Complaint, and as it relates to the NFLMC, Plaintiffs claim in Counts I and II that the implementation of the Social Security offset and whole-person evaluation process for benefit eligibility will impermissibly reduce or eliminate the disability benefits of Article 3 and Article 4 players in violation of ERISA.  In Counts III and IV, Plaintiffs make the same ERISA claims for both subclasses of players, except they limit the claims to only those players who are already in "paid status" (i.e., players who have already qualified for and begun to receive their benefits).  Finally, in Count VI[7], Plaintiffs claim that the NFLPA and NFLMC breached the 2020 CBA in violation of Section 301 of the LMRA by adding in a provision applying the Social Security offset to one of the subclasses of players after the players had already voted on the 2020 CBA.

III.    **ARGUMENT**

A.     **Plaintiffs' ERISA Claims Should Be Dismissed Pursuant To Rule 12(b)(1) For Lack Of Subject Matter Jurisdiction.**

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of demonstrating the Court's subject matter jurisdiction over the claims asserted.  *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Hall v. Dep't*

---

[7] In Count V of the Complaint, Plaintiffs claim that the NFLPA, the Bert Bell/Pete Rozelle NFL Player Retirement Plan Board ("Retirement Board"), and the NFL Player Disability and Neurocognitive Plan Board ("Disability Board") breached their fiduciary duties by failing to disclose the impact of the amendments to the Plaintiffs and other class members.  Because this Count does not assert a claim against the NFLMC, it is not addressed in this motion.

*of Labor*, 289 F. Supp. 3d 93, 97 (D.D.C. 2018) (citations omitted), *aff'd*, No. 18-5100, 2018 WL 5919255 (D.C. Cir. Nov. 1, 2018); *see also Fox v. McCormick*, 20 F. Supp. 3d 133, 139 (D.D.C. 2013) ("[S]ubject matter jurisdiction over ERISA claims only where the [litigants] have both statutory and constitutional standing" (citation omitted)).  Because the Court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," the factual allegations in the complaint "'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  *Grand Lodge of Fraternal Order of Police*, 185 F. Supp. 2d at 13-14 (citation omitted).  "Absent subject matter jurisdiction over a [claim], the court must dismiss it."  *Hall*, 289 F. Supp. 3d at 97 (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006)); Fed. R. Civ. P. 12(h)(3) (requiring dismissal of action "at any time" the court determines it lacks subject matter jurisdiction).  Here, Plaintiffs have not met their burden to demonstrate that the Court has subject matter jurisdiction over their ERISA claims in Counts I-IV of the Complaint.

### 1. Plaintiffs Lack Standing to Assert Their Claims in Counts I-IV Because They Have Not Suffered Any Injury In Fact.

Plaintiffs bear the burden of establishing that they have Article III constitutional standing to bring their ERISA claims.  *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).  To satisfy this burden, Plaintiffs must demonstrate: "(1) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."  *Id.* at 1618 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "Courts consider the injury-in-fact prong the 'principal limitation imposed by Article III.'"  *Grand Lodge of Fraternal Order of Police*, 185 F. Supp. 2d at 14 (citation omitted); *see also Nat'l Star Route Mail Contractors Ass'n v. U.S. Postal Serv.*, 223 F. Supp. 3d 14, 27 (D.D.C. 2016) ("The critical

question in this case centers around injury in fact, which is the '[f]irst and foremost' element of

standing") (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).  Even in the context of

a class action lawsuit, all named Plaintiffs "must allege and show that they *personally* have been

injured, not that injury has been suffered by other, unidentified members of the class to which

they belong and which they purport to represent."  *Warth v. Seldin*, 422 U.S. 490, 502 (1975)

(emphasis added).  Here, Plaintiffs fail to demonstrate any injury in fact based on either the

Social Security offset or the whole-person evaluation process.

> ### a.    *Plaintiffs Pled No Facts Demonstrating That They Will Personally Suffer Any Injury By The Social Security Offset.*

In Counts I-IV of their Complaint, Plaintiffs claim that the Social Security offset

amendment contemplated in the 2020 CBA will impermissibly reduce their (and other class

members') T&P benefits.  Compl. ¶¶ 103-34.  But neither Plaintiff alleges that they are currently

receiving Social Security benefits or that they intend to seek them, and thus it is unclear whether

the offset would even apply to Plaintiffs.  *See generally* Compl. ¶¶ 10-11, 34-50.  Without any

factual allegations showing that Plaintiffs will *personally* be affected by the allegedly improper

Social Security offset, their claims must be dismissed.  *See Warth*, 422 U.S. at 502, 508, 518

(affirming dismissal of claims challenging exclusionary zoning practices because plaintiff did

not allege "specific, concrete facts demonstrating that the challenged practices harm him");

*Molina v. Ocwen Loan Servicing*, 545 F. App'x 1, 2 (D.C. Cir. 2013) (per curiam) (affirming

dismissal of claims of discriminatory lending, loan servicing and foreclosure practices for lack of

standing because plaintiff "did not allege…that he himself had been subjected to any of the

discriminatory practices identified in the complaint"); *Wilcox v. Georgetown Univ.*, No. 18-422

(RMC), 2019 WL 132281, at *9-10 (D.D.C. Jan. 8, 2019) (dismissing ERISA breach of fiduciary

claims based on investment in Vanguard funds because neither plaintiff selected those funds as

an investment option).  The mere fact that *other* class members may receive Social Security benefits that will be offset by the amendment is not sufficient to cure this deficiency.  *See Molina*, 545 F. App'x at 2 (Plaintiffs cannot demonstrate standing "by simply pleading membership in an affected group").

