# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AVEION CASON and DONALD VINCENT MAJKOWSKI, in their individual capacity and on behalf of others similarly situated, )<br>)<br>)<br>)<br>)<br>) | |
| *Plaintiffs*, )<br>) | |
| v. ) | No. 1:20-cv-1875-TNM |
| ) | |
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, *et al*., )<br>)<br>) | |
| *Defendants*. )<br>) | |

## THE BOARD DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

DEFENDANTS RETIREMENT BOARD of the BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN ("Retirement Board") and DISABILITY BOARD of the NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN ("Disability Board"), collectively referred to here as the "Board Defendants," move to dismiss Plaintiffs' Class Action Complaint (ECF 1) pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    I.     A Brief History Of The Retirement Plan ................................................................4

    II.    A Brief History Of The Disability Plan .................................................................5

    III.   Funding And Duration Of Inactive A Benefits ....................................................5

          A.    Relevant terms of the Plan documents and summary plan descriptions .................5

          B.    Relevant terms of the 2011 Collective Bargaining Agreement .............................9

    IV.   The Amendments Anticipated By The March 2020 Collective Bargaining
          Agreement .........................................................................................................10

ARGUMENT & AUTHORITIES ................................................................................... 12

    I.     Plaintiffs Do Not Have Standing To Pursue Counts I Through IV Against The
          Board Defendants. .............................................................................................12

          A.    Plaintiffs must establish that they have suffered an injury-in-fact that is
                traceable to the Board Defendants. ........................................................12

          B.    Plaintiffs cannot trace any injury to the Board Defendants because the Plans
                have not been amended. ........................................................................13

          C.    Even if the Plans are amended, Plaintiffs still cannot trace any injury to the
                Retirement Board. .................................................................................14

          D.    Plaintiffs have not suffered an injury-in-fact because their claimed injuries
                are remote and speculative. ...................................................................14

    II.    Counts I Through IV Fail As A Matter Of Law For The Additional Reason That
          Disability Benefits Do Not Vest Under The Plans. ............................................15

    III.   Count V Fails As A Matter Of Law Because The Pleaded Facts Do Not Support
          A Plausible Breach-Of-Fiduciary-Duty Claim Against The Board Defendants ............20

CONCLUSION ............................................................................................................ 23

## **TABLE OF AUTHORITIES**

**Cases**

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ........................................................ 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................... 22

*Black & Decker Disab. Plan v. Nord*, 538 U.S. 822 (2003) ....................................... 16

*Blankenship v. Dominion Energy Transmission, Inc.*, __ F. App'x __, 2020 WL 3397740 (3d Cir. June 19, 2020) ................................................................................ 18

*Chiles v. Ceridian Corp.*, 95 F.3d 1505 (10th Cir. 1996) .......................................... 20

\*\**CNH Industrial N.V. v. Reese*, 138 S. Ct. 761 (2018).................................... 17, 18, 19

*Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995) ............................... 16, 19

*Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747 (D.C. Cir. 1990)........................ 21

*Haines v. Gen. Pension Plan of Int'l Union of Operating Engineers*, 965 F. Supp. 2d 119 (D.D.C. 2013).................................................................................................... 7

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99 (2013)............................... 13

*In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 58 F.3d 896 (3d Cir. 1995)............. 19, 20

*Int'l Union of United Auto., Aerospace & Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698 (7th Cir. 2003) .................................................. 19

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999)................................................................ 18

*IUE-CWA v. Gen. Elec. Co.*, 745 F. App'x 583 (6th Cir. 2018).................................. 19

*Keach v. U.S. Trust Co. N.A.*, 313 F. Supp. 2d 818 (C.D. Ill. 2004) .......................... 22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................... 12, 13

\*\**M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015) ......................... 16, 17, 18, 19

*Maryland v. U.S. Dep't of Educ.*, __ F. Supp. 3d __, 2020 WL 4039315 (D.D.C. July 17, 2020) ...................................................................................................................... 22

*Slate v. Pub. Def. Serv. for the D.C.*, 31 F. Supp. 3d 277 (D.D.C. 2014)....................... 3

*Soland v. George Washington Univ.*, 60 F. Supp. 3d 60 (D.D.C. 2014) ...................... 21

*\*\*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................................................. 12, 15

*Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215 (D.D.C. 2012)........................................ 7

## **Statutes**

29 U.S.C. § 1022(a) ........................................................................................................... 7

29 U.S.C. § 1104(a)(1)(A) ................................................................................................ 19

29 U.S.C. § 1104(a)(1)(B) ................................................................................................ 19

## **Regulations**

29 C.F.R. § 2520.102-3(l)................................................................................................. 7

## INTRODUCTION

This is a motion to dismiss all five claims stated against the Board Defendants.[1]

In Counts I through IV, Plaintiffs claim the disability benefits they receive from a set of collectively bargained pension and welfare benefit plans are "vested" for life and cannot be changed once "accepted."  These claims flatly contradict Supreme Court precedent emphasizing—twice within the last six years, no less—the "traditional principle" that welfare benefits, such as disability benefits, are ***not vested***, and they typically last only for the term of the collective bargaining agreement.  That "traditional principle" is dispositive here, where the history of bargaining between the NFL Players Association and the NFL Management Council and the underlying collective bargaining agreement(s) clearly express an intent to limit benefits; the plan documents do not say that disability benefits are vested, but instead expressly state that the bargaining parties can amend or terminate benefits; the summary plan descriptions highlight that disability benefits are not vested; and the bargaining parties have mutually agreed to the benefit changes challenged by Plaintiffs.  "'When the intent of the parties [to limit benefits] is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further.'"  *CNH Industrial N.V. v. Reese*, 138 S. Ct. 761, 766 (2018) (quoting *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 443 (2015) (Ginsburg, J., concurring)).  Plaintiffs' claim that their disability benefits are "vested" or otherwise unalterable has no basis in fact or law.

