# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AVEION CASON, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DONALD VINCENT MAJKOWSKI, | ) | |
| in their individual capacity and on behalf | ) | |
| of others similarly situated, | ) | |
| | ) | |
| *Plaintiffs* | ) | Case No. 1:20-cv-01875-TNM |
| | ) | Honorable Trevor N. McFadden |
| v. | ) | |
| | ) | |
| NATIONAL FOOTBALL LEAGUE | ) | |
| PLAYERS ASSOCIATION, | ) | |
| | ) | |
| THE BERT BELL/PETE ROZELLE NFL | ) | |
| PLAYER RETIREMENT PLAN BOARD, | ) | |
| | ) | |
| THE NFL PLAYER DISABILITY AND | ) | |
| NEUROCOGNITIVE BENEFIT PLAN | ) | |
| BOARD, and | ) | |
| | ) | |
| NATIONAL FOOTBALL LEAGUE | ) | |
| MANAGEMENT COUNCIL | ) | |
| | ) | |
| *Defendants.* | ) | |

---

## DEFENDANT NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.    LEGAL BACKGROUND FOR PLAINTIFFS' CLAIMS ............................... 4

    A.    ERISA's Special Rules For Multiemployer "Taft-Hartley" Plans Strictly Limit The Union's Role And Duties.............................................. 4

    B.    Under Federal Labor Law, A Union's Duty Is To Its Current Members, Only................................................................................ 7

III.    SUMMARY OF COMPLAINT ALLEGATIONS .......................................... 9

    A.    The Welfare Plans At Issue................................................................ 9

    B.    Plaintiffs And Their Status Under The Retirement Plans. .................... 10

    C.    Plaintiffs' Allegations About The NFLPA's Negotiation And Ratification Of The 2020 CBA. ........................................................ 11

        1.    The Social Security offset and the whole-person evaluation process......... 111

        2.    The NFLPA's alleged communications about new benefits for former players in the 2020 CBA............................................... 12

        3.    Plaintiffs allege the NFLPA and NFLMC improperly changed the CBA (*i.e.*, the so-called "switcheroo"). ....................................... 13

    D.    The Putative Classes And Their Claims. ............................................. 13

IV.    APPLICABLE LEGAL STANDARD ON A MOTION TO DISMISS ................ 16

V.    LEGAL ARGUMENT ............................................................................ 16

    A.    Plaintiffs Have Not And Cannot State An ERISA Claim Against the NFLPA. ........................................................................................ 16

        1.    ERISA Claims 1-4—"Violations for Changing [Plan] Terms"— Should be Dismissed................................................................. 17

            a.    Plaintiffs lack Article III standing because they have not alleged any "actual," "imminent" injuries.. ................................ 17

            b.    Absent express language to the contrary, Plaintiffs' alleged "vested" welfare benefits expired when the new CBA was adopted. ...................................................................... 21

c.     The NFLPA had no fiduciary duties in connection with Plaintiffs' allegations. ................................................. 18

2.     ERISA Claim 5—"Failure to Disclose Material Information"—Should Also Be Dismissed...................................................... 25

a.     Plaintiffs lack Article III standing to pursue Claim 5. ................. 25

b.     Plaintiffs have also failed to plead a viable cause of action against the NFLPA under Claim 5.............................................. 27

B.     Plaintiffs Have Not And Cannot State An LMRA § 301 Claim........................... 28

1.     Plaintiffs have failed to plead any plausible breach of the CBA. ................ 29

2.     Plaintiffs Lack Standing To Pursue Their Legally Defective Allegations About Internal NFLPA Governance Processes. ...................... 30

a.     Plaintiffs have no "legally protected interest" in enforcing the NFLPA Constitution. ............................................ 31

b.     Again, the connection between the asserted injury and the NFLPA's conduct is impermissibly speculative.......................... 31

c.     Plaintiffs' claimed injuries cannot be redressed by a favorable outcome....................................................... 33

CONCLUSION.................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Health Inc. v. Davila,*
  542 U.S. 200 (2004).................................................................................................4

*Alday v. Container Corp. of Am.,*
  906 F.2d 660 (11th Cir. 1990) ...............................................................................21

\*\**Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.,*
  404 U.S. 157 (1971)............................................................................................8, 31

*Am. Postal Workers Union v. U.S. Postal Serv.,*
  657 F. Supp. 2d 97 (D.D.C. 2009) ......................................................................7, 33

*Amato v. Bernard,*
  618 F.2d 559 (9th Cir. 1980) ...................................................................................4

*Anderson v. Alpha Portland Indus., Inc.,*
  727 F.2d 177 (8th Cir. 1984), *on reh'g,* 752 F.2d 1293 (8th Cir. 1985)..................9

*Anderson v. Alpha Portland Indus., Inc.,*
  836 F.2d 1512 (8th Cir. 1988) ...............................................................................21

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015)..................................................................................26

\*\**Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................................16

*Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,*
  941 F.2d 561 (7th Cir. 1991) .................................................................................23

*Baskin v. Hawley,*
  807 F.2d 1120 (2d Cir. 1986)..............................................................................9, 31

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.,*
  763 F. Supp. 2d 423 (S.D.N.Y. 2011).................................................................6, 21

\*\**Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................................16

*Bilello v. JPMorgan Chase Ret. Plan,*
  649 F. Supp. 2d 142 (S.D.N.Y. 2009)...............................................................27, 28

*Black & Decker Disability Plan v. Nord,*
  538 U.S. 822 (2003)................................................................................5

*Bove v. Long Island R.R.,*
  1995 WL 901990 (E.D.N.Y. Dec. 12, 1995) ......................................31

*Chiles v. Ceridian Corp.,*
  95 F.3d 1505 (10th Cir. 1996) ............................................................21

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)..............................................................................18

*Clarett v. NFL,*
  369 F.3d 124 (2d Cir. 2004)...................................................................1

*CNH Indus. N.V. v. Reese,*
  138 S. Ct. 761 (2018)............................................................................19

*Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pens. Trust for S. Cal.,*
  508 U.S. 602 (1993)................................................................................6

*Curtiss-Wright Corp. v. Schoonejongen,*
  514 U.S. 73 (1995).........................................................................5, 19

*DeCarlo v. Rochester Carpenters Pension, Annuity, Welfare & S.U.B. Funds,*
  823 F. Supp. 115 (W.D.N.Y. 1993) ....................................................23

*Ege v. U.S. Dep't of Homeland Sec.,*
  784 F.3d 791 (D.C. Cir. 2015) ............................................................26

*Eller v. NFL Players Ass'n,*
  731 F.3d 752 (8th Cir. 2013) ............................................................1, 32

*F.H. Krear & Co. v. Nineteen Named Trs.,*
  810 F.2d 1250 (2d Cir. 1987)..............................................................22

*Ford Motor Co. v. Huffman,*
  345 U.S. 330 (1953)................................................................................8

*Fulani v. Brady,*
  935 F.2d 1324 (D.C. Cir. 1991) ..........................................................26

*Gable v. Sweetheart Cup Co., Inc.,*
  35 F.3d 851 (4th Cir. 1994) ................................................................21

*Grand Lodge of Fraternal Order of Police v. Ashcroft,*
  185 F. Supp. 2d 9 (D.D.C. 2001) ........................................................16

*Harmon v. Am. Elec. Power Serv. Corp.*,
 371 F. Supp. 2d 804 (S.D. W. Va. 2005) ......................................................................32

\*\**Hudson v. NFL Mgmt. Council*,
 2019 WL 5722220 (S.D.N.Y. Sept. 5, 2019) ...................................................22, 24, 25

\*\**Hudson v. NFL Mgmt. Council*,
 2020 WL 1547467 (S.D.N.Y. Mar. 31, 2020) ...........................................................1, 24, 25

*Humphrey v. Moore*,
 375 U.S. 335 (1964) ......................................................................................................8, 31

*IBEW Local 90 v. Nat'l Elec. Contractors Ass'n*,
 2008 WL 918481 (D. Conn. Mar. 31, 2008) .....................................................................23

*IUE-CWA v. Gen. Elec. Co.*,
 745 F. App'x 583 (6th Cir. 2018) .....................................................................................20

*Karo v. San Diego Symphony Orchestra Ass'n*,
 762 F.2d 819 (9th Cir. 1985) ............................................................................................32

*Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB*,
 501 U.S. 190 (1991) ....................................................................................................19, 20

\*\**Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ............................................................................................... *passim*

\*\**M&G Polymers USA, LLC v. Tackett*,
 574 U.S. 427 (2015) ............................................................................................... *passim*

*Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*,
 792 F.2d 1172 (D.C. Cir. 1986) ........................................................................................27

*Moore v. U.S. Dep't of State*,
 351 F. Supp. 3d 76 (D.D.C. 2019) ....................................................................................16

*Nachman Corp. v. Pension Ben. Guar. Corp.*,
 446 U.S. 359 (1980) ...........................................................................................................4

\*\**NLRB v. Amax Coal Co.*,
 453 U.S. 322 (1981) ......................................................................................22, 23, 25

*NLRB v. Magnavox Co.*,
 415 U.S. 322 (1974) ..........................................................................................................34

\*\**Pegram v. Herdrich*,
 530 U.S. 211 (2000) ...........................................................................................6, 7, 21, 24

*Pilot Life Ins. Co. v. Dedeaux*,
   481 U.S. 41 (1987)..............................................................................................5

*Pompano v. Michael Schiavone & Sons, Inc.*,
   680 F.2d 911 (2d Cir. 1982)................................................................................5

