# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AVEION CASON
27451 Cedar Park Court
Wesley Chapel, Florida 33544

and

DONALD VINCENT MAJKOWSKI,
6138 Narcissa Pl
Johns Creek, Georgia 30097

in their individual capacity and on
behalf of others similarly situated,

No. 1:20-cv-01875

*Plaintiffs*

**CLASS ACTION
AMENDED COMPLAINT**

v.

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION
1133 20th Street, NW
Washington, D.C. 20036

THE BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN BOARD
200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202

THE NFL PLAYER DISABILITY AND
NEUROCOGNITIVE BENEFIT PLAN
BOARD
200 St. Paul Street, Suite 2420
Baltimore, Maryland 21202

and NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL
345 Park Ave, Floor 8
New York, New York 10154

*Defendants*

Plaintiffs, Aveion Cason and Donald Vincent Majkowski, by their counsel, on behalf of themselves and all other similarly situated, allege the following facts related to their claims based on personal knowledge and all other facts based on investigation of counsel:

## NATURE OF THE ACTION

1. Plaintiffs, totally and permanently ("T&P") disabled former National Football League ("NFL") football ~~players~~Players, bring this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C § 185, on behalf of a Class of T&P disabled former NFL ~~players~~Players, who are participants in the Bert Bell/Pete Rozelle NFL Player Retirement Plan, Amended and Restated as of April 1, ~~2014~~2017 ("the Retirement Plan"), and the NFL Player Disability and Neurocognitive Benefit Plan, Amended and Restated as of April 1, 2019 ("the Disability Plan") (collectively "the Plans").

2. This action is brought against the fiduciaries of the Plans to enjoin and declare unlawful contractual violations of the Retirement Plan and the Disability Plan; to enjoin and declare fiduciary misrepresentations to Plan participants through plan communications about disability benefit amendments; to cure breaches of the 2020 ~~NFL/~~National Football League Management Council ("Management Council")/National Football League Players Association ("NFLPA" or "Players Association") Collective Bargaining Agreement ("2020 CBA"); and to obtain appropriate equitable relief to redress such violations.

3. Defendants are the plan sponsors, administrators, and fiduciaries of a disability program for NFL ~~players~~Players. As a result of the 2020 CBA between the ~~National Football League~~ Management Council ~~(the "Management Council")~~ and the Players Association, both as presented to ~~players~~Players in proposal form for a vote, and later secretly modified after

approval, T&P disabled former NFL ~~players~~Players will lose substantial vested T&P disability benefits.

4.      As fiduciaries of the Retirement Plan and the Disability Plan, Defendants have an obligation, characterized as the highest known to law, to fairly administer the Retirement Plan and the Disability Plan for ~~players~~Players in the Class and to act with a duty of loyalty and duty of care in providing them T&P disability benefits under these Plans.  Defendants have violated the language of the Retirement Plan and the Disability Plan and ~~by~~have violated their fiduciary duties under ERISA by failing to disclose and inform all members of the Class of the substantially negative consequences that these amendments to the Plans would have in the future for them and thereby ~~impede~~impeded Class members' ability to mobilize to influence the vote against the 2020 CBA.

5.      As a result of these substantial reductions in vested benefits, after Class members were already in paid status, and failure to disclose the adverse impact of the 2020 CBA Amendments to T&P disabled former NFL ~~players~~Players, Defendants have violated the terms of the Plans and breached their fiduciary duties under ERISA.  Plaintiffs, on behalf of the Class, seek ~~to reform the 2020 CBA to undo these amendments, seek~~ equitable relief to redress the fiduciaries' violations, and enjoin any actions that would diminish the Class' vested disability benefits in a manner inconsistent with the conditions under which these disability benefits were first granted and became vested under the Plans.

6.      Defendants Players Association and Management Council have also breached the 2020 CBA by impermissibly and significantly changing disability language from the time the ~~players~~Players voted on the March 5, 2020 version of the 2020 CBA, to when the approved 2020

CBA was posted on the Players Association website on March 15, 2020, all in violation of Section 301 of the LMRA, 29 U.S.C § 185.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this suit arises under the laws of the United States, pursuant to 29 U.S.C. §1132(e)(1), which provide for federal jurisdiction of actions brought under Title I of ERISA, and under Section 301 of the LMRA, 29 U.S.C § 185, which grants federal courts jurisdiction to resolve disputes between employers and labor unions about collective-bargaining agreements.

8.      This Court has personal jurisdiction over Defendants because Defendants transact business in and have significant contacts with the District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e), 29 U.S.C. § 1132(e)(2).

9.      Venue is proper in this District pursuant to ERISA § 502(e), 29 U.S.C. § 1132(e)(2).  and 28 U.S.C. § 1391(b) and (c), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and at least one of the Defendants may be found in this District.

## THE PARTIES

**Plaintiffs**

10.      Plaintiff Aveion Cason is a retired professional football player with the NFL within the meaning of Article 1.30 of the 2019 Disability Plan. He began his NFL career in 2001 and played 56 games during his nine-year NFL career.  Cason split his career between the Detroit Lions and the St. Louis Rams from 2001- 2008. Cason is a "participant" in the Disability Plan, as defined under 29 U.S.C. § 1002(7), and a "Vested Inactive Player" as defined in Article 1.35 of the 2019 Disability Plan. He started received T& P disability benefits on February 1,

2016Cason was awarded Social Security disability benefits on September 4, 2015. He started receiving T&P disability benefits on February 1, 2016, based on receiving Social Security disability benefits. Cason will be detrimentally impacted by the Social Security offset provisions in the 2020 CBA, as described below, because he will be receiving Social Security disability benefits in 2021, when the offset takes effect.

11.     Plaintiff Donald Vincent Majkowski is a former professional football player with the NFL within the meaning of Article 1.35 of the 20142017 Retirement Plan and Article 1.30 of the 2019 Disability Plan. He began his NFL career in 1987 playing for the Green Bay Packers. Majkowski played 90 games over 10 seasons in the NFL.  He played six years for the Packers, two years for the Colts, and two years for the Detroit Lions. Majkowski retired after the 1996 season. Majkowski is a "participant" in both the Retirement and Disability Plans, as defined under 29 U.S.C. § 1002(7), and a "Vested Inactive Player" as defined in 1.46 of the 20142017 Retirement Plan and a "Vested Inactive Player" as defined in 1.35 of the 2019 Disability Plan. Plaintiff Majkowski was awarded Social Security benefits on November 16, 2012. He started receivedreceiving T&-P disability benefits on March 27, 2013, with an effective date of November 1, 2011.based on receiving Social Security disability benefits.  Majkowski will be detrimentally impacted by the Social Security offset provisions in the 2020 CBA, as described below, because he will be receiving Social Security disability benefits in 2021, when the offset takes effect.

**Defendants**

12.     Defendant National Football League Players Association ("Players Association" or "NFLPA") is located at 63 Gene Upshaw Place, 1133 20th Street, NW, Washington, D.C., and is the labor organization representing both former and current professional American football

players in the NFL.  Pursuant to Article 8.1 of the ~~2014~~2017 Retirement Plan Document and Article 9.1 of the 2019 Disability Plan Document, the Players Association has the authority to appoint three voting members of the Retirement Board and the Disability Board and also to remove and appoint a replacement for any member of the Retirement Board or Disability Board that the NFL Management Council has appointed. By virtue of these powers to appoint and remove other fiduciaries, Defendant Players Association is a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and had the fiduciary responsibility to monitor their fiduciary appointees and to take actions only in the best interests of participants and remedy any fiduciary violations.

13.     Defendant National Football League Management Council ("Management Council") is located at 345 Park Ave, Floor 8, New York, New York and is a non-profit association of clubs of the NFL.  Pursuant to Article 8.1 of the ~~2014~~2017 Retirement Plan Document and Article 9.1 of the 2019 Disability Plan, the NFL Management Council has the authority to appoint three voting members of the Retirement Board and the Disability Board and also to remove and appoint a replacement for any member of the Retirement Board or Disability Board that the NFL Players Association has appointed. By virtue of these powers to appoint and remove other fiduciaries, Defendant NFL Management Council was a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and had the fiduciary responsibility to monitor their fiduciary appointees and to take actions only in the best interests of participants and remedy any fiduciary violations.

14.     Defendant Bert Bell/Pete Rozelle NFL Retirement Plan Board ("Retirement Board") is located at 200 St. Paul Street, Suite 2420, Baltimore, Maryland, and is identified in Article 1.3 of the ~~2014~~2017 Plan Document as the designated Plan Administrator of the

Retirement Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a named fiduciary of the Plan within the meaning of ERISA § 402, 29 U.S.C. § 1102.  The Retirement Board is and has been a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or discretionary control respecting management of the Retirement Plan, and/or had discretionary authority or discretionary responsibility in the administration of the Retirement Plan.

15.     Specifically, under Article 8.2 of the Retirement Plan, Defendant Retirement Board was responsible for, *inter alia*, the following: defining the terms of the Retirement Plan and Trust; construing the Retirement Plan and Trust; reconciling any inconsistencies in the definition or interpretation of the Retirement Plan and Trust; deciding claims for benefits; paying all reasonable and necessary expenses of the Retirement Plan; adopting procedures, rules, and forms; delegating authority as necessary in the administration of the Plan; selecting Trustees and setting forth terms of the Trust; commencing or defending suits or legal proceedings involving the Retirement Plan and the Trust; and settling, compromise, or submitting to arbitration claims, debts, or damages due or owing to or from the Retirement Plan or Trust. Pursuant to the Retirement Plan's Summary Plan Description, the Retirement Board is composed of six voting members, three of whom are selected by the NFLPA and three of whom are selected by the Management Council.

16.     Defendant NFL Player Disability and Neurocognitive Benefit Board ("Disability Board") is located at 200 St, Paul Street, Suite 2420, Baltimore, Maryland, and is identified in Article 1.2 of the 2019 Plan Document as the designated Plan Administrator of the Disability Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and a named fiduciary of the Disability Plan within the meaning of ERISA § 402, 29 U.S.C. § 1102.  The Disability

Board is and has been a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority or discretionary control respecting management of the Disability Plan, and/or had discretionary authority or discretionary responsibility in the administration of the Disability Plan.

17.     Specifically, under Article 9.2 of the 2019 Disability Plan, Defendant Disability Board was responsible for, *inter alia*, the following: defining the terms of the Disability Plan and Trust; construing the Disability Plan and Trust; reconciling any inconsistencies in the definition or interpretation of the Disability Plan and Trust; deciding claims for benefits; paying all reasonable and necessary expenses of the Plan; adopting procedures, rules, and forms; delegating authority as necessary in the administration of the Disability Plan; selecting Trustees and setting forth terms of the Trust; commencing or defending suits or legal proceedings involving the Disability Plan and the Trust; and settling, compromise, or submitting to arbitration claims, debts, or damages due or owing to or from the Disability Plan or Trust.   Pursuant to the Disability Plan Summary Plan Description, the Disability Board is composed of six voting members, three of whom are selected by the NFLPA and three of whom are selected by the Management Council.

