**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AVEION CASON | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DONALD VINCENT MAJKOWSKI, | ) | |
| in their individual capacity and on behalf | ) | |
| of others similarly situated, | ) | |
| | ) | |
| *Plaintiffs* | ) | Case No. 1:20-cv-01875-TNM |
| | ) | Honorable Trevor N. McFadden |
| v. | ) | |
| | ) | |
| NATIONAL FOOTBALL LEAGUE | ) | |
| PLAYERS ASSOCIATION, | ) | |
| | ) | |
| THE BERT BELL/PETE ROZELLE NFL | ) | |
| PLAYER RETIREMENT PLAN BOARD, | ) | |
| | ) | |
| THE NFL PLAYER DISABILITY AND | ) | |
| NEUROCOGNITIVE BENEFIT PLAN | ) | |
| BOARD, and | ) | |
| | ) | |
| NATIONAL FOOTBALL LEAGUE | ) | |
| MANAGEMENT COUNCIL, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**DEFENDANT NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION'S**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS**
**MOTION TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION.................................................................................................. 1

II.  LEGAL BACKGROUND FOR PLAINTIFFS' CLAIMS ................................... 5

   A.  ERISA's Special Rules For Multiemployer "Taft-Hartley" Plans Strictly Limit The Union's Role And Duties. ......................... 5

   B.  Under Federal Labor Law, A Union's Duty Is To Its Current Members Only, Not Retirees. ............................................. 8

III.  SUMMARY OF COMPLAINT ALLEGATIONS ...................................... 10

   A.  The Welfare Benefit Plans At Issue. .............................................. 10

   B.  Plaintiffs And Their Status Under The Retirement Plans................. 10

   C.  Plaintiffs' Allegations About The NFLPA's Ratification Of The 2020 CBA................................................................................. 11

      1.  The Social Security disability offset and "whole-person evaluation.".......... 12

      2.  The NFLPA's alleged communications about new benefits for former players in the 2020 CBA......................... 12

      3.  Plaintiffs allege the NFLPA and NFLMC improperly changed the CBA (*i.e.*, the so-called "switcheroo")................... 13

   D.  The Putative Classes And Their Claims. ...................................... 14

IV.  LEGAL STANDARD ON A MOTION TO DISMISS............................... 17

V.  LEGAL ARGUMENT .................................................................................. 17

   A.  Plaintiffs Have Not And Cannot State An ERISA Claim Against the NFLPA.............................................................................. 17

      1.  *ERISA Claims 1-4*—"Violations for Changing [Plan] Terms"— Should be Dismissed.................................................. 18

         a.  Plaintiffs lack Article III standing to pursue any claim concerning the "whole person evaluation" process.................... 18

         b.  Plaintiffs have not pled any relevant fiduciary duty.................... 20

c.   Plaintiffs' alleged "vested" welfare benefits are not vested; they expired when the new CBA was adopted ............................ 24

2.   *ERISA Claim 5*—"Failure to Disclose Material Information"— Should Also Be Dismissed ...................................................... 27

a.   Plaintiffs lack Article III standing to pursue Claim 5 ................. 27

b.   Plaintiffs have also failed to plead a viable cause of action against the NFLPA under Claim 5 ............................................. 29

3.   ERISA New Claim 7—"Duty to Monitor" Cannot Be Sustained. .............. 31

B.   Plaintiffs Have Not And Cannot State An LMRA § 301 Claim. ........................ 34

1.   Plaintiffs lack standing to pursue Claim 8 .................................................. 34

a.   Plaintiffs have no "legally protected interest" in enforcing the NFLPA Constitution. ........................................................... 34

b.   The connection between the asserted injury and the NFLPA's alleged LMRA violation is impermissibly speculative. ................................................................................. 38

c.   Plaintiffs' claimed injuries cannot be redressed by a favorable outcome. ................................................................... 38

2.   Plaintiffs have failed to plead any plausible breach of the CBA. ................. 40

CONCLUSION ........................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna Health Inc. v. Davila*,
   542 U.S. 200 (2004)................................................................... 5

*Alday v. Container Corp. of Am.*,
   906 F.2d 660 (11th Cir. 1990) ............................................ 27

\*\**Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*,
   404 U.S. 157 (1971)...............................................................9, 35, 37

*Am. Oversight v. U.S. Dep't of Veterans Affairs*,
   2020 WL 6381895 (D.D.C. Oct. 30, 2020)................................ 19

*Am. Postal Workers Union v. U.S. Postal Serv.*,
   657 F. Supp. 2d 97 (D.D.C. 2009) .........................................8, 39

*Amato v. Bernard*,
   618 F.2d 559 (9th Cir. 1980) ...................................................... 5

*Anderson v. Alpha Portland Indus., Inc.*,
   752 F.2d 1293 (8th Cir. 1985) ................................................ 10

*Anderson v. Alpha Portland Indus., Inc.*,
   836 F.2d 1512 (8th Cir. 1988) ................................................ 27

*Am. Petroleum Inst. v. EPA*,
   683 F.3d 382 (D.C. Cir. 2012).................................................18, 20

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015)....................................................27, 32

\*\**Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................17, 19, 30

*Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
   941 F.2d 561 (7th Cir. 1991) ................................................ 22

*Barroca v. Hurwitz*,
   342 F. Supp. 3d 178 (D.D.C. 2018) ...................................... 20

*Baskin v. Hawley*,
   807 F.2d 1120 (2d Cir. 1986) .................................................10, 35

*Bauman v. Presser*,
    1984 WL 3255 (D.D.C. Sept. 19, 1984) ....................................................................... 39

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ....................................................................... 7, 20

*Bilello v. JPMorgan Chase Ret. Plan*,
    649 F. Supp. 2d 142 (S.D.N.Y. 2009) ..................................................................... 29, 30

*Bove v. Long Island R.R.*,
    1995 WL 901990 (E.D.N.Y. Dec. 12, 1995) ............................................................... 35

*Carpenters Local 42-L v. Carpenters*,
    73 F.3d 958 (9th Cir. 1996) ....................................................................................... 39

*Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*,
    35 F.3d 29 (2d Cir. 1994) ......................................................................................... 37

*Chiles v. Ceridian Corp.*,
    95 F.3d 1505 (10th Cir. 1996) ................................................................................... 26

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................................... 20

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................. 19

*Clarett v. Nat'l Football League*,
    369 F.3d 124 (2d Cir. 2004) ....................................................................................... 1

*CNH Indus. N.V. v. Reese*,
    138 S. Ct. 761 (2018) ............................................................................................... 25

*Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pens. Trust for S. Cal.*,
    508 U.S. 602 (1993) ................................................................................................... 7

*Ege v. U.S. Dep't of Homeland Sec.*,
    784 F.3d 791 (D.C. Cir. 2015) ................................................................................... 28

*Eller v. NFL Players Ass'n*,
    731 F.3d 752 (8th Cir. 2013) ................................................................................. 1, 35

*Eller v. NFL Players Ass'n*,
    872 F. Supp. 2d 823 (D. Minn. 2012) .................................................................... 37, 39

*F.H. Krear & Co. v. Nineteen Named Trs.*,
    810 F.2d 1250 (2d Cir. 1987) ................................................................................... 21

*Ford Motor Co. v. Huffman*,
   345 U.S. 330 (1953) ................................................................................ 9

*Fulani v. Brady*,
   935 F.2d 1324 (D.C. Cir. 1991) .............................................................. 27

*Gable v. Sweetheart Cup Co., Inc.*,
   35 F.3d 851 (4th Cir. 1994) .................................................................... 27

*Grand Lodge of Fraternal Ord. of Police v. Ashcroft*,
   185 F. Supp. 2d 9 (D.D.C. 2001) ............................................................ 17

*Harmon v. Am. Elec. Power Serv. Corp.*,
   371 F. Supp. 2d 804 (S.D. W. Va. 2005) ................................................ 35

**Hudson v. NFL Mgmt. Council*,
   2019 WL 5722220 (S.D.N.Y. Sept. 5, 2019) ...................................*passim*

**Hudson v. NFL Mgmt. Council*,
   2020 WL 1547467 (S.D.N.Y. Mar. 31, 2020) ...................................*passim*

*Humphrey v. Moore*,
   375 U.S. 335 (1964) ............................................................................9, 35

*IBEW Local 90 v. Nat'l Elec. Contractors Ass'n*,
   2008 WL 918481 (D. Conn. Mar. 31, 2008) ........................................... 22

*Int'l Painters & Allied Trades Indus. Pension Fund v. Davanc Contracting, Inc.*,
   808 F. Supp. 2d 89 (D.D.C. 2011) ......................................................... 37

*IUE-CWA v. Gen. Elec. Co.*,
   745 F. App'x 583 (6th Cir. 2018) ........................................................... 26

*Karo v. San Diego Symphony Orchestra Ass'n*,
   762 F.2d 819 (9th Cir. 1985) .................................................................. 35

*Laborers' Pension Fund v. Joe Cachey Const. Co.*,
   947 F. Supp. 365 (N.D. Ill. 1996) .......................................................... 37

**Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .........................................................................*passim*

**M&G Polymers USA, LLC v. Tackett*,
   574 U.S. 427 (2015) .........................................................................*passim*

*Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*,
   792 F.2d 1172 (D.C. Cir. 1986) .............................................................. 28

*Moore v. U.S. Dep't of State*,
  351 F. Supp. 3d 76 (D.D.C. 2019) ................................................. 17

*Nachman Corp. v. Pension Ben. Guar. Corp.*,
  446 U.S. 359 (1980) ..................................................................... 5

*Newell v. Elec. Workers (IBEW)*,
  789 F.2d 1186 (5th Cir. 1986) ..................................................... 39

*NFL Players Ass'n (Los Angeles Chargers)*,
  No. 21-CB-257665 (N.L.R.B. 2020) ............................................ 36

\*\**NLRB v. Amax Coal Co.*,
  453 U.S. 322 (1981) ............................................................... 30, 32

*NLRB v. Magnavox Co.*,
  415 U.S. 322 (1974) ............................................................... 38, 39

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ........................................................ 7, 20, 22

*Pilot Life Ins. Co. v. Dedeaux*,
  481 U.S. 41 (1987) ........................................................................ 6

*Pompano v. Michael Schiavone & Sons, Inc.*,
  680 F.2d 911 (2d Cir. 1982) ........................................................ 5

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  294 F.3d 82 (D.C. Cir. 2002) ...................................................... 17

*Saunders v. Mills*,
  842 F. Supp. 2d 284 (D.D.C. 2012) ............................................ 25

*Schneider Moving & Storage Co. v. Robbins*,
  466 U.S. 364 (1984) ..................................................................... 9

*Siegel v. U.S. Dep't of Treasury*,
  304 F. Supp. 3d 45 (D.D.C. 2018) .............................................. 28

*Sim v. N.Y. Mailers Union No. 6*,
  166 F.3d 465 (2d Cir. 1999) ........................................................ 39

*Soland v. George Washington Univ.*,
  916 F. Supp. 2d 33 (D.D.C. 2013) .......................................... 18, 20

*Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan Enters., Inc.*,
  793 F.2d 1456 (5th Cir. 1986) ............................................ 21, 22, 32

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .................................................................. 18

*Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*,
    567 F. Supp. 1184 (N.D. W. Va.) ................................................... 21

*Textile Workers Union of Am. v. Lincoln Mills of Ala.*,
    353 U.S. 448 (1957) ........................................................................ 8

*Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*,
    523 U.S. 653 (1998) ...................................................................... 40

*Barry v. West*,
    503 F. Supp. 2d 313 (D.D.C. 2007) ............................................... 31

*UAW v. Rockford Powertrain, Inc.*,
    350 F.3d 698 (7th Cir. 2003) ......................................................... 26

*UMWA Health & Ret. Funds v. Robinson*,
    455 U.S. 562 (1982) .................................................................. 8, 38

*In re Unisys Corp. Retiree Med. Ben. "ERISA" Litig.*,
    58 F.3d 896 (3d Cir. 1995) ............................................................ 26

*United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*,
    756 F.2d 1262 (7th Cir. 1985) ....................................................... 21

*Vaca v. Sipes*,
    386 U.S. 171 (1967) ........................................................................ 8

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ...................................................................... 31

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...................................................................... 19

*Yolton v. El Paso Tenn. Pipeline Co.*,
    668 F. Supp. 2d 1023 (E.D. Mich. 2009) ....................................... 37

**Statutes**

Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 ................ *passim*

Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141–197 ................................. *passim*

National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169 ........................................ 8, 38

29 U.S.C. § 141 .................................................................................................... 6

29 U.S.C. § 185 .................................................................................................8, 37

29 U.S.C. § 186 ............................................................................................6, 7, 32

29 U.S.C. § 1001 ..................................................................................................... 5

29 U.S.C. § 1002 .................................................................................................6, 7

29 U.S.C. § 1051 ..................................................................................................... 6

29 U.S.C. § 1109 ................................................................................................... 31

29 U.S.C. § 1132(a) ("ERISA § 502(a)") .......................................................*passim*

**Other Authorities**

29 C.F.R. § 2509.75-8 ............................................................................................. 7

Fed. R. Civ. P. 12(b) .........................................................................................1, 17

Defendant National Football League Players Association (NFLPA) respectfully moves to dismiss all claims against it in the amended complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1) and/or failure to state a claim pursuant to Rule 12(b)(6).

## I.   INTRODUCTION

The NFLPA is the labor union and collective bargaining representative for all *current* NFL players.  *Clarett v. Nat'l Football League*, 369 F.3d 124, 127 (2d Cir. 2004).  Plaintiffs are *retired* NFL players who are no longer active members of the NFLPA.  *See* Am. Compl. ¶¶ 10-11 (ECF 34).  Under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461, the NFLPA, as one of the two bargaining parties, has no duty or responsibility to maintain any level of former player benefits and *may not* administer retired player benefit plans.  *Hudson v. NFL Mgmt. Council*, 2020 WL 1547467, at *8 (S.D.N.Y. Mar. 31, 2020) (dismissing ERISA claims).  And under bedrock labor law, the NFLPA has no duty to represent the interests of former players when the union collectively bargains with its management counterpart—the NFL Management Council (NFLMC).  *Eller v. NFL Players Ass'n*, 731 F.3d 752, 755 (8th Cir. 2013).

Plaintiffs—retired NFL players Aveion Cason and Donald Vincent Majkowski—nonetheless bring this putative class action attacking both the collective bargaining process and collective bargaining outcome of the new, ten-year agreement that the NFLPA entered into with the NFLMC in March 2020 (the CBA).  Even though the new CBA generally *increases* total benefits for former players compared to the expired CBA, Plaintiffs complain that two new provisions violate ERISA, and that the NFLPA's internal ratification procedures violated the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141–197.  On the face of the complaint, each of Plaintiffs' eight claims—seven under ERISA and one under the LMRA—fails as a matter of law.

This is the second motion to dismiss that the NFLPA has filed; Plaintiffs promptly amended their complaint after reviewing the prior motion.  The amended complaint reads like a response

brief.  Plaintiffs, however, need plausible factual allegations—not conclusory legal arguments—to state their claims.  On that score, what new facts they actually allege are alternatively implausible and immaterial.

**Claims 1-4 (ERISA—allegedly improper reduction in retirement benefits).**  Plaintiffs lack standing to pursue claims over the "whole-person evaluation" requirement, which will not take effect until *2024*—and *even then* may not harm Plaintiffs.  "Injury in fact" under Article III requires plausible allegations of an injury that is both imminent and non-speculative.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  ERISA claims concerning this term are neither.

Claims 1 through 4 also fail to state a viable cause of action against the NFLPA.  To do so, Plaintiffs must plausibly allege that the NFLPA owed them a fiduciary duty in connection with implementing the two retirement benefits changes that are the subjects of Plaintiffs' complaint.  But Plaintiffs do not and cannot do so.  Unlike conventional "single-employer" plans, the "multiemployer" "Taft-Hartley" plans at issue here allow groups of employers (*i.e.*, each NFL team) to pool money that is managed by a board of trustees and a third-party plan administrator to provide benefits to NFL players.  Under settled law, the union (the NFLPA) and the multi-employer representative (the NFLMC) merely "sponsor" the Taft-Hartley plan.  ERISA *prohibits* Taft-Hartley plan sponsors from controlling the plan.  The plan is run by a designated third-party administrator, an independent board of trustees, which has a separate legal status under ERISA.  Indeed, Plaintiffs acknowledge that the plan sponsors—the NFLPA and the NFLMC—merely appoint an equal number of the board members.  The NFLPA has a fiduciary duty to select its respective board members with care, period.  The NFLPA owed Plaintiffs no duty as to bargaining over retirement benefits.

To the extent that Plaintiffs allege that certain disability benefits under the prior (2011) CBA were "vested" and could not be eliminated or reduced when a new CBA was settled, the

Supreme Court has ruled otherwise. *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 434–35 (2015). In fact, as Plaintiffs admit, if the NFLPA had not bargained for new disability benefits in the new CBA, Plaintiffs would have been left with substantially reduced benefits.

 *Claim 5 (ERISA—alleged NFLPA non-disclosure of material facts about the new CBA).*[1] Even if the Court were to take at face value Plaintiffs' implausible and legally defective allegations that the NFLPA did not disclose all material facts about the new CBA's impact on retirement benefits, Plaintiffs would still lack Article III standing to bring the claim. Their theory—that *if* the NFLPA had disclosed all such pertinent information, unspecified retired players *might* have mobilized to lobby unspecified active players to vote against the CBA, and then unknown active players *might* have changed their votes in sufficient numbers to change the CBA outcome, and this *might* have led to the negotiation of a different CBA that *might* have provided Plaintiffs greater benefits—is far too remote and speculative to satisfy Article III's "fairly traceable" injury requirement. *See Lujan*, 504 U.S. at 560.

 *Claim 7 (ERISA—alleged breach of duty to monitor board appointees).* The amended complaint presents a new claim that the NFLPA's purported failure to inform (Claim 5) gave rise to a second (and circular) ERISA violation: that the NFLPA failed to monitor its appointed board members, who should have corrected the NFLPA's own supposed misstatements. Plaintiffs' counsel recently advanced a similar claim in the Southern District of New York, where it was roundly rejected on the pleadings. As that court made clear, the duty to monitor under ERISA has to do with appointing board members with care and making sure appointees perform their basic administrative duties like attending meetings and voting; it does not extend to the substantive decision-making by board members challenged here—indeed, it *cannot*, under federal labor law.

---

[1] Claim 6 presents the same theory but is directed at the boards.

Plaintiffs' failure-to-monitor claims are even more tenuous than those asserted in the New York case. They incorrectly presuppose that the boards had a legal duty to review and correct information shared by the NFLPA in its outreach to retired players—a function wholly outside the boards' role in administering the plans. On top of this faulty legal premise, Claim 7 adds yet more links in the already too-attenuated chain of events between the alleged NFLPA misstatements and Plaintiffs' alleged injuries, *i.e.*, if the NFLPA's board appointees—who do not command a majority of either board—kept abreast of the NFLPA's communications and sent "corrections" to unidentified beneficiaries, those persons might have persuaded active union members to vote down the CBA, and the NFLPA might then have been able to negotiate a different CBA more to Plaintiffs' liking. This long-and-winding road falls far short of Article III standing.

**Claim 8 (LMRA—alleged breach of the CBA).** LMRA § 301 supplies the cause of action for breach of a collective bargaining agreement. But Plaintiffs merely complain about the *changes* the 2020 CBA imposes relative to the 2011 CBA. They do not allege (nor could they) that the NFLPA and NFLMC have breached or will *breach* the 2020 CBA as written. To the contrary, Plaintiffs' gripe is that the NFLPA and NFLMC *will* enforce the new CBA. Plaintiffs are really trying to take a square peg (their allegations that the NFLPA did not follow the governance procedures set forth in the NFLPA Constitution) and put it into a round hole (an LMRA breach-of-CBA claim). Section 301 does not provide a vehicle for such a misplaced theory of liability.

Moreover, Plaintiffs' challenge to the NFLPA's internal governance procedures for CBA ratification fails again for want of standing. First, as retired players, Plaintiffs have no cognizable legal interest in the internal collective bargaining ratification process of the NFLPA. Plaintiffs' attempt to reposition retirees as third-party beneficiaries does not address this problem, because even *if* they had such status, they could only sue to enforce the terms of the CBA—not to have it

renegotiated.  Second, after the NFLPA pointed out in its first motion to dismiss that Plaintiffs' request for the Court to reform the CBA was unavailable under federal labor law, they now request a court-ordered re-vote.  This is a different version of the same legal defect: the LMRA does not permit courts to upend collective bargaining and labor peace.

Because Plaintiffs' claims fail as a matter of law and are—demonstrably—not susceptible to cure, the Court should dismiss the complaint with prejudice as to the NFLPA.

## II.      LEGAL BACKGROUND FOR PLAINTIFFS' CLAIMS

 As a matter of ERISA law, unions owe strictly limited duties to retired members under Taft-Hartley benefit plans like those at issue here.  Under federal labor law, they owe none.

### A.      ERISA's Special Rules For Multiemployer "Taft-Hartley" Plans Strictly Limit The Union's Role And Duties.

In 1974, in response to the rapid growth of employee benefit plans, Congress enacted ERISA "to provide a uniform regulatory regime" that would impose "minimum standards" to "assur[e] the [plans'] equitable character" and "financial soundness."  *See* 29 U.S.C. § 1001(a); *see, e.g.*, *id.* § 1001(b) (requirement to "disclos[e] and report[] to participants and beneficiaries . . . financial and other information"); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004); *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 375 (1980).

To enforce these standards, ERISA "provid[ed] for appropriate remedies, sanctions, and ready access to the Federal courts" (29 U.S.C. § 1001(b)), which would develop a body of substantive law to apply to disputes concerning employee benefit plans.  *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980); *see Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911, 916 (2d Cir. 1982).  With an eye toward "balancing . . . the need for prompt and fair claims settlement procedures against the public interest in encouraging [plan] formation," Congress created a private right of action under § 502(a) for plan participants, beneficiaries, and fiduciaries to (among other

things) "recover benefits due . . . under the terms of [the] plan" and "enforce" or "clarify" rights under the plan. 29 U.S.C. § 1132(a); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987).