Furthermore, even assuming Plaintiffs pled facts demonstrating that they will personally be impacted by the offset, their allegations do not establish any injury because the amendment actually increases their total benefits.  According to Plaintiffs' allegations, the Social Security offset will result in a $2,000 to $3,000 decrease in benefits.  *See* Compl. ¶ 43.  However, the amendments to the 2020 CBA simultaneously *increase* the benefits players will receive by retaining the $11,250 benefit amounts in effect immediately before April 1, 2021, which would have dropped to $4,000 for Article 3 players and $0 for Article 4 players without the amendment. *See* Ex. D, 2020 CBA, art. 60; Ex. B, 2019 Disability Plan, arts. 3.6, 4.2.  Because the amount that the benefits will increase for both sets of players is greater than the amount by which they will decrease under the amendments, Plaintiffs' net benefits will go up as a result of the changes. Under similar circumstances, courts have concluded that there is no loss or injury sufficient to establish standing.  *See Wilcox*, 2019 WL 132281, at *10 (dismissing breach of fiduciary duty claims under ERISA because the funds in the allegedly improper investment performed better, and therefore plaintiffs experienced no loss or injury); *see also Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2010) (holding that, in an ERISA case, "at a minimum, a plaintiff must allege a net loss in investment value that is fairly traceable to the defendants' challenged actions"); *Taylor v. KeyCorp.*, 680 F.3d 609, 615 (6th Cir. 2012) (same); *Jackson v. Volvo Trucks N. Am., Inc.*, 462 F.3d 1234, 1243 (10th Cir. 2006) (same).

   b.   *Plaintiffs' Allegations of a Possible Future Injury Under The Whole-Person Evaluation Process Are Insufficient to Demonstrate an Injury in Fact.*

Additionally, by Plaintiffs' own allegations, neither they nor any member of their purported class has personally suffered an injury in fact based on the switch to the whole-person evaluation process.  According to the Complaint, the change to the whole-person evaluation process will not occur until *on or after April 1, 2024*, and re-evaluations under this new standard will take place between April 1, 2024 and April 1, 2026.  *See* Compl. ¶¶ 60, 69-70.  Plaintiffs allege that "*it is likely* that Plaintiffs and members of the Class will lose their vested lifetime T&P disability benefits under both the Retirement Plan and the Disability Plan starting in 2026." Compl. ¶ 71 (emphasis supplied).  But it is well-established that these types of "[a]llegations of possible future injury" do not demonstrate that Plaintiffs have suffered "an injury in fact" that is "concrete, particularized, and actual or imminent."  *See, e.g.*, *Clapper*, 568 U.S. at 409.  Indeed, "a future injury is imminent only if the injury is 'certainly impending,' . . . speculative allegations of future injury will not suffice."  *Grand Lodge of Fraternal Order of Police*, 185 F. Supp. 2d at 14 (citations omitted); *Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1137 n.3 (D.C. Cir. 1989) (noting that claims for declaratory judgment or injunctive relief must "demonstrate a possibility of future injury which is of 'sufficient immediacy and reality'" (citation omitted)).  A possible elimination of benefits based on evaluation under the new standard, which will not occur until four to six years from now, is certainly not "imminent" or "impending."

Two cases in this district are instructive.  In *Systems Council EM-3 v. AT&T*, 972 F. Supp. 21 (D.D.C. 1997), *aff'd*, 159 F.3d 1376 (D.C. Cir. 1998), current and retired employees and the union brought an action against AT&T and Lucent, a new company created by AT&T as part of a restructuring, asserting that the spin-off of AT&T's pension and welfare plans to Lucent violated ERISA and constituted breach of contract because Lucent "may not be able to carry out"

the obligation to provide benefits under the plans in the future.  *Id.* at 25-26, 38-39.  This Court dismissed the claims for lack of subject matter jurisdiction because plaintiffs had not alleged that they ceased to receive benefits under either of the plans, and because uncertainty about whether benefits will be paid in the future is "insufficient to give rise to an Article III injury in fact."  *Id.* at 39-40.

Similarly, in *National Star Route Mail Contractors Ass'n v. United States Postal Service*, an arbitration award directed the Postal Service to convert certain private routes into postal routes to be staffed by Union members after an arbitrator found that the Postal Service violated the CBA.  223 F. Supp. 3d at 19.  The National Star Route Mail Contractors Association, which operated some of the private routes under contract with the Postal Service, filed suit challenging the arbitration award and seeking to enjoin the Postal Service from terminating any of its routes. *Id.* at 19-20.  This Court dismissed the case for lack of subject matter jurisdiction because the Postal Service and Union had not yet determined which of the private routes would, in fact, be terminated.  *Id.* at 28-29, 36.  The Court reasoned that "it is ultimately uncertain whether the contracts held by any of Plaintiff's members will be terminated by the Postal Service" and "[t]his uncertainty as to whether any members of Plaintiff Association will ultimately suffer injury requires this Court to find that this injury is not sufficiently concrete to establish standing."  *Id.* at 28-29.