Counts I through IV also fail because Plaintiffs lack standing to pursue their claims against the Board Defendants.  Plaintiffs have not suffered an injury-in-fact traceable to the

---

[1] This motion provides a relatively abbreviated introduction to Plaintiffs' claims and the background of this case to avoid repeating ground already covered in Defendant NFL Management Council's and Defendant NFL Players Association's separate motions to dismiss.

Board Defendants because the NFL Players Association and the NFL Management Council have not amended the plan documents to incorporate any of the challenged modifications to the disability program proposed by the 2020 collective bargaining agreement.  In addition, Plaintiffs' speculation that the proposed changes may someday impact them does not constitute an injury-in-fact sufficient to establish constitutional standing.

In Count V, Plaintiffs claim the Board Defendants breached fiduciary duties of loyalty and prudence by failing to disclose the changes to the disability benefit program as they were being negotiated by the bargaining parties during the collective bargaining process in March 2020.  Count V and the factual allegations supporting it have nothing to do with the Board Defendants, however, and therefore Plaintiffs do not state a plausible breach-of-fiduciary-duty claim against the Board Defendants.  Even if Count V did implicate the Board Defendants, Plaintiffs do not have standing to bring the claim because an injury-in-fact does not exist.  The claim impermissibly turns on the intervening and superseding conduct of all of the active NFL players who voted to approve the 2020 collective bargaining agreement.

For these reasons, as more fully set out below, the Board Defendants respectfully ask that all claims against them be dismissed.[2]

## **BACKGROUND**

The Bert Bell/Pete Rozelle NFL Player Retirement Plan and the NFL Player Disability & Neurocognitive Benefit Plan (the "Retirement Plan" and "Disability Plan," respectively, and together the "Plans") are Taft-Hartley pension and welfare benefit plans established and maintained by a series of collective bargaining agreements ("CBAs") between the NFL

---

[2] This motion does not address Count VI of the Complaint, which is brought against the NFL Players Association and the NFL Management Council, exclusively.

Management Council and the NFL Players Association.  4/1/14 Ret. Plan Doc. ("RPD," Ex. A) at 1; 4/1/19 Disab. Plan Doc. ("DPD," Ex. B) at 1.[3]

The Board Defendants are the administrators and "named fiduciaries," as defined by ERISA, of the Plans.  Compl. ¶¶ 14, 16.  Each Board has six voting members:  three individuals appointed by the Management Council, and three individuals appointed by the Players Association.  Compl. ¶¶ 12-13; RPD § 8.1; DPD § 9.1.  The Board Defendants are "responsible for implementing and administering the Plan[s], subject to the terms of the Plan[s] and Trust[s]" that fund them.  RPD § 8.2; DPD § 9.2.  Together, the Plans provide a range of benefits to eligible participants ("Players"), including the "Inactive A" total and permanent disability ("T&P") benefit at issue in this case.

The rules surrounding T&P benefits are numerous and complex.  At the risk of oversimplification, a Player will receive T&P benefits under the Plans' "General Standard" if the Retirement Board or the Disability Board, as the case may be, determines that he is "unable to engage in any occupation or employment."  RPD § 5.2(a); DPD § 3.1(c)-(d).  To help make this determination, the Plans typically refer Players for evaluations with one or more "Neutral Physicians" in various medical specialties, including orthopedics, neurology, neuropsychology, and psychiatry.  *See* RPD § 5.2(c) (describing the medical evaluation process); DPD § 3.3(a)

---

[3] Plaintiffs reference the terms of the Plans throughout the Complaint, and allege that the April 1, 2014 Retirement Plan document and the April 1, 2019 Disability Plan document are the "relevant" plan documents.  Compl. ¶¶ 19-20.  In fact, the Retirement Plan was amended and restated as of April 1, 2017.  The 2014 version cited by Plaintiffs is the same in all material respects as the 2017 version, however, and therefore the Board Defendants cite the 2014 version of the Retirement Plan referenced in the Complaint.  The Court may consider these documents in connection with the Board Defendants' motion to dismiss.  *See Slate v. Pub. Def. Serv. for the D.C.*, 31 F. Supp. 3d 277, 287 (D.D.C. 2014) ("Courts have considered documents attached to motions to dismiss and opposition papers without converting the motion into one for summary judgment when the documents were referenced in the Complaint and were central to the plaintiff's claims.").

(same); RPD § 11.3 (describing the role of Neutral Physicians); DPD § 12.3 (same).  The Neutral

Physicians personally evaluate Players and provide reports "on [their] condition as necessary for

the [Boards] to make an adequate determination as to [each] Player's physical or mental

condition."  RPD § 11.3(b); DPD § 12.3(b).  Alternatively, under the Plan's "Social Security

Standard," a Player will be deemed to be totally and permanently disabled under the Plans, and

can skip the Neutral Physician evaluation process altogether, if he shows that he already receives

disability benefits from the Social Security Administration.  RPD § 5.2(b); DPD § 3.2; Compl. ¶¶

23, 29.

      The Inactive A benefit is one of four categories of T&P benefits available to Players who

qualify for T&P benefits under the General Standard and the Social Security Standard.  The

minimum Inactive A benefit is currently $11,250 per month, Compl. ¶¶ 30-31, and most Players

awarded Inactive A benefits receive this amount, free from any third-party offsets.  The only

mandatory offset is for "any disability benefits provided by an employer other than the League"

or an NFL Club.  RPD § 5.5; DPD § 3.6.