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002)............................................................................16

*Saunders v. Mills*,
   842 F. Supp. 2d 284 (D.D.C. 2012)............................................................10, 20

*Schneider Moving & Storage Co. v. Robbins*,
   466 U.S. 364 (1984)............................................................................................8

*Siegel v. U.S. Dep't of Treasury*,
   304 F. Supp. 3d 45 (D.D.C. 2018)....................................................................26

*Soland v. George Washington Univ.*,
   916 F. Supp. 2d 33 (D.D.C. 2013)...............................................................17, 22

*Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan Enters., Inc.*,
   793 F.2d 1456 (5th Cir. 1986)...........................................................................23

**Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016).......................................................................................18

*Sutton v. Weirton Steel Div. of Nat. Steel Corp.*,
   567 F. Supp. 1184 (N.D. W. Va.)......................................................................22

*Textile Workers Union of Am. v. Lincoln Mills of Ala.*,
   353 U.S. 448 (1957)............................................................................................7

*Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*,
   523 U.S. 653 (1998)..........................................................................................29

*UAW v. Rockford Powertrain, Inc.*,
   350 F.3d 698 (7th Cir. 2003) ............................................................................21

*UMWA Health & Ret. Funds v. Robinson*,
   455 U.S. 562 (1982)................................................................................7, 22, 33

*In re Unisys Corp. Retiree Med. Ben. "ERISA" Litig.*,
   58 F.3d 896 (3d Cir. 1995)................................................................................20

*United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*,
   756 F.2d 1262 (7th Cir. 1985) ..........................................................................22

*Vaca v. Sipes*,
    386 U.S. 171 (1967)..............................................................................8

*Warth v. Seldin*,
    422 U.S. 490 (1975)............................................................................18

*Yolton v. El Paso Tenn. Pipeline Co.*,
    668 F. Supp. 2d 1023 (E.D. Mich. 2009)..........................................31

**Statutes**

29 U.S.C. §§ 141–197 (LMRA)...................................................................1

29 U.S.C. §§ 151–169 (NLRA)...................................................................7

**29 U.S.C. § 185 (LMRA § 301) ...................................................... *passim*

**29 U.S.C. § 186......................................................................................6, 23

29 U.S.C. §§ 1001–1461 (ERISA) ...........................................................1

29 U.S.C. § 1001........................................................................................4

**29 U.S.C. § 1002...................................................................................5, 6

29 U.S.C. § 1051........................................................................................5

29 U.S.C. § 1104...................................................................................15, 25

29 U.S.C. § 1109......................................................................................28

**29 U.S.C. § 1132(a) (ERISA § 502(a)(3)) .............................5, 16, 17, 22

**Other Authorities**

29 C.F.R. § 2509.75-8.............................................................................6, 7

Fed. R. Civ. P. 12(b)(1)....................................................................1, 16, 18

Fed. R. Civ. P. 12(b)(6)........................................................................1, 16

Defendant National Football League Players Association (NFLPA) respectfully moves to dismiss all claims against it for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1) and/or failure to state a claim pursuant to Rule 12(b)(6).

## I.   INTRODUCTION

The NFLPA is the labor union and collective bargaining representative for all *current* NFL players.  *Clarett v. NFL*, 369 F.3d 124, 127 (2d Cir. 2004).  Plaintiffs are *retired* NFL players who are no longer active members of their former union.  *See* Compl. ¶¶ 10-11 (ECF 3).  Under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461, the NFLPA has no duty or responsibility to maintain any particular level of former player benefits, and *may not* administer retired player benefit plans.  *Hudson v. NFL Mgmt. Council*, 2020 WL 1547467, at *8 (S.D.N.Y. Mar. 31, 2020).  And under bedrock labor law, the NFLPA has no duty to represent the interests of former players when the union collectively bargains with its management counter-part—the NFL Management Council (NFLMC).  *Eller v. NFL Players Ass'n*, 731 F.3d 752, 755 (8th Cir. 2013).

Plaintiffs—retired NFL players Aveion Cason and Donald Vincent Majkowski—nonethe-less bring this putative class action attacking both the collective bargaining process and collective bargaining outcome of the new, ten-year agreement (the CBA) that the NFLPA entered into with the NFLMC in March 2020.  Despite the fact that the new CBA generally *increases* total benefits for former players relative to the prior CBA, Plaintiffs complain that two discrete differences vio-late ERISA, and that the NFLPA's internal ratification procedures violated the Labor-Management Relations Act (LMRA), 29 U.S.C. §§ 141–197.  Each permutation of Plaintiffs' five ERISA claims and lone LMRA claim fails as a matter of law on the face of the complaint.

***Claims 1-4 (ERISA—allegedly improper reduction in retirement benefits).***  At the thresh-old, Plaintiffs do not have standing to pursue these claims.  Plaintiffs do not plead any facts that

the first benefit change they complain about (the "Social Security disability offset") even applies to them, and as to the second benefit change at issue (the "whole-person evaluation"), it will not take effect until *2024*, and at that future time, the change still may not adversely impact Plaintiffs. Thus, on the face of the pleadings, Plaintiffs have failed to plausibly allege an "injury in fact" *to them*, that is both *imminent* and *non-speculative*. Accordingly, they lack Article III standing to pursue Claims 1 through 4. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

These claims also fall far short of stating a viable cause of action against the NFLPA. To do so, Plaintiffs must plausibly allege that the NFLPA is a fiduciary to them vis-à-vis the two changes to the retirement benefits they complain about. Plaintiffs do not and cannot. Unlike conventional "single-employer" plans, the "multiemployer" "Taft-Hartley" plans at issue here allow groups of employers (*i.e.*, each NFL team) to pool money that is then used by a plan administrator to provide benefits to NFL players. Under settled law, in a Taft-Hartley plan, the union (the NFLPA) and the multi-employer representative (the NFLMC) merely "sponsor" the plan. ERISA *prohibits* them from controlling the plan. The plan is instead run by a designated third-party administrator, an independent board of trustees, which has a separate legal status under ERISA. Indeed, Plaintiffs allege that all that the plan sponsors—the NFLPA and the NFLMC—do is appoint the board members. The NFLPA has a fiduciary duty to select its respective board members with care, but that duty extends no further.

This is why Plaintiffs' ERISA Claims 1-4 against the NFLPA also fail as a matter of law. Nowhere do they allege—much less plausibly allege—that the NFLPA did not appoint or supervise its board members with the requisite care. Nor do Plaintiffs allege that the NFLPA's appointment of board members has anything to do with their claim about reduced benefits. This is dis-

positive.  Even if there were any plausible allegations that the plan administrators acted improperly—and there is nothing close—such allegations could not state any claim against the NFLPA. And to the extent that Plaintiffs allege that certain disability benefits under the prior (2011) CBA were "vested" and could not be eliminated or reduced when a new CBA was entered into, the Supreme Court has ruled otherwise.  *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 434–35 (2015).  In fact, if the NFLPA had not bargained for new disability benefits in the new CBA, Plaintiffs would have been left with substantially reduced benefits.

**Claim 5 (ERISA—alleged NFLPA non-disclosure of material facts about the new CBA).** Even if the Court were to take at face value Plaintiffs' implausible and legally defective allegations that the NFLPA did not disclose all material facts about the new CBA's impact on retirement benefits, Plaintiffs would still lack Article III standing to pursue such a claim.  Their theory—that *if* the NFLPA had disclosed all such pertinent information, then the retired players *might* have mobilized to lobby active players to vote against the CBA, and then the active players *might* have changed their votes in sufficient numbers to change the CBA outcome, and this *might* have led to the negotiation of a different CBA with the NFL that *might* have provided Plaintiffs greater benefits—is far too remote and speculative to confer standing.

**Claim 6 (LMRA—alleged breach of the CBA).**  LMRA § 301 supplies a cause of action for breach of a collective bargaining agreement.  But Plaintiffs merely complain about the *changes* the 2020 CBA imposes relative to the 2011 CBA.  They do not allege (nor could they) that the NFLPA and NFLMC will not implement the 2020 CBA as written.  Because no breach of the CBA has been alleged, this should be the end of the Court's LMRA analysis.

What Plaintiffs are really trying to do is take a square peg (their allegations that the NFLPA did not follow the governance procedures set forth in the NFLPA Constitution) and put it into a

round hole (an LMRA breach-of-CBA claim).  Such allegations simply do not state a § 301 claim. In any event, Plaintiffs lack Article III standing to mount any challenge to the NFLPA's internal governance procedures for ratifying a CBA.  First, Plaintiffs have no cognizable legal interest in the internal collective bargaining ratification process of a union that does not represent their interests during collective bargaining.  Second, the relief that Plaintiffs seek to redress their claims— "reform[ing] the CBA" to provide them with greater benefits—is flatly prohibited by the LMRA. "Reforming" a collective bargaining agreement is anathema to the LMRA, which Congress enacted to promote—not upend—collective bargaining and labor peace.

Because all of Plaintiffs' claims fail as a matter of law for reasons that are not susceptible to cure, the Court should dismiss the complaint with prejudice as to the NFLPA.

## II.   LEGAL BACKGROUND FOR PLAINTIFFS' CLAIMS

As a matter of law, unions have very limited duties under ERISA, and no duties under the LMRA, to their former members.