## FACTUAL ALLEGATIONS

### The Retirement Plan and The Disability Plan

18.     The Bert Bell/Peter Rozelle NFL Player Retirement Plan ("Retirement Plan") is an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). However, the disability provisions of the Retirement Plan are an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1).

19.     The relevant written instrument of the Plan within the meaning of ERISA §
402(a) is the Bert Bell/Pete Rozelle NFL Player Retirement Plan Amended and Restated as of
April 1, 2014. Since at least 1994, the Retirement Plan has provided retirement, disability, and
related benefits to eligible professional football players. Players. Although there is a separate
NFL Player Disability and Neurocognitive Benefit Plan ("Disability Plan"), that plan only
applies to disability benefits payable, and claims for benefits made, on or after January 1, 2015.
The Retirement Plan continues to pay part of the T&P disability benefits for claims filed prior to
January 1, 2015.

20.     The Disability Plan is an employee welfare benefit plan within the meaning of
ERISA § 3(1), 29 U.S.C. § 1002(1). The relevant written instrument of the Disability Plan within
the meaning of ERISA § 402(a) is the NFL Player Disability and Neurocognitive Benefit Plan
Amended and Restated as of April 1, 2019. Since January 1, 2015, the Disability Plan has
provided disability and related benefits to eligible professional football playersPlayers. Although
there is a separate Retirement Plan, that Plan only applies to disability benefits payable, and
claims for benefits made, before January 1, 2015.  The Disability Plan pays T&P disability
benefits for claims filed both before and after January 1, 2015.

21.     Article 5 of the 20142017 Retirement Plan addresses Total and Permanent
Disability ("T&P") benefits. Article 5.1 defines "Eligibility" as follows: "An Eligible Player
whose application for total and permanent disability ("T&P") benefits is received before January
1, 2015, who is determined by the Retirement Board or the Disability Initial Claims Committee
to be totally and permanently disabled in accordance with Section 5.2, and who satisfies the
other requirements of this Article 5, will receive a monthly T&P benefit from this Plan in the

amount described in Section 5.5 for the months described in Sections 5.8 and 5.9. For purposes

of this Article, "an Eligible Player is a Vested Inactive Player. . . or an Active Player."

22.     Article 1.46 of the Retirement Plan defines "Inactive Vested Player" as "a Vested

Player who is not an Active Player."  Article 1.47 of the Plan defines "Vested Player" as a player

who "earns five Credited Seasons; (b) earns four Credited Seasons, including a Credited Season

after the 1973 Plan Year; (c) earned three Credited Seasons, including a Credited Season after

the 1992 Plan Year . . . ." Article 2 address eligibility under the Retirement Plan noting that "[a]ll

Players participate in the Plan."

23.     Article 5.2(b) of the ~~2014~~2017 Retirement Plan provides eligibility for T&P

disability benefits through Social Security disability awards as follows: "An Eligible Player who

is not receiving monthly pension benefits under Article 4 or 4A, who has been determined by the

Social Security Administration to be eligible for disability benefits under either the Social

Security disability insurance program or Supplemental Security Income Program, and who is still

receiving such benefits at the time he applies, will be deemed to be totally and permanently

disabled . . . ."

24.     Article 5.3 of the ~~2014~~2017 Retirement Plan also provide four categories of T&P

benefits, of which one is relevant: "(c) Inactive A.  . . . "a Player will qualify for benefits in this

category if a written application for T&P benefits or similar letter that the administrative process

that resulted in the award of T&P benefits was received within fifteen (15) year after the end of

the Player's last Credited Season. This category does not require that the disability arise out of

League football activities."   Under Article 5.5(b), the minimum amount of monthly T&P

Payments for Inactive A former Players under the Retirement Plan is $4000 per month through

April 1, 2021.

25.     Section 5.9, on Duration of T&P Benefits states: "All benefits provided by this Article will be payable until the earlier of (a) the cessation of the Player's total and permanent disability, (b) the termination of benefits under Section 5.6, or (c) the Player's Death."  Thus, if the Player is total and permanently disabled for his entire life, and submits to periodic examination under Article 5.6, he receives the T&P disability benefits in the specified amount <u>for life</u> by express terms of the Retirement Plan.

26.     There is no language in the ~~2014~~2017 Retirement Plan which requires the amount of benefit available to Inactive A Players to be offset by the amount of Social Security benefit received.

27.     The 2020 CBA indirectly makes modifications to the Retirement Plan. Currently, $4000 per month of T&P disability benefits come from the Retirement Plan for Players who became eligible for these benefits prior to January 1, 2015. Although the Retirement Plan will not be directly modified by the 2020 CBA, the operation of the Social Security offset will mean than some of this benefit from the Retirement Plan will be reduced or eliminated. Similarly, the operation of the reevaluation under the whole person evaluation process means that many members of the Class will lose their $4000 benefit for T&P disability benefits from the Retirement Plan.

~~27.~~28.   Not only does the Retirement Plan not have a reservation of rights clause, but it expressly states in Article 10.1(c): "The Retirement Board . . . may not: (c) <u>Reduce, as a direct result of an amendment, the value of any benefit already earned</u> and otherwise payable under the Plan."  Furthermore, Article 10.3 states: "No amendment of the Plan may operate to deprive a Player or beneficiary of any rights or benefits irrevocably vested in him under the Plan."

28.29.  With regard to the T&P provisions of the 2019 Disability Plan, Article 3 addresses benefits for those who receive T&P disability benefits under the Disability Plan on and after January 1, 2015.  In pertinent part, Article 3.1 states: "An Article 3 Eligible Player will receive monthly Plan total and permanent disability benefits ("Plan T&P benefits") in the amount described in Section 3.6, for the months described in Sections 3.10 and 3.11 . . . ."

29.30.  Under Article 3.2(a) of the 2019 Plan, "[a]n Article 3 Eligible Player who is not receiving monthly pension benefits under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan, who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, and who is still receiving such benefits at the time he applies, will receive Plan T&P benefits in the amount described in Section 3.6, for the months described in Sections 3.10 and 3.11 . . . ."  Article 1.35 of the 2019 Disability Plan defines "Vested Inactive Player" has "the same meaning as defined in the Bert Bell/Pete Rozelle Plan." Article 2 address eligibility under the Retirement Plan noting that "[a]ll Players participate in the Plan."

30.31.  In the table in Article 3.6 of the 2019 Disability Plan, Inactive A former players Players receive $10,000 per month of T&P disability benefits effective September 1, 2011, $11,250 effective January 1, 2016, and $0 effective April 1, 2021.  Consequently, Inactive A players Players who applied for T&P benefits after January 1, 2015, are receiving Disability Plan payments of $11,250 per month from the Disability Plan (or a total of $135,000/year), with no offset for any Social Security benefit received.

32.  Because Defendants Management Council and Players Association agreed to an amendment to the Disability Plan in March 2020, the provision concerning T&P disability benefits dropping to $0 on April 1, 2021, never became a reality.  The idea that there is an

increase in benefits for Plaintiffs and the Class is based on a fallacy that these benefits started from $0, which never happened. The impact of the Disability Plan amendments to Article 3 of the Plan wrought by the March 2020 CBA was to *reduce* the amount of disability benefits from $11,250 per month to somewhere between $8,250 and $9,250 a month for Plaintiffs and Member of the Class.

31.33.  Article 4 of the 2019 Disability Plan is identical to Article 3, except it applies to T&P disability benefits resulting from applications received before January 1, 2015. Such Article 4 playersPlayers are eligible for disability benefits under both the Retirement Plan and the Disability Plan, but receive in total no more than $11,250 per month.  Under Article 4.2, an Inactive A player who applied for T&P disability benefits prior to January 1, 2015, receives $4,000 per month from the Retirement Plan and $7250 per month from the Disability Plan, for a total of $11,250 per month or $135,000 per year.

34.     Because Defendants Management Council and Players Association agreed to an amendment to the Disability Plan in March 2020, the provision concerning T&P disability benefits dropping to $0 on April 1, 2021, never became a reality.  The idea that there is an increase in benefits for Plaintiffs and the Class is based on a fallacy that these benefits started from $0, which never happened. The impact of the Disability Plan amendments to Article 4 of the Plan wrought by the March 2020 CBA was to *reduce* the amount of disability benefits from $11,250 per month to somewhere between $8,250 and $9,250 a month for Plaintiffs and Member of the Class.

32.35.  There is no language in the 2019 Disability Plan which requires the amount of benefit available to Inactive A playersPlayers, under either Article 3 or Article 4, to be offset by the amount of Social Security benefit received.

33.36.  Under Articles 3.11 and 4.5, ~~players~~Players are vested for life in the entire T&P disability amount "until the earliest of (a) the cessation of the Player's total and permanent disability, (b) the termination of his benefits under Section 3.8 [dealing with periodic recertification of disability], or (c) the Player's death."   Thus, if the player is total and permanently disabled for his entire life, and submits to periodic examination, he receives the T&P disability benefits in the specified amount for life by the express terms of the Disability Plan.

37.   Although there is language in the Disability Plan Summary Plan Description (SPD) to the effect that Disability benefits do not vest, this language is superseded by the language of the Plan itself which does not contain such language and which supersedes the language of the SPD when there is a conflict between the Plan and the SPD. Nothing in the Disability Plan itself prevents disability benefits from vesting under circumstances laid out by the Plan itself.

34.38.  There is no unilateral reservation of rights clause in the Disability Plan by which the Disability Board is able to unilaterally amend the Disability Plan.   Article 10.1 states in pertinent part: "This Plan may only be amended . . . by joint action of the NFLPA and the Management Council while there is a Collective Bargaining Agreement in effect . . . ."   ~~That being said, the Plan cannot be amended in a way that violates ERISA~~In turn, "joint action" is possible only if the NFLPA has been authorized under its Constitution to enter into a Collective Bargaining Agreement with the Management Council.   No such authorization occurred, as explained further below.

39.   Article 61, Section 1 of the 2011 CBA states that, "[T]his new Disability Plan will be continued and maintained in full force and effect during the term of this Agreement."

Significantly, it does *not* say that the Disability Plan shall continue *only* for the duration of the 2011 CBA, nor does it say that the Disability Plan runs concurrently with the 2011 CBA. The 2011 CBA is silent on what happens to the Disability Plan at the expiration of the Agreement. This ambiguity means, consistent with recent U.S. Supreme Court law in *M&G Polymers USA, Inc. v. Tackett*, 574 U.S. 427 (2015), that extrinsic evidence may be consulted to show that the Disability Plan will remain in effect, regardless of the cessation of the CBA. Extrinsic evidence, in the form of the Disability Plan itself and income verification statements, establishes that the T&P disability benefits provided thereunder, are to be provided for the life of the Player, as long as they remain disabled.

35.40. During the Class Period, and as recently as June 22, 2020, Plaintiffs and Class members have received numerous Income Verification statements from Defendants Retirement Board and Disability Board which state that ~~players~~Players who applied for benefits prior to 2015, "receive a benefit from the Bert Bell/Pete Rozelle NFL Retirement Plan, as well as a benefit from the NFL Player Disability & Neurocognitive Benefit Plan."