The extent of these rights under ERISA depends in significant part on the type of benefit at issue. Generally speaking, a pension plan "provides retirement income to employees," whereas an "employee welfare benefit plan" (or "welfare plan") provides for benefits "other than pensions," such as "medical . . . benefits" and "benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1)–(2)(A). This distinction is important because, in contrast to pension plans, "employers have large leeway to design disability and other welfare plans as they see fit" and "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Tackett*, 574 U.S. at 434–35 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003), and *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)); *see* 29 U.S.C. § 1051. The plans at issue here are welfare plans. Am. Compl. ¶¶ 18, 20.

In a conventional single-employer plan, the employer may administer its employees' benefit plans and be sued for failing to comply with its ERISA obligations. *See* 29 U.S.C. § 1002(16)(A)–(B). But when, as here, a plan was negotiated between a union (the NFLPA) and a multi-employer bargaining representative (the NFLMC), those "plan sponsors" have strictly limited roles.

These rules predate ERISA by nearly 30 years, having been adopted in the LMRA, or "Taft-Hartley Act," which governs the relationships between employers, employees, and unions. *See* 29 U.S.C. § 141(b); *see also infra* Part II.B. While the LMRA forbids employers from paying "money or other thing of value" to unions and unionized employees, it makes an exception for funds placed in trust "for the purpose of paying" benefits. 29 U.S.C. § 186(a), (c)(5). "[M]ore than one employer" contributes to these collectively bargained "multiemployer" or "Taft-Hartley"

plans (29 U.S.C. § 1002(37)(A)), which "operate by pooling contributions and liabilities." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pens. Trust for S. Cal.*, 508 U.S. 602, 637–38 (1993). The employers and the union are both "plan sponsor[s]." *See* 29 U.S.C. § 1002(16)(B).

Because the LMRA requires that "employees and employers [be] equally represented in the [fund's] administration" (29 U.S.C. § 186(c)(5)), Taft-Hartley plans are administered by a "group of representatives of the parties," such as "a joint board of trustees"—with half appointed by the union and half appointed by the employers—which has separate legal status under ERISA. 29 U.S.C. § 1002(16)(B). Here, the plan sponsors are the NFLPA and NFLMC, and the plan administrators are the boards.

An administrator has a wide range of duties. Some are ministerial, such as determining eligibility for benefits under the applicable rules, calculating benefits, and processing claims. 29 C.F.R. § 2509.75-8 (D-2). Others entail the exercise of "discretionary authority or discretionary control respecting management of [the] plan" and "management or disposition of its assets." 29 U.S.C. § 1002(21)(A). An administrator has a fiduciary duty to plan beneficiaries *only* as to the latter category. *See Pegram v. Herdrich*, 530 U.S. 211, 225–26 (2000).

An ERISA plan sponsor can be a "de facto" fiduciary, but only as to the very limited set of acts it has "discretionary authority or discretionary responsibility" for: appointing its allotted trustees. *See* 29 U.S.C. § 1002(21)(A); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 565 (S.D.N.Y. 2011); 29 C.F.R. § 2509.75-8(D-2). "In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. Put into this context, the NFLPA's ERISA duties to Plaintiffs are strictly limited, applying only to the appointment of the NFLPA's trustees with care

7

and making sure these trustees actually carry out their administrative functions, such as attending meetings and voting. *Hudson v. NFL Mgmt. Council*, 2019 WL 5722220, at *20 (S.D.N.Y. Sept. 5, 2019), *report and recommendation adopted*, 2020 WL 1547467 (S.D.N.Y. Mar. 31, 2020).

  **B. Under Federal Labor Law, A Union's Duty Is To Its Current Members Only, Not Retirees.**

  The LMRA was enacted to "promote industrial peace" between labor and management by encouraging and enforcing "faithful performance" of collective bargaining agreements. *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 454 (1957). Congress did this through § 301 (codified at 29 U.S.C. § 185), which grants the federal courts jurisdiction to resolve disputes over those agreements. 29 U.S.C. § 185; *Tackett*, 574 U.S. at 434; *Textile Workers*, 353 U.S. at 456. Section 301 provides the basis for a federal breach of contract claim when the relevant contract is a collective bargaining agreement. To further the LMRA's goal of promoting labor peace, courts avoid interfering in the collective bargaining process and the internal governance process. *See Am. Postal Workers Union v. U.S. Postal Serv.*, 657 F. Supp. 2d 97, 103 (D.D.C. 2009) (refusing to "interfere with the terms of [bargained-for labor contracts]"); *compare* Am. Compl. ¶ E (requesting an "[o]rder that the 2020 CBA . . . be subject to a re-vote"), *with UMWA Health & Ret. Funds v. Robinson*, 455 U.S. 562, 576 (1982) ("when neither the collective-bargaining process nor its end product violates any command of Congress, a federal court has no authority to modify the substantive terms of a collective-bargaining contract").

  A separate statute—the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169—gives rise to the so-called "duty of fair representation" that unions owe to the members of their collective bargaining unit as to the negotiation, administration, and enforcement of collective bargaining agreements. *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967) ("the Union ha[s] a statutory duty fairly to represent all of those employees, both in its collective bargaining . . . and in its

enforcement of the resulting collective bargaining agreement"); *Humphrey v. Moore*, 375 U.S. 335, 342 (1964) (observing, in extending duty to administration of agreements, the "undoubted broad authority of the union as exclusive bargaining agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation"); *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38 (1953) (bargaining representatives' "statutory obligation [under the NLRA] to represent all members of an appropriate unit requires them to make an honest effort to serve the interests of all of those members" with "complete loyalty to[] the interests of all whom it represents").

Plaintiffs do not invoke the NLRA because they concede that the NFLPA "owes no duty of fair representation to retired Players." Am. Compl. ¶ 196. Indeed, "[a] union's statutory duty of fair representation traditionally runs only to the members of its collective-bargaining unit, and is coextensive with its statutory authority to act as the exclusive representative for all the *employees within the unit*." *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 n.22 (1984) (emphasis added) (citing *Vaca*, 386 U.S. at 182, and *Humphrey*, 375 U.S. at 342). "Nowhere in the history of the National Labor Relations Act is there any evidence that retired workers are to be considered as within the ambit of the collective-bargaining obligations of the statute." *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166 (1971). Former union members "plainly do not share a community of interests [with active employees] broad enough to justify inclusion of the retirees in the bargaining unit." *Id.* at 173. Because of the risk that "union representatives on occasion might see fit to bargain for improved wages or other conditions favoring active employees at the expense of retirees' benefits," to include retirees "in the bargaining unit would create the potential for severe internal conflicts that would impair the unit's ability to function and would disrupt the processes of collective bargaining." *Id.* Accordingly, federal courts

of appeals have uniformly concluded that "a union's duty of fair representation does not include an obligation to take into account the interests of its retired members when it is negotiating contracts with an employer." *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986); *accord Anderson v. Alpha Portland Indus., Inc.*, 727 F.2d 177, 181 (8th Cir. 1984), *on reh'g*, 752 F.2d 1293 (8th Cir. 1985) ("Because plaintiffs are retirees the Union owes them no duty of fair representation.").

## III.   SUMMARY OF COMPLAINT ALLEGATIONS

### A.   The Welfare Benefit Plans At Issue.

Two different plans—both of which are Taft-Hartley plans—are at issue here. The older of the two is the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Plan"), which, since 1994, has included a welfare plan that "provided retirement, disability, and related benefits" to eligible players. Am. Compl. ¶ 19. Since January 1, 2015, a separate NFL Player Disability and Neurocognitive Benefit Plan ("Disability Plan") has applied to players' disability benefits. *Id.*

Each plan is administered by a board: the Bert Bell/Pete Rozelle NFL Player Retirement Plan Board ("Retirement Board") and the NFL Player Disability and Neurocognitive Benefit Plan Board ("Disability Board"), respectively. Am. Compl. ¶¶ 14, 16. Both boards are composed of six voting members, three of whom are appointed by the NFLPA, and three by the NFLMC. *Id.* ¶¶ 12-13, 17. The Retirement Plan grants the Retirement Board the "full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan," including the authority to adjudicate claims for benefits. Retirement Plan § 8.2 (excerpts attached as Ex. A to Miossi Decl.) (incorporated by reference in the complaint, *see infra* note 5 (citing *Saunders v. Mills*, 842 F. Supp. 2d 284, 293 n.2 (D.D.C. 2012))).

### B.   Plaintiffs And Their Status Under The Retirement Plans.

Cason and Majkowski each played in the NFL for several years. Am. Compl. ¶¶ 10-11. Majkowski retired in 1996 and Cason retired in 2008. *Id.*

Both Plaintiffs are classified under the plans as "Inactive A" players, meaning they have been deemed qualified to receive total and permanent disability benefits.[2]  *Id.* ¶ 24.  Both are beneficiaries of NFL disability benefit plans; Majkowski has received benefits since March 27, 2013, and Cason since February 1, 2016.  *Id.* ¶¶ 10-11.

Plaintiffs claim to be "vested for life in the entire . . . amount" of disability benefits available to them under the plans, citing plan provisions that predate the new (March 2020) CBA.  *See id.* ¶¶ 10-11, 22, 30, 36.  However, as discussed further below, the Supreme Court has instructed "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life."  *Tackett*, 574 U.S. at 436, 442 (requiring "explicit terms [stating] that certain benefits continue after the agreement's expiration"); *see infra* Part V.A.1.c. Plaintiffs do not allege any provision of either plan that extends these benefits beyond the termination of the previous CBA.  On the contrary, the amended complaint makes clear that retired benefits can and *did* expire with the old CBA.  *See, e.g.*, ¶ 52 ("The poison pill provision in the 2011 CBA [] states that these T&P disability benefits would be reduced to $0 on April 1, 2021."). Accordingly, if the NFLPA had not bargained for new retired-player welfare benefits through the new CBA, Plaintiffs would have been left with substantially reduced benefits.

## C.    Plaintiffs' Allegations About The NFLPA's Ratification Of The 2020 CBA.

Ignoring the undisputed fact that the new CBA generally *increases* the total amount of benefits for former players, Plaintiffs take issue with two particular provisions in the 2020 CBA: the Social Security disability offset and the "whole-person evaluation" process.  Am. Compl.

---

[2] The complaint refers to total and permanent disability benefits as "T&P" benefits.  Am. Compl. ¶ 1.  This memorandum uses the term "disability benefits."

¶¶ 48-54, 73-74, 81-85. Plaintiffs further complain that various communications about these provisions "were misleading" (*id.* ¶¶ 86-113), and assert that the NFLPA and NFLMC made "changes to the 2020 CBA language" while finalizing the CBA, and that in doing so, the NFLPA did not adhere to the internal union governance process set forth in the NFLPA Constitution (*id.* ¶¶ 55-72).