The same uncertainty of injury exists here.  What whole-person standard is adopted by the Plan, and whether Plaintiffs' benefits will be terminated after they are reevaluated under the whole-person evaluation standard, is entirely speculative—it is possible that Plaintiffs (and the other class members) will still be eligible for benefits under the new standard, resulting in no loss at all.  Plaintiffs' allegations relating to the past denial of benefits under the "harder-to-meet

whole-person evaluation process," *see* Compl. ¶¶ 62-71, do not make the future injury any more "actual" or "imminent" for purposes of Article III standing.  *See Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("[Past injury,] . . . does nothing to establish a real and immediate threat that [plaintiff] would again be [injured in the future.]"); *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) ("[Plaintiff's] allegations of past injury are irrelevant to the standing inquiry in this case"). Accordingly, Plaintiffs' alleged "likely" future injuries stemming from the change to a whole-person evaluation process are "not sufficiently concrete to establish standing" and their claims must be dismissed.  *See Nat'l Star Route Mail Contractors Ass'n*, 223 F. Supp. 3d at 29; *Sys. Council EM-3*, 972 F. Supp. at 39.

> ## 2.   *Plaintiffs' ERISA Claims Based On The Whole-Person Evaluation Process Are Also Not Ripe For Adjudication.*

In addition to lacking standing to assert their claims, Plaintiffs have failed to demonstrate that their claims in Counts I-IV based on the whole-person evaluation process are ripe. "'[Ripeness] is peculiarly a question of timing.'"  *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (citations omitted).  Prudentially, "[i]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Id.*; *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).  The test for ripeness requires a court to "'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Grand Lodge of Fraternal Order of Police*, 185 F. Supp. 2d at 17 (*citing Abbott Labs.*, 387 U.S. at 148).

"With respect to the 'fitness for judicial decision' prong, a claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed

may not occur at all.'" *See Grand Lodge*, 185 F. Supp. 2d at 17 (quoting *Thomas*, 473 U.S. at 580-81); *see also In re Aiken Cty.*, 645 F.3d 428, 434 (D.C. Cir. 2011) ("'But when an agency decision may never have its effects felt in a concrete way by the challenging parties, the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well'" (quoting *Devia v. NRC*, 492 F.3d 421, 424 (D.C. Cir. 2007))).  Such is the case here.  As described above, Plaintiffs' benefits have not yet been terminated based on the whole-person evaluation standard and they may never be terminated—that decision depends on a determination by the Disability Board at some point after April 1, 2024.  Indeed, "deferring consideration might eliminate the need for review altogether" if the Disability Board were to conclude that Plaintiffs are still eligible for benefits under the new standard.  *See Nat'l Star Route Mail Contractors Ass'n*, 223 F. Supp. 3d at 28.  Plaintiffs' claims accordingly are not fit for judicial decision.  *See In re Aiken Cty.*, 645 F.3d at 434-36, 438 (dismissing on ripeness grounds petitioners' claims based on fear that the Department of Energy would withdraw their license application and prevent construction of a repository because the claims depended on two ongoing administrative procedures that could moot the claim entirely); *Sys. Council EM-3*, 972 F. Supp. at 39-40 (concluding that plaintiffs' claims were not "prudentially ripe for review" because plaintiffs had not yet "ceased to receive benefits" and there was "uncertainty" as to whether the benefits would actually be terminated).

Nor can Plaintiffs demonstrate any hardship if the Court withholds consideration of their claims based on the whole-person evaluation process.  "Considerations of hardship that might result from delaying review 'will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.'" *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 389 (D.C. Cir. 2012) (citation omitted).  Moreover, "an abstract harm is not sufficient; there must be an

17

immediate harm with a 'direct effect on the day-to-day business of the plaintiffs.'"  *Grand Lodge*, 185 F. Supp. 2d at 17-18 (internal citations omitted).  Here, there is none.

Thus, "in light of the conjectural nature of the [Plaintiffs'] future injuries," Plaintiffs cannot demonstrate that their claims are ripe, providing another basis to dismiss Plaintiffs' claims for lack of subject matter jurisdiction.  *See id.* at 18; *Sys. Council EM-3*, 972 F. Supp. at 40.

## B.    Plaintiffs Fail To State Any Claims For Relief Against NFLMC.

Putting aside whether Plaintiffs have standing to assert the above-mentioned claims, the Complaint independently fails to state a single claim for relief against NFLMC.  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Anderson v. Holder*, 691 F. Supp. 2d 57, 61 (D.D.C. 2010), *aff'd*, 647 F.3d 1165 (D.C. Cir. 2011).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Additionally, the Court "need not 'accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.'"  *Anderson v. Holder*, 691 F. Supp. 2d at 61 (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  "Nor must [a] court accept legal conclusions cast in the form of factual allegations."  *Id.*  In ruling on a Rule 12(b)(6) motion to dismiss in an ERISA or LMRA action, "the court 'is not confined to the allegations in the complaint, but may review documents referred to in the complaint and relied on by the plaintiff.'"  *Wilcox*, 2019 WL 132281, at *7 (citation omitted); *Cefarrati*, 75 F. Supp. 3d at 61 n.1.  Where the relevant documents clearly demonstrate that a claim fails as a matter of law, the claim must be dismissed.  *Wilcox*, 2019 WL 132281, at *10; *Cefarrati*, 75 F. Supp. 3d at

69-70.  In this case, Plaintiffs have not pled sufficient facts to state plausible claims under ERISA or under the LMRA.