## I.     A Brief History Of The Retirement Plan

      The origins of the Retirement Plan date to 1962, when collective bargaining between the

Management Council and the Players Association produced the Bert Bell NFL Player Retirement

Plan ("Bert Bell Plan").  RPD at 1.  The Bert Bell Plan and the benefits it provided evolved over

a series of subsequent collective-bargaining sessions in 1970, 1977, and 1982.  *Id*.  In 1989, the

Pete Rozelle NFL Player Retirement Plan ("Pete Rozelle Plan") was adopted to provide

additional retirement benefits.  *Id*.

      In 1993, the Management Council and the Players Association agreed to merge the Bert

Bell Plan and the Pete Rozelle Plan to form what is known today as the Bert Bell/Pete Rozelle

NFL Player Retirement Plan.  *Id*.  The Retirement Plan has been amended numerous times since

1993, and until recently was maintained pursuant to the August 4, 2011 CBA executed between

the Management Council and the Players Association.  *Id*.  *See also* 8/4/11 CBA (Ex. C) Art. 53

§ 1 ("The Bert Bell/Pete Rozelle NFL Player Retirement Plan… will be continued and

maintained in full force and effect during the term of this Agreement….  The Retirement Plan,

and all past and future amendments thereto as adopted in accordance with the terms of that Plan,

are incorporated by reference and made a part of this Agreement.…").

## II.      A Brief History Of The Disability Plan

The 1993 CBA that led to the formation of the Retirement Plan also created the NFL

Player Supplemental Disability Plan ("Supplemental Disability Plan").  DPD at 1.  As its name

suggests, the Supplemental Disability Plan was established to provide certain Players with

supplemental disability benefits that the Retirement Plan could not provide under federal law.

The Supplemental Disability Plan was amended a number of times and was eventually renamed

the NFL Player Disability & Neurocognitive Benefit Plan.  *Id*.  Like the Retirement Plan, the

Disability Plan was until recently maintained pursuant to the August 4, 2011 CBA.  *See* 8/4/11

CBA Art. 61 § 1 (terminating the Supplemental Disability Plan, and establishing in its place the

Disability Plan to "be continued and maintained in full force and effect during the term of this

Agreement").

## III.     Funding And Duration Of Inactive A Benefits

### A.      Relevant terms of the Plan documents and summary plan descriptions

The Plans work in tandem to provide T&P benefits to a subset of Players.  The

Retirement Plan governed all applications for T&P benefits received prior to January 1, 2015.

RPD at 1; DPD at 1.  If a Player applied before that date and was awarded Inactive A benefits, as

relevant here, the Retirement Plan funded a portion of the benefit, and the Disability Plan paid

the rest.  Compl. ¶ 31.  Players like Plaintiff Vincent Majkowski, who were awarded Inactive A

5

benefits prior to January 1, 2015, therefore receive a portion of their benefit from the Retirement Plan, and a portion of their benefit from the Disability Plan.

Effective January 1, 2015, T&P applications and awards shifted from the Retirement Plan to the Disability Plan exclusively.  RPD at 1; DPD at 1.  Players like Plaintiff Aveion Cason, who applied for benefits after that date, did so under the Disability Plan, and they receive T&P benefits from the Disability Plan alone.  Compl. ¶ 30.

Regardless of whether the benefit is paid by the Retirement Plan, the Disability Plan, or both, **the Inactive A benefit for all Players was set to reduce from $11,250 per month to $4,000 per month on April 1, 2021**.

Table 1 below illustrates these concepts as they apply to Plaintiffs specifically.

**Table 1**

|  | Date of Application & Award | Relevant Plan Documents & Provisions | Current Funding Source & Amount for Inactive A T&P Benefits | Funding Source & Amount Effective 4/1/21 |
|---|---|---|---|---|
| Plaintiff Majkowski | Before 1/1/15 | RPD Art. 5 (providing disability standards and amount of base benefit)<br><br>DPD Art. 4 (providing supplemental benefit) | Retirement Plan — $4,000 per month (RPD § 5.5(b))<br><br>Disability Plan — $7,250 per month (DPD § 4.2) | Retirement Plan — $4,000 per month (RPD § 5.5(b))<br><br>Disability Plan — $0 (DPD § 4.2) |
| Plaintiff Cason | After 1/1/15 | DPD Art. 3 (providing disability standards and amount of benefit) | Disability Plan — $11,250 per month (DPD § 3.6(b)) | Disability Plan — $4,000 per month (DPD § 3.6(b)) |

The Plans have substantively identical duration-of-benefit provisions, as alluded to in the Complaint.  *See, e.g.*, Compl. ¶¶ 25, 33 (citing duration-of-benefit provisions and alleging (incorrectly) that the disability benefits are vested "for life").  The provisions state that T&P

benefits "will be payable until the earlier of (a) the cessation of the Player's total and permanent disability, (b) the termination of his benefits under [a separate provision that requires Players to attend periodic evaluations and submit tax and Social Security records], or (c) the Player's death."  RPD § 5.9; DPD § 3.11.

Neither Plan states that T&P benefits are "vested" in any amount or that the terms under which they are provided are unalterable.  Putting aside the automatic reduction that would take place on April 1, 2021 (noted above), both Plans contain reservation-of-rights language that allows the bargaining parties to amend or terminate the Plans and the disability benefits they provide.  The Retirement Plan says the Management Council and the Players Association "when acting jointly, may amend th[e] Plan in any respect and may terminate th[e] Plan."  RPD § 10.2. The Disability Plan similarly states, in pertinent part, that it may "be amended or terminated by joint action of the NFLPA and the Management Council while there is a Collective Bargaining Agreement in effect."  DPD § 10.1.