### A.   ERISA's Special Rules For Multiemployer "Taft-Hartley" Plans Strictly Limit The Union's Role And Duties.

In 1974, in response to the rapid growth of employee benefit plans, Congress enacted ERISA "to provide a uniform regulatory regime" that would impose "minimum standards" to "assur[e] the [plans'] equitable character" and "financial soundness."  *See* 29 U.S.C. § 1001(a); *see, e.g., id.* § 1001(c) (requirement to "disclos[e] and report[] to participants and beneficiaries . . . financial and other information"); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004); *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 375 (1980).

To enforce these standards, ERISA "provid[ed] for appropriate remedies, sanctions, and ready access to the Federal courts" (29 U.S.C. § 1001(b)), which would develop a body of substantive law to apply to disputes concerning employee benefit plans.  *Amato v. Bernard*, 618 F.2d

559, 568 (9th Cir. 1980); *see Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 916 (2d Cir. 1982). With an eye toward "balancing . . . the need for prompt and fair claims settlement procedures against the public interest in encouraging [plan] formation," Congress created a private right of action under § 502(a) for plan participants, beneficiaries, and fiduciaries to (among other things) "recover benefits due . . . under the terms of [the] plan" and "enforce" or "clarify" rights under the plan. 29 U.S.C. § 1132(a); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987).

The extent of these rights under ERISA depends in significant part on the type of benefit at issue. Generally speaking, a pension plan "provides retirement income to employees," whereas an "employee welfare benefit plan" (or "welfare plan") provides for benefits "other than pensions," such as "medical . . . benefits" and "benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1)–(2)(A). This distinction is important because, in contrast to pension plans, "employers have large leeway to design disability and other welfare plans as they see fit" and "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Tackett*, 574 U.S. at 434–35 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003), and *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)); *see* 29 U.S.C. § 1051. The plans at issue here are welfare plans. Compl. ¶¶ 18, 20.

Whatever rights an employee might have under a pension or welfare benefit plan, the proper defendant depends on the plan's structure. In a conventional single-employer plan, the employer may administer its employees' benefit plans and be sued for failing to comply with its ERISA obligations. *See* 29 U.S.C. § 1002(16)(A)–(B). The same is not the case when, as here, the plans were negotiated between a union (the NFLPA) and a multi-employer bargaining representative (the NFLMC).

5

These rules predate ERISA by nearly 30 years, having been adopted in the LMRA, or "Taft-Hartley Act," which governs the relationships between employers, employees, and unions. *See* 29 U.S.C. § 141(b); *see also infra* Part II.B.  While the LMRA forbids employers from paying "money or other thing of value" to unions and unionized employees, it makes an exception for funds placed in trust "for the purpose of paying" benefits."  29 U.S.C. § 186(a), (c)(5).  "[M]ore than one employer" contributes to these collectively bargained "multiemployer" or "Taft-Hartley" plans (29 U.S.C. § 1002(37)(A)), which "operate by pooling contributions and liabilities."  *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pens. Trust for S. Cal.*, 508 U.S. 602, 637–38 (1993).  The employers and the union are both "plan sponsor[s]."  *See* 29 U.S.C. § 1002(16)(B).

The plan sponsors' roles with respect to the plans are strictly limited.  Because the LMRA requires that "employees and employers [be] equally represented in the [fund's] administration" (29 U.S.C. § 186(c)(5)), Taft-Hartley plans are administered by a "group of representatives of the parties," such as "a joint board of trustees" with half appointed by the union and half appointed by the employers—which has separate legal status under ERISA.  29 U.S.C. § 1002(16)(B).

An administrator has a wide range of duties.  Some are ministerial, such as determining eligibility for benefits under the applicable rules, calculating benefits, and processing claims.  29 C.F.R. § 2509.75-8 (D-2).  Others entail the exercise of "discretionary authority or discretionary control respecting management of [the] plan" and "management or disposition of its assets."  29 U.S.C. § 1002(21)(A).  An administrator has a fiduciary duty to plan beneficiaries *only* as to the latter category.  *See Pegram v. Herdrich*, 530 U.S. 211, 225–26 (2000).

An ERISA plan sponsor—here, the NFLPA or the NFLMC—can be a "de facto" fiduciary but only to the very limited set of acts it has "discretionary authority or discretionary responsibility" for:  namely, appointing its allotted trustees.  *See* 29 U.S.C. § 1002(21)(A); *In re Bear Stearns*

*Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 565 (S.D.N.Y. 2011); 29 C.F.R. § 2509.75-8(D-2).  "In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Pegram*, 530 U.S. at 226.

### B.    Under Federal Labor Law, A Union's Duty Is To Its Current Members, Only.

The LMRA was intended to "promote industrial peace" between labor and management by encouraging and enforcing "faithful performance" of collective bargaining agreements.  *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 454 (1957).  Congress did this through § 301 (codified at 29 U.S.C. § 185), which grants the federal courts jurisdiction to resolve disputes over those agreements.  29 U.S.C. § 185; *Tackett*, 574 U.S. at 434–35; *Textile Workers*, 353 U.S. at 456; *see* 29 U.S.C. § 185(a).  In essence, § 301 provides the basis for a federal breach of contract claim when the relevant contract is a collective bargaining agreement.  Courts are not authorized to re-write—or, in Plaintiffs' language, "reform"—a collective bargaining agreement.  *Compare* Compl. ¶ E (requesting an "[o]rder requiring Defendants Management Council and Players Association to *jointly reform the 2020 CBA*" (emphasis added)), *with UMWA Health & Ret. Funds v. Robinson*, 455 U.S. 562, 576 (1982) ("when neither the collective-bargaining process nor its end product violates any command of Congress, a federal court has no authority to modify the substantive terms of a collective-bargaining contract").  *See also Am. Postal Workers Union v. U.S. Postal Serv.*, 657 F. Supp. 2d 97, 103 (D.D.C. 2009) (refusing to "interfere with the terms of [bargained-for labor contracts]").

A separate statute—the National Labor Relations Act, 29 U.S.C. §§ 151–169 (NLRA)— gives rise to the so-called "duty of fair representation" that unions owe to the members of their

collective bargaining unit as to the negotiation, administration, and enforcement of collective bargaining agreements.  *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967) ("the Union ha[s] a statutory duty fairly to represent all of those employees, both in its collective bargaining . . . and in its enforcement of the resulting collective bargaining agreement"); *Humphrey v. Moore*, 375 U.S. 335, 342 (1964) (observing, in extending duty to administration of agreements, the "undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation"); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38 (1953) (bargaining representatives' "statutory obligation [under the NLRA] to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of those members" with "complete loyalty to[] the interests of all whom it represents").

Plaintiffs do not invoke the NLRA and admit the NFLPA "owes no duty of fair representation to retired players."  Compl. ¶ 147.  Indeed, "[a] union's statutory duty of fair representation traditionally runs only to the members of its collective-bargaining unit, and is coextensive with its statutory authority to act as the exclusive representative for all the *employees within the unit*." *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 n.22 (1984) (emphasis added) (citing *Vaca*, 386 U.S. at 182, and *Humphrey*, 375 U.S. at 342).  "Nowhere in the history of the National Labor Relations Act is there any evidence that retired workers are to be considered as within the ambit of the collective-bargaining obligations of the statute."  *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166 (1971).  Former union members "plainly do not share a community of interests [with active employees] broad enough to justify inclusion of the retirees in the bargaining unit."  *Id.* at 173.  Because of the risk that "union representatives

on occasion might see fit to bargain for improved wages or other conditions favoring active em-
ployees at the expense of retirees' benefits," including retirees "in the bargaining unit would create
the potential for severe internal conflicts that would impair the unit's ability to function and would
disrupt the processes of collective bargaining." *Id.*  Accordingly, federal courts of appeals have
uniformly concluded that "a union's duty of fair representation does not include an obligation to
take into account the interests of its retired members when it is negotiating contracts with an em-
ployer." *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986); *accord Anderson v. Alpha Port-
land Indus., Inc.*, 727 F.2d 177, 181 (8th Cir. 1984), *on reh'g*, 752 F.2d 1293 (8th Cir. 1985)
("Because plaintiffs are retirees the Union owes them no duty of fair representation.").

## III.    SUMMARY OF COMPLAINT ALLEGATIONS

### A.    The Welfare Plans At Issue.

Two different Taft-Hartley plans are relevant here.  The older of the two is the Bert
Bell/Pete Rozelle NFL Player Retirement Plan, which, since 1994, has included a welfare plan that
"provided retirement, disability, and related benefits" to eligible players (the "retirement plan").
Compl. ¶ 19.  Since January 1, 2015, a separate NFL Player Disability and Neurocognitive Benefit
Plan ("disability plan") has applied to players' disability benefits.  *Id.*

The retirement plan and the disability plan are both multiemployer employee welfare ben-
efit plans subject to ERISA.  *Id.* ¶¶ 18, 20.  Each is administered by a board: the Bert Bell/Pete
Rozelle NFL Player Retirement Plan Board ("Retirement Board") and the NFL Player Disability
and Neurocognitive Benefit Plan Board ("Disability Board"), respectively.  Compl. ¶¶ 14, 16.
Both boards are composed of six voting members, three of whom are appointed by the NFLPA,
and three by the NFLMC.  *Id.* ¶¶ 12-17.  The plan grants the Retirement Board the "full and abso-
lute discretion, authority and power to interpret, control, implement, and manage the Plan," in-
cluding the authority to adjudicate claims for benefits.  Retirement Plan § 8.2 (excerpts attached

as Ex. A to Miossi Decl.) (incorporated by reference in the complaint, *see infra* note 2 (citing *Saunders v. Mills*, 842 F. Supp. 2d 284, 293 n.2 (D.D.C. 2012))).