36.41. These Income Verification statements confirm that the maximum amount an Inactive A player who started receiving their T&P disability prior to 2015 was $4,000 per month from the Retirement Plan, $7250 per month from the Disability Plan, for a total of $11,250 per month or $135,000 per year.

37.42. Similarly, Income Verifications statements confirm that the maximum amount an Inactive A player who started receiving their T&P disability after January 1, 2015, is $11,250 per month from the Disability Plan, for a total of $135,000 per year.

38.43. Importantly, in ~~either case~~both cases, the Income Verification statements sent to the Class state unequivocally:

The participant is collecting a monthly Total and Permanent Disability Benefit . . . in the amount of $11,250. The benefit is <u>payable for life</u> or cessation of the disablement.

39.44.  T&P disability benefits for both post-2015 and pre-2015 eligible <s>players</s><u>Players</u> are "<u>payable for life</u>" and the Plans, along with the Income Verification statements, create a vested right to lifetime T&P disability benefits for former NFL <s>players</s><u>Players</u>, their surviving spouses, and their dependents. <u>Nothing in the Plan itself prevents this vesting of disability benefits from occurring.</u>

**The 2020 NFL-NFLPA Collective Bargaining Agreement**

40.45.  Starting on or around March 5, 2020, during the beginning of the global pandemic, the NFLPA conducted a rushed, sporadic, and ad hoc voting process that left <s>players</s><u>Players</u> disenfranchised and misled. NFL <s>players</s><u>Players</u> were presented with a 456-page proposed Collective Bargaining Agreement (2020 CBA) between Defendant Management Council and Defendant Players Association and given nine days to digest the Agreement and vote on it.   The March 5th version of the 2020 CBA can be found here: https://nflpaweb.blob.core.windows.net/media/Default/NFLPA/CBA2020/NFLNFLPA_CBA_March_5_2020.pdf.

41.46.  Current NFL player Eric Reid and his attorneys published a Fact Sheet on March 9, 2020, critical of the CBA which reached wide circulation.  The March 9th Fact Sheet sought to guide both current and former NFL <s>players</s><u>Players</u> on their employment rights more generally in light of problematic language in the 2020 CBA.

42.47.  Specifically, T&P disability benefits for Plaintiffs and members of the Class were impacted in two <u>real, non-speculative</u> ways by T&P disability amendments according to the Fact

Sheet: (1) through a new ~~social security~~Social Security offset; and (2) through requiring reevaluation of those already in paid status under the "whole person" evaluation process.

**The Social Security Offset**

~~43.~~48. ~~First, a~~A new Social Security offset was enacted for Inactive A ~~players~~Players who also ~~received~~receive Social Security disability benefits. Under this Social Security offset, starting on January 1, 2021, Inactive A ~~players would~~Players will see their ~~lifetime vested~~ disability benefits diminished by the amount of Social Security benefits they ~~received.~~receive. In practice, this means Plaintiffs and members of the Class will receive somewhere between $2000 to $3000 less a month or lose approximately 20% of their fixed income.

~~44.~~49. Initially, under the March 5th version of the 2020 CBA on which ~~players~~Players voted, only ~~players~~Players who received disability benefits from the Disability Plan starting after January 1, 2015 ("Article 3 Players") ~~saw~~will see their monthly Disability Plan T&P reduced by the amount they received from Social Security starting on January 1, 2021.

~~45.~~50. Importantly, the March 5th version of the 2020 CBA voted upon by ~~players~~Players did not apply the new Social Security offset to those Inactive A ~~players~~Players who commenced receiving T&P disability benefits ~~initially~~ prior to January 1, 2015 ("Article 4 Players").

~~46.~~51. Without explanation, and without going through the ~~approved~~authorized voting process established by the NFLPA Constitution, the March 15th version of the 2020 CBA ~~applied~~seeks to apply the Social Security offset to these Article 4 Players for the first time. The March 15th version of the 2020 CBA on the NFLPA website can be found here: https://nflpaweb.blob.core.windows.net/media/Default/PDFs/Agents/NFLNFLPA%20CBA%20March%205,%202020.pdf.

47.52.  In the March 5th CBA, Article 60, Section 4 states that Article 3.6 of the Disability Plan is amended to permit Social Security offsets, thus resulting in lower monthly benefits for the T&P disabled retired playersPlayers who are governed by Article 3 of the Disability Plan.  The poison pill provision in the 2011 CBA that states that these T&P disability benefits would be reduced to $0 on April 1, 2021, never came into play, nor is it anything more than speculative that such a provision would ever come into effect.

48.     With regard to Article 3 Players, these amendments impermissibly changed the conditions under which these players had been receiving T&P disability benefits and impermissibly reduced their lifetime vested rights to these disability benefits.

49.     If active employees do not like the terms of the changed benefit, they have the option to reject the terms by seek other employment with better benefits elsewhere. But this choice is not one that a disabled employee can make. Nor does a disabled employee generally enjoy the retiree's advantage of being able to select, or at least predict, his or her date of separation from the company, and plan accordingly.

53.     It is inaccurate to suggest that somehow Players received an increase in disability benefits, as this completely fails to consider the reality of how Plaintiffs and Class Members' T&P disability benefits will be impacted by the unlawful disability-related amendments to the 2020 CBA  The impact of the Disability Plan amendments to Article 3 of the Plan wrought by the March 2020 CBA will be to *reduce* the amount of disability benefits from $11,250 per month to somewhere between $8,250 and $9,250 a month for Plaintiffs and Member of the Class.

50.54.  The nature of T&P disability benefits strongly suggests that the parties did not intend or expect that Defendants could unilaterally change the terms of T&P disability benefits after Class members had already started receiving benefits, absent an explicit provision to that

effect. ~~T&P Disabilities~~ which does not exist in the Plan itself. T&P disabilities commencing prior to the effective date of these Plan disability amendments should be provided for under the terms of the Plans in effect at the time those disabilities commenced.

**The 2020 CBA Switcheroo**

~~51.~~55.   On March 15, 2020, additional language was secretly added to the 2020 CBA by Defendants Players Association and Management Council in the newly formed subparagraph (a), and an entirely new subparagraph (b), of Article 60, Section 4.  The new language of subsection (b) states that Article 4 of the Disability Plan will be amended to apply a Social Security offset to ~~players~~Players who have been receiving T&P disability since before 2015.

~~52.~~56.   This change to the language of Article 60, Section 4 of the 2020 CBA was done surreptitiously without player knowledge, without following procedures for modifications of CBAs, and without an additional player vote.

57.   Although Plaintiffs and members of the Class are not members of the NFLPA, they are intended third-party beneficiaries under the March 2020 CBA and they therefore have standing to maintain an action against the Management Council and Players Associations as if they were a party to the contract. The March 2020 Collective Bargaining Agreement is a written contract conferring a benefit upon Plaintiffs and members of the Class as intended beneficiaries for T&P disability benefits, and Plaintiffs have the right to contest the unauthorized manner by which the 2020 CBA was ratified.

58.   Further, Plaintiffs have standing to challenge this unauthorized change to the 2020 CBA because they have a legally protectable interest, not in the NFLPA's internal governance rules or in enforcing the NFLPA Constitution, but in not having their T&P disability benefits detrimentally impacted by unauthorized actions by the NFLPA and Management Council.  This

harm to their benefits is fairly traceable to the actions of the NFLPA and Management Council. And finally, these injuries could be redressed by requiring a re-vote on the 2020 CBA with full information available to all impacted parties, including active Players, many of whom will be disabled former Players someday unfortunately.

53.59.  When confronted with these secretive changes to the 2020 CBA language, Defendant NFLPA acknowledged such changes were made, but replied that such changes were not substantive and did not require a vote.

60.    The Management Council, for its part, also acknowledged the change was made, but argued that Section 4(b) of Article 60 in the 2020 was "inadvertently omitted" from the version ratified by the Players. The Management Council does not, and cannot, explain how that provision could be added without being ratified by the Players, instead admitting that representatives from the Management Council and the NFLPA alone agreed to this clarification without rank-and-file Player involvement.

54.61.  These March 15th changes to the 2020 CBA, by Defendant NFLPA's own admission, impacted 400-900 former NFL playersPlayers on T&P disability benefits.  Clearly, such a change was a substantive change to the 2020 CBA, should have been bargained transparently, and voted upon by playersPlayers.

55.62.  With regard to Article 4 Players, these amendments impermissibly changed the terms under which these Players had been receiving T&P disability benefits and impermissibly reduced their lifetime vested rights to these T&P disability benefits.

56.63.  Pursuant to Article 67, Section 9 of the 2020 CBA: "Th[e] Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties." There is no such written agreement signed between authorized

representatives of the Players Association and the Management Council. Even if such changes are permitted through the joint action of authorized representatives, such joint action did not occur because the NFLPA, according to its own Constitution, was not acting as an "authorized" representative of the Players when Players did not vote on this substantial change.

64.     The NFLPA is only an "authorized representative of the parties" if it had the right under its Constitution to enter into the Collective Bargaining Agreement with the Management Council.  This is not a Trojan Horse to litigate dissatisfaction with the bargaining process, but rather fundamental to the power the NFLPA has (or does not have in this case) to advance proposals in the collective bargaining process.

57.65.  Section 6.05 of the NFLPA Constitution, sets out the procedure for when there is an amendment to a ratified CBA: "If it is proposed to amend a Collective Bargaining Agreement during the period of its agreed duration, any such proposal shall be submitted to the Board of Representatives upon recommendation from the Executive Committee." The new language in Article 60, Section 4 was never submitted to the NFLPA Executive Committee or Board of Representatives. The NFLPA thus did not adhere to the terms of the CBA in adding in a clandestine manner, and in an unauthorized manner, Article 60, Section 4 to the 2020 CBA.

66.     The Management Council breached the collective bargaining agreement, for its part, by entering into an understanding with the NFLPA, which it knew the NFLPA was not acting as an "authorized" representative for the Players under Article 67, Section 9 of the 2020 CBA (only permitting amendment of the CBA "by a written agreement signed by *authorized* representatives of the parties") (emphasis added).

67.     Having realized that Article 60, Section 4 had been left out of the 2020 CBA voted on by the Players, the NFL Management Council was duty bound, under the amendment

and modification provisions of Article 67 of the 2020 CBA, to ensure that this omitted language was added through appropriate procedures and not through some secret handshake with NFLPA representatives after the Players voted.

68.    The NFL Management Council knew that the NFLPA was only "authorized" to enter into an amendment with the Management Council if it had gone through the proper procedure within the NFLPA.  The fact that the Management Council and the NFLPA resorted to a clandestine meeting to unlawfully amend the 2020 CBA is proof that the Management Council and NFLPA both knew they were in violation of the applicable 2020 CBA provisions.

69.    In short, although the Management Council is not a party to the NFLPA Constitution, it is in violation of the binding contract between itself and the NFLPA because it entered into an amendment with the NFLPA, which it knew was not acting as an authorized party for these purposes.