### 1.    The Social Security disability offset and "whole-person evaluation."

The Social Security disability offset is a collectively bargained term that applies to Inactive A players (like Cason and Majkowski) if they also receive Social Security disability benefits. *Id.* ¶ 48. Beginning on January 1, 2021, such an individual's disability benefits under the plans will be offset by the amount of Social Security disability benefits he receives; if he receives no Social Security disability payments, then there is no offset. *Id.*

The "whole-person evaluation process" is another collectively bargained CBA provision. Under the prior CBA, former players were presumed to be eligible to receive benefits under the Disability Plan if the Social Security Administration had previously deemed them eligible for Social Security Disability Insurance or Supplemental Security Income. *Id.* ¶ 74. Under the 2020 CBA, beginning in April 2024, retirees receiving disability benefits will need to be re-evaluated by independent doctors to determine if they still qualify. *Id.* ¶¶ 73-74. Plaintiffs do not and could not allege that they would lose any benefits *in 2024*, when this requirement takes effect, as no such re-evaluation has yet taken place.

### 2.    The NFLPA's alleged communications about new benefits for former players in the 2020 CBA.

Plaintiffs allege that the NFLPA made a series of "misleading" communications about the benefits it negotiated for former players in the proposed 2020 CBA—principally, alleged omissions, rather than misrepresentations, in its outreach materials in advance of the CBA vote. *See* Am. Compl. ¶ 100 ("CBA Proposal Fact Sheet" made "*no mention* of potential benefit decreases"),

¶ 101 ("Highlights of the Proposed CBA" included "*no language* about a significant decrease in benefits"), ¶ 102 ("CBA Side by Side" "*nowhere mentions* the future reevaluation of currently disabled Players"), ¶ 107 (alleging an NFLPA "strategy and mission of *withholding relevant information*"), and ¶ 109 (alleging the NFLPA would tweet "positives" about the new CBA "but *failed to disclose* . . . negative information") (emphases added).

According to Plaintiffs, if the NFLPA had provided more information about the changes it negotiated to retired players' welfare benefits, then the former players *might* have been motivated to lobby active players to vote against the 2020 CBA, and those active players *might* have changed their votes in sufficient numbers such that the NFLPA would not have ratified the 2020 CBA. Am. Compl. ¶ 99 ("Had the truth about these . . . benefit changes been known, the vote for ratification would not have been secured improperly, the ratification vote would have *most likely* failed, and former Players *might* have mobilized effectively." (emphases added)). Plaintiffs do not even attempt conjecture about what would have then happened next—would a different CBA have been negotiated with the NFL and ratified? Would a new CBA still contain a Social Security disability offset and whole-person evaluation process? If it did not, what concessions would the NFLPA have to have made about *other* retirement benefits? The complaint of course supplies no answers for these unanswerable and wholly speculative questions, and neither could a court.

### 3. Plaintiffs allege the NFLPA and NFLMC improperly changed the CBA (*i.e.*, the so-called "switcheroo").

Plaintiffs further contend that the NFLPA and the NFLMC pulled a "switcheroo" by "impermissibly and significantly changing disability language" on March 15, after active players had finished voting on the 2020 CBA. *Id.* ¶¶ 6, 55. Specifically, they allege that "additional language

was secretly added to the 2020 CBA" in two "newly formed" subparagraphs of "Article 60, Section 4," and that this had the effect of extending the Social Security disability offset "to Players who have been receiving [] disability [benefits] since before 2015." *Id.* ¶ 55.

According to Plaintiffs, this change was made "surreptitiously[,] without player knowledge, without following procedures for modifications of CBAs, and without an additional player vote." *Id.* ¶ 56. Yet, in the amended complaint, they assert that the NFLMC has explained that this was a correction to a scrivener's error. *See id.* ¶ 60 (according to the NFLMC, the language "was 'inadvertently omitted' from the version ratified by the Players").

Plaintiffs' ostensible objection to this change is that it did not comport with the internal governance procedures in the NFLPA Constitution for ratifying a new CBA. *Id.* ¶¶ 65, 69-70. They also make a throwaway argument that the "switcheroo" violated Article 67 of the 2020 CBA (*id.* ¶ 63) ("Th[e] Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties"), despite the fact that, just a few paragraphs earlier, Plaintiffs specifically allege that the NFLPA and NFLMC *did* alter and publish a new written version of their agreement containing the two challenged provisions (*e.g.*, *id.* ¶¶ 55, 57 ("The March 2020 [CBA] is a *written contract* . . . ." (emphasis added))).

### D.   The Putative Classes And Their Claims.

Plaintiffs have sued defendants on behalf of themselves and on behalf of a putative class made up of all retired NFL players who are Inactive A plan participants "qualified to receive total and permanent disability benefits at the time of the disability amendments to the 2020 [CBA] between the NFLPA and NFL Management Council." *Id.* ¶ 114; *see also id.* ¶ 24.

The amended complaint also proposes two subclasses, the "Article 4" subclass and the "Article 3" subclass. *Id.* ¶¶ 116-17. The Article 4 subclass is made up of "[a]ll participants qualified to receive total and permanent disability benefits at the time of the disability amendments" to

the 2020 CBA, and who started "receiving these benefits *prior to* January 1, 2015." *Id.* ¶ 116 (emphasis added). The Article 3 subclass includes retired players who started "receiving . . . benefits *after* January 1, 2015." *Id.* ¶ 117 (emphasis added).

In total, the two proposed subclasses allege seven ERISA claims: (i) "[v]iolation[s] of vested lifetime [] disability benefit rights" (*id.* ¶¶ 129-48 (***Claims 1–2***)), (ii) "[v]iolation[s] for changing terms of [] disability benefits for those already in paid status" (*id.* ¶¶ 149-64 (***Claims 3–4***)), (iii) "failure to disclose material information" (*id.* ¶¶ 165-83 (***Claims 5–6***)), and (iv) "failure to monitor appointed fiduciaries" (*id.* ¶¶ 184-89 (***Claim 7***)).

***Claims 1-4*** are all similar. In Claims 1 and 2—brought against the NFLPA, the NFLMC, and the boards—Plaintiffs allege that they had been "promised . . . a defined amount of T&P disability benefits for life," and the addition of the Social Security disability offset in the 2020 CBA "impermissibly reduced or eliminated" those "vested lifetime benefits." *Id.* ¶¶ 131-34, 141-44. Claims 3 and 4 are brought against the same sets of defendants. *Id.* at 149-56, 157-64. These claims rest on the premise that, "once a participant qualifies for benefits and begins receiving those benefits under the terms of the [plans], the terms that govern the benefits owed to and to be paid to the participant are fixed." *Id.* ¶¶ 150, 158. Plaintiffs allege that they enjoy this "paid status," that their disability benefits are "fixed," and that "the Social Security offset and the whole-person reevaluation process amendments" in the 2020 CBA "affect[] the[ir] rights to [] disability benefits" in an impermissible way. *Id.* ¶¶ 150, 152–53, 158, 160–61. Yet Plaintiffs concede that they have not yet suffered any purported harm, and that the whole-person evaluation process will not come into being until 2024.

In ***Claim 5***, Plaintiffs allege that the NFLPA violated its ERISA "duty to disclose" to former players (who had no CBA vote) "the impact of the Social Security offset and the reevaluation

process." *Id.* ¶¶ 167-68.  Plaintiffs aver that these were "material omissions" that "influenc[ed] *active* players to vote in favor of the disability amendments" and "imped[ed]" Plaintiffs from "mobilizing to influence" the *active players'* vote. *Id.* ¶ 170 (emphases added).

The final ERISA claim, ***Claim 7***, alleges that the NFLPA breached its "fiduciary dut[y] to monitor [its] appointees to the . . . Boards" by not "informing th[ose] appointees . . . that they needed to correct [the NFLPA's own] misstatements" or, failing that, "removing the breaching fiduciary appointees." *Id.* ¶¶ 186-87.

Finally, in ***Claim 8***, Plaintiffs sue under LMRA § 301 for "breach of [the] collective bargaining agreement" for "impermissibly . . . adding" disability provisions. *Id.* ¶ 191.  Yet the "breaches" Plaintiffs allege, which could possibly affect only the Article 4 subclass, only concern the NFLPA's internal ratification process, rather than any of the terms of the 2020 CBA.  *Id.* ¶¶ 191-206 (the "language was [not] added through appropriate procedures").

In terms of relief, Plaintiffs seek, among other things, "injunctive and declaratory relief to enjoin the enforcement of this Social Security offset disability amendment and the whole person evaluation process amendment," to "maintain the disability eligibility of all Class members who were deemed eligible for disability benefits under the Social Security Administration qualification standard," and an order "that the 2020 CBA between the NFLPA and Management be subject to a re-vote to ratify the changes to Article 60." *Id.* ¶¶ A-P; *see also id.* ¶¶ 156, 164, 206.[3]  Plaintiffs also seek damages in the form of surcharges against the allegedly "breaching fiduciaries" and disgorgement of alleged profits from the Social Security offset. *Id.* ¶¶ H-J.

_____

[3] Although Plaintiffs appear to request "a re-vote on the 2020 CBA" in general in a few of their complaint allegations (Am. Compl. ¶¶ 58, 207), in other places—including the prayer for relief—the request is limited to a re-vote on just "the [March 15] changes to Article 60" (*id.* ¶¶ 207, E).

## IV.      LEGAL STANDARD ON A MOTION TO DISMISS

A motion to dismiss under Civil Rule 12(b)(6) should be granted where the complaint fails to state a claim upon which relief can be granted. *Moore v. U.S. Dep't of State*, 351 F. Supp. 3d 76, 87 (D.D.C. 2019). To survive a motion to dismiss, a claim must be "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation." *Id.* (court must accept factual allegations as true, but not legal conclusions). Rather, it requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility is "more than a sheer possibility that a defendant has acted unlawfully," and a complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

A court also has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Under Civil Rule 12(b)(1), a "plaintiff bears the burden of establishing that the court has [subject-matter] jurisdiction" to hear its claims. *Id.* When a defendant presents a facial challenge to subject matter jurisdiction (such as Article III standing), "the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

## V.      LEGAL ARGUMENT

### A.      Plaintiffs Have Not And Cannot State An ERISA Claim Against the NFLPA.

Plaintiffs seek relief under ERISA § 502(a)(3). Am. Compl. ¶¶ 137, 147, 155, 163, 173, 183, 189. For varying reasons, they lack constitutional standing to assert some or all of each

ERISA claim.  Moreover, they have not pled any plausible ERISA claim.  "To state a claim under ERISA § 502(a)(3), Plaintiff[s] must demonstrate Defendants acted in a fiduciary capacity."  *Soland v. George Washington Univ.*, 916 F. Supp. 2d 33, 37 (D.D.C. 2013).  Because (a) the NFLPA is not a fiduciary in any sense relevant to Plaintiffs' claims, and (b) because even if the NFLPA were such a fiduciary, Plaintiffs have failed to plausibly allege any breach by the NFLPA of any duty to Plaintiffs, their ERISA claims against the NFLPA fail as a matter of law.