       **1.**       ***Plaintiffs Fail To State An ERISA Claim In Counts I Through IV Of The Complaint Because The Retirement Plan Did Not Change And The Plain Language Of The CBA and Disability Plan Are Clear That Disability Plan Benefits Are Not For Life.***

       Each of Plaintiffs' benefit claims are based upon the theory that the implementation of a Social Security offset and the change to a whole-person evaluation process improperly decrease their benefits under the Retirement and Disability Plans, and therefore violate ERISA.  Compl. ¶¶ 103-34.  These claims fail as to the *Retirement Plan* because the 2020 CBA did not make any amendments to disability benefits under that Plan.  *See generally* Ex. D, 2020 CBA, art. 53 & 60; *see, e.g.*, *Border v. Nat'l Real Estate Advisors, LLC*, No. 19-974, 2020 WL 1536187, at *2 (D.D.C. Mar. 31, 2020) (courts may dismiss claims on motion to dismiss where plain language of governing documents demonstrate that plaintiff's claims fail as a matter of law).  And Plaintiffs' claims fail to the extent they are based on T&P benefits provided under the *Disability Plan*, because both ERISA and the Plan documents permit the NFLMC and NFLPA to amend these benefits.

       **a.**       ***The Disability Plan Specifically Limits the Duration of Disability Benefits and Authorizes the NFLMC and NFLPA to Amend Them.***

       As Plaintiffs themselves acknowledge, the Disability Plan is a "welfare" plan.  *See* Compl. ¶ 20.  It accordingly is not subject to ERISA's anti-cutback rule, which only applies to pension plans.  *See* ERISA §§ 3(2), 201(a)(1); 29 U.S.C. §§ 1002(1), 1051(a)(1); *see also, e.g.*, *Robinson v. Sheet Metal Workers' Nat'l Pension Fund*, 515 F.3d 93, 98 (2d Cir. 2008) (affirming district court's rejection of anti-cutback claim because plan was a welfare benefit plan, not a pension plan).  Unlike pension plans, "employers have large leeway to design…welfare plans as

they see fit," and they are "generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003); *Curtiss-Wright Corp.*, 514 U.S. at 78.  Accordingly, the only way Plaintiffs' claims survive is if the Disability Plan intended to vest the players with lifetime benefits.  *See Tackett*, 574 U.S. at 435.  It did not.

In order to make this determination, the Court must apply "ordinary principles of contract law" to interpret the 2011 CBA and the 2019 Disability Plan Document.  *See id.*; *see also Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 373 (D.C. Cir. 2017).  Enforcing contract provisions as written is especially appropriate when enforcing an ERISA welfare benefits plan because the "focus on the written terms of the plan is the linchpin of a 'system that is not so complex that administrative costs, or litigation expense, unduly discourage employers from offering [welfare benefit] plans in the first place.'"  *Heimeshoff v. Hartford Life & Accident Ins., Co.*, 571 U.S. 99, 108 (2013) (citation omitted).  With respect to retiree welfare benefits specifically, the United States Supreme Court has made clear that a court should not infer an employer's commitment to vest such benefits—any promise for lifetime retiree benefits must be explicit.  *Tackett*, 574 U.S. at 442; *Reese*, 138 S. Ct. at 766.  This is in line with traditional contract principles, which hold that promises for life are discouraged, and the terms under a collective bargaining agreement end at the duration of the agreement.  *Tackett*, 574 U.S. at 438-39; *Reese*, 138 S. Ct. at 763-64.

Here, the plain language of the 2011 CBA and the 2019 Disability Plan Document are explicit that the Disability Plan benefits are not for life and last only as long as the 2011 CBA is in effect.  Article 61 of 2011 CBA provides that, except for the disability benefit previously provided under the Retirement Plan, the Disability Plan shall continue only for the duration of

the CBA itself.  *See* Ex. C, 2011 CBA, Art. 61, § 1 ("[T]his new Disability Plan will be

continued and maintained in full force and effect *during the term of this Agreement*") (emphasis

added).[8]  Additionally, Article 10.1 of the Disability Plan expressly permits the NFLPA and

NFLMC to amend the Disability Plan while there is a CBA in effect.[9]  Ex. B, 2019 Disability

Plan, art. 10.1.  If no CBA is in effect, the terms of the Disability Plan permit the Disability

Board to amend or terminate the Plan.  *Id.*  In short, the language of both the 2011 CBA and the

Disability Plan itself make clear that most of the benefits provided under the Plan are of a limited

duration, and the benefits may be amended by the parties at any time.  Ex. C, 2011 CBA, art. 61,

§ 1; Ex. B, 2019 Disability Plan, art. 10.1.

It is well-established that a beneficiary of a welfare plan cannot make a claim for vested,

lifetime benefits where there is either a durational clause or an express reservation of rights in the

plan documents allowing an employer to modify or terminate the plan.  *See, e.g.*, *Reese*, 138 S.