The Summary Plan Descriptions ("SPDs") for both Plans highlight the bargaining parties' ability to modify or amend the Plans, as depicted below.[4]

---

[4] ERISA mandates that SPDs be provided to plan participants and beneficiaries, that they "be written in a manner calculated to be understood by the average plan participant," and that they "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  29 U.S.C. § 1022(a).  Federal regulations require SPDs to "include a summary of any plan provisions governing the authority of the plan sponsors or others to terminate the plan or amend or eliminate benefits under the plan and the circumstances, if any, under which the plan may be terminated or benefits may be amended or eliminated…."  29 C.F.R. § 2520.102-3(l).  The Court may therefore consider the SPDs in connection with this motion to dismiss because they too are central to Plaintiffs' claims. *See Haines v. Gen. Pension Plan of Int'l Union of Operating Engineers*, 965 F. Supp. 2d 119, 123 (D.D.C. 2013) ("[W]hen a complaint centers on plan benefits, the key plan documents are properly considered without converting the motion to dismiss into one for summary judgment."); *Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 218 (D.D.C. 2012) (finding that summary plan description was properly considered in connection with a plaintiff's claim for benefits).

| **Retirement Plan** | **Disability Plan** |
|---|---|
| **Plan amendment or termination**<br><br>The Retirement Board intends to continue the Pension Plan indefinitely. Nevertheless, the voting members of the Retirement Board have the power, by majority vote, to terminate or generally amend the Pension Plan at any time, subject to certain limitations stated in the Pension Plan document, and subject to the provisions of the CBA. The NFLPA and the NFLMC, when acting jointly, also have the power to generally amend or terminate the Pension Plan. However, no amendment may reduce the value of any pension benefit already earned and otherwise payable under the Pension Plan. The official Pension Plan document contains more specific rules regarding amendment or termination of the Pension Plan. | **Plan amendment or termination**<br><br>The Disability Plan is maintained under Collective Bargaining Agreements between the NFLPA and the NFLMC. While there is a Collective Bargaining Agreement in effect, the NFLPA and the NFLMC, when acting jointly, may amend or terminate the Disability Plan. If there is no Collective Bargaining Agreement in effect, the Disability Board may amend the Disability Plan at any time, and may terminate the Disability Plan if no Collective Bargaining Agreement is in effect for more than one year. |
| (12/18 Ret. Plan SPD, Ex. D, at 42.) | (8/19 Disab. Plan SPD, Ex. E, at 47.) |

The SPD for the Retirement Plan alludes to vesting of ***pension*** benefits—as opposed to disability benefits—when it states that "no amendment may reduce the value of any ***pension*** benefit already earned." Ret. Plan SPD at 42 (emphasis added). Because the Disability Plan provides only disability benefits, its SPD (and its Plan document) makes no such distinction. The following advisory appears in the Disability Plan SPD in three separate places:

 **Benefits under this Disability Plan are not vested.**

(8/19 Disab. Plan SPD at 18, 26, 31.)

This statement also appears in the Disability Plan SPD:

**No vesting**

Disability benefits are not vested. They can be changed or terminated at any time by amendment or termination of the Plan.

(8/19 Disab. Plan SPD at 42.)

### B.      Relevant terms of the 2011 Collective Bargaining Agreement

The 2011 CBA was "effective from August 4, 2011 until the last day of the 2020 League Year," *i.e.*, March 31, 2020.  8/4/11 CBA Art. 69 § 1.  *See id.* at 1 (defining "League Year").

In Article 61 of the 2011 CBA, the Players Association and the Management Council agreed to move the funding and provision of disability benefits from the Retirement Plan to the Disability Plan, and they further agreed that the Disability Plan and its benefits would "be continued and maintained in full force and effect during the term of th[e] Agreement."  8/4/11 CBA Art. 61 § 1.  When the CBA terminated, disability benefits would automatically reduce (to $4,000, as discussed above).  8/4/11 CBA Art. 61 § 4 ("After the term of the Agreement, the portion of the disability benefit that would have been paid under the Retirement Plan but for the changes made pursuant to this Article shall continue to be paid from the Disability Plan, provided that the player continues to qualify for the benefit.").  But otherwise, the funding, accrual, and payment of benefits ended with the expiration of the 2011 CBA:

> No NFL Club shall have any obligation, directly or indirectly, to contribute to… the NFL Player Disability Plan (except that portion of the Disability Plan referenced in Section 4 of Article 61)… (individually, a "Player Benefit Arrangement") with respect to any year following expiration of this Agreement except to the extent required by the Internal Revenue Code or other applicable laws except to the extent preempted by ERISA.  Each Player Benefit Arrangement shall be amended to prevent any employer-provided benefit from accruing or being otherwise credited or earned thereunder with respect to any year following the expiration of this Agreement, and to provide that no expense incurred in maintaining the Player Benefit Arrangement in a year following the

9

expiration of this Agreement shall be paid, directly or indirectly, by an NFL Club except to the extent required by law.

8/4/11 CBA Art. 52 § 4(a).

The 2011 CBA was the "complete understanding of the parties on all subjects covered" by it.  8/4/11 CBA Art. 2 § 4(a).  The 2011 CBA could be modified, but only by "mutual consent" of the parties.  *Id.  See also* 8/4/11 CBA Art. 70 § 9 (noting that the CBA could be modified "by a written agreement signed by authorized representatives of the parties").

## IV.    The Amendments Anticipated By The March 2020 Collective Bargaining Agreement

As the expiration date of the 2011 CBA approached, the Management Council and the Players Association engaged in another round of collective bargaining and, on March 15, 2020, executed another CBA.  *See generally* 3/15/20 CBA (Ex. F).