**B.    Plaintiffs And Their Status Under The Retirement Plans.**

Cason and Majkowski each played in the NFL for several years.  Compl. ¶¶ 10-11.  Majkowski retired in 1996 and Cason retired in 2008—long before the alleged events at issue.  *Id.*

Both Plaintiffs are classified under the plans as "Inactive A" players, meaning they have been deemed qualified to receive total and permanent disability benefits.[1]  *Id.* ¶ 24.  Both are beneficiaries of NFL disability benefit plans; Majkowski has received benefits since March 27, 2013, and Cason since February 1, 2016.  *Id.* ¶¶ 10-11.  But neither Plaintiff alleges that he is presently receiving Social Security disability benefits *or* that he will be in 2021, when the offset takes effect.

Plaintiffs claim to be "vested for life in the entire . . . amount" of disability benefits available to them under the plans, citing plan provisions that predate the new (March 2020) CBA.  *See id.* ¶¶ 10-11, 22, 29, 33.  But Plaintiffs do not allege that any provision of either plan extends these benefits beyond the termination of the prior (2011) CBA.  And, as discussed further below, "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life."  *Tackett*, 574 U.S. at 436, 442 (requiring "explicit terms [stating] that certain benefits continue after the agreement's expiration").  *See infra* Part V.A.1.b.  In fact, if the NFLPA had not negotiated for new welfare benefits for retired players through the new CBA, Plaintiffs would have been left with substantially reduced welfare benefits.

---

[1] The complaint refers to total and permanent disability benefits as "T&P Benefits."  Compl. ¶ 1. This memorandum uses the term "disability benefits."

### C.       Plaintiffs' Allegations About The NFLPA's Negotiation And Ratification Of The 2020 CBA.

Ignoring that the new CBA generally *increases* the total amount of benefits for former players, Plaintiffs take issue with two provisions introduced during the 2020 CBA bargaining process: a Social Security disability offset and a "whole-person evaluation" process.   Compl. ¶¶ 43-50, 60-61, 68-71.  Plaintiffs further complain that various communications about the CBA changes "were misleading" (*id.* ¶¶ 72-87), and assert that the NFLPA and NFLMC made "changes to the 2020 CBA language" while finalizing the CBA, and that in doing so the NFLPA did not adhere to the internal union governance process set forth in the NFLPA Constitution (*id.* ¶¶ 51-59).

### 1.       The Social Security disability offset and the whole-person evaluation process.

The Social Security disability offset is a collectively bargained term that applies to Inactive A players (like Cason and Majkowski) if they additionally receive Social Security disability benefits.  *Id.* ¶ 43.  Beginning on January 1, 2021, such an individual's disability benefits under the plans will be offset by the amount of Social Security disability benefits he receives; if he receives no Social Security disability payments, then there is no offset.  *Id.*

As for the "whole-person evaluation process," it was another collectively bargained CBA provision.  Under the prior CBA, former players were presumed to be eligible to receive benefits under the disability plan if the Social Security Administration had previously deemed them eligible for Social Security Disability Insurance or Supplemental Security Income.  *Id.* ¶ 61.  Under the 2020 CBA, beginning in *April 2024*, retirees receiving disability benefits will need to be re-evaluated by independent doctors to determine if they still qualify.  *Id.* ¶¶ 60-61.

Although legally irrelevant, it bears mention that the NFLPA did not *want* the Social Security disability offset and whole-person evaluation process, but these were necessary concessions to obtain increases in other benefits as part of the give-and-take of collective bargaining.  This is

precisely what the NLRA empowers a union to do, and pursuant to the LMRA, courts are prohibited from interfering in this bargaining process.  *See infra* Part V.B.2.c.

> **2.**  **The NFLPA's alleged communications about new benefits for former players in the 2020 CBA.**

Plaintiffs allege that the NFLPA made a series of "misleading" communications about the benefits it negotiated for former players in the proposed 2020 CBA—principally, omissions and non-disclosures.  *See, e.g.*, Compl. ¶ 74 ("CBA Proposal Fact Sheet" made "*no mention* of potential benefit decreases"), ¶ 75 ("Highlights of the Proposed CBA" included "*no language* about a significant decrease in benefits"), ¶ 76 ("CBA Side by Side" "*nowhere mentions* the future reevaluation of currently disabled players"), ¶ 81 (alleging an NFLPA "strategy and mission of *withholding relevant information*"), and ¶ 83 (alleging the NFLPA would tweet "positives" about the new CBA "but *failed to disclose* . . . negative information") (emphases added throughout).

According to Plaintiffs, if the NFLPA had provided more information about the changes it negotiated to retired players' welfare benefits, then the former players *might* have lobbied active players to vote against the 2020 CBA, and active players *might* have changed their vote in sufficient numbers such that the NFLPA would not have ratified the 2020 CBA.  Compl. ¶ 73 ("[h]ad the truth about these . . . benefit changes been known, the vote for ratification would not have been secured improperly, the ratification vote *might* have failed, and former players *might* have mobilized effectively against ratification." (emphases added)).  Plaintiffs do not even attempt conjecture about what would have then happened next—would a different CBA have been negotiated with the NFL and ratified?  Would a new CBA still contain a Social Security disability offset and wholeperson evaluation process?  If it did not, what concessions would the NFLPA have to have made about *other* retirement benefits?  The complaint of course supplies no answers for these unanswerable and wholly speculative questions, and neither could a court.

### 3.   Plaintiffs allege the NFLPA and NFLMC improperly changed the CBA (*i.e.*, the so-called "switcheroo").

Plaintiffs further contend that the NFLPA and the NFLMC pulled a "switcheroo" by "impermissibly and significantly changing disability language" on March 15, after the players finished voting on the 2020 CBA.  *Id.* ¶¶ 6, 51.  Specifically, they allege that "additional language was secretly added to the 2020 CBA" in two "newly formed" subparagraphs of "Article 60, Section 4," and that this had the effect of extending the Social Security disability offset "to players who have been receiving [] disability [benefits] since before 2015."  *Id.* ¶ 51.

According to Plaintiffs, this change was made "surreptitiously[,] without player knowledge, without following procedures for modifications of CBAs, and without an additional player vote."  *Id.* ¶ 52.  Plaintiffs' principal objection to this change was that it did not comport with the internal governance procedures in the NFLPA Constitution for ratifying a new CBA.  *Id.* ¶¶ 57-58.  They also make a throwaway argument that the "switcheroo" violated Article 67 of the 2020 CBA (*id.* ¶ 56) ("Th[e] Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties"), despite the fact that, two paragraphs earlier, Plaintiffs specifically allege that the NFLPA and NFLMC *did* alter and publish a new version of their agreement containing the two challenged provisions (*e.g.*, *id.* ¶ 51).

### D.   The Putative Classes And Their Claims.

Plaintiffs have sued defendants on behalf of themselves and on behalf of a putative class made up of all retired NFL players who are Inactive A plan participants "qualified to receive total and permanent disability benefits at the time of the disability amendments to the 2020 [CBA] between the NFLPA and NFL Management Council."  Compl. ¶ 88; *see also id.* ¶ 24.

The complaint also proposes two subclasses, the "Article 4" subclass and the "Article 3" subclass.  Compl. ¶¶ 90-91.  The Article 4 subclass is made up of "[a]ll participants qualified to

receive total and permanent disability benefits at the time of the disability amendments" to the 2020 CBA, and who started "receiving these benefits *prior to January 1, 2015*." *Id.* ¶ 90 (emphasis added); *see also id.* ¶ 95 (Majkowski is a member of the Article 4 subclass).  The Article 3 subclass includes retired players who started "receiving . . . benefits *after January 1, 2015*." *Id.* ¶ 91 (emphasis added); *see also id.* ¶ 95 (Cason is a member of the Article 3 subclass).

In total, the two proposed subclasses allege five ERISA claims: (i) "[v]iolation[s] of vested lifetime [] disability benefit rights" (Compl. ¶¶ 103-18 (***Claims 1–2***)), (ii) "[v]iolation[s] for changing terms of [] disability benefits for those already in paid status" (*id.* ¶¶ 119-34 (***Claims 3–4***)), and (iii) "failure to disclose material information" (*id.* ¶¶ 135-43 (***Claim 5***)).

***Claims 1-4*** are all similar.  In Claims 1 and 2—brought against the NFLPA, the NFLMC, and the Boards relevant to the respective classes' plans (both the Retirement and Disability Boards for the Article 4 class, but only the Disability Board for the Article 3 class)—Plaintiffs allege that they had been "promised . . . a defined amount of T&P disability benefits for life," and the addition of the Social Security disability offset in the 2020 CBA "impermissibly reduced or eliminated" those "vested lifetime benefits." *Id.* ¶¶ 105-07, 113-15.  Claims 3 and 4 are brought against the same defendants.  *Id.* at 35, 37.  These claims rest on the premise that, "once a participant qualifies for benefits and begins receiving those benefits under the terms of the [plans], the terms that govern the benefits owed to and to be paid to the participant are fixed." *Id.* ¶¶ 120, 128.  Plaintiffs allege that they enjoy this "paid status," that their disability benefits are "fixed," and that "the Social Security offset and the whole-person reevaluation process amendments" in the 2020 CBA "affect[] the[ir] rights to [] disability benefits" in an impermissible way.  *Id.* ¶¶ 120, 122-23, 128, 130-31.  Yet Plaintiffs do not allege that they actually receive Social Security disability benefits, and the whole-person evaluation process will not come into being until 2024.