58.70.  Section 6.05 of the NFLPA Constitution continues by stating: "Any such proposed amendment to the Collective Bargaining Agreement which is agreed to by majority vote of the Board of Player Representatives and agreed to by the owner representatives shall not be binding on the NFLPA until one of the following requirements has been satisfied: 1. The Board of Representatives determines by a two-thirds (2/3) vote that the proposed amendment is not of such substance as to call for ratification by the members; or 2. The Board of Representatives determines by a two-thirds (2/3) vote that the proposed amendment is of such substance as to call for ratification by the members, and the proposed amendment is ratified by a majority of the members voting for ratification or rejection."

59.71.  The changes made on March 15th to Article 60, Section 4 of the 2020 CBA are not binding on the NFLPA because the Board of Representatives never determined, let alone by 2/3

votes, that the proposed amendment was not of substance, nor was the proposed amendment subject to a ratification vote by the majority of the voting NFLPA members.

72.   Although existing law does not *require* a union to accord its rank-and-file members the right to ratify a collective-bargaining contract, nonetheless, a union may choose to do so.  Here, the NFLPA expressly gave its rank-and-file members the ability to ratify its CBAs under its Constitution. The 2020 CBA between the NFLPA and the Management Council recognize this entitlement to Player input by requiring that the NFLPA be acting in an "authorized" capacity under Article 67 of the 2020 CBA.

**Reenactment of the Whole-Person Evaluation Process**

60.73.  In addition to the Social Security offset disability amendment, the 2020 CBA also rescinds the automatic Social Security approval for T&P disability benefits for the Disability Plan starting on April 1, 2024. There is nothing speculative about this change in T&P eligibility procedures as it will happen in one form or another by this date  and will likely harm Plaintiffs and the Class in their ability to be considered eligible for such benefits.

61.74.  Currently, playersPlayers can be deemed disabled based on being found disabled by the Social Security Administration (SSA) under SSDI or SSI., as Plaintiff Majkowski and Cason have been.  This provision was put into placeadded after Congressional Hearings on the NFL's reluctance to find their playersPlayers disabled using "neutral" physicians and the whole-person evaluation process.  The harm about to be suffered by Plaintiffs and the Class can only be properly understood in light of how fraudulently the whole person evaluation process was handled by the NFL and NFLPA historically.

62.75.  More specifically, in In 2007, Congressional hearings were held before the U.S. House and Senate because there were hundreds of obviously disabled former NFL playersPlayers

who qualified for Social Security disability benefits but were being denied benefits by the Retirement Plan. Then, as now, both the NFL and NFLPA boasted of their generous benefits while former ~~players~~Players became homeless after their benefits were denied.~~–~~ Legislators, including then-Senator John Kerry, threatened to intervene if the NFL did not "get its act together."

~~63.~~76.  Representative Maxine Waters testified at the Senate Hearing. She shared her experiences in trying to help a former NFL player in dire need of obtaining T&P disability benefits:

> Jim Shorter died a broke man, stripped of his dignity and his silver years by an unfair and unyielding NFL disabilities program. This program, which is built like the rest of the functions of the NFL, from the blood, sweat, and tears of men like Jim Shorter, was designed, in my belief, to refuse benefits for the very ~~players~~Players that needed them most.

~~64.~~77.  Daryl "Moose" Johnson, who played eleven years for the Dallas Cowboys, testified his career ended prematurely because of a neck injury, and he knew first-hand the frustration of trying to obtain T&P disability benefits from the NFL disability program under the whole-person evaluation process:

> The initial doctor that filed my claim, and the doctor who heard my appeal, are designated as neutral physicians, but, in reality, are handpicked doctors by the NFL Players Association. The Board that denied my claim is selected by NFL ownership and the NFL Players Association. Obviously, this is a system that is, by design, not interested in assisting the retired player.

~~65.~~78.  Notably, NFL Commissioner Roger Goodell was present and testified at the 2007 Senate Hearing.  There, he stated:

> I begin from a premise which I think no one seriously disputes: the men who played professional football decades ago deserve our respect and recognition, and their contributions to our game must never be overlooked. I honor them, and **neither I, nor the NFL clubs, will turn our backs on them**. And this is not Gene Upshaw's problem alone, nor is it the NFL's. The responsibility for helping retired ~~players~~Players belongs to all of us—NFL owners, the union, current and

retired ~~players~~Players, and me, as Commissioner. I must be compassionate, creative, and responsible." (emphasis added)

~~66.~~79.  Commissioner Goodell promised in his written statement to the Senate in 2007:

We also recently agreed to expand the standards for determining Total & Permanent disability by incorporating the medical findings of the Social Security Administration. **If a player has been determined to be eligible for disability benefits by Social Security, no separate medical assessments will be needed. Instead, the determination of the Social Security Administration will govern the former player's medical eligibility for NFL disability benefits**." (emphasis added)

~~67.~~80.  Since 2007, Defendants NFLPA and NFL Management Council have turned their backs on former disabled ~~players~~Players.  As just one example, Attorney Gene Egdorf had a conversation with DeMaurice Smith, the Executive Director of the NFLPA, during Super Bowl Week in February 2020.  In a Twitter discussion, Mr. Egdorf related what Mr. Smith said to him regarding his view on retired ~~players~~Players:



Gene Egdorf @GeneEgdorf · Mar 14
Replying to @SheillaDingus
When the Super Bowl was in Houston I talked to Smith about retiree issues. He said that wasn't a burden to be put on current players. He gave an analogy that money my law firm makes today wouldn't/shouldn't be shared with partners who retired 20 years ago bc didn't earn it

💬 6        ↻ 3        ♥ 5        ✉

~~68.~~81.  Even more stunning and egregious, not only will future ~~players~~Players who apply for T&P disability benefits have to be certified disabled by "neutral" physicians selected by the Disability ~~Plan~~Board, but Plaintiffs and members of the Class will also have to be reevaluated under this more difficult-to-meet, T&P disability benefits standard~~—~~ in order to maintain their current benefits at all.  Defendants suggest this injury is speculative, but the reevaluation will

occur and the NFL's history all but make certain numerous currently disabled Players will lose their eligibility for T&P benefits.

69.82.  Plaintiffs' and members of the Class' vested, lifetime T&P disability benefits are also threatened by the reenactment of the whole-person evaluation process. SuchThis is an imminent and non-speculative threat given the NFL and NFLPA's history with these issues. Additionally, such a system impermissibly changes the terms under which T&P disabilities had been received by those already in paid status prior to enactment of this provision by requiring that their disability status be "reevaluated" starting on April 1, 2026.

70.83.  Section 6 of Article 60 of the 2020 CBA states: "The parties shall amend Section 3.2 of the Disability Plan by adding a subsection 3.2(c) to state that as of April 1, 2024, a Social Security determination of disability does not establish a player's eligibility for benefits under this Disability Plan . . . . On or before April 1, 2026, playersPlayers receiving benefits under the Disability Plan based on a Social Security determination submitted to the Disability Plan prior to April 1, 2024, shall be re-evaluated under the whole-person evaluation process to determine if they continue to meet the Disability Plan's eligibility requirements for T&P benefits. Players determined to no longer meet the Disability Plan's eligibility requirements for T&P benefits shall have their benefits terminated." (emphasis added)

71.84.  Given the Retirement Board's inglorious and well-documented history under this harder-to-meet, whole-person evaluation process, it is more than likely that thatnumerous Plaintiffs and members of the Class will lose their vested lifetime T&P disability benefits under both the Retirement Plan and the Disability Plan starting in 2026.

85.    These claims are ripe now because Plaintiffs and Class members face statute of limitation issues if they cannot bring this claim now before the effects are felt.  Disabled former

Players will also have out of pocket costs to retain attorneys to fight these changes irrespective of whether they are successful in maintaining their benefits.

**Misleading and Inaccurate Plan Communications**

72.86.  In addition to these obvious and illegal substantive and material changes to the 2020 CBA to the terms of T&P disability program for those already in paid status and in violation of the vested lifetime T&P disability benefit promises made to Plaintiffs and Class members, Defendant Players Association, through its directorsdelegated employees and officers, Nolan Harrison III, Bethany Marshall, and Sam Acho, sent plan communications to current and former playersPlayers both before the 2020 CBA ratification vote and after the vote that were false, misleading because they, and omitted material information.

87.    The NFLPA knew that these alleged communicated by its representatives were false and/or lacked a reasonable basis, as they were aware of what had actually been negotiated with the Management Council, and that the NFLPA had thrown the Plaintiffs and these members of the Class under the proverbial bus.

88.    These false and misleading statements by representatives of the NFLPA give rise to liability under ERISA because such misrepresentations are statements about the contents and inner workings of the Disability and Retirement Plans, specifically about how T&P disability benefits will be calculated and awarded under these Plans.

89.    These losses are recoverable even if there has not been a loss to the Plans themselves. ERISA provides for individual recovery against plan fiduciaries for violating their duties to inform participants of their rights under the Plan, consistent with their duties of loyalty and prudence.

90.     Knowing that the NFLPA, through its employees and officers, was making incomplete and misleading statements about disability benefits under the Plans, the Retirement Board and Disability Board had an affirmative duty as fiduciaries to explain to the Plaintiffs and members of the Class as participants of the Plans, the true impact of these amendments on the Retirement Plan and Disability Plan. Because they provided no such corrections to known misrepresentations and omissions by the NFLPA and its representatives, the Retirement Board and Disability Board breached its fiduciary duties to Plaintiffs and members of the Class.

91.     The NFLPA breached its fiduciary duty to monitor its appointees to the Retirement and Disability Boards because those appointees knew or should have known that the NFLPA representatives were engaged in misrepresentations and omissions in their communications with Plaintiffs and member of the Class about amendments to the disability provisions of those Plans.

92.     By failing to take action to remedy that breach by informing their appointees to the Board that they needed to correct those misstatements or failing that, removing the breaching fiduciaries from the Boards, the NFLPA caused harm to Plaintiffs and members of the Class as far as their disability benefits. Had the truth about these T&P disability benefit changes been known, the vote for ratification would not have been secured improperly, the ratification vote would have most likely failed, and former Players might have mobilized effectively, with current Players, against ratification of the 2020 CBA.   As a result, a new CBA would have been negotiated with the NFL and ratified – without the Social Security offset and whole person evaluation process – and with other less draconian trade-offs being made between the parties.

93.     The Management Council breached its fiduciary duty to monitor its appointees to the Retirement and Disability Boards because those appointees should have known that the

NFLPA representatives were engaged in misrepresentations and omissions in their communications with Plaintiffs and member of the Class about amendments to the disability provisions of those Plans.

94.    By failing to take action to remedy those breach by informing those appointed fiduciaries that they needed to correct those misstatements or failing that, removing the breaching fiduciaries from the Board, the Management Council caused harm to Plaintiffs and members of the Class as far as their disability benefits.  Had the truth about these T&P disability benefit changes been known, the vote for ratification would not have been secured improperly, the ratification vote would have most likely failed, and former Players might have mobilized effectively, with current Players, against ratification of the 2020 CBA.  As a result, a new CBA would have been negotiated with the NFL and ratified – without the Social Security offset and whole person evaluation process – and with other less draconian trade-offs being made between the parties.