1.  ***ERISA Claims 1-4—"Violations for Changing [Plan] Terms"—Should be Dismissed.***

In Claims 1-4, Plaintiffs assert that the NFLPA "impermissibly reduced or eliminated" or "affect[ed] the rights to" vested disability benefits by agreeing to the Social Security disability offset and whole-person evaluation process in the CBA.  Am. Compl. ¶¶ 134, 144, 153, 161.

a.  **Plaintiffs lack Article III standing to pursue any claim concerning the "whole person evaluation" process.**

Plaintiffs "bear[] the burden of establishing" the three elements of "the irreducible constitutional minimum of standing" under Article III: (1) "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent"; (2) "a causal connection between the injury and the conduct" that ensures the injury is "fairly . . . trace[able]" to the defendant's actions; and (3) a "likel[ihood] . . . that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560–61 (alterations in original) (quotation marks and citations omitted).  "[I]njury in fact[ is] the first and foremost of [these] elements."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alterations and quotation marks omitted).  In the absence of "an injury-in-fact that is 'imminent' or 'certainly impending,'" a case is not "constitutionally ripe."  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012).  And even if it is, "there may also be 'prudential reasons for refusing to exercise jurisdiction.'"  *Id.* (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)); *see also Am. Oversight v. U.S. Dep't*

*of Veterans Affairs*, 2020 WL 6381895, at \*8 n.1 (D.D.C. Oct. 30, 2020) ("Ripeness doctrine subsumes two inquiries—the Article III requirement that plaintiffs demonstrate an injury-in-fact as well as separate prudential reasons").

Plaintiffs concede they have not yet "felt" the "effects" of whole-person evaluation process.[4] *Id.* ¶ 85; *see Warth v. Seldin*, 422 U.S. 490, 502 (1975) (named plaintiffs in class actions must allege that they have been injured "personally"). As Plaintiffs allege, it will not take effect until between April 1, 2024 and April 1, 2026, and even then, it is not certain but supposedly "*likely*" that Plaintiffs and members of the Class will lose their vested lifetime [] disability benefits" at that time. *See* Am. Compl. ¶¶ 73, 82-84 (emphasis added). The amended complaint adds no facts to explain how a change that will not go into effect until 2024 could be "imminent," nor on what basis Plaintiffs may in good faith allege that it is "likely" they will not satisfy the whole-person evaluation process and lose their benefits. *See id.* ¶¶ 82, 84.

Such speculation is "divorced from any concrete harm" (*Spokeo*, 136 S. Ct. at 1549), and the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact" for purposes of Article III standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks and citations omitted). Plaintiffs' conclusory declaration that they "were impacted in . . . real, non-speculative ways" (Am. Compl. ¶ 47) cannot fill this gap. *See Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Nor can this fatal constitutional standing gap be filled by Plaintiffs' allegation that their injury is not pure speculation because of the "NFL and NFLPA's history with these issues." Am. Compl. ¶ 82. Even if there were a basis

---

[4] The Social Security offset likewise does not take effect until the beginning of next year. Am. Compl. ¶ 48.

for this wild assertion, it would be immaterial, because past conduct—especially past conduct allegedly affecting *others*, not Plaintiffs—cannot serve as a basis for asserting speculative injury from future conduct that will not take place until years in the future, with a completely unknown effect, if any, on Plaintiffs. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 95–96 (1983) ("[p]ast exposure to . . . conduct does not in itself show a present case or controversy . . . if unaccompanied by any continuing, present adverse effects"); *Barroca v. Hurwitz*, 342 F. Supp. 3d 178, 198 (D.D.C. 2018) (even "prior alleged exposure to harm . . . is too speculative to support standing"). Plaintiffs have no constitutional standing to pursue *any* claim now insofar as it concerns the whole-person evaluation process. Accordingly, these claims are not yet ripe. And even if they had been *constitutionally* ripe, the Court may still decline to decide them on grounds of *prudential* ripeness, which "ensures that Article III courts make decisions only when they have to, and then, only once." *Am. Petroleum Inst.*, 683 F.3d at 387.

**b.    Plaintiffs have not pled any relevant fiduciary duty.**

Plaintiffs also cannot make it past "the threshold question" of their ERISA claims, which "is not whether the actions of [an ERISA defendant] adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram*, 530 U.S. at 226. Because "[f]iduciary status can be determined as a matter of law at the motion to dismiss stage based on a plaintiff's allegations that the defendants were ERISA fiduciaries," dismissal on these grounds is appropriate. *In re Bear Stearns*, 763 F. Supp. 2d at 565.

Plaintiffs do not even *allege* the NFLPA was acting as their fiduciary in connection with bargaining over their retirement benefits. This omission is dispositive. A fiduciary duty is a prerequisite to any § 502(a)(3) claim. *See Soland*, 916 F. Supp. 2d at 37. Such an allegation would not have succeeded anyway; as will be discussed in greater detail below, just this year, another

20

district court explained in dismissing similar claims by retired players against the NFLPA that "[w]hatever control the [NFLPA] ha[d] over the Plan through collective bargaining . . . is not a 'fiduciary act' for purposes of ERISA liability." *See Hudson*, 2019 WL 5722220 at *19 (citing *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336 (1981)).

Courts have recognized the established "distinction between [the board] administering the pension program (under a fiduciary duty) and [the parties to the CBA] creating or amending the program through negotiations"—particularly when it comes to retirees' benefits. *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1269 (7th Cir. 1985) ("a union is not a fiduciary while, or merely because, it is negotiating the terms and conditions of future pension benefits"); *see also, e.g.*, *Sutton v. Weirton Steel Div. of Nat'l Steel Corp.*, 567 F. Supp. 1184, 1193 (N.D. W. Va.), *aff'd*, 724 F.2d 406 (4th Cir. 1983) ("union fiduciary duties in regard to employee welfare plan participants and beneficiaries arising under ERISA . . . are not necessarily implicated when union leadership participates in negotiations . . . and recommends the products of such negotiations to union membership" (citing *Robinson*, 455 U.S. at 562)).

The Retirement and Disability Boards, the plans' administrators, are the named fiduciaries for the plans (*Hudson*, 2019 WL 5722220, at *2 (S.D.N.Y. Sept. 5, 2019), *report and recommendation adopted as modified*, 2019 WL 4784680 (S.D.N.Y. Sept. 30, 2019)), and de facto fiduciary liability on the part of another party involved in the plan extends only so far as the fiduciary "has discretionary authority . . . in the administration of [the] plan." *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987). That is, "a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control." *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1459–60 (5th Cir. 1986).

Here, Plaintiffs allege the NFLPA "is a fiduciary of the Plans" for purposes of its allegations in Claims 1-4 only "[b]y virtue of [its] powers to appoint and remove other fiduciaries." Am. Compl. ¶ 12.  Even if the court were to accept this legal conclusion, the only "discretionary authority" the NFLPA has with respect to the plans is the power to appoint three board members—thus its fiduciary duty extends *only to appointing those board members*.  *See Sommers*, 793 F.2d at 1459–60 ("if an employer and its board of directors have no power with respect to the plan other than to appoint the plan administrator and the trustees, then their fiduciary duty extends only to those functions"); *see also Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991) (union's "obligation as a fiduciary pertain[ed] only to" areas in which it had "limited discretion"); *IBEW Local 90 v. Nat'l Elec. Contractors Ass'n*, 2008 WL 918481, at *6–7 (D. Conn. Mar. 31, 2008) (employer association representing contributing employers was an ERISA fiduciary by virtue of its power to appoint and remove trustees, but its "fiduciary obligations are, of course, limited to 'those aspects of the plan over which [it] exercises authority or control,'" *i.e.*, the appointments process (citing *Sommers*, 793 F.2d at 1459–60)).  And having appointed only 50% of the voting members, the NFLPA could not possibly take any unilateral or discretion action with respect to the plans.  *See* Am. Compl. ¶¶ 12–13.

Because Plaintiffs do not allege *any* misconduct in connection with the NFLPA's appointing responsibilities, the NFLPA could not have been "acting as a fiduciary . . . when taking the action subject to complaint" in Claims 1-4.  *Pegram*, 530 U.S. at 226.  And without any fiduciary duty to the retired players with respect to the CBA terms being challenged, these claims do not state an ERISA cause of action against the NFLPA.

The Southern District of New York recently dismissed claims by a former NFL player against the NFLPA, the NFLMC, and the plan administrators for many of the same reasons the

Court should dismiss such claims here.  *Hudson*, 2019 WL 5722220, at *4.  Although the claims in *Hudson* were slightly different from Claims 1-4 (they alleged a breach of the duty to monitor and a breach of the duty to provide certain information in the SPD), the rationale applies here with equal force.  The court explained that, because the plans at issue are multiemployer Taft-Hartley plans, the NFLPA's duties are "limited only to its functional responsibilities": "the power to appoint and remove three members of the [Retirement] Board."  *Id.* at *18.  The NFLPA "had no broader 'control' or 'authority' over the Plan" (*id.*)—a broader scope "would undermine the [Taft-Hartley Act's] rationale for delegating responsibility for the administration of the Plan to the Board in the first place" (2020 WL 1547467, at *8), and the LMRA "prohibited [the NFLPA] from directing or supervising the decisions of the appointed board members."  2019 WL 5722220, at *19.

The NFLPA's "fiduciary duties d[id] not extend to liability for the Retirement Board's substantive decisions."  *Id.* at *17.  It need only "ensur[e] that appointing fiduciaries are performing their duties, not *how* they are performing those duties."  2020 WL 1547467, at *8.  Yet the plaintiff in *Hudson*, as here, made no allegations about the NFLPA breaching *those* limited appointment duties.  2019 WL 5722220, at *20.  The NFLPA "did not have the unilateral ability to revise the Plan or affect particular decisions under the Plan," and there was no allegation of a breach of "any specific duty that it did have."  *Id.* at *19.  And, as explained above, an action taken in conjunction with "collective bargaining . . . is not a 'fiduciary act.'"  *Id.* (citing *Amax*, 453 U.S. at 336).

The pleading defects in *Hudson*—filed by some of the same counsel as in this case—are repeated here.  Plaintiffs' allegations of a breach of fiduciary duty in Claims 1-4 are nominally premised on the NFLPA's appointment power (Am. Compl. ¶ 12), but the substantive averments have nothing to do with the NFLPA's "appointment of three [board] members."  2019 WL

5722220, at *18.  Nor, as in *Hudson*, do Plaintiffs so much as aver that those board members failed to "carr[y] out their other duties."  2020 WL 1547467, at *8.

**c.    Plaintiffs' alleged "vested" welfare benefits are not vested; they expired when the new CBA was adopted.**

Even if Plaintiffs had any standing to pursue claims concerning the whole-person evaluation process (they don't), and even if they plausibly alleged a fiduciary duty owed to them by the NFLPA with respect to the challenged conduct (they didn't), Claims 1-4 would still fail because they rest on a legally erroneous premise of liability: that the disability benefits Plaintiffs claim will be adversely affected by the 2020 CBA's Social Security offset and whole-person evaluation process were "vested lifetime rights" that could not be "reduced or eliminated."  Am. Compl. ¶¶ 134, 144; *see also id.* ¶¶ 132, 142, 153, 161.  According to Plaintiffs, "[n]othing in the relevant [CBAs or plans] suggest [*sic*] that Defendants had the unilateral ability to alter vested lifetime benefits by adding a Social Security offset."  *Id.* ¶¶ 132, 142.