Ct. at 766 (dismissing claim that benefits vested for life because health benefits plan ran

concurrently with CBA and CBA expired in May 2004); *Blankenship v. Dominion Energy

Transmission, Inc.*, 818 F. App'x 121, 124-25 (3d Cir. 2020) (dismissing claims for vested

lifetime benefits in part because durational clause stated that the medical plan expired when the

CBA expired); *Abernethy v. EmblemHealth, Inc.*, 790 F. App'x 250, 254 (2d Cir. 2019)

("Because the employment agreements unambiguously reserve to EmblemHealth the right to

amend or terminate the retiree health plan at issue, the employment agreements cannot

---

[8] As stated above, Article 3 Players under the Disability Plan continue to receive $4,000 a
month after expiration of the CBA since that is the amount that would have been provided under
the Retirement Plan but for the 2011 CBA amendments, and Article 4 Players would continue to
receive $4,000 a month from the Retirement Plan.

[9] The only limitation on the parties' ability to amend the Disability Plan is that no
amendment may allow plan assets to revert to the NFL, the Clubs, or the NFLPA, but there is no
such reversion here.  Ex. B, 2019 Disability Plan, art. 10.1.

reasonably be interpreted as promising to vest retiree health benefits."); *see also Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 804 (8th Cir. 2014) ("It is well settled that a 'clause expressly limiting the duration of the retirement health benefits ... to the duration of the Master Agreement ... [is] inconsistent with an intent to vest health benefits for life.'" (citations omitted)). Here, both a durational clause and an express reservation of rights are present.

> **b.    Plaintiffs Are Not Entitled to "Lifetime Benefits" When the Plan Includes Durational and Reservation of Rights Clauses.**

Plaintiffs attempt to avoid the consequences of the Disability Plan's durational and reservation-of-rights clauses by ignoring them—they omit the durational clause in the 2011 CBA and claim that "[t]here is no reservation of rights clause in the Disability Plan by which the Disability Board is able to unilaterally amend the Disability Plan."  *See* Compl. ¶ 34.  But as discussed above, the agreement to provide benefits under the Disability Plan in the 2011 CBA is subject to an express durational clause, and Article 10.1 of the Disability Plan specifically permits the NFLPA and NFLMC to amend the Disability Plan.  Ex. B, 2019 Disability Plan, art. 10.1.  Plaintiffs may not plead around this express language with conclusory assertions to the contrary.  *See Anderson*, 691 F. Supp. 2d at 61 (district court need not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint" when deciding motion to dismiss (citation omitted)).

Nor do any of Plaintiffs' Plan-based arguments have merit.  Plaintiffs allege Article 3.11 of the Disability Plan constitutes a promise of lifetime, vested benefits because it states that "[a]ll benefits provided by this Article, except under Section 3.7, will be payable until the earliest of (a) the cessation of the Player's total and permanent disability, (b) the termination of his benefits under Section 3.8, or (c) the Player's death."  Compl. ¶ 33. But it is well-established that this sort of "lifetime language" does not supersede an express reservation of rights and durational

clause or make a plan reasonably susceptible to an interpretation of vested lifetime benefits. *See IUE-CWA v. Gen. Elec. Co.*, 745 F. App'x 583, 594, 599 (6th Cir. 2018) (affirming dismissal of ERISA claims because a "reservation-of-rights clause means that any alleged lifetime promise in a benefit plan is actually 'a qualified one . . . benefits were for life provided the company chose not to terminate the plans, pursuant to clauses that preserved the company's right to terminate the plan'" (citation omitted)); *Coriale v. Xerox Corp.*, 490 F. App'x 387, 389 (2d Cir. 2012) (holding that any alleged "lifetime" promise was unenforceable "in light of a reservation-of-rights clause . . . that clearly reserved to Xerox the right 'to amend, suspend or terminate the Plan . . . at any time and for any reason'" (citation omitted)); *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703-04 (7th Cir. 2003) (employer reserved right to modify, amend, suspend, or terminate the plan, and therefore welfare benefits were not vested despite language that "health coverage is continued until . . . death"); *In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 58 F.3d 896, 905-06 (3d Cir. 1995) (affirming district court's conclusion that the fact employer used terms such as "lifetime" or "for life" to describe medical benefits, while reserving the right to amend those benefits, did not demonstrate an intent to vest).[10]  Article 3.11 of the Disability Plan must be read in conjunction with Articles 3.6 and 4.2 (substantially reduce or eliminate T&P benefits at end of CBA), Article 10.1 (allowing for plan amendment and termination of Disability Plan),

---

[10] *See also Robinson*, 515 F.3d at 99 (holding that "the 'lifetime' language does not give [a]ppellants a contractual and absolute right to continue receiving [benefits] for their lives" because it must be read in the context of the amendment provision); *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 98 (2d Cir. 2001) (same); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1512 n.2 (10th Cir. 1996) (noting "the weight of case authority supports the *Unisys* approach" and citing the Fourth, Eighth, and Eleventh circuits), *abrogated on other grounds by Tomlinson v. El Paso Corp.*, 653 F.3d 1281 (10th Cir. 2011); *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 855-56 (4th Cir. 1994) (no "vested right to receive lifetime benefits after retirement" where company "reserv[ed] the right to modify plan benefits"); *Alday v. Container Corp. of Am.*, 906 F.2d 660, 665 (11th Cir. 1990) (SPD indicated that retiree health insurance could be terminated or modified).

and Article 61 of the 2011 CBA, all of which make clear that the promise of Disability Plan benefits until "the Player's death" is a qualified one.  *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (A contract "should be read to give effect to all its provisions and to render them consistent with each other").  This is particularly so when traditional contract principles discourage reading welfare plans to promise benefits for life, and presume that benefits provided under a collective bargaining agreement expire at the end at the agreement.  *Tackett*, 574 U.S. at 438-39; *Reese*, 138 S. Ct. at 763-64.