Plaintiffs challenge certain aspects of the 2020 CBA that would (i) introduce a Social Security offset for Players receiving Inactive A T&P benefits, (ii) modify the existing Neutral Physician evaluation process to include a "whole-person" type of assessment, and (iii) eliminate the Social Security eligibility provision.[5]  On each of these issues, the 2020 CBA states:

- The bargaining parties "shall amend Sections 3.6 and 4.2 of the **Disability Plan**" to reduce the amount of Inactive A benefits a Player receives by the amount of Social Security disability benefits he receives, effective January 1, 2021.  3/15/20 CBA Art. 60 § 4 (emphasis added).

---

[5] Article 60 of the new CBA continues the $11,250 minimum monthly payment for Inactive A benefits—currently set to reduce to $4,000 per month on April 1, 2021—for another 10 years. 3/15/20 CBA Art. 60 § 2 ("Unless otherwise stated below, the minimum benefit amounts currently in effect under the Disability Plan before April 1, 2021, shall remain in effect for the duration of this agreement.").  Plaintiffs do not challenge the CBA to the extent it would continue funding benefits that would automatically reduce on April 1, 2021 without it.

- The bargaining parties "agree to amend Section 3.1 of the **Disability Plan** to base the determination that a Player is totally and permanently disabled on a 'whole person' evaluation of the Player[,] with such amendment to be effective on April 1, 2024.  By June 1, 2020, a three-person panel shall be established to assist the bargaining parties in developing the whole-person evaluation process.  The bargaining parties shall appoint one person each to the panel, and shall jointly appoint the third person to the panel.  Any dispute between the bargaining parties over the evaluation process shall be decided by a majority vote of the panel.  Solely for purposes of evaluating the whole-person evaluation process, and not for determining a player's eligibility for T&P benefits, for the Plan Year commencing April 1, 2023, players applying for T&P benefits shall be evaluated under both the evaluation process in effect under the Disability Plan as of the effective date of this Agreement, and under the whole-person evaluation developed under this Section 5. Effective April 1, 2024, the whole-person evaluation process shall be the basis for determining whether a player is totally and permanently disabled.  The bargaining parties may re-evaluate the whole-person evaluation process again before April 1, 2025."  *Id*. § 5 (emphasis added).

- "The [bargaining] parties shall amend Section 3.2 of the **Disability Plan** by adding a subsection 3.2(c) to state that as of April 1, 2024, a Social Security determination of disability does not establish a Player's eligibility for benefits under th[e] Disability Plan." *Id*. § 6 (emphasis added).

Plaintiffs claim the foregoing changes will reduce or eliminate their disability benefits.  Compl. ¶¶ 71, 107, 115.

The Management Council and the Players Association have ***not*** yet amended the Disability Plan to implement any of the changes enumerated above.  The 2020 CBA does not envision any amendments to the Retirement Plan's T&P provisions.  *See generally* 3/15/20 CBA Art. 53 §§ 1-6 ("continu[ing] and maintain[ing the Retirement Plan] in full force and effect during the term of this Agreement," and generally enhancing the pension benefits provided by the Retirement Plan through a series of anticipated amendments).

## ARGUMENT & AUTHORITIES

I.      **Plaintiffs Do Not Have Standing To Pursue Counts I Through IV Against The Board Defendants.**

In Counts I and II, Plaintiffs challenge the anticipated changes to the disability program under the theory that implementation of these provisions will reduce or eliminate their disability benefits.  Compl. ¶¶ 107, 115.  Counts III and IV do not identify any different or additional impact of the proposed amendments, and thus appear to spring from the same premise.  These nebulous allegations of future harm do not give Plaintiffs standing to pursue claims against the Board Defendants.

### A.      Plaintiffs must establish that they have suffered an injury-in-fact that is traceable to the Board Defendants.

As the party invoking this Court's jurisdiction, Plaintiffs must establish subject matter jurisdiction by showing they have Article III standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To do so, Plaintiffs must satisfy three elements.

First, Plaintiffs "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (citations and quotations omitted).  A particularized injury is one that affects a plaintiff in a personal and individual way.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016).  To be concrete, an injury "must actually exist."  *Id.* at 1548.  Plaintiffs cannot satisfy the demands of Article III by "alleg[ing] a bare procedural violation, divorced from any concrete harm."  *Id.* at 1549 ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.").

12

Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly… trace[able] to the challenged action of the defendant….'" *Lujan*, 504 U.S. at 560 (citations omitted) (alteration in original).

Third, it must be "likely," not merely "'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citation omitted).

### B. Plaintiffs cannot trace any injury to the Board Defendants because the Plans have not been amended.

The Board Defendants are the administrators and "named fiduciaries" of the Retirement Plan and the Disability Plan. Compl. ¶¶ 14, 16. As ERISA fiduciaries, the Board Defendants' chief responsibility is to administer the plans "in accordance with the documents and instruments governing the plan[s]." 29 U.S.C. § 1104(a)(1)(D). *See also Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) ("The plan, in short, is at the center of ERISA. [E]mployers have large leeway to design disability and other welfare plans as they see fit. And once a plan is established, the administrator's duty is to see that the plan is maintained pursuant to [that] written instrument. This focus on the written terms of the plan is the linchpin of a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.") (internal quotation marks and citations omitted; alterations in original); RPD § 8.2 (describing authority of the Retirement Board, and noting that the Retirement Board is "responsible for implementing and administering the Plan, subject to the terms of the Plan and Trust"); DPD § 9.2 (describing authority of the Disability Board, and noting that the Disability Board is "responsible for implementing and administering the Plan, subject to the terms of the Plan and Trust").

The Board Defendants do not have the authority to amend the Plans, as Plaintiffs acknowledge. *See* Compl. ¶ 27 (noting that the Retirement Board does not have the ability to

amend the Retirement Plan in a way that would directly affect the value of benefits payable by the plan); *id*. ¶ 34 (noting that the Disability Board does not have the power to amend the Disability Plan). They enforce the terms of the Plans *as written*.