In the final ERISA claim—*Claim 5*—Plaintiffs allege that the NFLPA and the Boards violated their "duty to disclose and inform" former players (who had no CBA vote) of "the impact of the Social Security offset and the reevaluation process" by "omitting material information" about changes to the disability benefits from its emails, social media, and written materials, and "ignor[ing]" emails from participants and beneficiaries requesting "clarification." *Id.* ¶¶ 136-39 (citing 29 U.S.C. § 1104(a)(1)(A)–(B) (reciting fiduciary's duty to exercise "care, skill, prudence, and diligence")). Plaintiffs aver that these were "material omissions" that "influenc[ed] *active* players to vote in favor of the disability amendments" and "imped[ed]" Plaintiffs from "mobilizing to influence" the *active players'* vote. *Id.* ¶¶ 140-41 (emphases added).

Finally, in *Claim 6*, the Article 4 subclass sues under LMRA § 301 for "breach of the collective bargaining agreement for impermissibly adding [] disability provisions." *Id.* at 41 & ¶ 145. Yet the "breaches" Plaintiffs allege only concern the NFLPA's internal ratification process, rather than any of the terms of the 2020 CBA. *Id.* ¶¶ 148-51.

In terms of relief, Plaintiffs seek, among other things, "injunctive and declaratory relief to enjoin the enforcement of this Social Security offset disability amendment," to "maintain the disability eligibility of all Class members who were deemed eligible for disability benefits under the Social Security Administration qualification standard," and to "reform the 2020 CBA and the Retirement and Disability Plans to eliminate the unlawful [] disability benefit amendments." Compl. ¶ 152, ¶¶ A-E, G, K-M; *see also* Compl. ¶¶ 126, 134.

In other words, Plaintiffs want the Court to rewrite the CBA and upend a collective bargaining process in which Plaintiffs had no standing to participate. Plaintiffs also seek damages in the form of surcharges against the allegedly "breaching fiduciaries" and disgorgement of alleged profits from the Social Security offset, as well as other monetary penalties. *Id.* ¶¶ H-J, N-O.

IV.     APPLICABLE LEGAL STANDARD ON A MOTION TO DISMISS

A motion to dismiss under Civil Rule 12(b)(6) should be granted where the complaint fails to state a claim upon which relief can be granted. *Moore v. U.S. Dep't of State*, 351 F. Supp. 3d 76, 87 (D.D.C. 2019). To survive a motion to dismiss, a claim must be "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (court must accept factual allegations as true, but not legal conclusions). Rather, it requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility is "more than a sheer possibility that a defendant has acted unlawfully," and a complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

A court also has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Under Civil Rule 12(b)(1), a "plaintiff bears the burden of establishing that the court has [subject-matter] jurisdiction" to hear its claims. *Id.* When a Defendant presents a facial challenge to subject matter jurisdiction (such as Article III standing), "the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

V.      LEGAL ARGUMENT

A.      Plaintiffs Have Not And Cannot State An ERISA Claim Against the NFLPA.

Plaintiffs seek relief under ERISA § 502(a)(3). Compl. ¶¶ 109, 117, 125, 133, 143. For varying reasons for Claims 1 through 4 on the one hand, and Claim 5 on the other, they have no

constitutional standing to pursue any ERISA claim.  Nor have they stated any plausible ERISA claim.  "To state a claim under ERISA § 502(a)(3), Plaintiff[s] must demonstrate Defendants acted in a fiduciary capacity."  *Soland v. George Washington Univ.*, 916 F. Supp. 2d 33, 37 (D.D.C. 2013).  Because (a) the NFLPA is not a fiduciary in any sense relevant to Plaintiffs' claims, and (b) because even if the NFLPA were such a fiduciary, Plaintiffs have failed to plausibly allege any breach, their ERISA claims against the NFLPA fail as a matter of law.

1.   ***ERISA Claims 1-4*—"Violations for Changing [Plan] Terms"—Should be Dismissed.**

In Claims 1 through 4, Plaintiffs assert that the NFLPA "impermissibly reduced or eliminated" or "affect[ed] the rights to" vested disability benefits by agreeing to the Social Security disability offset and whole-person evaluation process in the CBA.  Compl. ¶¶ 107, 115, 123, 131. If the Court reaches the merits of these claims—it should not, because Plaintiffs have not established a constitutionally cognizable injury necessary to establish standing—they must fail.  The NFLPA had no fiduciary duty to any retired players with respect to the CBA terms in question, and Plaintiffs' fundamental assumption that their benefits were legally required to last a "lifetime" is mistaken as a matter of law.  *Id.* ¶ 39.

a.   **Plaintiffs lack Article III standing because they have not alleged any "actual," "imminent" injuries.**

Plaintiffs "bear[] the burden of establishing" the three elements of "the irreducible constitutional minimum of standing" under Article III: (1) "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent"; (2) "a causal connection between the injury and the conduct" that ensures the injury is "fairly . . . trace[able]" to the defendant's actions; and (3) a "likel[ihood] . . . that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations in original) (quotation marks and citations omitted).  "[I]njury in fact[ is] the first and foremost of

[these] elements," (*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alterations and quotation marks omitted)), and Plaintiffs have not plausibly alleged it.

Claims 1-4 hinge on the allegedly improper implementation of the Social Security disability offset and whole-person evaluation process (Compl. ¶¶ 62-71, 103-34), yet neither named Plaintiff alleges that *he* has been injured by those provisions. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975) (named plaintiffs in class actions must allege that they have been injured "personally"). The complaint abstractly alleges that the Social Security disability offset will reduce disability benefits, but neither Cason nor Majkowski alleges that they actually receive Social Security Disability benefits now or expect to do so when the offset takes effect. *See* Compl. ¶¶ 43, 103-34. Absent such a claim, their allegations are "divorced from any concrete harm" and therefore cannot "satisfy the injury-in-fact requirement." *Spokeo*, 136 S. Ct. at 1549.

As for the whole-person evaluation process, Plaintiffs allege that it will not take place until between April 1, 2024 and April 1, 2026, and even then, it is not certain but only (purportedly) "*likely* that Plaintiffs and members of the Class will lose their vested lifetime [] disability benefits" at that time. *See* Compl. ¶¶ 60, 69-71 (emphasis added). Such speculation is not sufficient to confer Article III standing, as the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks and citations omitted). Because Plaintiffs have not alleged an injury sufficiently certain and concrete to support constitutional standing, Claims 1 through 4 should be dismissed on jurisdictional grounds. *See* Fed. R. Civ. P. 12(b)(1).

> **b.    Plaintiffs' alleged "vested" welfare benefits expired when the new CBA was adopted.**

Even if the Court were to reach the merits of Claims 1-4, they rest on a false premise: that the disability benefits Plaintiffs claim will be adversely affected by the 2020 CBA were "vested

lifetime rights" that could not be "reduced or eliminated."  Compl. ¶¶ 107, 115; *see also id.* ¶¶ 106, 114, 123, 131 (alleging Social Security disability offset and whole-person evaluation process "alter[ed]" or "divested" Plaintiffs' disability benefits, or "are being applied in a manner that affects the[ir] rights" to those benefits).  According to Plaintiffs, "[n]othing in the relevant [CBAs or plans] suggest [*sic*] that Defendants had the unilateral ability to alter vested lifetime benefits by adding a Social Security offset."  *Id.* ¶¶ 106, 114.

This claim gets the law backward.  Welfare plans are more malleable than pension plans under ERISA, so welfare "*plan sponsors are generally free . . . to adopt, modify, or terminate welfare plans*"—unilaterally, and "for any reason at any time."  *Tackett*, 574 U.S. at 434–35 (2015) (emphasis added) (quoting *Curtiss-Wright*, 514 U.S. at 78).

In *Tackett*, the Supreme Court confirmed that retirees' welfare benefits are not legally required to outlive the CBA they were adopted under.  *Id.* at 441–42.  This rule is rooted in two traditional principles: "that courts should not construe ambiguous writings to create lifetime promises," and that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement."  *Id.* (quoting *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991)).  While the Court has "recognized that 'a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration,'" if the "contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life."  *Id.* at 442 (quoting *Litton*, 501 U.S. at 207); *accord CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 766 (2018) ("If the parties meant to vest health care benefits for life, they easily could have said so in the text.  But they did not.").