95.    ERISA states that a "person is a fiduciary with respect to a plan," and therefore subject to ERISA fiduciary duties, "to the extent" that he or she "exercises any discretionary authority or discretionary control respecting management" of the plan, or "has any discretionary authority or discretionary responsibility in the administration" of the plan. ERISA § 3(21)(A).

96.    As the United States Supreme Court held in *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996), "Conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose."

97.    "The factual context in which the statements were made, combined with the plan-related nature of the activity, engaged in by those who had plan-related authority to do so,

together provide sufficient support," *id.* at 503, for the legal conclusion that the NFLPA's employees and officers were acting as a fiduciary to the Retirement and Disability Plans when speaking to the Plaintiffs and members of the Class with regard to their benefits under the Plans. The NFLPA's statements through its employees and officer "about the security of benefits amounted to an act of plan administration." *Id.* at 505.

98.     The U.S. Supreme Court has held that, "making intentional representations about the future of plan benefits is an act of plan administration," and that is what the NFLPA and its delegees did in intentionally misrepresenting the impact of Plan changes to current and former Players in order to secure the necessary votes for ratification of the March 2020 CBA.

73.99.  These statements, which omitted material information, harmed Plaintiffs and members of the Class in two ways: (1) by improperly influencing active players Players to vote in favor of the disability amendments; and (2) by impeding the ability of Plaintiffs and members of the Class from mobilizing to influence the vote by the active players Players against the proposed 2020 CBA.  Had the truth about these T&P disability benefit changes been known, the vote for ratification would not have been secured improperly, the ratification vote might would have most likely failed, and former players Players might have mobilized effectively, with current Players, against ratification of the 2020 CBA.  As a result, a new CBA would have been negotiated with the NFL and ratified – without the Social Security offset and whole person evaluation process – and other less draconian trade-offs being made between the parties.

74.100.          Defendant Players Association's "CBA Proposal Fact Sheet," posted on its website prior to the vote, touts benefit increases to former players. Players. But this statement is misleadingly because there is no mention of potential benefit decreases. The reduction of T&P disability benefits to hundreds of former disabled players Players is not mentioned anywhere.

~~75.~~101.        In a communication entitled "Highlights of the Proposed CBA (As of February 27, 2020)," the Players Association discussed "[s]ignificant increases for <u>current</u> ~~players~~<u>Players</u>," and [s]ignificant increases for <u>retired</u> ~~players~~<u>Players</u> in a variety of benefits, including Pension, HRA, Neurocognitive Benefit." At the end of this retired ~~players~~<u>Players</u> section, there is a bullet point on "T&P disability."  But there is no language about a significant decrease in benefits and no mention that current, automatically qualified SSA disabled player will be forced to go through a reevaluation using the whole-person evaluation process to keep their T&P disability benefits.

~~76.~~102.        Also before the ratification vote, in the Players Association's "CBA Side by Side," communication, the NFLPA nowhere mentions the future reevaluation of currently disabled ~~players~~<u>Players</u> under the more arduous whole-person evaluation process and the fact that T&P disability benefits could be lost by these former ~~players~~<u>Players</u> currently in paid status.

~~77.~~103.        In response to the March 9, 2020 Fact Sheet produced by NFL Player Eric Reid and his attorneys, the NFLPA published, "Response to CBA Inaccuracies."  In point #11, the Players Association falsely states: "Players understand the potential impact [the changes to Social Security qualification and offset to Total & Permanent disability] <u>may</u> have on a subset of our former ~~players~~<u>Players</u>."

~~78.~~104.        The "Response to CBA Inaccuracies" document is false for three reasons. First, as contemporaneous Tweets from current and former ~~players~~<u>Players</u> illustrate, there was no such understanding by the ~~players~~<u>Players</u> generally.  Second, the impact <u>will</u> happen, be unlawful, and be devastating to Plaintiffs and members of the Class.  Third, the statement about the whole-person evaluation process in this document is also misleading as it does not explain

that currently disabled ~~players~~Players will have to be reevaluated under the whole-person evaluation process and that many of them will lose their T&P disability benefits.

~~79.~~105.        As an example of former ~~players~~Players and their families not understanding the T&P disability benefit changes in the proposed 2020 CBA, Plaintiff Majkowski's spouse, Kelly Majkowski, along with families of numerous other members of the Class, had specific questions regarding the impact of the proposed CBA on their T&P disability benefits.

~~80.~~106.        In violation of its duty to inform, and every conceivable sense of fairness, Defendant NFLPA uniformly stonewalled on direct and simple questions. Instead of providing answers, the NFLPA, through Senior Director Nolan Harrison III, gave various vague answers to desperate pleas for help and in many cases, he flat out ignored information requests:

    a.    In response to questions about the impact of the proposed 2020 CBA would have on Article 4 ~~players~~Players rights to T&P disability benefit without ~~social security~~Social Security offset:

        i.    "It is still so new. I will let you know when I have something." (March 4th Email from Nolan Harrison III to Kelly Majkowski, spouse of Plaintiff Don Majkowski)

        ii.    "I am not equipped to answer that question [about your husband's T&P disability benefits]." (March 11th Email from Nolan Harrison III to Kelly Majkowski)

    b.    There were at least four non-responses to Kelly Majkowski's emails to Director Harrison seeking clarification of proposed changes to T&P disability benefits.

81.107.        As a further example of withholding accurate and timely information from disabled player families, the NFLPA's Director of Benefits, Bethany Marshall, flatly admits the NFLPA's strategy and mission of withholding relevant information until after the proposed CBA was ratified:  "I have to reiterate what Nolan had previously said, that as of now the CBA is still in the voting stage (as you mentioned) and until that vote is completed there isn't much that can be said until Monday."  (March 13th Email from Bethany Marshall to Kelly Majkowski)

82.108.        In all, Plaintiff Majkowski's spouse had sent more than eighteen email pleas for information from March 4-17, 2020 to the NFLPA's officers and directors, each of who were acting in a fiduciary capacity in discussing plan benefits with Plan participants.  Defendant NFLPA understood clearly that the answers to Plaintiffs and class Member's questions were relevant plan administration information that actually could impact the CBA ratification vote on the proposed 2020 CBA and that they should have forwarded the requests for information to the Retirement or Disability Board if they believed those entities were the proper fiduciaries of the Plan.  They did not, and instead acted themselves in a functional fiduciary capacity in making these intentional misrepresentations to both current and former NFL Players.

83.109.        In yet another example of misinformation by Defendant Players Association, one of its Vice-Presidents, Sam Acho, repeatedly tweeted information regarding the "positives" of the CBA, and with regard to the T&P disability benefits specifically, but failed to disclose material negative information, which omissions made the statements false and misleading.

84.110.        Acho regularly used his personal Twitter account to publicly communicate information on behalf of the NFLPA to interested parties and Players Association members.  Acho, in a public dialogue with a player on March 11, 2020, knowing other playersPlayers

would see it, publicly tweeted: "Players can still get both T&P AND ~~social~~Social Security disability.  Players used to go through SS if T&P was denied.  Then once SS was accepted, they automatically got T&P. Now ~~players~~Players will need to go through T&P first THEN SS if they want both."  He also stated in a tweet, "You can go get T&P first then go get SS – with no offset.  So if a player wanted both he could still get it."  Acho's statements were inaccurate, false, and misled Plaintiffs and members of the Class because they omitted material information about the T&P disability amendments to the 2020 CBA and the retroactive effect that they would have on player benefits.  By doing so, he made it less likely that Plaintiffs, members of the Class, or active Players would oppose ratification of the 2020 CBA.

~~85.~~111.        After the 2020 CBA ratification vote, the NFLPA published a "FAQ on 2020 CBA and Disability Benefits" on their website.  Although the FAQ mentions that active ~~players~~Players applying for T&P disability benefits starting April 1, 2024, will have to qualify under the whole-person evaluation process, this FAQ omits that lifetime and vested former disabled ~~players~~Players will be required to be reevaluated under this new whole-person evaluation process and may lose their lifetime vested disability benefits as a result.

~~86.~~112.        In response to wide-spread dissatisfaction from current and former NFL ~~players~~Players, the NFLPA issued a "2020 CBA Former Player Benefit Improvements" bullet point memo after the vote, which was sent class-wide as recently as June 12, 2020.  Again, the Players Association mislead ~~players~~Players in the labeling, headings, and presentation of this document that should have been a simple, straightforward and fair explanation of the terms of the CBA by omitting material information. Specifically, this memo again omits any reference to the devastating new T&P disability qualification process that will lead to many current T&P

disability beneficiaries wrongly losing their benefits under the historically-biased and arduous whole-person evaluation process.

87.113.     In all, the NFLPA, through its directors and officers acting in a fiduciary capacity to the Disability and Retirement Plans, have made numerous statements that omitted material information about the 2020 CBA T&P disability amendments that have harmed Plaintiffs and members of the Class. By omitting material information from these statements, the misrepresentations both improperly influenced active playersPlayers to vote in favor of the disability amendments and interfered with the ability of Plaintiffs and members of the Class to mobilize to influence the vote by joining with the active playersPlayers against the proposed 2020 CBA.

## CLASS ACTION ALLEGATIONS

88.114.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following persons:

> *All participants qualified to receive total and permanent disability benefits at the time of the disability amendments to the 2020 Collective Bargaining Agreement between the NFLPA and NFL Management Council, excluding the Defendants or any participant/beneficiary who is a fiduciary of the plan.*

89.115.     This proposed class is divided into the following two subclasses pursuant to Rule 23(c)(5) of the Rules of Civil Procedure.

90.116.     The "Article 4 Subclass":

> *All participants qualified to receive total and permanent disability benefits at the time of the disability amendments to the 2020 Collective Bargaining Agreement between the NFLPA and NFL Management Council, and who commenced receiving these benefits prior to January 1, 2015.*

91117.     The "Article 3 Subclass" :

> *All participants qualified to receive total and permanent disability*

*benefits at the time of the disability amendments to the 2020 Collective Bargaining Agreement between the NFLPA and NFL Management Council, and who commenced receiving these benefits January 1, 2015 or after.*

**Impracticability of Joinder**

~~92.~~118.        The members of the Class and each individual subclass are so numerous and geographically dispersed that joinder of all members is impracticable. The number of class members in the proposed class, based on Defendants' own numbers, is between 400 and 900 former disabled NFL ~~players~~Players.  The number of Article 4 Subclass members is between 200 and 500 former disabled NFL ~~players~~Players and the number of Article 3 Subclass members is between 200 and 400 former disabled NFL ~~players.~~Players. These numbers are conservative, but consistent with the Disability Plan's most recent Form 5500, which reports that 2,034 retired or separated participants were actively receiving disability benefits.