Plaintiffs have it backwards.  Welfare "*plan sponsors are generally free . . . to adopt, modify, or terminate welfare plans*"—unilaterally, and "for any reason at any time."  *Tackett*, 574 U.S. at 434–35 (emphasis added) (quoting *Curtiss-Wright*, 514 U.S. at 78).  In *Tackett*, the Supreme Court confirmed that retirees' welfare benefits are not legally required to outlive the CBA they were adopted under.  *Id.* at 441–42.  This rule is rooted in two traditional principles: "that courts should not construe ambiguous writings to create lifetime promises," and that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement."  *Id.* (quoting *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991)).  While the Court has "recognized that 'a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration,'" if the "contract is silent as to the duration of retiree bene-

24

fits, a court may not infer that the parties intended those benefits to vest for life." *Id.* at 442 (quoting *Litton*, 501 U.S. at 207); *accord CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 766 (2018) ("If the parties meant to vest health care benefits for life, they easily could have said so in the text. But they did not.").

Here, Plaintiffs allege without factual detail that they "were promised in clear and unambiguous terms . . . a defined amount of T&P disability benefits for life." Am. Compl. ¶¶ 131, 141. But they point to no such language in "Article 5.5(b) of the Retirement Plan and Articles 3.6 and 4.2 of the 2019 Disability Plan"—or anywhere else—that "provid[es] in explicit terms" that these benefits were intended to "*continue after the agreement's expiration.*" *Id.*; *Tackett*, 574 U.S. at 442 (emphasis added) (quoting *Litton*, 501 U.S. at 207). There is no such language—both plans say just the opposite, as did the previous CBA. *See, e.g.*, 2011 CBA Art. 61 § 1 (excerpts attached as Exhibit C to Miossi Decl.) (Disability Plan is to "be continued and maintained in full force and effect *during the term of this Agreement*" (emphasis added)); Ex. A to Miossi Decl., Retirement Plan § 10.2 (NFLPA and NFLMC "may amend this Plan in any respect and may terminate this Plan"); Ex. B to Miossi Decl., Disability Plan § 10.1 (plan may be "amended or terminated by joint action of the NFLPA and the [NFLMC] while there is a [CBA] in effect"); *see also* Sept. 2019 Disability Plan Summary Plan Description (SPD) at 42 (excerpt attached as Exhibit D to Miossi Decl.) ("Disability benefits are not vested" and "can be changed or terminated at any time").[5] Indeed, Plaintiffs admit that "there is language in the Disability Plan Summary Plan Description (SPD) to the effect that Disability benefits do not vest." Am. Compl. ¶ 37. They further admit

---

[5] Because these documents are "repeatedly referenced in the Complaint" and are central to [Plaintiffs'] claim[s]," the Court may consider them at the motion-to-dismiss stage. *See Saunders*, 842 F. Supp. 2d at 293 n.2.

that, under the previous CBA, their benefits would have dropped to $0 upon its expiration in April 2021.  Am. Compl. ¶¶ 31-32, 34, 52, 135, 145.

To try to overcome the ruling in *Tackett*, Plaintiffs argue that under the decision, extrinsic evidence—*i.e.*, "the Disability Plan itself and income verification statements"—"may be consulted to show that the Disability Plan will remain in effect, regardless of the cessation of the CBA."  *Id.* ¶ 39.  This is legally incorrect.  In *Tackett*, the Court *rejected* the Sixth Circuit's presumption that, "in the absence of extrinsic evidence to the contrary, the provisions of the contract indicated an intent to vest retirees with lifetime benefits."  574 U.S. at 435.  Instead, the Court reaffirmed the principle that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement."  *Id.* at 441–42 (quoting *Litton*, 501 U.S. at 207).

Plaintiffs alternatively rely on language in the plans that disability benefits would last until "cessation of . . . disability," "termination" following decertification, or "Death."  Am. Compl. ¶¶ 25, 36.  But, again, the law is clear that "[a]n employer who promises lifetime medical benefits, while at the same time reserving the right to amend the plan under which those benefits were provided, has informed plan participants of the time period during which they will be eligible to receive benefits *provided* the plan continues to exist."  *In re Unisys Corp. Retiree Med. Ben. "ERISA" Litig.*, 58 F.3d 896, 904 (3d Cir. 1995); *accord IUE-CWA v. Gen. Elec. Co.*, 745 F. App'x 583, 594 (6th Cir. 2018) ("a reservation-of-rights clause means that any alleged lifetime promise in a benefit plan is actually a qualified one" (quotation marks omitted)); *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003) (no vesting despite language stating that health benefits "continue[] until . . . death" because employer had reserved right to amend or terminate); *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1512 n.2 (10th Cir. 1996) ("the weight of case authority" holds "that a reservation of rights clause allows the employer to retroactively change the medical

26

benefits of retired participants, even in the face of clear language promising company-paid lifetime benefits"); *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851, 855–56 (4th Cir. 1994) (no "vested right to receive lifetime benefits after retirement" where company "reserv[ed] . . . the right to modify plan benefits"); *Alday v. Container Corp. of Am.*, 906 F.2d 660, 665 (11th Cir. 1990) (summary plan description indicated that retiree health insurance could be terminated or modified); *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1518 (8th Cir. 1988) (language promising welfare benefits "until death of retiree" did not cause benefits to vest where employer reserved right to terminate or amend plan). The amended complaint acknowledges that the Disability Plan "may . . . be amended," which fits it squarely into this settled case law. Am. Compl. ¶ 38.

### 2. *ERISA Claim 5*—"Failure to Disclose Material Information"—Should Also Be Dismissed.

Claim 5 should be dismissed because the allegations are (a) too remote and speculative to confer Article III standing and (b) fail to state any claim against the NFLPA.

### a. Plaintiffs lack Article III standing to pursue Claim 5.

To plead Article III standing under Claim 5, Plaintiffs must plausibly allege (among other things) an "injury in fact" that is "fairly . . . trace[able]" to the NFLPA's alleged conduct. *Lujan*, 504 U.S. at 560–61 (alterations in original) (quotation marks and citations omitted). Constitutional standing also requires that the injury be "fairly . . . trace[able] to the challenged action of the *defendant*, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* at 560 (emphasis added). "When considering any chain of allegations for standing purposes, [a court] may reject as overly speculative those links which are predictions of future events (especially future actions [of] third parties)." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015); *Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991) (no standing where "the plaintiff s[ought] to change the defendant's behavior *only as a means* to alter the conduct of a third party,

not before the court, who [wa]s the direct source of the plaintiff's injury"); *Ege v. U.S. Dep't of Homeland Sec.*, 784 F.3d 791, 795 (D.C. Cir. 2015) (no standing where the injury resulted from the actions of a third party not before the court); *Siegel v. U.S. Dep't of Treasury*, 304 F. Supp. 3d 45, 54 (D.D.C. 2018) ("reliance on the anticipated action[s] of unrelated third parties makes it considerably harder to show the causation required to support standing").

Applying these principles to Claim 5, Plaintiffs' alleged reduction in welfare benefits—*i.e.*, the Social Security disability offset and whole-person evaluation—must plausibly be "fairly traceable" to the allegedly "misleading" NFLPA communications and not the unknown conduct of third parties. *Lujan*, 504 U.S. at 560–61; Am. Compl. ¶¶ 86, 88, 90, 100, 104, 109, 178. But the causal chain alleged by Plaintiffs—that if they had more material information from the NFLPA on benefit changes, they "*might*" have been able to lobby active players to reject the CBA in their ratification vote, enough active players might have voted differently, and the course of the CBA negotiations might have changed such that Plaintiffs would have been better off with the ensuing package of retired benefits (Am. Compl. ¶ 99)—is too speculative, remote, and uncertain to confer constitutional standing. Indeed, Plaintiffs specifically rely on the unknown, speculative acts of third parties as a central causal premise of their claims, *e.g.*, whether the active players would have altered their ratification votes and what the NFLMC would have agreed to in an alternative, hypothetical CBA.

Confronted with these fatal standing defects, Plaintiffs now speculate in their amended complaint that "other less draconian trade-offs [would have been] made between the parties." *Id.* This rank conjecture makes—not refutes—the NFLPA's point. *See Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986) ("the mere possibility that causation is present is not enough; the presence of an independent variable between

either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied"). Plaintiffs acknowledge "trade-offs" would have been required to eliminate the Social Security offset and whole-person evaluation process, but do not venture to guess what those trade-offs might have been, whether Plaintiffs would have been better or worse off, or whether either the active players or the NFLMC would have ever agreed to these unknown "trade-offs." Speculation about alternative permutations of a 400+-page CBA in a multi-billion-dollar industry with innumerable variables, concessions, and *quid pro quos* would not merely be implausible—it would be impossible.

Claim 5 thus rests upon speculation upon speculation upon speculation, as well as the unknown conduct of third parties, to "trace" the NFLPA's alleged misinformation to Plaintiffs' alleged injuries. This does not come close to satisfying Plaintiffs' burden to plead Article III standing.

### b. Plaintiffs have also failed to plead a viable cause of action against the NFLPA under Claim 5.

Unlike in Claims 1-4, in Claim 5, Plaintiffs *do* allege that the NFLPA assumed a fiduciary duty by making communications to former players about changes to the CBA. *See* Am. Compl. ¶¶ 165-73. While the NFLPA's communications about changes to the welfare plans in the new CBA could theoretically give rise to a limited fiduciary duty (*see Bilello v. JPMorgan Chase Ret. Plan*, 649 F. Supp. 2d 142, 164–65 (S.D.N.Y. 2009)), the specific duty Plaintiffs allege here does not exist.

In the amended complaint, Plaintiffs add an allegation that the NFLPA had a duty to "forward[] the requests for information to the [boards] if [it] believed those entities were the proper fiduciaries" but did not do so, "instead act[ing] themselves in a functional fiduciary capacity." Am. Compl. ¶ 108. But when a Taft-Hartley plan is at issue, a union's only power is to "appoint

29

the plan administrator and the trustees," so its "fiduciary duty extends only to those functions" (*Sommers*, 793 F.2d at 1459–60): basically, "attend[ing] meetings" and "cast[ing] votes." *Hudson*, 2019 WL 5722220, at *20. Plaintiffs allege no failure of the union's duty with respect to these issues. And the LMRA *prohibits* plan sponsors like the NFLPA from "direct[ing] or supervis[ing]" the activities of their appointed trustees, such as by "forward[ing] requests for information." *Compare* Am. Compl. ¶ 108, *with Amax*, 453 U.S. at 329.

Plaintiffs' allegations about purported NFLPA communications fail to state a claim for breach of fiduciary duty against the NFLPA in at least two respects: (1) the NFLPA's alleged affirmative misstatements did not concern the contents of the plans; and (2) Plaintiffs concede that no NFLPA statement has caused any loss *to the plan*.

*First*, as for the affirmatively *false* communications attributed to the NFLPA, they concern purported NFLPA assertions that active players understood the potential impact that the 2020 CBA could have on former players' benefits. Am. Compl. ¶¶ 103-05. Plaintiffs take issue with these assertions, arguing that (unidentified) tweets from (unidentified) players illustrate "there was no such understanding by the Players generally." *Id.* ¶ 104. Even if Plaintiffs were correct that most active players did not understand the CBA's potential impact on retirement benefits, ERISA still requires knowledge that the communications were "false or lack[ed] a reasonable basis." *Bilello*, 649 F. Supp. 2d at 166. Plaintiffs allege no plausible *facts* that the NFLPA's statements were "false and/or lacked a reasonable basis" (Am. Compl. ¶ 87)—they just offer their conclusory say-so. That "do[es] not suffice." *Iqbal*, 556 U.S. at 678.