Indeed, the NFLMC and the NFLPA knew how to explicitly vest benefits when they intended to do so.  In direct contrast to Article 10 of the Disability Plan, which is silent as to vesting and allows the NFLMC and the NFLPA to amend the plan at any time, Article 10 of the Retirement Plan states that the Retirement Board may not "[r]educe, as a direct result of an amendment, the value of any benefit already earned and otherwise payable under the Plan" and further provides that "[n]o amendment of the Plan may operate to deprive a Player or beneficiary of any rights or benefits irrevocably vested in him under the Plan."  *Compare* Ex. B, 2019 Disability Plan, art. 10, *with* Ex. A, 2014 Retirement Plan Document, arts. 10.1(c), 10.3.  Because a contract "should be read to give effect to all its provisions and to render them consistent with each other," *Mastrobuono*, 514 U.S. at 63, the Court should assume that the explicit guarantee of lifetime benefits in some of the benefit plan documents and not others means something.  *See Reese*, 138 S. Ct. at 766 ("If the parties meant to vest health care benefits for life, they easily could have said so in the text. But they did not"); *Blankenship*, 818 F. App'x at 124-25 (affirming dismissal of claims of vested lifetime benefits in part because other welfare benefits plans included vesting clauses and the Medical Plan did not); *IUE-CWA*, 745 F. App'x at 595-96 (same).

Nor should the Court give any weight to Plaintiffs' attempt to override the plain language of the Plan with extrinsic evidence.  In particular, Plaintiffs cite language from income verification statements to support their claim that the disability benefits are vested for life.  *See* Compl. ¶¶ 35-38.  However, these allegations are irrelevant.  The income verification statements are extrinsic evidence and can only be considered if the language in the collective bargaining agreement and plan documents is ambiguous.  *See Am. Postal Workers Union v. U.S. Postal Serv.*, 940 F.2d 704, 707-08 (D.C. Cir. 1991) ("In the absence of ambiguity in the collective bargaining agreement . . . we have no cause to examine extrinsic evidence of the parties' intent.").  As demonstrated above, the express plan benefit provisions, reservation of rights, and durational clauses are clear—the Disability Plan is subject to amendment and the $11,250 Inactive A benefit lasted only as long as the 2011 CBA is in place.

Finally, the fact that some of the putative Plaintiffs are in "paid status" as alleged in Counts III and IV of the Complaint is also irrelevant.  *See* Compl. ¶¶ 119-34.  These individuals will continue to receive the $4,000 benefit due to them based on the terms of the Retirement Plan.  As to the remaining benefits provided for under the terms of the Disability Plan, the analysis for these claims is the same as above—the only issue is whether the 2011 CBA and 2019 Disability Plan Document allow for the benefits to be amended or terminated.  *See, e.g.*, *Tackett*, 574 U.S. at 435.  It is indisputable that they do.  Nothing in the documents cited by Plaintiffs suggest that classifying benefits in paid status different from benefits not yet in paid status somehow overcomes this express language.  *See generally* Ex. B, 2019 Disability Plan, arts. 4.8, 10; Ex. C, 2011 CBA, art. 61.

Accordingly, for all of the foregoing reasons, Plaintiffs' claims in Counts I-IV of the Complaint must be dismissed.

### 2.     *Plaintiffs Fail To State A Section 301 LMRA Claim In Count VI Of The Complaint*

Plaintiffs' claim under Section 301 of the LMRA also fails.  Plaintiffs do not (and cannot) allege that the NFLMC breached any provision in the CBA by agreeing to the revisions in Article 60.  The CBA contains no requirement that these revisions must be ratified by the players.  Nor does it eliminate Plaintiffs' duty to exhaust their remedies under the NFLPA's internal union remedies.  Because Plaintiffs' claim is nothing more than an attempt to invalidate a provision negotiated by the NFLPA that they disagree with, it is foreclosed as a matter of law.

### a.     *Plaintiffs Do Not Allege That The NFLMC Breached Any Labor Agreement.*

To state a Section 301 claim against the NFLMC, Plaintiffs must plead that "the employer breached the [collective bargaining agreement]."  *Cephas v. MVM, Inc.*, 520 F.3d 480, 485 (D.C. Cir. 2008); *see also* Compl. ¶ 145 ("§ 301 of the LMRA provides for relief for breach of a collective bargaining agreement.").  Plaintiffs do not even attempt to specify how any of the NFLMC's alleged conduct breached the CBA.  That alone dooms Plaintiffs' claim.  *See, e.g.*, *Cephas*, 520 F.3d at 485; *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 787 (6th Cir. 2007) (affirming dismissal "because there is a complete absence of factual allegations to support a claim for breach of contract"); *Llanos v. Brookdale Univ. Hosp. & Med. Ctr.*, No. 10-CV-1726 (DLI)(RML), 2011 WL 809615, at *4 (E.D.N.Y. Mar. 2, 2011) ("[T]he claim for breach of the CBA fails because the complaint fails to allege what provisions [were] violated."); *Young v. Int'l Union, UAW*, 148 F. Supp. 3d 602, 616 (E.D. Mich. 2015) (dismissing Section 301 claims where plaintiffs "do not identify specific contract provisions that support their assertions of how Defendants breached the CBA and other agreements."), *aff'd*, 686 F. App'x 304 (6th Cir. 2017).