Because the bargaining parties have not formally amended the Plans to incorporate the changes envisioned by the 2020 CBA, the Board Defendants are not yet applying any of the provisions that Plaintiffs find objectionable. As a result, the Board Defendants have not acted against Plaintiffs' interests, and Plaintiffs have no injury traceable to the Board Defendants at this time.

### C.   Even if the Plans are amended, Plaintiffs still cannot trace any injury to the Retirement Board.

Plaintiffs lack standing to bring claims against the Retirement Board regardless of whether or when the bargaining parties amend the Plans. If the bargaining parties adopt every provision contemplated by the 2020 CBA, Plaintiffs still would have no injury traceable to the Retirement Board because the 2020 CBA does not propose a single disability-related amendment to the Retirement Plan. *See generally* 3/15/20 CBA Art. 53 §§ 1-6 ("continu[ing] and maintain[ing the Retirement Plan] in full force and effect during the term of this Agreement," and generally enhancing the pension benefits provided by the Retirement Plan through a series of anticipated amendments). All of the challenged amendments relate to the Disability Plan, which falls under the purview of the Disability Board. *See generally* 3/15/20 CBA Art. 60 §§ 4-6 (describing anticipated amendments to the Disability Plan).

### D.   Plaintiffs have not suffered an injury-in-fact because their claimed injuries are remote and speculative.

Plaintiffs lack standing to challenge the whole-person evaluation process because their claimed injury is purely speculative. The whole-person evaluation process is 3 ½ years from implementation. 3/15/20 CBA Art. 60, §§ 5-6. The bargaining parties have agreed to *develop*

the process during that time span.  *See id*. at § 5 (explaining that the bargaining parties will appoint a panel "to assist the bargaining parties in developing the whole-person evaluation process").  Once the whole-person evaluation process is developed and implemented, "the bargaining parties may [still] re-evaluate the… process again before April 1, 2025."  *Id*.

No one—not even Plaintiffs—knows what shape the whole-person evaluation process will take, or whether it will adversely impact Plaintiffs.  Plaintiffs' allegation that the process will be "harder-to-meet" than the current Neutral evaluation process or the Social Security eligibility standard, and that they are "likely" to "lose their vested lifetime T&P disability benefits," Compl. ¶ 71, is rank speculation, not an injury-in-fact that "actually exist[s]."  *Spokeo*, 136 S. Ct. at 1548.

Plaintiffs lack standing to challenge the Social Security offset because their claimed injury is more than speculative—it seems non-existent.  The Complaint does not allege that either Plaintiff receives Social Security disability benefits now or that they will receive them in the future.  Therefore Plaintiffs have not established that they would be impacted by the offset, assuming it is formally adopted and implemented by January 1, 2021 or at some point thereafter.

## II.    Counts I Through IV Fail As A Matter Of Law For The Additional Reason That Disability Benefits Do Not Vest Under The Plans.

In Counts I and II, Plaintiffs allege the changes anticipated by the 2020 CBA will impermissibly reduce or eliminate "vested lifetime rights" to disability benefits.  Compl. ¶¶ 107, 115.  In Counts III and IV Plaintiffs bring parallel claims alleging the 2020 CBA changes violate contract law because Plaintiffs' right to disability benefits is "fixed at the time of acceptance."[6]

---

[6] Although pleaded as separate causes of action, the Board Defendants have not identified any case law supporting Plaintiffs' theory that welfare benefits are unalterable once accepted. Conceptually, this time-of-acceptance claim is the same as Plaintiffs' vesting claim.  Practically, the claim contradicts Plaintiffs' vesting argument because the terms of the Plans that Plaintiffs

Compl. ¶¶ 120, 128.  These claims fail as a matter of law because T&P benefits are not vested, and nothing in ERISA or federal common law prevents the bargaining parties from amending the Plans or modifying the disability benefit framework, as they have done numerous times over the past six decades.[7]

Two recent Supreme Court cases obliterate Plaintiffs' vested-benefit claims.  The first is *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015).  In *Tackett*, the plaintiffs were retirees who—along with their union—alleged that a collectively bargained welfare benefit plan created vested health care benefits that survived the expiration of the bargaining agreement.  574 U.S. at 430.  The Court began its analysis with the observation that ERISA treats pension benefits differently than welfare and disability benefits:  "Although ERISA imposes elaborate minimum funding and vesting standards for pension plans, it explicitly exempts welfare benefits plans from those rules."  574 U.S. at 434 (internal citations omitted).  Consequently, plan sponsors "have large leeway to design disability and other welfare benefit plans as they see fit," 574 U.S. at 435 (quoting *Black & Decker Disab. Plan v. Nord*, 538 U.S. 822, 833 (2003)), and they "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."  574 U.S. at 435 (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)).

Against this statutory backdrop, the Court said the central question was whether the parties intended to vest welfare benefits for life, and to answer that question the Court turned to

---

allegedly "accepted" drastically reduce Plaintiffs' benefits (to $4,000 per month) starting April 1, 2021.

[7] Plaintiff Cason played in the NFL between 2001 to 2008.  Compl. ¶ 10.  Plaintiff Majkowski played in the NFL between 1987-1996.  Compl. ¶ 11.  Given the timeframe in which they played, both Plaintiffs participated in the bargaining process that created and/or modified the disability benefits provided by the Plans.

the terms of bargaining agreement and plan documents and "ordinary principles of contract law." 574 U.S. at 435. The Court noted there is no presumption that welfare benefits vest in the collective bargaining context. 574 U.S. at 438 (a rule that "plac[es] a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements" "has no basis in ordinary principles of contract law"). To the contrary, the "traditional principle" is that benefits typically last only for the term of the bargaining agreement. 574 U.S. at 441-42. To overcome this principle, the contractual documents must clearly, explicitly, and unambiguously create a right to lifetime vested benefits. 574 U.S. at 442 (holding that "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life"); *id*. at 441 (noting "that courts should not construe ambiguous writings to create lifetime promises").