Here, Plaintiffs conclusorily allege that they "were promised in clear and unambiguous terms . . . a defined amount of T&P disability benefits for life."  Compl. ¶¶ 105, 113.  Tellingly,

they point to no language in "Article 5.5(b) of the Retirement Plan and Articles 3.6 and 4.2 of the 2019 Disability Plan" that "provid[es] in explicit terms" that these benefits were intended to "*continue after the agreement's expiration*." *Id.*; *Tackett*, 574 U.S. at 442 (emphasis added) (quoting *Litton*, 501 U.S. at 207). There is no such language—both plans say just the opposite, as did the previous CBA. *See, e.g.*, 2011 CBA Art. 61 § 1 (excerpts attached as Exhibit C to Miossi Decl.) (disability plan is to "be continued and maintained in full force and effect *during the term of this Agreement*" (emphasis added)); Ex. A to Miossi Decl., Retirement Plan § 10.2 (NFLPA and NFLMC "may amend this Plan in any respect and may terminate this Plan"); Ex. B to Miossi Decl., Disability Plan § 10.1 (plan may be "amended or terminated by joint action of the NFLPA and the [NFLMC] while there is a [CBA] in effect"); *see also* Sept. 2019 disability plan Summary Plan Description (SPD) at 42 (excerpt attached as Exhibit D to Miossi Decl.) ("Disability benefits are not vested" and "can be changed or terminated at any time").[2]

Ignoring these rules, Plaintiffs allege that, because the plans stated that disability benefits would last until "cessation of . . . disability," "termination" following decertification, or "Death," they expected to "receive[] . . . disability benefits in the specified amount for life." Compl. ¶¶ 25, 33. Their purported expectation is implausible and, in any event, irrelevant in the face of the plain language of the collectively bargained agreements. "An employer who promises lifetime medical benefits, while at the same time reserving the right to amend the plan under which those benefits were provided, has informed plan participants of the time period during which they will be eligible to receive benefits *provided* the plan continues to exist." *In re Unisys Corp. Retiree Med. Ben. "ERISA" Litig.*, 58 F.3d 896, 904 (3d Cir. 1995); *accord IUE-CWA v. Gen. Elec. Co.*, 745 F.

---

[2] Because these documents are "repeatedly referenced in the Complaint" and are central to [Plaintiffs'] claim[s]," the Court may consider them at the motion-to-dismiss stage. *See Saunders*, 842 F. Supp. 2d at 293 n.2.

App'x 583, 594 (6th Cir. 2018) ("a reservation-of-rights clause means that any alleged lifetime promise in a benefit plan is actually a qualified one" (quotation marks omitted)); *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003) (no vesting despite language stating that health benefits "continue[] until . . . death" because employer had reserved right to amend or terminate); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1512 n.2 (10th Cir. 1996) ("the weight of case authority" holds "that a reservation of rights clause allows the employer to retroactively change the medical benefits of retired participants, even in the face of clear language promising company-paid lifetime benefits"); *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 855–56 (4th Cir. 1994) (no "vested right to receive lifetime benefits after retirement" where company "reserv[ed] . . . the right to modify plan benefits"); *Alday v. Container Corp. of Am.*, 906 F.2d 660, 665 (11th Cir. 1990) (summary plan description indicated that retiree health insurance could be terminated or modified); *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1518 (8th Cir. 1988) (language promising welfare benefits "until death of retiree" did not cause benefits to vest where employer reserved right to terminate or amend plan).  The Court should reject Plaintiffs' contrary assertions.

**c.      The NFLPA had no fiduciary duties in connection with Plaintiffs' allegations.**

The Court need not reach the heart of the allegations against the NFLPA in Claims 1-4, as Plaintiffs cannot make it past "the threshold question," which "is not whether the actions of [an ERISA defendant] adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226.  Because "[f]iduciary status can be determined as a matter of law at the motion to dismiss stage based on a plaintiff's allegations that the defendants were ERISA fiduciaries," dismissal on these grounds is appropriate.  *In re Bear Stearns*, 763 F. Supp. 2d at 565.

Plaintiffs do not even *allege* the NFLPA was acting as their fiduciary in connection with bargaining over their retirement benefits.  This omission is dispositive.  *See Soland*, 916 F. Supp. 2d at 37 (fiduciary duty is a prerequisite to a § 502(a)(3) claim).  Such an allegation would not have succeeded anyway; as will be discussed in greater detail below, just this year, another district court explained in dismissing similar claims by former players against the NFLPA that "[w]hatever control the [NFLPA] ha[d] over the Plan through collective bargaining . . . is not a 'fiduciary act' for purposes of ERISA liability."  *See Hudson*, 2019 WL 5722220 at *19 (citing *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336 (1981)).

Courts have also drawn a "distinction between administering the pension program (under a fiduciary duty) and creating or amending the program through negotiations"—particularly when it comes to retirees' benefits.  *See, e.g.*, *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1268-69 (7th Cir. 1985) ("a union is not a fiduciary while, or merely because, it is negotiating the terms and conditions of future pension benefits"); *Sutton v. Weirton Steel Div. of Nat. Steel Corp.*, 567 F. Supp. 1184, 1193 (N.D. W. Va.), *aff'd*, 724 F.2d 406 (4th Cir. 1983) ("union fiduciary duties in regard to employee welfare plan participants and beneficiaries arising under ERISA . . . are not necessarily implicated when union leadership participates in negotiations for amendments to existing agreements and recommends the products of such negotiations to un-ion membership" (citing *Robinson*, 455 U.S. at 562)).

The Retirement and Disability Boards, the plans' administrators, are the named fiduciaries (*Hudson*, 2019 WL 5722220, at *2 (S.D.N.Y. Sept. 5, 2019), *report and recommendation adopted as modified*, 2019 WL 4784680 (S.D.N.Y. Sept. 30, 2019)), and de facto fiduciary liability on the part of another party involved in the plan extends only so far as the fiduciary "has discretionary authority . . . in the administration of [the] plan."  *F.H. Krear & Co. v. Nineteen Named Trs.*, 810

F.2d 1250, 1259 (2d Cir. 1987).  That is, "a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control."  *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1459–60 (5th Cir. 1986).

Here, Plaintiffs allege that the NFLPA "is a fiduciary of the Plans" for purposes of its allegations in Claims 1-4 only "[b]y virtue of these powers to appoint and remove other fiduciaries."  Compl. ¶ 12.  Even if the court were to accept this legal conclusion, the only "discretionary authority" the NFLPA has with respect to the plans is the power to appoint board members—thus its fiduciary duty extends *only to appointing those board members*.  *See Sommers*, 793 F.2d at 1459–60 ("if an employer and its board of directors have no power with respect to the plan other than to appoint the plan administrator and the trustees, then their fiduciary duty extends only to those functions"); *see also Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991) (union's "obligation as a fiduciary pertain[ed] only to" areas in which it had "limited discretion"); *IBEW Local 90 v. Nat'l Elec. Contractors Ass'n*, 2008 WL 918481, at *6–7 (D. Conn. Mar. 31, 2008) (employer association representing contributing employers was an ERISA fiduciary by virtue of its power to appoint and remove trustees, but its "fiduciary obligations are, of course, limited to 'those aspects of the plan over which [it] exercises authority or control,'" *i.e.*, the appointments process) (citing *Sommers*, 793 F.2d at 1459–60).[3]  And having appointed only 50% of the voting members, the NFLPA could not possibly take any unilateral action with respect to the plans.  *See* Compl. ¶¶ 12–13.

---

[3] Plaintiffs do not allege that the NFLPA had a duty to supervise or monitor its appointees' decision-making.  Nor could they: in a Taft-Hartley plan like those at issue here, the LMRA *prohibits* the union (*and* the employer, the other plan sponsor) from "direct[ing] or supervis[ing] the decisions of a trustee he has appointed."  *Amax*, 453 U.S. at 329; *see* 29 U.S.C. § 186; *see also Hudson*, 2019 WL 5722220, at *19 (citing *Amax*, 453 U.S. at 329–30); *DeCarlo v. Rochester Carpenters Pension, Annuity, Welfare & S.U.B. Funds*, 823 F. Supp. 115, 118 (W.D.N.Y. 1993).

Because Plaintiffs do not allege *any* NFLPA misconduct in connection with its appointing or supervising Board members for the plans, the NFLPA could not have been "acting as a fiduciary . . . when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. And without any fiduciary duty to the retired players with respect to the CBA terms being challenged, Claims 1 through 4 do not state an ERISA cause of action against the NFLPA.

The Southern District of New York recently dismissed claims by a former NFL player against the NFLPA, the NFLMC, and the plan administrators for many of the same reasons the Court should dismiss these claims. *Hudson*, 2019 WL 5722220, at *4. Although the claims in *Hudson* were slightly different (alleging a breach of the duty to monitor the board and a breach of the duty to provide certain information in the SPD), the rationale should apply with equal force here. The court explained that because the plans at issue are multiemployer Taft-Hartley plans, the NFLPA's duties are "limited only to its functional responsibilities": "the power to appoint and remove three members of the [Retirement] Board." *Id.* at *18. The NFLPA "had no broader 'control' or 'authority' over the Plan" (*id.*)—a broader scope "would undermine the [Taft-Hartley Act's] rationale for delegating responsibility for the administration of the Plan to the Board in the first place" (2020 WL 1547467, at *8), and the LMRA "prohibited [the NFLPA] from directing or supervising the decisions of the appointed board members." 2019 WL 5722220, at *19.

The NFLPA's "fiduciary duties do not extend to liability for the [Retirement] Board's substantive decisions." *Id.* at *17. It need only "ensur[e] that appointing fiduciaries are performing their duties, not *how* they are performing those duties." 2020 WL 1547467, at *8. Yet the plaintiff in *Hudson*, as here, made no allegations about the NFLPA breaching *those* limited appointment duties. 2019 WL 5722220, at *20. The NFLPA "did not have the unilateral ability to revise the Plan or affect particular decisions under the Plan," and there was no allegation of a breach of "any

specific duty that it did have." *Id.* at *19.  And, as explained above, an action taken in conjunction with "collective bargaining . . . is not a 'fiduciary act.'"  *Id.* (citing *Amax*, 453 U.S. at 336).  Nor was there any allegation of a breach of any fiduciary duty to disclose under § 1104(a)(1)(A)–(B), as the plaintiff had not alleged "any misleading representations" about the contents of the plan. *Hudson*, 2020 WL 1547467 at *8.  The court thus "conclude[d] that repleading would be futile" and dismissed with prejudice.  *Id.*

The pleading defects in *Hudson*—filed by some of the same counsel as this case—are repeated here.  Plaintiffs' allegations of duty in Claims 1-4 are nominally premised entirely on the NFLPA's appointment power (Compl. ¶ 12), but the substantive averments do not have anything to do with the NFLPA's "appointment of three [board] members."  2019 WL 5722220, at *18. Nor, as in *Hudson*, do Plaintiffs so much as aver that those board members failed to "carr[y] out their other duties."  2020 WL 1547467, at *8.