**Commonality**

~~93.~~119.        The issues of liability are common to all members of the Class and subclasses and are capable of common answers as those issues include:

a.    Whether the Defendants breached their fiduciary duties to Plaintiffs and members of the Class, and subclasses, by impermissibly reducing vested lifetime T&P disability benefits, under the NFL Retirement Plan and NFL Disability Plan, in light of the  Social Security Offset amendment and the reintroduction of the whole-person evaluation process in the 2020 CBA;

b.    Whether the Defendants breached their fiduciary duties to Plaintiffs and members of the Class, and subclasses, by impermissibly changing the terms of the T&P disability benefits after Plaintiffs and members of the Class, and subclasses, were already receiving these benefits in paid status, in light of the Social Security

Offset amendment and the reintroduction of the whole-person evaluation process in the 2020 CBA;

c.     Whether Defendants breached their fiduciary duties to Plaintiffs, and members of the Class by failing to disclose and inform them about accurate and relevant disability benefit information related to the ratification of the 2020 CBA, in light of the Social Security Offset amendment and the reintroduction of the whole-person evaluation process in the 2020 CBA;

d.     Whether the March 15th version of the 2020 CBA is invalid, and should be reformed as to the T&P disability benefit modification added after the ratification vote; and and

e.     Whether Plaintiffs and the Class, and Subclasses, are entitled to other appropriate equitable remedies and relief for Defendants' violations and breaches.

**Typicality**

94.120.     Plaintiffs' claims are typical of the claims of other members of the Class, Plaintiff Majkowski's claims are typical of the claims of the Article 4 Subclass, and Plaintiff Cason's claims are typical of the claims of the Article 3 Subclass, because their claims arise from the same event, practice and/or course of conduct. Specifically, Plaintiffs, on behalf of the Class, and subclasses, allege that Defendants breached their fiduciary duties or otherwise violated ERISA by reducing vested lifetime T&P disability benefits through the ratification of the 2020 CBA process in light of the Social Security Offset amendment and the reintroduction of the whole person evaluation process in the 2020 CBA.  Plaintiffs' claims are also typical of the claims of the Class, and subclasses, because they generally seek recovery and relief that will result in a declaration, injunction, and appropriate equitable relief for the Class and subclasses.

**Adequacy**

95. 121.        Plaintiffs will fairly and adequately represent and protect the interests of the Class and subclasses. Plaintiff Majkowski is a member of the Article 4 Subclass and the Class. Plaintiff Cason is a member of the Article 3 Subclass and the Class. Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class or subclasses.  Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class or subclasses.

96. 122.        Plaintiffs are represented by counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

**Rule 23(b)(1)**

97. 123.        The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied as to the Class and each of the Subclasses. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the plan and their participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA with respect to disclosures that affected all Class Members uniformly and amendments to the Disability Plan that uniformly affected the members of the Article 4 Subclass and Article 3 Subclass. Similarly, parties to a collective bargaining have a duty not to breach the collective bargaining agreement and treat all members of the union fairly under the LMRA. As a result, prosecution of separate claims by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the CBA, Retirement Plan, and Disability Plan.

98. 124.        The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied as to the

Class and each of the Subclasses. Administration of both an ERISA-covered plan and a LMRA-covered CBA require that all similarly situated participants to be treated the same. Resolving whether the amendments to the Disability Plan contemplated by the 2020 CBA are enforceable as to Plaintiffs Majkowski and Cason would, as a practical matter, be dispositive of the interests of the other members of the Class and the Subclasses. Likewise, resolving whether Defendants breached the CBA as to Plaintiffs would, as a practical matter, be dispositive of the interests of the other members of the Class even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class and Subclasses.

**Rule 23(b)(2)**

99.125.      The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class and Subclasses because Defendants have acted and/or failed to act on grounds generally applicable to the Class and Subclasses, making declaratory and injunctive appropriate with respect to the Class and Subclasses as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA or the LMRA as to the Class and Subclasses as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties or engaged in other violations of ERISA and LMRA, and of injunctive and equitable relief. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

**Rule 23(b)(3)**

100.126.      The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied as to the

Class and each of the Subclasses. The common questions of law and fact concern whether Defendants breached their fiduciary duties or violated ERISA or the LMRA.  As the members of the Class and Subclasses were participants in the Plans, their rights and benefits were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants in the Retirement Plan and the Disability Plan and therefore to all members of the Class and Subclasses. As relief and any recovery will be on behalf of the Plaintiffs and members of the Class and Subclasses covered under the CBA and associated Plan documents, common questions as to remedies will likewise predominate over any individual issues.

101.127.    A class action is a superior method to other available methods of the fair and efficient adjudication of this action as to both the claims of the Class and the Subclasses. Resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for all Class and Subclass members under the 2020 CBA and associated Plan documents. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to Plaintiffs and members of the Class and Subclasses under the 2020 CBA and associated Plan documents.

102.128.    The following factors set forth in Rule 23(b)(3) also support certification:

a.    The members of the Class and Subclasses have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.      No other litigation concerning this controversy has been filed by any other members of the Class.

c.      This District is the most desirable location for concentrating this litigation because the National Football League Players Association is headquartered in this District, the Defendants have significant contacts in this District, and at least some of the breaches took place in this District.

d.      As the relief sought is primarily class-wide declaratory, injunctive, and equitable relief, there are no management issues that present difficulties to manage this case as a class action.

**FIRST CLAIM FOR RELIEF – VIOLATION OF VESTED LIFETIME
T&P DISABILITY BENEFIT RIGHTS
(Plaintiff Majkowski and Article 4 Subclass Against All Defendants)**

103.129.      Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

104.130.      Provisions in retirement and disability plans and associated plan documents should ordinarily be enforced as written especially when enforcing an ERISA welfare benefit plan. Collective bargaining agreements, including those establishing ERISA plans, should be enforced according to ordinary principles of contract law. Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.

105.131.      Here, Plaintiff Majkowski and members of the Article 4 Subclass are Inactive A Players who were promised in clear and unambiguous terms, in Article 5.5(b) of the

Retirement Plan and in Articles 3.6 and 4.2 of the 2019 Disability Plan, and Income Verification statements, a defined amount of T&P disability benefits for life. Under Article 5.9 of the Retirement Plan and Articles 3.11 and 4.5 of the 2019 Disability Plan, those defined amounts of benefits would be payable until the player's death (in other words, for life), unless the disablement ceased at some point.

106.132.    Nothing in the relevant CBAs, 2014CBA, 2017 Retirement Plan, 2019 Disability Plan, or the Income Verification Statements, suggest that Defendants had the unilateral ability to alter vested lifetime benefits by adding a Social Security offset. Nor is there any suggestion that Plaintiffs or Class Members could lose their T&P disability benefits completely by a subsequent change to the eligibility conditions or evaluation process after already in paid status.

133.    Although the Disability Plan SPD mentions that that disability benefits are not vested, this language is not found anywhere in the Plan, and indeed, is contradicted by lifetime vesting language in the Plans themselves and associated documents, like the Income Verification Statements. Plan language always trumps contradictory SPD language.

134.    As a result of these violations, Plaintiffs and the other members of the Class hadwill have their vested lifetime rights to T&P disability benefits impermissibly reduced or eliminated. More specifically, benefits will be reduced from $11,250 per month to $2000 to $3000 less through the Social Security offset.

107.135.    The poison pill provision in the 2011 CBA that states that these T&P disability benefits would be reduced to $0 on April 1, 2021, never came into play, nor is it anything more than speculative that such a provision would ever come into effect. It is inaccurate to suggest that somehow Players received an increase in disability benefits, as this completely

fails to consider the reality of how Plaintiffs and Class Members' T&P disability benefits are being impacted by the unlawful disability-related amendments to the 2020 CBA.

108.136.    ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

109.137.    Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)), is not adequate because the terms of the Disability and Retirement PlanPlans, as reflected in the 2020 CBA, do now or will not include the terms of the amendments. Therefore, a claim challenging the validity of the amendments is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

110.138.    As a result, Plaintiff Majkowski and the Article 4 Subclass are entitled to have the Social Security offset and whole-person evaluation process provisions of the amendments to the Disability and Retirement Plan contemplated by the 2020 CBA declared invalid as to them, to a declaration that their rights and benefits will not be reduced by operation of either provision, and, as necessary, Plaintiff Majkowski and the Article 4 Subclass are entitled to have the Disability and Retirement Plan reformed accordingly and/or to an injunction prohibiting enforcement of either provision against them.

**SECOND CLAIM FOR RELIEF – VIOLATION OF VESTED LIFETIME
T&P DISABILITY BENEFIT RIGHTS
(Plaintiff Cason and Article 3 Subclass Against Defendants Disability Board, Management
Council, and NFLPA)**

~~111.~~139.　　Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

~~112.~~140.　　Provisions in retirement and disability plans and associated plan documents should ordinarily be enforced as written especially when enforcing an ERISA welfare benefit plan. Collective bargaining agreements, including those establishing ERISA plans, should be enforced according to ordinary principles of contract law. Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent.

~~113.~~141.　　Here, Plaintiff Cason and members of the Article 3 Subclass are Inactive A Players who were promised in clear and unambiguous terms, in Articles 3.6 and 4.2 of the 2019 Disability Plan and Income Verification statements, a defined amount of T&P disability benefits for life. Under Articles 3.11 and 4.5 of the 2019 Disability Plan, those defined amount of benefits would be payable until the player's death ~~(in other words, for life),~~. unless the disablement ceased at some point.

~~114.~~142.　　Nothing in the relevant CBAs, 2019 Disability Plan, or the Income Verification Statements suggest that Defendants had the unilateral ability to alter vested lifetime benefits by adding a Social Security offset. Nor is there any suggestion that Plaintiffs or Class Members could be divested of their T&P disability benefits completely by changing the eligibility conditions and subjecting these ~~players~~Players to the whole-person evaluation process after already in paid status.

143.    Although the Disability Plan SPD mentions that that disability benefits are not vested, this language is not found anywhere in the Plan, and indeed, is contradicted by lifetime vesting language in the Plans themselves and associated documents, like the Income Verification Statements.  Plan language always trumps contradictory SPD language.

144.    As a result of the amendments to the Disability Planthese violations, Plaintiffs and the other members of the Class hadwill have their vested lifetime rights to T&P disability benefits impermissibly reduced or eliminated.  More specifically, benefits will be reduced from $11,250 per month to $2000 to $3000 less through the Social Security offset.

115.145.    The poison pill provision in the 2011 CBA that states that these T&P disability benefits would be reduced to $0 on April 1, 2021, never came into play, nor is it anything more than speculative that such a provision would ever come into effect. It is inaccurate to suggest that somehow Players received an increase in disability benefits, as this completely fails to consider the reality of how Plaintiffs and Class Members' T&P disability benefits are being impacted by the unlawful disability-related amendments to the 2020 CBA.

116.146.    ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

117.147.    Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)), is not adequate because the terms of the Disability Plan, as reflected in the 2020 CBA, do now or will

not include the terms of the amendments. Therefore, a claim challenging the validity of the amendments is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

118.148.    As a result, Plaintiff Cason and the Article 3 Subclass are entitled to have the Social Security offset and whole-person evaluation process provisions of the amendments to the Disability Plan contemplated by the 2020 CBA declared invalid as to them, to a declaration that their rights and benefits will not be reduced by operation of either provision, and, as necessary, Plaintiff Cason and the Article 3 Subclass are entitled to have the Disability Plan reformed accordingly and/or to an injunction prohibiting enforcement of either provision against them.