More fundamentally, false statements give rise to ERISA liability only when they concern "*the contents of a plan*." *Bilello*, 649 F. Supp. 2d at 165. The NFLPA's allegedly false statements

30

about its members' understanding are not statements about "the contents of a plan." *See id.*  Indeed, most of Plaintiffs' complaints about NFLPA communications concern the NFLPA *not* providing information to active players about the new disability benefits terms. Compare Am. Compl. ¶ 88 ("such misrepresentations are statements about the contents . . . of the . . . Plans"), *with* ¶ 101 ("Highlights of the Proposed CBA" includes "*no language* about a significant decrease in benefits and *no mention*" of "the whole-person evaluation process"), ¶ 102 ("CBA Side by Side" "*nowhere mentions* the . . . whole-person evaluation process") (emphases added).[6]

*Second*, a required element of Plaintiffs' claim of a breach of fiduciary duty is that the NFLPA caused a loss to *the plan*. *Barry v. West*, 503 F. Supp. 2d 313, 326 (D.D.C. 2007); *see* 29 U.S.C. § 1109(a).  Plaintiffs concede that "there has not been a loss to the Plans themselves" but argue that they can recover anyway. Am. Compl. ¶ 89.  This is both a legal conclusion masquerading as an allegation of fact and an incorrect statement of the law.

### 3.    ERISA New Claim 7—"Duty to Monitor" Cannot Be Sustained.

In Claim 7, Plaintiffs allege that the NFLPA breached its duty to monitor its appointed trustees with respect to the "misrepresentations and omissions" alleged in Claim 5. *Id.* ¶¶ 184-89. Specifically, they claim the NFLPA failed to either "inform[] [its] appointees to the Board[s] that they needed to correct those misstatements" or "remov[e] the breaching fiduciary appointees," and that the NFLPA's supposed failure to do so led to the passage of the Social Security offset and whole-person evaluation process. *Id.* ¶ 187.  This claim fails for at least four reasons.

---

[6] Plaintiffs argue that *Varity Corp. v. Howe*, 516 U.S. 489 (1996), supports their argument that the communications at issue here are of the type contemplated by the drafters of ERISA. Am. Compl. ¶¶ 96, 98.  This is not correct.  *Varity* concerned "detailed plan information in order to help [beneficiaries] decide whether to remain with the plan," which the Court held was "essentially the same kind of plan-related activity" as statutorily-required disclosures like the SPD.  516 U.S. at 503. This detailed benefits-election information has nothing in common with a labor union's communications to its members about collective bargaining.

*First*, Plaintiffs lack standing to pursue Claim 7 because it adds yet *more* layers of remoteness and speculation to the already too-attenuated connection between the NFLPA's supposedly misleading statements and Plaintiffs' supposed injuries.  *Supra* Part V.A.2.a (addressing lack of standing under Claim 5).  Claim 7 *additionally* hypothesizes that if NFLPA had properly monitored the boards, the boards would have identified and corrected the NFLPA's alleged misstatements, and this would have set off Plaintiffs' speculative chain of events leading to a new-and-improved CBA that would benefit them.  Am. Compl. ¶ 187.  Not only does this add more remoteness and speculation to Claim 5, it continues to hinge on the conduct of a party the NFLPA does not control.  Such "predictions of future events"—"especially future actions [of] third parties"—are "overly speculative" and cannot establish Article III standing.  *Arpaio*, 797 F.3d at 21.

*Second*, Claim 7 presupposes that the NFLPA made "misrepresentations and omissions" that are relevant to ERISA.  As explained above (*supra* Part V.A.2.b), this is wrong as a matter of law.  Indeed, the alleged statements at issue concerned communications to union members about collective bargaining—not about the plans themselves.  *Id.*

*Third*, not only did the NFLPA have no ERISA duty to monitor the boards in the way Claim 7 posits, the NFLPA was legally *forbidden* from doing so.  In a Taft-Hartley plan, the LMRA prohibits the plan sponsors from "direct[ing] or supervis[ing] the decisions of a trustee he has appointed."  *Amax*, 453 U.S. at 330; *see* 29 U.S.C. § 186; *see also Hudson*, 2019 WL 5722220, at *19 (citing *Amax*).  Rather, as a plan sponsor, the NFLPA's fiduciary duties were "limited to those aspects of the plan over which [it] exercises authority or control, namely the appointments process."  *Hudson*, 2019 WL 5722220, at *11 (quotation omitted); *accord Sommers*, 793 F.2d at 1460 (sponsor's "fiduciary duty extends only" to "appoint[ing] the plan administrator and the trustees").  *See also supra* Part V.A.1.b.

Again, *Hudson* is instructive, as it involved a very similar duty to monitor claim against the NFLPA "relat[ing] to [the] Board's alleged failure to disclose important information to [plan] participants." 2020 WL 1547467, at *2. That claim was dismissed because, among other things, the NFLPA's "fiduciary duties do not extend to liability for the Retirement Board's substantive decisions." *Hudson*, 2019 WL 5722220, at *17. The court found "no support" for the allegations that the NFLPA's co-sponsor, the NFLMC, had "the responsibility to supervise, evaluate, or second-guess the substantive decisions of their selected members of the Retirement Board," and the ability to "appoint and remove three members of the Retirement Board d[id] not suffice to make the Council liable for the Retirement Board's substantive decisions." *Id.* And because, "just like the [NFLMC], the [NFLPA] is an appointing party for a multi-employer plan and is therefore prohibited from directing or supervising the decisions of the appointed board members," the NFLPA's "fiduciary duties under ERISA do not create liability for the substantive decisions reached by the Retirement Board." *Id.* at *19. Claim 7 can thus be dismissed on this independent ground as well.

*Fourth*, Plaintiffs have alleged no plausible facts of a breach by either the board or the NFLPA. An NFLPA breach of the duty to monitor requires an antecedent breach on the part of the Boards; "[w]ith no antecedent breach . . . [the] duty to monitor claim fails." *Id.* at *17 n.11 (quoting *In re Bear Stearns*, 763 F. Supp. 2d at 580). If the Court finds that Plaintiffs did not plausibly allege any breach by the boards with respect to the communications (Claim 6)—as it should—Claim 7 against the NFLPA must also be dismissed. *See id.* Nor, in any case, do Plaintiffs so much as allege that the NFLPA breached any of its limited fiduciary duties, such as by "appoint[ing] unqualified trustees" or not monitoring whether the "appointees failed to attend meetings [or] cast votes." *Id.* at *20.

B.      **Plaintiffs Have Not And Cannot State An LMRA § 301 Claim.**

Plaintiffs attempt to use LMRA § 301 as a Trojan horse to litigate their dissatisfaction with the NFLPA's internal governance processes for ratifying the 2020 CBA.  But Plaintiffs—yet again—have no constitutional standing to pursue such a claim: they have no cognizable legal interest in the governance of their *former* union; their requested relief (a "re-vote") is barred by federal labor law and thus is unavailable to redress their claimed injuries; and those injuries are far too speculative and remote (and based on the actions of third parties) and not fairly traceable to the NFLPA's alleged breaches of union governance.  Further still, even if the Court were to reach the merits of the LMRA claim, Plaintiffs have not actually alleged any breach of the CBA.  Quite to the contrary, their complaint is that the NFLPA and NFLMC are *enforcing* the new CBA.  The LMRA claim thus fails every which way.

1.      **Plaintiffs lack standing to pursue Claim 8.**

a.      **Plaintiffs have no "legally protected interest" in enforcing the NFLPA Constitution.**

Plaintiffs' LMRA claim squarely and exclusively depends on their contention that the NFLPA did not follow its own internal governance procedures during the 2020 CBA ratification process.  *See* Am. Compl. ¶¶ 191-205.  All of their § 301 allegations, including the ones expanded on in the amended complaint, ultimately go back to the interpretation and application of the NFLPA's own constitution.  *See, e.g.*, *id.* ¶ 63 ("such joint action did not occur because the NFLPA, *according to its own Constitution*, was not acting as an 'authorized' representative" (emphasis added)); ¶ 64 ("The NFLPA is only an 'authorized representative of the parties' if it had the right under its Constitution to enter into the Collective Bargaining Agreement with the Management Council.").  But Plaintiffs have no "legally protected interest" in the NFLPA's CBA ratification process.  *See Lujan*, 504 U.S. at 560.

In fact, Plaintiffs concede that "the union owes no duty of fair representation to retired Players." Am. Compl. ¶ 196. The Supreme Court recognized a half-century ago that active and retired employees "plainly do not share a community of interests." *Allied Chem.*, 404 U.S. at 173. A union has a statutory duty to represent the interests of *active* employees "fairly and impartially" (*Humphrey*, 375 U.S. at 342), but because retirees are not part of the bargaining unit, "a union's duty of fair representation does not include an obligation to take into account the interests of its retired members when it is negotiating contracts with an employer." *Baskin*, 807 F.2d at 1131 (discussing, inter alia, *Allied Chem.*, 404 U.S. at 172–75); *see also Bove v. Long Island R.R.*, 1995 WL 901990, at *6 (E.D.N.Y. Dec. 12, 1995) ("the duty of fair representation derives from the fact that a union is defined by statute as the exclusive bargaining representative for all members of a bargaining unit . . . [i]t follows that the union's duty does not extend to persons outside the bargaining unit, such as retirees"). "[R]etiree benefits"—including those of NFL retirees—are "commonly bargained by labor unions representing current employees [but] are not mandatory subjects of collective bargaining." *Eller*, 731 F.3d at 755, 758 ("retired [NFL] players are not members of a collective bargaining unit").[7]

Labor law gives unions broad discretion to manage their affairs; even *active* union members have a very limited ability to challenge union governance outside of internal union procedures. For example, earlier this year, an active NFL player filed a complaint with the National Labor

---

[7] *See also Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821 (9th Cir. 1985) ("Because the union owed no duty [of fair representation] to [plaintiff] as a nonemployee of the bargaining unit, he lacks standing to sue for breach of such a duty."); *Harmon v. Am. Elec. Power Serv. Corp.*, 371 F. Supp. 2d 804, 812 (S.D. W. Va. 2005) ("no standing to bring [a duty of fair representation] suit under [the CBA's] terms" because she was "neither an employee nor a member of the bargaining unit and therefore [could not] enforce any rights created under the agreement").

Relations Board, alleging that the NFLPA's CBA ratification process did not comply with its con-stitution—allegations similar to Plaintiffs'. *Compare* Denial Letter, *NFL Players Ass'n (Los Angeles Chargers)*, No. 21-CB-257665 (N.L.R.B. Aug. 14, 2020) (declining to reconsider) (attached as Ex. E to Miossi Decl.), *with* Am. Compl. ¶¶ 199-205. The NLRB dismissed the charge precisely because its jurisdiction over the NFLPA's administration of its internal affairs is so limited:

> Regarding the Union's internal procedures and ratification, the Board has found that a union has the ability to decide how to carry out its ratification process. *International Longshoremen's Association, Local 1575, AFL-CIO (Navieras, NPR, Inc.)*, 332 NLRB 1336 (2000). When a union seeks "employee ratification, it is for the union 'to construe and apply its internal regulations relating to what would be sufficient to amount to ratification." *Id.* at 1336 citing *M & M Oldsmobile*, 156 NLRB 903, 905 (1966), enfd. 377 F.2d 712 (2d Cir. 1967). Here the evidence failed to establish that the Union's handling of the ratification of its contract or any of the other alleged internal anomalies violated the National Labor Relations Act.