Plaintiffs' sole allegation in support of its LMRA claim is that the NFLPA and NFLMC "changed Article 60, Section 4 of the 2020 CBA after it had already been voted upon by adding a

never-before-seen provision." Compl. ¶ 145.  But nothing in the CBA prohibits the parties from

agreeing to revise provisions in the CBA.  To the contrary, as Plaintiffs' themselves

acknowledge, Article 67, Section 9 of the 2020 CBA expressly contemplates that the NFLPA

and NFLMC can amend the CBA "by a written agreement signed by authorized representatives

of the *parties*."  Compl. ¶ 56 (emphasis added); Ex. D, 2020 CBA, art. 67, § 9.  By Plaintiffs'

own admission, such an agreement was plainly reached here.  Compl. ¶ 51.

Plaintiffs attempt to sidestep the LMRA requirements by asserting that the parties did not

"follow[] procedures for modifications of CBAs" under Section 6.05 of the NFLPA Constitution.

Compl. ¶ 52; *see also id.* ¶¶ 56-59, 148-51.  But the NFLMC is not a party to the NFLPA

Constitution, and only a binding contract between the NFLMC and a "labor organization" can

form the basis of a claim under Section 301.[11]  *See* 29 U.S.C. § 185(a) (Section 301 confers

federal jurisdiction over "contracts between an employer and a labor organization…or

between…labor organizations").  "The balance federal statutes strike between employer and

union relations in the collective-bargaining arena is carefully calibrated," and thus Section 301 is

narrowly confined as "a grant of jurisdiction only to enforce contracts."  *Granite Rock Co. v.*

*Int'l Bhd. of Teamsters*, 561 U.S. 287, 311 (2010) (rejecting argument to expand Section 301 to

reach "tort cause[s] of action").  Plaintiffs have failed to plead any facts demonstrating that the

NFLMC has breached a collective bargaining agreement; they cannot bootstrap a LMRA claim

against the NFLMC by arguing their collective bargaining agent breached its own internal

procedures.  Indeed, although under "limited circumstances," Section 301 establishes a cause of

action for breach of the duty of fair representation, *see Price v. Unite Here Local 25*, 883 F.

---

[11] "[L]abor organization" is statutorily defined as "any organization . . . in which employees
participate and which exists for the purpose, in whole or in part, of dealing with employers
concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions
of work." 29 U.S.C. § 152(5).

Supp. 2d 146, 154 (D.D.C. 2012), no such claim can be made here because, as Plaintiffs

concede, "the union owes no duty of fair representation to retired players."  Compl. ¶ 147; *see*

*Allied Chem. & Alkali Workers, Local I v. Pittsburgh Plate & Glass Co*., 404 U.S. 157, 181 n.20

(1971) (holding union need not "affirmatively . . . represent [retirees] or . . . take into account

their interests in making bona fide economic decisions on behalf of those whom it does

represent"); *Thomas v. United Mine Workers of Am*., 422 F. Supp. 1111, 1118 (D.D.C. 1976)

("[T]here is no reason to imply a federal duty of fair representation with regard to retired

persons.").

      Plaintiffs' theory also fails because it contradicts the D.C. Circuit's recognition that "[t]he

[LMRA] does not require a union to accord its rank-and-file members the right to ratify a

collective-bargaining contract which it has negotiated."  *Int'l Bhd. of Teamsters, Local No. 310*

*v. NLRB*, 587 F.2d 1176, 1182 (D.C. Cir. 1978); *see also Ackley v. W. Conference of Teamsters*,

958 F.2d 1463, 1477 (9th Cir. 1992) ("Time is of the essence during contract negotiation and

ratification," and "there may not be an opportunity for full argument on each of the provisions of

the contract.").  "The law does not require that a collective bargaining agreement be submitted to

. . . the union membership for authorization, negotiation or ratification, in the absence of an

*express requirement* in the agreement."  *Confederated Indep. Unions v. Rockwell-Standard Co.*,

465 F.2d 1137, 1140 (3d Cir. 1972) (emphasis added).  Thus, a union member claiming the right

to ratify a CBA must point to an "unambiguous contractual entitlement" in the CBA itself.

*Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 129 (2d Cir. 1998).  Plaintiffs point to no

such entitlement here.

      In reality, Plaintiffs claim amounts to nothing more than their dissatisfaction with the deal

the NFLPA negotiated and purported representations by the NFLPA.  However, Section 301

does not provide a cause of action to invalidate "a contract with which [Plaintiffs] are dissatisfied." *Am. Postal Workers Union Local v. Am. Postal Workers Union*, 665 F.2d 1096, 1109 (D.C. Cir. 1981); *see also Ackley*, 958 F.3d at 1473 ("statements made by union representatives during the contract ratification process furnish insufficient justification for invalidating a collective bargaining agreement.").  When the alleged harm stems from a union's "negotiation of the collective bargaining agreement—not by the employer's breach of a provision of it—the plaintiff may not maintain a cause of action under § 301." *Abdelmesih v. Waldorf-Astoria*, No. 93 CIV 4921 CSH, 1998 WL 740940, at *5 (S.D.N.Y. Oct. 21, 1998); *see Copeland v. Penske Logistics LLC*, 675 F.3d 1040, 1044 (7th Cir. 2012) ("[A] contention that a union did not bargain hard enough . . . is not a suit for a violation of the CBA and so is outside § 301."); *Newspaper Guild of Salem v. Ottaway Newspapers, Inc.*, 79 F.3d 1273, 1283-85 (1st Cir. 1996) (Section 301 inapplicable to claims premised on employer's "conduct during negotiations" rather than "breach of the collective bargaining agreement").  Because Count VI is based upon Plaintiffs' dissatisfaction with the NFLPA's negotiation of amendments to the Disability Plan, and does not identify any manner in which the NFLMC breached the CBA, the claim fails as a matter of law and must be dismissed.[12]