The Court revisited these principles just three years later, in *CNH Industrial N.V. v. Reese*, 138 S. Ct. 761 (2018) (per curiam). In *Reese*, retired employees again claimed—with support from their union—that collective bargaining agreements created a vested right to lifetime welfare benefits. 138 S. Ct. at 764. The Court again invoked ordinary contract principles and rejected an attempt to transform alleged contractual ambiguity into a vested right to benefits. The Justices criticized the appellate court for distorting the text of the bargaining agreement, failing to apply general durational clauses, erroneously presuming vesting from the agreement's silence, and contradicting how Congress specifically defined key terms in ERISA. 138 S. Ct. at 766. The Court also remarked that "[i]f the parties meant to vest health care benefits for life, they easily could have said so in the text [of the agreement]. But they did not." 138 S. Ct. at 766. "'When the intent of the parties is unambiguously expressed in the contract, that expression

17

controls, and the court's inquiry should proceed no further.'"  138 S. Ct. at 766 (quoting *Tackett*, 574 U.S. at 443 (Ginsburg, J., concurring)).

The takeaway from *Tackett* and *Reese* is that this Court's "inquiry should proceed no further" than the terms of the 2011 CBA and the Plans, *Reese*, 138 S. Ct. at 766, because when read together those documents clearly and unambiguously do ***not*** create a vested right to T&P benefits for multiple reasons. ***First***, nothing in the CBA or the Plan documents state that T&P benefits are vested or otherwise unalterable. *See Reese*, 138 S. Ct. at 766 ("If the parties meant to vest health care benefits for life, they easily could have said so in the text."); *Blankenship v. Dominion Energy Transmission, Inc.*, __ F. App'x __, 2020 WL 3397740, *2 (3d Cir. June 19, 2020) ("A collective bargaining agreement that intends to create a fixed, lifetime right to health insurance benefits—in other words, one that 'vest[s]' welfare benefits to its employees—must do so 'in clear and express language.'") (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 139 (3d Cir. 1999)). ***Second***, the CBA and the Plans specify that disability benefits are funded and fully paid only for the duration of the CBA. *See, e.g.*, Table 1, *supra*; 8/4/11 CBA Art. 52 § 4(a); *id.* Art. 61 § 4. ***Third***, the Plans and the SPDs describing them state that the bargaining parties reserve the right to amend or terminate the Plans and the disability benefits they provide.  RPD § 10.2; DPD § 10.1; Ret. Plan SPD at 42; 8/19 Disab. Plan SPD at 42.  ***Fourth***, if the point of interpreting the CBA and the Plans is to divine the bargaining parties' intentions, the Players Association's opposition to Plaintiffs' claim for vested benefits speaks volumes.  *See, e.g.*, *Tackett*, 574 U.S. at 435 ("In this endeavor, as with any other contract, the parties' intentions control.") (quotation marks and citation omitted).  The Board Defendants are unaware of another case in which a

plaintiff pursued—much less prevailed on—a claim for lifetime vested benefits **when his union also opposed the claim**.

"[T]he only reasonable interpretation" to be drawn from the CBA and the Plan documents is that disability benefits do **not** vest, *Reese*, 138 S. Ct. at 766, and as contemplated by ERISA the bargaining parties have the power, "for any reason at any time,… to modify" the disability program. *Tackett*, 574 U.S. at 435 (quoting *Schoonejongen*, 514 U.S. at 78). Counts I through IV accordingly fail as a matter of law.

Plaintiffs may argue that the Plans' duration-of-benefit provisions (which state that T&P benefits will be payable until the Player's death) create a vested interest. Compl. ¶¶ 25, 33. Courts of Appeal from nearly every circuit have rejected this argument. *See, e.g.*, *In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 58 F.3d 896, 905-06 (3d Cir. 1995) (affirming district court's conclusion that the fact employer used terms such as "lifetime" or "for life" to describe medical benefits, while reserving the right to amend those benefits, did not demonstrate an intent to vest); *IUE-CWA v. Gen. Elec. Co.*, 745 F. App'x 583, 592 (6th Cir. 2018) ("Most recently, in *Fletcher v. Honeywell Int'l, Inc.*[, 892 F.3d 217 (6th Cir. 2018)], we took the case law one step further, holding that language providing that '[u]pon the death of a retiree, the Company *will continue* coverage for the spouse and dependent children *for their lifetime*,' neither indicated nor even implied that the agreement provided healthcare to retirees until their deaths."); *Int'l Union of United Auto., Aerospace & Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003) (employer reserved right to modify, amend, suspend, or terminate the plan, and therefore welfare benefits were not vested despite language that "health coverage is continued until... death"). *See also Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1512 n.2 (10th Cir. 1996), *abrogated on other grounds by Tomlinson v. El Paso Corp.*, 653 F.3d 1281

(10th Cir. 2011) (noting "the weight of case authority supports the *Unisys* approach" and citing the Fourth, Eighth, and Eleventh circuits). These durational clauses must be read in light of the Plans' reservation-of-rights provisions. "An employer who promises lifetime [welfare] benefits, while at the same time reserving the right to amend the plan under which those benefits were provided, has informed plan participants of the time period during which they will be eligible to receive benefits *provided* the plan continues to exist." *In re Unisys*, 58 F.3d at 904 (emphasis in original).

### III.   Count V Fails As A Matter Of Law Because The Pleaded Facts Do Not Support A Plausible Breach-Of-Fiduciary-Duty Claim Against The Board Defendants.