### 2.   *ERISA Claim 5*—"Failure to Disclose Material Information"—Should Also Be Dismissed.

Claim 5 should be dismissed because the allegations are (1) too remote and speculative to confer Article III standing and (2) fail to state any claim against the NFLPA.

### a.    Plaintiffs lack Article III standing to pursue Claim 5.

To plead Article III standing under Claim 5, Plaintiffs must plausibly allege (among other things) an "injury in fact" that is "fairly . . . trace[able]" to the NFLPA's alleged conduct.  *Lujan*, 504 U.S. at 560–61 (alterations in original) (quotation marks and citations omitted).  Constitutional standing also requires that the injury be "fairly . . . trace[able] to the challenged action of the *defendant*, and not . . . th[e] result [of] the independent action of some third party not before the court."  *Id*. at 560 (emphasis added)).  "When considering any chain of allegations for standing purposes, [a court] may reject as overly speculative those links which are predictions of future

events (especially future actions [of] third parties)." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015); *Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991) (no standing where "the plaintiff s[ought] to change the defendant's behavior *only as a means* to alter the conduct of a third party, not before the court, who [wa]s the direct source of the plaintiff's injury"); *Ege v. U.S. Dep't of Homeland Sec.*, 784 F.3d 791, 795 (D.C. Cir. 2015) (no standing where the injury resulted from the actions of a third party not before the court); *Siegel v. U.S. Dep't of Treasury*, 304 F. Supp. 3d 45, 54 (D.D.C. 2018) ("reliance on the anticipated action[s] of unrelated third parties makes it considerably harder to show the causation required to support standing").

Applying these principles to Claim 5, Plaintiffs' alleged reduction in welfare benefits— *i.e.*, the Social Security disability offset and whole-person evaluation—must plausibly be "fairly traceable" to the allegedly "misleading" NFLPA communications and not the unknown conduct of third parties. *Lujan*, 504 U.S. at 560–61; Compl. ¶¶ 72, 74, 78, 83. But the causal chain alleged by Plaintiffs—that if they had more material information from the NFLPA on benefit changes, they "*might*" have been able to lobby active players to reject the CBA in their ratification vote, which "*might*" have led to the negotiation of a new CBA that *might* have provided greater benefits for Plaintiffs (Compl. ¶ 73 (emphases added))—is far too speculative, remote, and uncertain to confer constitutional standing. Indeed, Plaintiffs specifically rely on the unknown, speculative acts of third parties (*i.e.*, whether the active players would have altered their ratification votes) as a central causal premise of their claims.

Further, even if, as Plaintiffs posit, the CBA "*might*" not have been ratified had more information on benefit changes been provided by the NFLPA, Plaintiffs would *then* need to allege that an alternative CBA would have been agreed to, *and* that this CBA would not have a Social Security disability offset or whole-person evaluation provision. But Plaintiffs (correctly) do not

even *attempt* to plead such rank conjecture. *See Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986) ("the mere possibility that causation is present is not enough; the presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied"). Collectively bargaining the 400+ page CBA in a multi-billion-dollar industry is an intricate and multivariate process consisting of innumerable concessions and *quid pro quos*. If the NFLPA and NFLMC had reached an alternative CBA, the only plausible scenario in which the NFLMC might have agreed to drop the Social Security disability offset or whole-person evaluation requirement would be if the NFLPA had made other concessions. Not only is it speculative that active players would have been willing to engage in such a renegotiation and exchange of benefits, it is entirely possible that such concessions would have come at the expense of other retirement benefits so that Plaintiffs would be no better off. No one could predict what would actually happen in such a scenario, which underscores why Claim 5 is too speculative to satisfy the constitutional test for standing.

In sum, Claim 5 rests upon speculation upon speculation upon speculation, as well as the unknown conduct of third parties, to set forth its causal chain. This falls far short of Plaintiffs' burden to plead a concrete, non-speculative injury in fact.

> **b.     Plaintiffs have also failed to plead a viable cause of action against the NFLPA under Claim 5.**

Unlike in Claims 1-4, in Claim 5 Plaintiffs *do* allege that the NFLPA owed them a fiduciary duty by virtue of the NFLPA making communications to former players about changes to the CBA. *See* Compl. ¶¶ 136-42. However, while the NFLPA's communications about changes to the welfare plans in the new CBA could theoretically give rise to a limited fiduciary duty (*see Bilello v. JPMorgan Chase Ret. Plan*, 649 F. Supp. 2d 142, 164–65 (S.D.N.Y. 2009)), Plaintiffs' allegations

about purported NFLPA communications fall short of stating a claim for breach of fiduciary duty against the NFLPA in at least two respects: (1) the NFLPA's alleged affirmative misstatements did not concern the contents of the plans; and (2) Plaintiffs do not allege that any NFLPA statement caused any loss *to the plan*.

*First*, as for the affirmatively *false* communications attributed to the NFLPA, they concern purported NFLPA statements to the effect that its active-player-members understood the potential impact that the 2020 CBA could have on former players' benefits.  Compl. ¶¶ 77-79.  Plaintiffs disagree—arguing that (unidentified) tweets from (unidentified) players illustrate "there was no such understanding by the players generally." *Id.* ¶ 78.  Even if Plaintiffs were right that players generally did not understand the CBA's potential impact on retirement benefits, they have not come close to alleging that *the NFLPA knew its alleged communications* were "false or lack[ed] a reasonable basis," as ERISA requires. *Bilello*, 649 F. Supp. 2d at 166.  Moreover, and more fundamentally, false statements give rise to ERISA liability only when they concern "*the contents of a plan*." *Id*. at 165.  The NFLPA's allegedly false statements about its members' understanding are not statements about "the contents of a plan." *Id.*

*Second*, a required element of Plaintiffs' claim of a breach of fiduciary duty is that the NFLPA caused a loss to the plan. *See* 29 U.S.C. § 1109(a).  Plaintiffs make no such allegation. Instead, they merely allege harm to themselves.  Claim 5 thus independently fails as a matter of law for this reason as well.

### B.    Plaintiffs Have Not And Cannot State An LMRA § 301 Claim.

Plaintiffs attempt to use LMRA § 301 as a Trojan Horse to litigate their dissatisfaction with the NFLPA's internal governance processes for ratifying the 2020 CBA.  Both the claim that Plaintiffs *did* plead (that the NFLPA breached the CBA and violated the LMRA) and the claim that they *want* to pursue (that the NFLPA breached its Constitution and violated some unspecified duty to

Plaintiffs) fail as a matter of law.  The former claim fails because Plaintiffs have not alleged any plausible CBA breach; the latter claim fails because Plaintiffs have no Article III standing to challenge the internal governance proceedings of their *former* union.  And the relief Plaintiffs seek—asking the Court to "reform" the CBA so it includes benefits not provided for as a result of collective bargaining—is unavailable to them and anathema to the LMRA.

### 1.     Plaintiffs have failed to plead any plausible breach of the CBA.

Although styled as a "breach of the collective bargaining agreement," the factual allegations underpinning Claim 6 do not actually allege any CBA breach.  Compl. ¶¶ 144-52.  Absent a breach of the CBA, a § 301 claim fails as a matter of law.  *See Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 657 (1998) (no jurisdiction where § 301 claim failed to allege that "a contract has been violated").

The only CBA provision referenced in Claim 6 is Article 60: the provision that Plaintiffs contend "Defendants Management Council and Players Association impermissibly *changed*."  Compl. ¶ 145 (emphasis added).  There is, however, a fundamental difference between an allegation that the bargaining parties improperly *changed* or *modified* their agreement (what Plaintiffs allege) and an allegation that the bargaining parties are not adhering to the terms of the CBA (which Plaintiffs do *not* allege).  For example, if Plaintiffs averred that the NFLPA and NFLMC were applying a Social Security disability offset even though the CBA did not provide for any such offset, *that* would be a claim for breach of the CBA's terms.  But Plaintiffs do not, and could not, plausibly plead that the bargaining parties will not comply with the CBA as written.  Rather, their real gripe is the (alleged) manner in which the CBA was changed and ratified.  This is not a viable LMRA § 301 claim, as it does not allege a breach of the CBA.

The only other CBA provision referenced anywhere in the complaint is Article 67 (Compl. ¶ 56): "Th[e] Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties." This cannot possibly—much less plausibly—be the source of any alleged CBA breach. The plain intention of this standard contractual provision is to require that the parties make changes to their agreement in writing—rather than orally—to minimize disagreements over what they have agreed to. The very crux of Plaintiffs' complaint is that the NFLPA and NFLMC *jointly agreed* to the Social Security disability offset and whole-person evaluation, which they then put in writing in the 2020 CBA. So there is no arguable breach of Article 67 either.

In sum, despite labeling their claim as a breach-of-the-CBA under the LMRA, Plaintiffs have pleaded no such thing, which should end the § 301 analysis.

### 2.   Plaintiffs lack standing to pursue their legally defective allegations about internal NFLPA governance processes.