### THIRD CLAIM FOR RELIEF – VIOLATION FOR CHANGING TERMS OF T&P DISABILITY BENEFITS FOR THOSE ALREADY IN PAID STATUS
### (Plaintiffs and Article 4 Subclass Against All Defendants)

119.149.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

120.150.    As a matter of both federal common law and the common law of contract, which apply to ERISA plans, the terms of the Disability Plan and Retirement Plan are fixed at the time of acceptance by the participant, which is completed by performance. At the latest, once a participant qualifies for benefits and begins receiving those benefits under the terms of the Retirement Plan, the terms that govern the benefits owed to, and to be paid to, the participant are fixed.

121.151.    As a matter of contract law, the amendments to the Retirement Plan and Disability Plan contemplated by the 2020 CBA are and will be invalid to the extent they apply to participants in the Retirement Plan or Disability Plan who qualified for benefits and commenced receiving benefits under the Retirement Plan or Disability Plan prior to those amendments.

122.152.       Plaintiff Majkowski and members of the Article 4 Subclass have qualified for and already have begun receiving T&P disability benefits under both the Retirement Plan and the Disability Plan.

123.153.       The welfare plan amendments to the Retirement Plan and the Disability Plan implemented by the 2020 CBA are being applied in a manner that affects the rights to T&P disability benefits for Plaintiff Majkowski and members of the Article 4 Subclass under the Retirement Plan and Disability Plan who had qualified for benefits prior to the Social Security offset and the whole-person reevaluation process amendments.

124.154.       ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

125.155.       Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)), is not adequate because the terms of the Retirement Plan and Disability Plan, as reflected in the 2020 CBA, do not now orand will not include the terms of the amendments. Therefore, a claim challenging the validity of the amendments is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

126.156.       As a result, Plaintiff Majkowski and the Article 4 Subclass are entitled to have the amendments contemplated by the 2020 CBA declared invalid as to them, to a declaration that their rights and benefits are and will be determined under the Retirement Plan and Disability Plan in effect when they qualified for benefits, and, as necessary, Plaintiff

Majkowski and the Article 4 Subclass are entitled to ~~have the Retirement Plan and Disability Plan reformed accordingly and/or to~~ an injunction requiring administration of the Retirement Plan and Disability Plan in a manner consistent with the terms of the Retirement Plan in existence at the time of their qualification for benefits.

**FOURTH CLAIM FOR RELIEF – VIOLATION FOR CHANGING TERMS OF T&P DISABILITY BENEFITS FOR THOSE ALREADY IN PAID STATUS**
**(Plaintiff Cason and Article 3 Subclass against Defendants Disability Board, Management Council, and NFLPA)**

~~127.~~157.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

~~128.~~158.    As a matter of both federal common law and the common law of contract, which apply to ERISA plans, the terms of the Disability Plan are fixed at the time of acceptance by the participant, which is completed by performance. At the latest, once a participant qualifies for benefits and begins receiving those benefits under the terms of the Disability Plan, the terms that govern the benefits owed to and to be paid to the participant are fixed.

~~129.~~159.    As a matter of contract law, the amendments to the Disability Plan contemplated by the 2020 CBA are and will be invalid to the extent they apply to participants in the Disability Plan who qualified for benefits and commenced receiving benefits under the Retirement Plan prior to those amendments.

~~130.~~160.    Plaintiff Cason and members of the Article 3 Subclass have qualified for and already have begun receiving T&P disability benefits under the Disability Plan.

~~131.~~161.    The welfare plan amendments to the Disability Plan implemented by the 2020 CBA are being applied in a manner that affects the rights to T&P disability benefits for

Plaintiff Cason and members of the Article 3 Subclass under the Disability Plan who had qualified for benefits prior to the Social Security offset and the whole-person reevaluation process amendments.

132.162. ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

133.163. Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)), is not adequate because the terms of the Retirement Plan, as reflected in the 2020 CBA, do not now or, and will not, include the terms of the amendments. Therefore, a claim challenging the validity of the amendments is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

134.164. As a result, Plaintiff Cason and the Article 3 Subclass are entitled to have the amendments contemplated by the 2020 CBA declared invalid as to them, to a declaration that their rights and benefits are and will be determined under the Disability Plan in effect when they qualified for benefits, and, as necessary, Plaintiff Cason and the Article 3 Subclass are entitled to have the Disability Plan reformed accordingly and/or to an injunction requiring administration of the Disability Plan in a manner consistent with the terms of the Disability Plan in existence at the time of their qualification for benefits.

**FIFTH CLAIM FOR RELIEF - BREACH OF FIDUCIARY DUTY FOR FAILURE TO
DISCLOSE MATERIAL INFORMATION ABOUT T&P DISABILITY BENEFITS
(Plaintiffs and Class Against Defendants Players Association,
Retirement Board, and Disability Board)**

165.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs
as if fully set forth herein.

166.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary
discharge his or her duties with respect to a plan solely in the interest of the participants and
beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their
beneficiaries; and …. (B) with "care, skill, prudence, and diligence."

167.    An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A)
and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary
comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to
misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that
silence might be harmful, and (c) a duty to convey complete and accurate information material to
the circumstances of the participants and beneficiaries.

168.    Defendant NFLPA employees and officers, as fiduciaries, had an affirmative duty
to accurately disclose the impact of the Social Security offset and the reevaluation process under
the whole-person evaluation process on Plaintiffs and members of the Class under the
Retirement and Disability Plans.

169.    The NFLPA breached its fiduciary duties by: (1) omitting material information
about the changes to Players and their beneficiaries through class-wide Tweets and emails ; (2)
ignored requests by participants and their beneficiaries for clarification of their disability benefits
by email; (3) sent out written plan communication leading up to, and after, the vote on the 2020
CBA that omitted material information; and (4) omitted material information in written

communications that those currently receiving T&P disability benefits could lose their disability benefits based on a reevaluation under the whole-person evaluation process.

170.    These material omissions harmed Plaintiffs and members of the Class in two ways: (1) by improperly influencing active Players to vote in favor of the disability amendments in the 2020 CBA; and (2) by impeding the ability of Plaintiffs and members of the Class from mobilizing to influence the vote by the active Players against the proposed 2020 CBA.

171.    Had the truth about these T&P disability benefit changes been disclosed, the vote for ratification would not have been secured improperly, the ratification vote would have likely failed, and former Players would  have been able to mobilize effectively against ratification of the 2020 CBA.

172.    By failing to communicate this necessary and relevant information and otherwise omitting material information about how eligibility for T&P disability benefits would be determined, and how the amount of T&P disability benefits available would be offset for disabled former Players, the Defendant NFLPA, acting in a fiduciary capacity through its employees and officers, violated ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B), by not acting in the best interests of, or with the duty of care towards, Plaintiffs and members of the Class.

173.    As a result of these breaches, Plaintiffs and the Class are entitled under ERISA § 502(a)(3) to appropriate equitable relief, including injunctive and declaratory relief, and if appropriate, a surcharge against Defendants as result of the implementation of these amendments to the 2020 CBA, and/or  an order establishing a constructive trust and/or disgorging any profits.

**SIXTH CLAIM FOR RELIEF - BREACH OF FIDUCIARY DUTY FOR FAILURE TO DISCLOSE MATERIAL INFORMATION ABOUT T&P DISABILITY BENEFITS**
**(Plaintiffs and Class Against Defendants Retirement Board and Disability Board)**

~~135.~~174.        Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

~~136.~~175.        ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and …. (B) with "care, skill, prudence, and diligence."

~~137.~~176.        An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform.  Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also require (a) a duty not to misinform, (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful, and (c) a duty to convey complete and accurate information material to the circumstances of the participants and beneficiaries.

~~138.~~177.        ~~The~~ Defendants Retirement Board and Disability Board, as fiduciaries, had an affirmative duty to accurately disclose the impact of the Social Security offset and the reevaluation process under the whole-person evaluation process on Plaintiffs and members of the Class under the Retirement and Disability Plans.

~~139.   The NFLPA, Retirement Board, and Disability Board, breached their fiduciary duties by: (1) omitting material information about the changes to players and their beneficiaries through class-wide Tweets and emails ; (2) ignored requests by participants and their beneficiaries for clarification of their disability benefits by email; (3) sent out written plan communication leading up to, and after, the vote on the 2020 CBA that omitted material information; and (4) omitted material information in written communications that those currently~~

receiving T&P disability benefits could lose their disability benefits based on a reevaluation under the whole-person evaluation process..

178.   The Board Defendants breached their fiduciary duties because they knew that the NFLPA, through its employees and officers, was making incomplete and misleading statements about disability benefits under the Plans. The Retirement Board and Disability Board had an affirmative duty as fiduciaries to explain to the Plaintiffs and members of the Class, as participants of the Plans, the impact of these amendments on the Retirement Plan and Disability Plan.

179. Because Board Defendants provided no such corrections to known misrepresentations and omissions by the NFLPA and its representatives, the Retirement Board and Disability Board breached their fiduciary duties to Plaintiffs and members of the Class.

140.180.   These material misrepresentations and omissions harmed Plaintiffs and members of the Class in two ways: (1) by improperly influencing active players to vote in favor of the disability amendments in the 2020 CBA; and (2) by impeding the ability of Plaintiffs and members of the Class from mobilizing to influence the vote by the active playersPlayers against the proposed 2020 CBA.

141.181.   Had the truth about these T&P disability benefit changes been disclosed, the vote for ratification would not have been secured improperly, the ratification vote would have likely failed, and former playersPlayers would  have been able to mobilize effectively against ratification of the 2020 CBA.

142.182.   By failing to communicate this necessary and relevant information and otherwise omitting material information about how eligibility for T&P disability benefits would be determined, and how the amount of T&P disability benefits available would be offset for

disabled former ~~players~~Players, the Board Defendants, acting in their fiduciary capacities, violated ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B), by not acting in the best interests of, or with the duty of care towards, Plaintiffs and members of the Class.

~~143.~~183.     As a result of these breaches, Plaintiffs and the Class are entitled under ERISA § 502(a)(3) to appropriate equitable relief, including injunctive and declaratory relief ~~reforming the Plan to invalidate the amendments~~, and if appropriate, a surcharge against Board Defendants as result of the implementation of these amendments to the 2020 CBA, and/or  an order establishing a constructive trust and/or disgorging any profits.

**~~SIXTH~~SEVENTH CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTY FOR FAILURE TO MONITOR APPOINTED FIDUCIARIES**
**(Plaintiffs and Class Against Defendants Management Council and NFLPA)**

184.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

185.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and …. (B) with "care, skill, prudence, and diligence."

186.    The NFLPA and Management Council breached their fiduciary duties to monitor their appointees to the Retirement and Disability Boards because those appointees knew or should have known that the NFLPA representatives, including employees and officers, were engaged in misrepresentations and omissions in their communications with Plaintiffs and member of the Class about amendments to the disability provisions of those Plans.

187.    By failing to take action to remedy that breach by informing their appointees to the Board that they needed to correct those misstatements or failing that, removing the breaching fiduciary appointees from the Boards, the NFLPA and Management Council caused harm to Plaintiffs and members of the Class as far as their disability benefits. Had the truth about these T&P disability benefit changes been known, the vote for ratification would not have been secured improperly, the ratification vote would have most likely failed, and former Players might have mobilized effectively, with current Players, against ratification of the 2020 CBA.  As a result, a new CBA would have been negotiated with the NFL and ratified – without the Social Security offset and whole person evaluation process – and with other less draconian trade-offs being made between the parties.