Ex. E; *see also* Dismissal Letter, *NFL Players Ass'n (Los Angeles Chargers)*, No. 21-CB-257665 (N.L.R.B. May 6, 2020) (attached as Ex. F to Miossi Decl.) ("[W]ith respect to the ratification of the 2020 CBA, the Board does not interpret for a union its Constitution or the manner in which it ratifies contracts pursuant to its constitutional provisions."). The NLRB's conclusions apply with even greater force to the claims of *retired* players who, unlike the active player that filed the NLRB charge, have no standing to assert this claim because the union owes them no duty.

With this standing deficiency highlighted by the NFLPA's motion to dismiss the original complaint, Plaintiffs now attempt an end-run, alleging "they are intended third-party beneficiaries under the March 2020 CBA." Am. Compl. ¶¶ 57, 194. These allegations are unavailing for three reasons. *First*, Plaintiffs have not plausibly alleged that they are *intended* third-party beneficiaries. To be a third-party beneficiary of a CBA—like other contracts—"the contracting parties [must] intend the third-party to benefit directly thereunder." *Flynn v. Tiede-Zoeller*, Inc., 412 F. Supp. 2d 46, 53 n.10 (D.D.C. 2006) (quoting *Fields v. Tillerson*, 726 A.2d 670, 672 (D.C. 1999)). But

Plaintiffs' allegations are legal conclusions; they plead no specific facts to establish the requisite intent.  *See* Am. Compl. ¶¶ 57, 194.

*Second*, even if they had pled third-party status properly, courts only "apply local [contract] law," including the general definition of a third-party beneficiary, "to the extent that it is *compatible with federal labor policy*."  *Flynn*, 412 F. Supp. 2d at 53 n.10 (emphasis added).  Federal labor law has repeatedly recognized the inherent tension between the interests of active and retired employees (and the conflicts that tension may create), which makes it impossible for the union to act as a fiduciary in the interests of retirees at the same time it is representing its active members in collective bargaining.  *See, e.g.*, *Allied Chem.*, 404 U.S. at 172–73.  Indeed, this is why retired employees *cannot* be included in the bargaining unit the union represents.  *Id.*; *see also Yolton v. El Paso Tenn. Pipeline Co.*, 668 F. Supp. 2d 1023, 1033–35 (E.D. Mich. 2009).

*Third*, third-party beneficiary status would not give Plaintiffs standing to press *these particular claims*.  At most, third-party beneficiaries could enforce the terms of the CBA as written, to collect any benefits owed under them—not to claim that various CBA provisions are unenforceable or to challenge internal union governance procedures in the NFLPA Constitution.  *See Eller v. NFL Players Ass'n*, 872 F. Supp. 2d 823, 836 (D. Minn. 2012) (declining to decide whether NFL retirees were third-party beneficiaries but clarifying that "[e]ven third party beneficiaries to a contract have no standing to seek to excise or revise a contract's terms; rather, they may merely seek to enforce the contract"), *aff'd*, 731 F.3d 752 (8th Cir. 2013).  Third-party beneficiaries to a CBA are typically the *funds*, not beneficiaries like Plaintiffs.[8]

---

[8] *See, e.g.*, *Int'l Painters & Allied Trades Indus. Pension Fund v. Davanc Contracting, Inc.*, 808 F. Supp. 2d 89, 95 (D.D.C. 2011) ("a benefit trust fund may, as a third-party beneficiary, recover for breach of a collective bargaining agreement under 29 U.S.C. § 185(a)"); *Laborers' Pension Fund v. Joe Cachey Const. Co.*, 947 F. Supp. 365, 368 (N.D. Ill. 1996) ("Funds are third party beneficiaries of the [CBA]."); *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*,

> **b.  The connection between the asserted injury and the NFLPA's alleged LMRA violation is impermissibly speculative.**

Article III standing as to Claim 8 is also lacking for the same reason as Claims 5 and 7: it is far too speculative.  To attribute Plaintiffs' asserted injuries—*i.e.*, the adoption of the Social Security offset and whole-person evaluation process—to alleged union ratification process defects, Plaintiffs must speculate that the active players who *did* have a vote would have declined to ratify the CBA under the correct procedures, *and* that a new CBA would then have been negotiated that eliminated the benefit changes Plaintiffs do not want, without any offsetting changes that would put Plaintiffs in a worse position than they claim to be under the current CBA.  This is the same sort of rank conjecture that falls far short of the constitutional requirement that injuries be "*fairly traceable*" to the alleged violation.  *See Lujan*, 504 U.S. at 560; *supra* Parts V.A.2.a, A.3.

> **c.  Plaintiffs' claimed injuries cannot be redressed by a favorable outcome.**

Plaintiffs also lack standing to bring Claim 8 for the additional reason that, even if they could assert a claim for a breach of union governance procedures, their requested remedy—a re-vote on the terms of the CBA—is anathema to federal labor law.  The parties recently agreed to a new, 10-year CBA.  Now (in the midst of a pandemic and a recession) Plaintiffs seek to reopen the deal the active players agreed to.  This is "contrary to what the [Supreme] Court has recognized as '(o)ne of the (f)undamental policies' of the [NLRA]—'freedom of contract.'"  *NLRB v. Magnavox Co. of Tenn.*, 415 U.S. 322, 328 (1974) (Stewart, J., concurring in part and dissenting in part) (citing *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970)); *Robinson*, 455 U.S. at 576 ("when neither the collective-bargaining process nor its end product violates any command of Congress,

---

35 F.3d 29, 34–35 (2d Cir. 1994), *as amended* (Sept. 9, 1994) ("The Union is clearly authorized to sue under § 301; [the] administrator of the Funds[] may sue on behalf of the Funds as third party beneficiaries of the collective bargaining agreement.").

a federal court has no authority to modify the substantive terms of a collective-bargaining contract"); *see also Am. Postal Workers Union*, 657 F. Supp. 2d at 103 (refusing to "interfere with the terms of [bargained-for labor contracts]").

Because a "union typically exacts some form of quid pro quo from the management negotiators," and "it is usually impossible to identify the consideration given in return for a particular union concession," judicial "invalidation of bargained-for concessions does not promote stability in the collective-bargaining process." *Magnavox*, 415 U.S. at 328 (Stewart, J., concurring in part and dissenting in part).  For this reason, another district court faced with a similar request from retired NFL players to grant relief changing the terms of a CBA found that it was "in no position to declare the parties' respective rights in terms of the adequacy of what the active players obtained on behalf of the retired players, and if inadequate, to declare what additional benefits Plaintiffs would be entitled to as a matter of law." *Eller*, 872 F. Supp. 2d at 836.

Plaintiffs' invitation for the Court to scrutinize the NFLPA's internal governance procedures is strongly disfavored.  *See, e.g.*, *Sim v. N.Y. Mailers Union No. 6*, 166 F.3d 465, 470 (2d Cir. 1999) ("A Union's interpretation of its own constitution is entitled to great deference[] in order to avoid interference with internal union affairs . . . the interpretation of bylaw provisions by Union officials will be upheld unless patently unreasonable"); *Carpenters Local 42-L v. Carpenters*, 73 F.3d 958, 961 (9th Cir. 1996) (union's interpretation of "its own rules, regulations, and constitution is entitled to a high degree of deference" and courts must "be careful not to undermine union self-government"); *Newell v. Elec. Workers (IBEW)*, 789 F.2d 1186, 1189 (5th Cir. 1986) (court "will not invalidate [union's] interpretation of its own constitution unless it is 'patently unreasonable'"); *Bauman v. Presser*, 1984 WL 3255, at *6 (D.D.C. Sept. 19, 1984) ("[r]atification of a collective

bargaining agreement is an internal union affair," and courts "should not interfere when the judgment of the union's leadership appears to be fair and reasonable").

At bottom, Plaintiffs seek relief that is unavailable under federal labor law, and the Court cannot provide them with the redress Article III standing requires. *See Lujan*, 504 U.S. at 560.

### 2.    Plaintiffs have failed to plead any plausible breach of the CBA.

Finally, even if they had standing (they do not), Plaintiffs have failed to plead an actionable LMRA claim. Although styled as a "breach of the collective bargaining agreement," the factual allegations underpinning Claim 8 do not allege any CBA breach. *Id.* ¶¶ 190-207. This is dispositive. *See Textron Lycoming Reciprocating Engine Div., Avco Corp. v. UAW*, 523 U.S. 653, 657 (1998) (no jurisdiction where § 301 claim failed to allege that "a contract has been violated").

The only CBA provisions referenced in Claim 8 are Articles 60 and 67. Article 60 is the provision Plaintiffs contend the "[NFLMC] and [NFLPA] impermissibly *changed*." Am. Compl. ¶ 191 (emphasis added). There is, however, a fundamental difference between an allegation that the bargaining parties improperly *changed* or *modified* their agreement (what Plaintiffs allege) and an allegation that the bargaining parties are not adhering to the terms of the CBA (which Plaintiffs do *not* allege). For example, if Plaintiffs averred that the NFLPA and NFLMC were applying a Social Security disability offset even though the CBA did not provide for any such offset, *that* would be an LMRA claim for breach of the CBA's terms. But Plaintiffs here do not allege that the bargaining parties will not comply with the CBA as written.

The only other CBA provision referenced by Plaintiffs is Article 67: "Th[e] Agreement may not be changed, altered, or amended other than by a written agreement signed by authorized representatives of the parties." Am. Compl. ¶¶ 63, 66-67, 72, 198, 202-03. This CBA provision, however, cannot possibly—much less plausibly—be the source of any alleged CBA breach. The plain meaning of this standard contractual provision is to require that the parties make any changes

to their agreement in writing—rather than orally—to minimize disagreements over what they have agreed to. The very crux of Plaintiffs' complaint is that the NFLPA and NFLMC have *jointly agreed* to the Social Security disability offset and whole-person evaluation, which they then put in writing in the 2020 CBA. *Compare* ¶ 66 (CBA "only permit[s] amendment . . . 'by a written agreement'" (quoting Art. 67 § 9)), *with* ¶ 57 (describing CBA as "a written contract"). Plaintiffs do not allege any CBA breach and thus have no claim under the LMRA.

## CONCLUSION

The NFLPA respectfully requests that the Court dismiss the claims against it (Claims 1-5 and 7-8) with prejudice. Plaintiffs' prior amendment demonstrates that further amendment would be an exercise in futility.

Dated: November 17, 2020

Respectfully submitted,

/s/ *William G. Miossi*

William G. Miossi (Bar No. 445265)
Lauren Gailey (Bar No. 1631587)
WINSTON & STRAWN LLP
1901 L Street N.W.
Washington, DC  20036
Tel: (202) 282-5000
Fax: (202) 282-5100
wmiossi@winston.com
lgailey@winston.com

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY  10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com

*Counsel for Defendant National Football League Players Association*