---

[12] To the extent Plaintiffs' LMRA claim is somehow premised on a purported violation of the CBA, it also must be dismissed because Plaintiffs have failed to exhaust their remedies under the CBA's mandatory grievance procedures.  The CBA requires all disputes involving "the interpretation of, application of, or compliance with, any provision of" the CBA be resolved exclusively in accordance with agreed-to arbitration.  *See, e.g.*, Ex. C, 2011 CBA, art. 43, § 1; Ex. D, 2020 CBA, art. 43, § 1.  Federal policy "favors the peaceful resolution of labor disputes through arbitration."  *Prof'l Emps. Int'l Union, Local 2 v. Wash. Metro. Area Transit Auth.*, 724 F.2d 133, 137 (D.C. Cir. 1983).  Where parties have agreed to dispute resolution in accordance with procedures in a CBA—as here—the LMRA precludes parties from suing before exhausting those procedures, *see Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 219-21 (1985), and a court must dismiss claims where a party fails to exhaust mandatory grievance procedures unless it can be said "with positive assurance" that the arbitration provisions are "not susceptible of an interpretation that covers the asserted dispute."  *AT & T Techs., Inc. v. Commc'ns Workers of*

> b.     **Plaintiffs Fail To Adequately Allege That They Exhausted Their Internal Union Remedies.**

Finally, although the Court need not reach this issue given Plaintiffs' failure to plead that the NFLMC breached a labor contract, Count VI also must be dismissed because Plaintiffs failed to plead exhaustion of internal union remedies.  "[I]nexcusable failure to exhaust union appeals bars suit 'not only against the union, but also against the employer.'"  *Wagner v. Gen. Dynamics*, 905 F.2d 126, 127 (6th Cir. 1990) (per curiam) (quoting *Monroe v. Int'l Union, UAW*, 723 F.2d 22, 24 (6th Cir. 1983)).  Courts dismiss complaints where, as here, plaintiffs neither allege that they attempted to exhaust these procedures, nor pled "facts to show that the failure to exhaust should be excused."  *Young*, 148 F. Supp. 3d at 615; *see Spicer v. Ford Motor Co*., 491 F. App'x 543, 546 (6th Cir. 2012) ("conclusory allegations" cannot "excuse the requirement that [Plaintiffs] exhaust internal union remedies.").

Plaintiffs do not allege that they exhausted the NFLPA's internal procedures.  Instead, they contend that exhaustion is "not required" because they are "retired employees."  Compl. ¶ 147.  But courts routinely require retired employees to exhaust union remedies before filing Section 301 suits.  *See Wozniak v. Int'l Union, UAW*, 842 F.2d 633, 635 (2d Cir. 1988) (former employee required to fully exhaust Union grievance procedures prior to bringing federal court action); *Schwarz v. UAW Union*, 837 F. Supp. 530, 534 (W.D.N.Y. 1993) (employee's retirement did not excuse her from exhausting union remedies).  And they similarly hold that a "plaintiff bears the burden of showing that exhaustion should be excused."  *Pearson v. UAW*, 694 F. App'x 401, 403 (6th Cir. 2017); *see Fulk v. United Transp. Union*, 108 F.3d 113, 118 (7th Cir. 1997) ("'In a case involving failure to exhaust, the plaintiff has the burden of alleging facts showing

---

*America*, 475 U.S. 643, 650 (1986).

that the intra-union procedures are inadequate'" (citation omitted)); *Chappell v. Comm'cns Workers of Am.*, 993 F.2d 1536 (Table), 1993 WL 185635, at \*2-3 (4th Cir. 1993) (affirming dismissal of Section 301 claim for failure to allege facts that plaintiff "exhaust[ed] the internal union appeals procedure").  "Because [Plaintiffs] ha[ve] not alleged . . . any circumstances that would excuse [them] from the exhaustion requirement," their LMRA claim "must be dismissed." *Mays v. N. Am. Truck Platforms Flint Assembly*, No. 94-75229, 1995 WL 871013, at \*2 (E.D. Mich. Sept. 20, 1995).

## IV.    CONCLUSION

For the reasons discussed above, the NFLMC respectfully requests that Counts I-IV and Count VI of the Complaint be dismissed with prejudice.

DATED: September 20, 2020

Respectfully submitted,

_____/s/ Stacey Eisenstein_____
Stacey R. Eisenstein (D.C. Bar No. 474699)
Nathan J. Oleson (D.C. Bar No. 468592)
Amanda S. McGinn (D.C. Bar No. 1049085)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, D.C. 20006
(202) 887-4000 (phone)
(202) 887-4288 (facsimile)
seisenstein@akingump.com
noleson@akingump.com
amcginn@akingump.com

ATTORNEYS FOR DEFENDANT NATIONAL
FOOTBALL LEAGUE MANAGEMENT COUNCIL