In Count V, Plaintiffs allege the Board Defendants and the Players Association breached fiduciary duties of loyalty and prudence imposed by ERISA section 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B), by failing to disclose complete and accurate information about the changes to the disability program contemplated by the 2020 CBA.[8]  Compl. ¶¶ 136-138.  This claim fails as a matter of law as to the Board Defendants because the Complaint is devoid of facts suggesting that the Board Defendants owed or breached any duty to disclose information about the impact of potential amendments to the disability program.

Paragraphs 139 and 140 of the Complaint provide the gist of Count V.  In those two paragraphs, Plaintiffs allege that the Board Defendants breached their fiduciary duties by:

> (1) omitting material information about the changes to players and their beneficiaries through class-wide Tweets and emails; (2) ignor[ing] requests by

---

[8] Section 404(a) of ERISA requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the purpose of providing benefits, and to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(A) & (B).

participants and their beneficiaries for clarification of their disability benefits by email; (3) sen[ding] out written plan communication[s] leading up to, and after, the vote on the 2020 CBA that omitted material information; and (4) omit[ting] material information in written communications that those currently receiving T&P disability benefits could lose their disability benefits based on a reevaluation under the whole-person evaluation process.

Compl. ¶ 139.  According to Plaintiffs, they were "harmed" by these acts and omissions because (1) they "improperly influence[ed] active [NFL] players to vote in favor of the disability amendments in the 2020 CBA," and (2) they "imped[ed] the ability of Plaintiffs… from [sic] mobilizing to influence the vote by the active players against the proposed 2020 CBA."  Compl. ¶ 140.

None of the allegations supporting Count V have anything to do with the Board Defendants, as the section of the Complaint dedicated to the alleged "Misleading and Inaccurate Plan Communications" makes clear.  *See* Compl. ¶¶ 72-87 (alleging that the Players Association issued misleading communications before and after the vote on the 2020 CBA).  Plaintiffs do not allege that the Board Defendants (i) participated in the collective bargaining process; (ii) knew about the changes to the disability program that were proposed during the collective bargaining process; (iii) were asked by Plaintiffs or any other Player to explain or provide information about the proposed changes; or (iv) knowingly failed to provide material information about the proposed changes.  The absence of allegations such as these is fatal to Count V.  "ERISA does not impose a duty to disclose future changes to plans prior to their formal adoption unless a beneficiary has made a specific inquiry or the fiduciary has made a statement about future plans that would be misleading absent further disclosure."  *Soland v. George Washington Univ.*, 60 F. Supp. 3d 60, 64-65 (D.D.C. 2014).  *See also Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747 (D.C. Cir. 1990) (reasoning fiduciary may have an "affirmative duty to inform" where the fiduciary has "knowledge of prejudicial acts").  ERISA imposes duties of loyalty and prudence

21

on plan administrators, not a duty of omniscience.  *See Keach v. U.S. Trust Co. N.A.*, 313 F. Supp. 2d 818, 863 (C.D. Ill. 2004) ("[Fiduciary duties are] not equivalent to a standard of absolute liability, as ERISA fiduciaries are only required to exercise prudence, not prescience or omniscience.").  Count V does not state a plausible breach-of-fiduciary-duty claim against the Board Defendants, and it should be dismissed.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter" to "state a claim to relief that is plausible on its face.") (citation and internal quotation marks omitted).

Assuming for the sake of argument that Count V does implicate the Board Defendants, Plaintiffs lack standing to pursue the claim.  Plaintiffs allege that, if they had only received information about the potential changes to the disability program, "former players [like themselves] would have been able to mobilize effectively against ratification of the 2020 CBA" by active players, and "the ratification vote [by active players] would have likely failed." Compl. ¶ 141.  Such speculation—wholly dependent on the intervening and superseding actions of third parties—does not give a plaintiff constitutional standing.[9]  *See, e.g.*, *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) ("When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties).") (citation omitted); *Maryland v. U.S. Dep't of Educ.*, __ F. Supp. 3d __, 2020 WL 4039315, *13 (D.D.C. July 17, 2020) (concluding plaintiffs lacked Article III standing where alleged injury "rel[ied] on an attenuated and lengthy

---

[9] Plaintiffs' alleged harm merely highlights the disconnect between the Board Defendants and the allegations supporting Plaintiffs' theory of liability.  Plaintiffs cannot plausibly allege that the Board Defendants "improperly influence[d] active players to vote in favor of the disability amendments in the 2020 CBA" or "imped[ed]" Plaintiffs' ability to "mobilize" and "influence the vote of active players against the proposed 2020 CBA," Compl. ¶ 140, if the Board Defendants had no role in the bargaining process and did not communicate with active or retired players about that process or any proposed amendments to the disability program.

chain of reasoning that assume[d] that third parties would most certainly respond to the DOE's implementation of the [challenged act] in a particular way").

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss Counts I through V of Plaintiffs' Complaint as against the Board Defendants.

Dated:  September 20, 2020                     Respectfully submitted,

GROOM LAW GROUP, CHARTERED

By:  _____
      Michael L. Junk, DC Bar No. 476886
      Shaun A. Gates, DC Bar No. 1034196
      1701 Pennsylvania Avenue NW
      Washington, DC 20006
      P: (202) 857-0620
      F: (202) 659-4503
      mjunk@groom.com
      sgates@groom.com

COUNSEL FOR DEFENDANTS
RETIREMENT BOARD of the BERT
BELL/PETE ROZELLE NFL PLAYER
RETIREMENT PLAN and DISABILITY
BOARD of the NFL PLAYER DISABILITY
& NEUROCOGNITIVE BENEFIT PLAN

23