Labels aside, the *substance* of the "LMRA" claim squarely and exclusively depends on Plaintiffs' contention that the NFLPA did not follow its own internal governance procedures during the 2020 CBA ratification process. *See id.* ¶¶ 148-51. But Plaintiffs are no longer active NFLPA members, are not part of the bargaining unit, have no vote in the union's CBA ratification process, and have no standing to assert any claim based on a purported violation of those internal union processes. As described above, under *Lujan*, Plaintiffs have no constitutionally cognizable legal interest in the NFLPA's internal governance rules, nor could their requested remedy of reforming the CBA redress their purported injuries for the simple reason that such a remedy—changing the terms of a CBA by judicial command—is unavailable as a matter of law.

### a.    Plaintiffs have no "legally protected interest" in enforcing the NFLPA Constitution.

Plaintiffs concede in the complaint that "the union owes no duty of fair representation to retired players." Compl. ¶ 147. This is settled labor law. The Supreme Court recognized a half-century ago that active and retired employees "plainly do not share a community of interests." *Allied Chem.*, 404 U.S. at 173. A union has a statutory duty to represent the interests of *active* employees "fairly and impartially" (*Humphrey*, 375 U.S. at 342), and the inherent tension between the interests of active and retired employees (and the conflicts that tension may create) makes it impossible for the union to act as a fiduciary in the interests of retirees at the same time. For this reason, retired employees *cannot* be included in the bargaining unit the union represents. *Allied Chem.*, 404 U.S. at 172–73; *see also Yolton v. El Paso Tenn. Pipeline Co.*, 668 F. Supp. 2d 1023, 1034–35 (E.D. Mich. 2009).

Because retirees are not part of the bargaining unit, "a union's duty of fair representation does not include an obligation to take into account the interests of its retired members when it is negotiating contracts with an employer." *Baskin*, 807 F.2d at 1131 (discussing, inter alia, *Allied Chem.*, 404 U.S. at 172–75); *see also Bove v. Long Island R.R.*, 1995 WL 901990, at *6 (E.D.N.Y. Dec. 12, 1995) ("the duty of fair representation derives from the fact that a union is defined by statute as the exclusive bargaining representative for all members of a bargaining unit . . . [i]t follows that the union's duty does not extend to persons outside the bargaining unit, such as retirees"). "[A]nd retiree benefits"—including those of NFL retirees—are "commonly bargained by labor

31

unions representing current employees [but] are not mandatory subjects of collective bargaining." *Eller*, 731 F.3d at 755 ("retired [NFL] players are not members of a collective bargaining unit").[4]

Because the former player Plaintiffs have no "legally protected interest" (*Lujan*, 504 U.S. at 560) in the NFLPA's collective bargaining, they certainly have no "legally protected interest" in how the NFLPA goes about ratifying a collective bargaining agreement among its members.

Labor law gives unions broad discretion to manage their affairs; even *active* union members have a very limited ability to challenge union governance outside of any internal union procedures.  Relevant here, an active NFL player, filed a complaint earlier this year with the National Labor Relations Board alleging that the NFLPA's CBA ratification process did not comply with its Constitution—allegations that Plaintiffs here mimic in their complaint.  *Compare* Denial Letter, *NFL Players Ass'n (Los Angeles Chargers)*, No. 21-CB-257665 (N.L.R.B. Aug. 14, 2020) (declining to reconsider) (attached as Ex. E to Miossi Decl.), *with* Compl. ¶¶ 148-51.  The NLRB dismissed Okung's charge precisely because the Board's jurisdiction over the NFLPA's administration of its internal affairs is so limited:

> Regarding the Union's internal procedures and ratification, the Board has found that a union has the ability to decide how to carry out its ratification process.  *International Longshoremen's Association, Local 1575, AFL-CIO (Navieras, NPR, Inc.)*, 332 NLRB 1336 (2000).  When a union seeks "employee ratification, it is for the union 'to construe and apply its internal regulations relating to what would be sufficient to amount to ratification."  *Id.* at 1336 citing *M & M Oldsmobile*, 156 NLRB 903, 905 (1966), enfd. 377 F.2d 712 (2d Cir. 1967).  Here the evidence failed to establish that the Union's handling of the ratification of its contract or any of the other alleged internal anomalies violated the National Labor Relations Act.

---

[4] *See also Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821 (9th Cir. 1985) ("Because the union owed no duty [of fair representation] to [plaintiff] as a nonemployee of the bargaining unit, he lacks standing to sue for breach of such a duty."); *Harmon v. Am. Elec. Power Serv. Corp.*, 371 F. Supp. 2d 804, 812 (S.D. W. Va. 2005) ("no standing to bring [a duty of fair representation] suit under [the CBA's] terms" because she was "neither an employee nor a member of the bargaining unit and therefore [could not] enforce any rights created under the agreement").

Ex. E; *see also* Dismissal Letter, *NFL Players Ass'n (Los Angeles Chargers)*, No. 21-CB-257665 (N.L.R.B. May 6, 2020) (attached as Ex. F to Miossi Decl.) ("Finally, with respect to the ratification of the 2020 CBA, the Board does not interpret for a union its Constitution or the manner in which it ratifies contracts pursuant to its constitutional provisions.").  The Board's conclusions apply with even greater force to the claims of *retired* players who, unlike the active player that filed the charge, have no standing to assert this claim because the union owes them no duty.  At bottom, Plaintiffs have no legally cognizable right to complain about the NFLPA's internal governance.  Claim 6 should be dismissed on this ground alone.

    **b.**  **Again, the connection between the asserted injury and the NFLPA's conduct is impermissibly speculative.**

 Article III standing as to Claim 6 is also lacking for the same reason as Claim 5: it is too speculative.  To attribute Plaintiffs' asserted injuries to the alleged breach of the NFLPA's internal governance procedures, one must speculate that the active players who *did* have a vote would have declined to ratify the CBA under the correct procedures, *and* that a new CBA would then have been negotiated that contained the benefits Plaintiffs want.  This is hardly "*fairly* traceable."  *See Lujan*, 504 U.S. at 560.  For the reasons explained above, Claim 6 may be dismissed on this ground as well.  *See supra* Part V.A.2.a.

    **c.**  **Plaintiffs' claimed injuries cannot be redressed by a favorable outcome.**

 Plaintiffs also lack standing to bring Claim 6 for the additional reason that, even if they could assert a claim for a breach of union governance procedures, their requested remedy—reforming the terms of the CBA—is not available to redress their claimed injuries because it is precluded by federal labor law.  *Robinson*, 455 U.S. at 576 ("when neither the collective-bargaining process nor its end product violates any command of Congress, a federal court has no authority to modify the substantive terms of a collective-bargaining contract"); *see also Am. Postal Workers*

*Union*, 657 F. Supp. 2d at 103 (refusing to "interfere with the terms of [bargained-for labor contracts]").  In requesting that the Court compel the bargaining parties to blue-pencil the complex, carefully negotiated 2020 CBA, Plaintiffs seek "[j]udicial nullification of a contractual concession," which is "contrary to what the [Supreme] Court has recognized as '(o)ne of the (f)undamental policies' of the [NLRA]—'freedom of contract.'"  *NLRB v. Magnavox Co. of Tenn.*, 415 U.S. 322, 328 (1974) (Stewart, J., concurring in part and dissenting in part) (citing *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970)).

Further, even *if* the Court could require the NFLPA to re-do its CBA ratification processes (*see* Compl. ¶¶ 148-50), it still would not "likely" redress Plaintiffs' injuries, as there are no assurances that a new CBA would eliminate the Social Security disability offset and the whole-person evaluation requirement, or if it did so, that it would not require an offsetting reduction in welfare benefits that would leave Plaintiffs no better off.  *See supra* Part V.A.2.a.  To establish Article III standing, "it must be *likely*, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *See Lujan*, 504 U.S. at 560 (emphasis added) (quotation marks omitted).  Here, where the Court cannot mandate a particular bargaining outcome, what a new CBA negotiation would yield would always be entirely speculative.  As Justice Stewart observed, because a "union typically exacts some form of quid pro quo from the management negotiators," and "it is usually impossible to identify the consideration given in return for a particular union concession," judicial "invalidation of bargained-for concessions does not promote stability in the collective-bargaining process."  *Magnavox*, 415 U.S. at 328 (Stewart, J., concurring in part and dissenting in part).  The relief Plaintiffs request is thus not likely to provide them with any redress (*see Lujan*, 504 U.S. at 560), and would run afoul of the very principles of non-interference with

the bargaining process that animates the LMRA.  There is no legally viable claim Plaintiffs can assert to seek such relief.  For all of these reasons, the Court should dismiss Claim 6 as well.

## CONCLUSION

The NFLPA respectfully requests that the Court dismiss Claims 1-6 against it with prejudice, as the legal defects that infect Plaintiffs' claims against the union cannot be cured by amendment.

Dated: September 20, 2020                    Respectfully submitted,


/s/ *William G. Miossi*
William G. Miossi (Bar No. 445265)
Lauren Gailey (Bar No. 1631587)
WINSTON & STRAWN LLP
1901 L Street N.W.
Washington, DC  20036
Tel: (202) 282-5000
Fax: (202) 282-5100
wmiossi@winston.com
lgailey@winston.com

Jeffrey L. Kessler (*pro hac vice* pending)
David L. Greenspan (*pro hac vice* pending)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY  10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com

*Counsel for Defendant National Football League Players Association*