188.   By failing to communicate this necessary and relevant information to their appointed fiduciaries on the Retirement Board and the Disability Board, and otherwise failing to have these appointed fiduciaries provide accurate material information about how eligibility for T&P disability benefits would be determined, and how the amount of T&P disability benefits available would be offset for disabled former Players, the Defendants NFLPA and Management Council, acting in their fiduciary capacities, violated ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B), by not acting in the best interests of, or with the duty of care towards, Plaintiffs and members of the Class.

189.   As a result of these monitoring breaches, Plaintiffs and the Class are entitled under ERISA § 502(a)(3) to appropriate equitable relief, including injunctive and declaratory relief, and if appropriate, a surcharge against Defendants NFLPA and Management Council as result of the implementation of these amendments to the 2020 CBA, and/or an order establishing a constructive trust and/or disgorging any profits.

**EIGHTH CLAIM FOR RELIEF - BREACH OF THE COLLECTIVE BARGAINING AGREEMENT FOR IMPERMISSIBLY ADDING T&P DISABILITY PROVISIONS (Plaintiff MajkowskiPlaintiffs and Article 4 SubclassMembers of Class Against Defendants NFLPA and Management Council)**

144.190.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

145.191.   LMRA § 301 provides for relief for breach of a collective bargaining agreement. Defendants Management Council and Players Association impermissibly changed Article 60, Section 4 of the 2020 CBA after it had already been voted upon by adding a never-before-seen provision applying a Social Security offset to T&P disabled former playersPlayers who applied for benefits prior to January 1, 2015 (Subclass A or Article 4 Players).

146.192.    Although when confronted the Players Association said it was "a non-substantive change," approximately 200-500 former disabled NFL Players lost approximately 20% of their disability benefit income by operation of the Social Security offset and could lose more if reevaluated under the whole-person evaluation process.

193.    The Management Council, for its part, also acknowledged the change was made, but argued that Section 4(b) of Article 60 in the 2020 was "inadvertently omitted" from the version ratified by the Players. The Management Council does not, and cannot, explain how that provision could be added without being ratified by the Players, instead admitting that representatives from the Management Council and the NFLPA alone agreed to this clarification without Player involvement.

194.    Although Plaintiffs and members of the Class are not members of the NFLPA, they are intended third-party beneficiaries under the March 2020 CBA and they therefore have standing to maintain an action against the Management Council and Players Associations as if they were a party to the contract.

195.    The March 2020 Collective Bargaining Agreement is a written contract conferring a benefit upon Plaintiffs and members of the Class as intended beneficiaries for T&P disability benefits, and Plaintiffs have the right to contest the unauthorized manner by which the 2020 CBA was ratified.

147.196.    Because the union owes no duty of fair representation to retired playersPlayers, retired employees are not required to exhaust contractual remedies before bringing a Section 301 suit against its former employer, the NFL Management Council and its union, the NFLPA.

197.   Plaintiffs are not required to exhaust their remedies under the CBA's mandatory grievance procedures, because as retirees they are not covered by such procedures. Similarly, because they are not members of the Union, Plaintiffs and members of the Class need not exhaust any internal union remedies.

198.   Pursuant to Article 67, Section 9 of the 2020 CBA: "Th[e] Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties." There is no such written agreement signed between authorized representatives of the Players Association and the Management Council. Even if such changes were permitted through the joint action of authorized representatives, such joint action did not occur because the NFLPA, according to its own Constitution, was not acting as an authorized representative of the Players without the Players having voted on this substantial change.

148.199.   The NFLPA is only an "authorized representative of the parties" if it had the right under its Constitution to enter into the Collective Bargaining Agreement with the Management Council.  Section 6.05 of the NFLPA Constitution, sets out the procedure for when there is an amendment to a ratified CBA: "If it is proposed to amend a Collective Bargaining Agreement during the period of its agreed duration, any such proposal shall be submitted to the Board of Representatives upon recommendation from the Executive Committee." The new language in Article 60, Section 4 was never submitted to the NFLPA Executive Committee or Board of Representatives.

149.200.   The new language in Article 60, Section 4 was never submitted to the NFLPA Executive Committee or Board of Representatives.

150.201.   Section 6.05 continues by stating: "Any such proposed amendment to the Collective Bargaining Agreement which is agreed to by majority vote of the Board of Player

Representatives and agreed to by the owner representatives shall not be binding on the NFLPA until one of the following requirements has been satisfied: 1. The Board of Representatives determines by a two-thirds (2/3) vote that the proposed amendment is not of such substance as to call for ratification by the members; or 2. The Board of Representatives determines by a two-thirds (2/3) vote that the proposed amendment is of such substance as to call for ratification by the members, and the proposed amendment is ratified by a majority of the members voting for ratification or rejection."

202.   The ~~changes made to~~ Management Council breached the collective bargaining agreement, for its part, by entering into an understanding with the NFLPA, which it knew the NFLPA was not acting as an "authorized" representative for the Players under Article 67, Section 9 of the 2020 CBA (only permitting amendment of the CBA "by a written agreement signed by *authorized* representatives of the parties") (emphasis added).

203.   Having realized that Article 60, Section 4 ~~are not~~ had been left out of the 2020 CBA voted on by the Players, the NFL Management Council was duty bound, under the amendment and modification provisions of Article 67 of the 2020 CBA, to ensure that this omitted language was added through appropriate procedures and not through some secret handshake with NFLPA representatives after the Players voted.

204.   The NFL Management Council knew that the NFLPA was only "authorized" to enter into an amendment with the Management Council if it had gone through the proper procedure within the NFLPA. The fact that the Management Council and the NFLPA resorted to a clandestine meeting to unlawfully amend the 2020 CBA is proof that the Management Council and NFLPA both knew they were in violation of the applicable 2020 CBA provisions.

151.205.    In short, although the Management Council is not a party to the NFLPA Constitution, it is in violation of the binding on Plaintiff Majkowski or other members of the Article 4 Subclasscontract between itself and the NFLPA because the Board of Representatives never determined, let alone by 2/3 votes, that the proposedit entered into an amendment with the NFLPA, which it knew was not of substanceacting as an authorized party for these purposes.

152.206.    By breaching the 2020 CBA by adding provisions that were never voted upon, or that they were authorized to act upon, the Defendants Player Association and Management Council are liable to the Article 4 SubclassPlaintiffs and class members for injunctive and declaratory relief to enjoin the enforcement of this Social Security offset disability amendment and the whole person evaluation process amendment to the 2020 CBA.

207.    These injuries to the Plaintiffs and Class Members could be readily redressed by requiring a re-vote on the 2020 CBA by Players with the full information now available to all impacted parties. If the re-vote leads to ratification of the changes to Article 60 of the 2020 CBA, then the NFLPA would be duly authorized to enter into such an Agreement with the NFL Management Council, in conformance with Article 67 of the 2020 CBA.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A.    A Declaration that Defendants violated the terms of the Retirement and Disability Plans by reducing vested lifetime T&P disability benefits to Plaintiffs and members of the Class through the Social Security offset;

B.    A Declaration that Defendants violated the terms of the Retirement and Disability Plans by forcing Plaintiffs and members of the Class to be reevaluated under the whole-person

evaluation process standard;

C.      A Declaration that Defendants violated the terms of the Retirement and Disability Plans by enacting Plan amendments that affected the rights of Plaintiffs and members of the Class under the plan who had already qualified for benefits prior to the amendments and were in paid status;

D.      A Declaration that Defendants NFLPA and Management Council violated the Collective Bargaining Agreement by adding disability language not in the version of the 2020 CBA voted upon, in violation of Section 301 of the LMRA;

E.      An Order ~~requiring Defendants Management Council and Players Association to jointly reform~~that the 2020 CBA ~~and~~between the ~~Retirement and Disability Plans~~NFLPA and Management be subject to a   re-vote to ~~eliminate~~ratify the ~~unlawful T&P disability benefit amendments~~changes to Article 60 of the 2020 CBA;

F.      An Order that the NFL Retirement and Disability Boards continue to pay Plaintiffs and all Class Members accrued vested lifetime disability benefits without Social Security offset;

G.      An Order that the NFL Retirement and Disability Boards continue to maintain the disability eligibility of all Class members who were deemed eligible for disability benefits under the Social Security Administration qualification standard;

H.      Imposition of a surcharge against the breaching fiduciaries in the amount of benefits lost by reason of the Social Security offset or by reason of being reevaluated under the whole-person evaluation process standard;

I.      Imposition of a surcharge against the breaching fiduciaries in the amount of benefits lost by reason of providing false, misleading, and inaccurate plan disclosures,   in

connection with the unlawful Social Security offset and the reimplementation of the whole-person evaluation standard;

J.      An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

K.      An Order that Defendants not engage in any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

L.      An Order to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of the Plans' fiduciaries deemed to have breached their fiduciary duties;

M.      Award any such other relief that the Court determines that Plaintiffs and the Class are entitled to pursuant to ERISA §502(a) and LMRA § 301;

N.      An award of pre-judgment interest;

O.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g), and/or ordering the payment of reasonable fees and expenses of this action to Plaintiffs' Counsel on the basis of the common benefit and/or common fund doctrine (and/or other applicable law) out of any money or benefit recovered for the Class and Subclasses in this action.

P.      Any other relief that Plaintiffs, the Class or the Subclass is entitled to pursuant to ERISA § 502(a)(3), or Rule 54(c) of the Federal Rules of Civil Procedure.

Dated ~~July 10~~October 13, 2020~~——~~                     */s/ R. Joseph Barton*
                                        R. Joseph Barton (D.C. Bar No. 476510)
                                        Colin M. Downes (D.C. Bar No. 1048761)
                                        BLOCK & LEVITON LLP
                                        1735 20th Street NW
                                        Washington, DC 20009
                                        Telephone: (202) 734-7046
                                        Email: jbarton@blockesq.com
                                        Email: colin@blockesq.com

                                        Ray Genco
                                        *Appearing Pro hac vice ~~application to be filed~~*
                                        GENCO LAW FIRM
                                        177 Huntington Ave
                                        Boston, MA 02115
                                        Telephone: (561) 614-4256
                                        Email: ray@gencolaw.com

                                        James A. Walcheske
                                        Scott S. Luzi
                                        Paul M. Secunda
                                        *Appearing Pro hac vice ~~applications to be filed~~*
                                        WALCHESKE & LUZI, LLC
                                        ~~15850 W. Bluemound Rd~~235 N. Executive Dr., Suite
                                        ~~304~~240
                                        Brookfield, Wisconsin 53005
                                        Telephone: (262) 780-1953
                                        Fax: (262) 565-6469
                                        E-Mail: jwalcheske@walcheskeluzi.com
                                        E-Mail: sluzi@walcheskeluzi.com
                                        E-Mail: psecunda@walcheskeluzi.com

                                        *Class Counsel for Plaintiffs*