## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AVEION CASON**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION**, *et al.*, <br><br> Defendants. | Case No. 1:20-cv-01875 (TNM) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Aveion Cason and Donald Vincent Majkowski each played in the NFL for years. Both now suffer from "total and permanent" disability and receive monthly benefits as retired players. They argue that provisions in a new collective bargaining agreement ("CBA")—negotiated between NFL teams and the union representing active players—will decrease or altogether eliminate their benefits. Plaintiffs invoke the Employee Retirement Income Security Act ("ERISA") and the Labor Management Relations Act ("LMRA") to halt implementation of these provisions and obtain other relief. Defendants—the association representing NFL teams, the active players' union, and two benefit plan boards—move to dismiss the case. They contend that Plaintiffs lack standing to pursue some claims because their alleged injury (the loss of benefits) is too speculative, too attenuated, or not redressable. Defendants also argue that Plaintiffs' claims fail on the merits.

The Court determines that Plaintiffs have indeed failed to show Article III standing as to some of their challenges and failed to state a claim as to others. It will therefore dismiss the case.

**I.**

Defendant National Football League Players Association ("Players Association" or "NFLPA") is the union that represents current NFL players in collective bargaining.  *See* Pls.' Opp'n to Defs.' Mots. to Dismiss ("Pls.' Opp'n") at 16 & n.3, ECF No. 39; Def. NFLPA's Mem. in Supp. of Mot. to Dismiss ("NFLPA's Mot.") at 10, ECF No. 36-1.[1]  Defendant National Football League Management Council ("Management Council" or "NFLMC") is an association of NFL teams that bargains on the teams' behalf.  *See* Pls.' Opp'n at 16–17; Def. NFLMC's Mem. in Supp. of Mot. to Dismiss ("NFLMC's Mot.") at 10, ECF No. 37-1.  As relevant here, the Players Association and Management Council ("bargaining parties") negotiated two CBAs— one in 2011 and one in 2020.  *See* Decl. of Michael L. Junk in Supp. of Board Defs.' Mot. to Dismiss ("Junk Decl.") Ex. C ("2011 CBA"), ECF No. 38-4; Junk Decl. Ex. F ("2020 CBA"), ECF No. 38-7.

Through these CBAs, the Players Association and Management Council have established and maintained two multi-employer plans under ERISA: the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Plan") and the NFL Player Disability and Neurocognitive Benefit Plan ("Disability Plan") (collectively, "the Plans").  Board Defs.' Mot. to Dismiss ("Board Defs.' Mot.") at 7, ECF No. 38.

As relevant here, the Plans provide "total and permanent" ("T&P") disability benefits to players who are "totally disabled," meaning they are "substantially prevented from or substantially unable to engage in any occupation or employment."  Junk Decl. Ex. A ("Retirement Plan Doc.") Art. 5.2(a), ECF No. 38-2; Junk Decl. Ex. B ("Disability Plan Doc.") Art. 3.1(c), ECF No. 38-3.  Plaintiffs each receive T&P disability benefits.  Am. Compl. ¶¶ 10–

---

[1] All page citations refer to the page numbers that the CM/ECF system generates.

11, ECF No. 34.  While the Plans provide benefits to four categories of players, the only category relevant here is "Inactive A," to which both Plaintiffs belong.  *Id.* ¶¶ 131, 141.

The relevant difference between the two Plans is which players they cover and how.  If a player submitted his application for benefits before 2015, the Retirement Plan funds part of his T&P disability benefit (usually a minimum of $4,000 per month) and the Disability Plan pays the rest ($11,250 per month less the benefits from the Retirement Plan).  NFLMC's Mot. at 14; Board Defs.' Mot. at 9.  These players are called "Article 4 Players."  Am. Compl. ¶ 33.  In contrast, players who requested benefits after 2014 receive all benefits ($11,250 per month) from the Disability Plan.  NFLMC's Mot. at 14; Board Defs.' Mot. at 10.  These players are "Article 3 Players."  Am. Compl ¶ 29.  The minimum monthly benefit for Inactive A players—either Article 3 or 4—is thus $11,250 per month.  *See* Board Defs.' Mot. at 10.  Majkowski is an Article 4 Player, and Cason is an Article 3 Player.  Am. Compl. ¶¶ 131, 141.

The Plans contain duration-of-benefit provisions, which state that benefits "will be payable until the earliest of (a) the cessation of the Player's total and permanent disability, (b) the termination of his benefits under [a separate section providing requirements for the continuation of benefits], or (c) the Player's death."  Retirement Plan Doc. Art. 5.9; Disability Plan Doc. Art. 3.11; Board Defs.' Mot. at 10.  The Plans also contain reservation-of-rights provisions, allowing the bargaining parties to jointly amend or terminate the Plans.  *See* Retirement Plan Doc. Art. 10.2 (stating that the Players Association and Management Council, "when acting jointly, may amend th[e] Plan in any respect and may terminate th[e] Plan"); Disability Plan Doc. Art. 10.1 (stating that the Disability Plan may "be amended or terminated by joint action of the NFLPA and the Management Council while there is a [CBA] in effect").

Defendants Bert Bell/Pete Rozelle NFL Player Retirement Plan Board ("Retirement Board") and NFL Player Disability and Neurocognitive Benefit Plan Board ("Disability Board")—collectively, "the Boards"—are the Plans' fiduciaries.  Am. Compl. ¶¶ 14, 16.  Each Board has six voting members: three appointed by the Players Association and three appointed by the Management Council.  *Id.* ¶¶ 12–13.

The Plans were, until recently, maintained under the 2011 CBA.  The Players Association and Management Council then agreed to the 2020 CBA.  The 2020 CBA did not affect the Retirement Plan's T&P disability provisions.  *See* 2020 CBA Arts. 53, 60.

The 2020 CBA included two provisions ("the 2020 Amendments") relating to T&P disability benefits under the Disability Plan that are central to the parties' dispute.  First, the "Social Security offset," which reduces benefits by the amount of Social Security benefits that a player receives.  *Id.* Art. 60, § 4.  This provision was set to take effect in January 2021.  *Id.* Second, the "whole person" evaluation requirement, which (as its name suggests) states that a player's eligibility for benefits will turn on a comprehensive evaluation.  *Id.* Art. 60, § 5. Previously, a Social Security determination of disability also established a player's eligibility for T&P disability benefits.  *Id.* Art. 60, § 6.  The CBA makes the "whole person" evaluation process effective in April 2024.  *Id.* Art. 60, § 5.

Plaintiffs sue on behalf of themselves and a putative class comprising "[a]ll participants qualified to receive [T&P] disability benefits at the time of the disability amendments to the 2020 [CBA] between the NFLPA and NFL Management Council."  Am. Compl. ¶ 114 (cleaned up).  The operative complaint raises seven claims under ERISA and one claim under the LMRA. *Id.* ¶¶ 129–207.  In Counts 1 and 2, Plaintiffs claim that their T&P disability benefits vested for life and that the 2020 Amendments impermissibly reduced them.  *Id.* ¶¶ 129–48.  Counts 3 and 4

charge that the terms of Plaintiffs' benefits crystallized when Plaintiffs qualified for them, and Defendants cannot alter them. *Id.* ¶¶ 149–64. Counts 5–7 claim breaches of fiduciary duty related to alleged misrepresentations the Players Association made about benefits. *Id.* ¶¶ 165–89. And finally, Count 8 alleges that the Players Association and Management Council breached the CBA. *Id.* ¶¶ 190–207. Plaintiffs seek various forms of equitable relief, including an injunction prohibiting Defendants from implementing the new T&P disability provisions. *See id.* at 58–60.

Before the Court are Defendants' motions to dismiss. The motions are ripe for disposition.[2]

## II.

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Facing a 12(b)(1) motion to dismiss, a plaintiff has the burden to establish the predicates to jurisdiction, including "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). When considering a Rule 12(b)(1) motion, the Court "assume[s] the truth of all material factual allegations in the complaint and construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up).

Because "a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," though, a plaintiff's factual allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6)

---

[2] The Court has jurisdiction under the federal question statute. 28 U.S.C. § 1331. Although Plaintiffs request a hearing, *see* Pls.' Opp'n at 1, the Court finds one unnecessary to resolve Defendants' motions, *see* LCvR 7(f) ("A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the Court.").

motion for failure to state a claim." *Grand Lodge of Frat. Ord. of Police v. Ashcroft*, 185 F.

Supp. 2d 9, 13–14 (D.D.C. 2001) (cleaned up).  In deciding this motion, the Court "may consider

materials outside the pleadings." *DePolo v. Ciraolo-Klepper*, 197 F. Supp. 3d 186, 189 (D.D.C.

2016).  If a court determines that it lacks jurisdiction for any claim, it must dismiss that claim.

Fed. R. Civ. P. 12(h)(3).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hurd v.

District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up).  A plaintiff must plead

"factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Court accepts the complaint's factual allegations as true and grants plaintiff "all

inferences that can be derived from the facts alleged." *L. Xia v. Tillerson*, 865 F.3d 643, 649

(D.C. Cir. 2017) (cleaned up).  The Court need not, however credit "a legal conclusion couched

as a factual allegation." *Iqbal*, 556 U.S. at 678 (cleaned up).  The Court considers "only the facts

alleged in the complaint, any documents either attached to or incorporated in the complaint and

matters of which [it] may take judicial notice." *Hurd*, 864 F.3d at 678 (cleaned up).

### III.

The Court considers the parties' arguments in three groups: (A) Counts 1–4, which deal

with alleged violations stemming from the changes made to Plaintiffs' T&P disability benefits;

(B) Counts 5–7, covering purported misrepresentations relating to these benefits; and (C) Count

8, in which Plaintiffs assert a breach of the CBA.

**A.**

Plaintiffs bring Counts 1–4 under ERISA's civil enforcement provision:

> A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3); Am. Compl. ¶¶ 136, 146, 154, 162. They claim that Defendants' actions in reducing their T&P disability benefits through the 2020 Amendments—in particular, the whole-person evaluation process and the Social Security offset—violated ERISA. In Counts 1 and 2, Plaintiffs contend that they were "promised in clear and unambiguous terms . . . a defined amount of T&P disability benefits for life" and that the 2020 Amendments will "impermissibly reduce[] or eliminate[]" them. Am. Compl. ¶¶ 131, 134, 141, 144. And in Counts 3 and 4, Plaintiffs argue that the 2020 Amendments "are and will be invalid to the extent they apply to participants in the Retirement Plan or Disability Plan who qualified for benefits and commenced receiving benefits . . . prior to those amendments." *Id.* ¶¶ 151, 159.[3]

At the outset, the Retirement Board must be dismissed as a Defendant in Counts 1 and 3. *See id.* at 40, 45. The challenged 2020 CBA Amendments relate only to the Disability Plan. *See*

---

[3] The Court rejects Plaintiffs' assertion that Counts 1–4 differ. *See* Pls.' Opp'n at 48. The claims all hinge on whether Plaintiffs' benefits vested and therefore could not change. *See id.* (stating that Counts 3 and 4 argue "that Defendants may not modify the terms of the Plans as to participants who have become disabled and entered paid status"). Plaintiffs rely almost entirely on *Feifer v. Prudential Insurance Company of America*, 306 F.3d 1202 (2d Cir. 2002), to argue that Counts 3 and 4 "rest[] on ordinary unilateral contract principles" distinct from their "vested benefit argument." Pls.' Opp'n at 48–49. But *Feifer* is not persuasive. The Second Circuit "conclude[d] as a matter of law that, absent explicit language to the contrary, a plan document providing for disability benefits promises that these benefits vest with respect to an employee no later than the time that the employee becomes disabled." *Feifer*, 306 F.3d at 1212. As the Court will explain, this goes against the Supreme Court's decisions in *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427 (2015) and *CNH Industrial N.V. v. Reese*, 138 S. Ct. 761 (2018).

2020 CBA Art. 60.  Plaintiffs appear to concede as much.  *See* Pls.' Opp'n at 38 n.13 (acknowledging that Counts 1 and 2 "focus only on the Disability Plan" because the 2020 CBA did not modify the Retirement Plan); *see also id.* at 48–51 (not responding to the Board Defendants' arguments that Plaintiffs have no claim against the Retirement Board in Counts 3 and 4).  There is thus no potential injury traceable to the Retirement Board, and it will be dismissed for these Counts.  *See Lujan*, 504 U.S. at 560 (explaining that an injury must be "fairly traceable to the challenged action of the defendant" (cleaned up)).[4]

The Court next addresses Plaintiffs' arguments on (1) the whole-person evaluation process, and (2) the Social Security offset.

## 1.

Defendants argue that Plaintiffs lack standing to challenge the whole-person evaluation process.  *See* NFLPA's Mot. at 27; NFLMC's Mot. at 21; Board Defs.' Mot. at 19.  The Court agrees.

Article III constrains the judicial power to deciding "Cases" and "Controversies."  U.S. Const. art. III, § 2.  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  It "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.*  Only a plaintiff who shows "(1) that he or she suffered an injury in fact that is concrete,

---

[4]  At the time of briefing, the Board Defendants represented (and Plaintiffs did not dispute) that the bargaining parties had not yet amended the Disability Plan to incorporate the changes proposed by the 2020 CBA, and the Disability Board lacks any authority to do so itself.  *See* Board Defs.' Mot. at 17–18; *see also* Pls.' Opp'n at 39 (seemingly acknowledging that the bargaining parties have not amended the Disability Plan but contending that fact "is irrelevant").  The Court does not know, however, whether the Disability Plan remains unamended.  Because it makes no difference to the outcome, the Court will assume that the bargaining parties have amended the Disability Plan, or will do so soon, to incorporate the 2020 CBA's changes.

particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief" may sue. *Thole v. U.S. Bank*, 140 S. Ct. 1615, 1618 (2020).

An Article III injury is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up).  "A concrete injury must be *de facto*; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548 (cleaned up).  As for "imminence," although it "is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).  The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* (cleaned up).

That a case is a putative class action does not alleviate a plaintiff's burden to show standing.  Named class members "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *see also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

**a.**

The whole-person evaluation process could only harm Plaintiffs at some future time.  The requirement will not take effect until April 2024, with reevaluations between then and April 2026.  *See* Am. Compl. ¶¶ 73, 83.  Plaintiffs do not "concede" that "they have not yet felt the

effects of [the] whole-person evaluation process." Pls.' Opp'n at 25 n.6 (cleaned up). Yet they only allege future injury. *See, e.g.*, Am. Compl. ⁋ 73 (stating that the whole-person evaluation process "will happen in one form or another . . . and will likely harm Plaintiffs and the Class"); *id.* ⁋ 82 ("Plaintiffs' and members of the Class' vested, lifetime T&P disability benefits are threatened by the reenactment of the whole-person evaluation process."); *id.* ⁋ 84 (alleging that "it is more than likely that numerous Plaintiffs and members of the Class will lose their vested lifetime T&P disability benefits").

"[A]ny petitioner alleging only future injuries confronts a significantly more rigorous burden to establish standing." *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989). When a plaintiff "alleges only an injury at some indefinite future time," the injury must "proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Lujan*, 504 U.S. at 564 n.2. Plaintiffs do not carry that burden.

For starters, the bargaining parties have not solidified the evaluation process. *See* Board Defs.' Mot. at 18. The 2020 CBA calls for the formation of "a three-person panel . . . . to assist the bargaining parties in developing" it. 2020 CBA Art. 60, § 5. It also states that, although the whole-person evaluation process will be effective in April 2024, the bargaining parties "may re-evaluate [it] again before April 1, 2025." *Id.*

Even if the bargaining parties had hammered out the details and the whole-person evaluation process were to take effect sooner, there is still no way to know whether it would harm Plaintiffs. They suggest that "the reevaluation under the whole-person evaluation process is 'certainly impending.'" Pls.' Opp'n at 26. But Plaintiffs could go through the evaluation process and *still qualify* for benefits, as they acknowledge. *See id.* ("at least *some members* of

the Class, including Plaintiffs, will lose their benefits" (emphasis added)).  They will "have their benefits terminated" only if they "no longer meet the Disability Plan's eligibility requirements for T&P benefits" (*i.e.*, the "whole-person evaluation process").  2020 CBA Art. 60, § 6; *see also* Am. Compl. ⁋ 83 (acknowledging this provision).  That "automatic eligibility will end on April 1, 2024 and they will be reevaluated . . . on or before April 1, 2026 under the whole-person process," Pls.' Opp'n at 25 (cleaned up), says nothing about whether Plaintiffs *will lose* their benefits.[5]

Plaintiffs' standing theory cannot carry the day.  "Allegations of *possible* future injury are not sufficient" to confer standing.  *Clapper*, 568 U.S. at 409 (cleaned up).  The Supreme Court has cautioned that allegations that events will take place "some day"—"without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury that [its] cases require."  *Lujan*, 504 U.S. at 564 (cleaned up).  Any injury that Plaintiffs might suffer here as a result of the whole-person evaluation process is not actual or imminent.

The Court rejects Plaintiffs' contentions that it must accept as true their predictions of future injury.  *See, e.g.*, Pls.' Opp'n at 24.  "When considering any chain of allegations for standing purposes, [courts] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a

_____

[5] Plaintiffs hang their hat on the loss of benefits and have not argued that merely going through the reevaluation process injures them.  *See, e.g.*, Pls.' Opp'n at 27 ("Plaintiffs here have already been injured by the certain reinstitution of the whole-person standard which will inexorably lead to some number of them to be without disability benefits."); *id.* at 28 (stating that there is "a causal connection between [Defendants'] actions (of modifying the [D]isability [P]lan) and their injury (loss of disability benefits)"); *id.* (arguing that their "injury is likely to be redressed by a favorable judgment in form of the lost disability benefits being restored to Plaintiffs").  And even if they did, that injury would likely be too speculative (given that the bargaining parties have not fully developed the process) or at least unripe for adjudication.

future injury that will result from present or ongoing actions—those types of allegations that are not normally susceptible of labelling as 'true' or 'false.'" *United Transp. Union*, 891 F.2d at 912; *see also id.* (recognizing this principle as "well-established" and collecting Supreme Court authorities).

Just so here.  A chain of future events must occur for Plaintiffs to suffer any injury: the bargaining parties must decide on a whole-person evaluation process; Plaintiffs must remain disabled and qualified for Social Security benefits; Plaintiffs must go through the whole-person evaluation process; and finally, that process must lead to ineligibility for benefits, despite Plaintiffs' qualification under the Social Security standard.  "[A]ny future injury that [Plaintiffs] might suffer" thus "follows from an extended chain of contingencies." *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016); *see also Proctor v. District of Columbia*, --- F. Supp. 3d ---, No. 1:18-cv-701-TNM, 2021 WL 1209298, at *9 (D.D.C. Mar. 31, 2021) (rejecting as "speculation atop speculation" a chain of six contingent events that must occur before plaintiffs' injury).

**b.**

Plaintiffs' counterarguments are unconvincing.  *First*, they mainly rely on Defendants' "inglorious and well-documented history" of abuse of the whole-person evaluation process to bolster their claim of impending future harm.  Am. Compl. ⁋ 84.  Plaintiffs claim that the "history all but make[s] certain numerous currently disabled Players will lose their eligibility for T&P benefits."  *Id.* ⁋ 81.

True, "[p]ast wrongs" can be "evidence bearing on whether there is a real and immediate threat of repeated injury."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (cleaned up); Pls.' Opp'n at 28.  But Plaintiffs' allegations of past wrongs are conclusory.  *See, e.g.*, Am. Compl. ⁋ 74 (referring to "how fraudulently the whole person evaluation process was handled by

the NFL and NFLPA historically"); *id.* ¶ 81 (referencing "the NFL's history"); *id.* ¶ 82 (referencing "the NFL and NFLPA's history with these issues").  Even taking them as true, the past conduct relates to persons other than Plaintiffs and does not show "any continuing, present adverse effects."  *O'Shea*, 414 U.S. at 495–96.

Plaintiffs also do not allege how this "history" suggests that such abuses will continue under an evaluation process that the bargaining parties have not yet determined.  *See* 2020 CBA Art. 60, § 5.  There is no telling whether the new process will be anything like the old one. Indeed, Plaintiffs say it is only "[a] natural *inference* . . . that the entire purpose of the reinstitution of the whole-person evaluation process is to make sure that at least some segment of currently eligible former Players will no longer receive disability benefits under this new standard."  Pls.' Opp'n at 26 (emphasis added).

*Second*, Plaintiffs suggest that they "face statute of limitation issues if they cannot bring [their] claim[s] now before the effects" of the whole-person evaluation "are felt."  *Id.* at 25 n.6 (cleaned up).  But Plaintiffs do not explain what these "issues" are.  If Plaintiffs' benefits are eventually reduced as a result of the whole-person evaluation process, any statute-of-limitations clock would presumably begin to run *then*.  More, supposed statute-of-limitations issues do not excuse Plaintiffs from establishing the "irreducible" elements of Article III standing.  *Lujan*, 504 U.S. at 560.

*Third*, Plaintiffs claim that they "will also have out of pocket costs to retain attorneys to fight these changes irrespective of whether they are successful in maintaining their benefits." Pls.' Opp'n at 25 n.6 (cleaned up).  But the Supreme Court has already rejected this argument. In *Clapper*, the Court rejected plaintiffs' "contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm" as "unavailing" because

plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." 568 U.S. at 416.[6]

The Court thus will dismiss Plaintiffs' challenge to the whole-person evaluation process in Counts 1–4 because Plaintiffs failed to allege an injury in fact.[7]

**2.**

In contrast, Plaintiffs show standing to challenge the Social Security offset. Even though Plaintiffs allege a future injury here too, their allegations of future harm are much less speculative. Plaintiffs claim that they receive Social Security benefits and will be receiving the benefits when the Social Security offset becomes operative.[8] Am. Compl. ¶¶ 10–11. And there is no suggestion that Plaintiffs must do anything to maintain their eligibility for Social Security benefits.

Thus, if Plaintiffs remain eligible for Social Security benefits, Plaintiffs' T&P disability benefits will decrease when the provision takes effect. The chain of events necessary for Plaintiffs to suffer injury under the whole-person evaluation process—development of the

---

[6] Because the Court finds that Plaintiffs lack constitutional standing, it need not address Defendants' prudential ripeness arguments. *See, e.g.*, NFLPA's Mot. at 29; NFLMC's Mot. at 24 n.7. But the standing concerns discussed suggest that Plaintiffs' claims, if "not adjudicated at this time . . . may not require adjudication at all." *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 235 (D.C. Cir. 1988).

[7] The Court need not address class certification issues, as Plaintiffs had planned to seek class certification later. *See* Min. Order (Oct. 8, 2020). In any event, Plaintiffs must prove their own standing to seek relief on behalf of a class, *see O'Shea*, 414 U.S. at 494, and they have not done so here.

[8] Defendants' replies represent that, although the Social Security offset was set to take effect in January 2021, the bargaining parties amended the 2020 CBA to delay its implementation by three years. *See, e.g.*, Def. NFLPA's Reply in Supp. of Mot. to Dismiss at 9 n.1, ECF No. 42; Def. NFLMC's Reply in Supp. of Mot. to Dismiss at 13 n.3, ECF No. 40. But any discrepancy makes no difference to the ultimate outcome here. Because Plaintiffs allege it will take effect in 2021, *see* Am. Compl. ¶ 48, the Court will assume that for purposes of its analysis.

evaluation process, reevaluation under that process, and a determination that Plaintiffs are no longer entitled to benefits—need not occur for Plaintiffs to suffer injury under the Social Security offset.  Plaintiffs' allegations here surmount the lower standing bar at the dismissal stage.  *Cf. Cal. Cattlemen's Ass'n v. USFWS*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019) (explaining that plaintiffs' burden to establish standing grows heavier as litigation progresses).[9]

That said, Plaintiffs' claims about the Social Security offset do not survive.  Plaintiffs fail to state a claim because the relevant agreements did not create a vested right to T&P disability benefits.[10]

**a.**

The Disability Plan is a welfare plan, not a pension plan.  *See* Am. Compl. ¶ 20.  This is important because "ERISA treats these two types of plans differently."  *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 434 (2015).  The statute requires pension plans to comply with "elaborate minimum funding and vesting standards," but explicitly exempts welfare plans.  *Id.* Although welfare plans have to be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans," *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

---

[9]  The Management Council argues that Plaintiffs lack standing to challenge the Social Security offset because Plaintiffs still receive more total benefits after the 2020 Amendments than they would without the 2020 CBA and so they cannot experience injury.  *See* NFLMC's Mot. at 20–21.  But this is just another way to argue that Plaintiffs' benefits did not vest.  True, Plaintiffs might not have an injury if the 2020 Amendments extended benefits that Plaintiffs would not otherwise receive.  But this presumes that the benefits could be terminated altogether.

[10]  This analysis would apply to the whole-person evaluation process too.  But given the Court's separate determination that Plaintiffs lack standing to challenge the whole-person evaluation process, the Court does not address it here.

The Supreme Court has thus recognized that "employers have large leeway to design disability and other welfare plans as they see fit." *Tackett*, 574 U.S. at 435 (cleaned up).  And it has emphasized that "the rule that contractual provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA welfare benefits plan" because the "focus on the written terms of the plan is the linchpin of a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefits plans in the first place." *Id.* (cleaned up).

Plaintiffs argue that, through the 2020 Amendments, Defendants have "unlawfully reduced" their "vested, lifetime T&P disability benefits." Pls.' Opp'n at 38 (as to Counts 1 and 2); *see also id.* at 48 (stating, as to Counts 3 and 4, that "Plaintiffs allege that Defendants acted unlawfully and contrary to its own *plan* limitations" in "cut[ting] off disability benefits which had already accrued").  But vesting is not the default for welfare plans like the Disability Plan. The "traditional principle" is that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Tackett*, 574 U.S. at 441–42 (cleaned up).

A court may conclude "that the parties intended to vest lifetime benefits for retirees," as a CBA "may provide in explicit terms that certain benefits continue after the agreement's expiration." *Id.* at 442 (cleaned up).  "[W]hen a contract is silent as to the duration of retiree benefits," though, "a court may not infer that the parties intended those benefits to vest for life" because "the traditional principle [is] that courts should not construe ambiguous writings to create lifetime promises." *Id.* at 441–42.  Thus, when a CBA "is merely silent on the question of vesting," courts typically "conclude that it does *not* vest benefits for life." *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 766 (2018).

Similarly, when contracts contain "general durational clauses," they can be applied "to provisions governing retiree benefits." *Tackett*, 574 U.S. at 440. To refuse to apply a general durational clause, or to "requir[e] a contract to include a specific durational clause for retiree health care benefits to prevent vesting," would "distort the text of the agreement and conflict with the principle of contract law that the written agreement is presumed to encompass the whole agreement of the parties." *Id.* Thus, "when an agreement does not specify a duration for health care benefits in particular," courts "simply apply the general durational clause." *Reese*, 138 S. Ct. at 766.

So the question before the Court hinges on an interpretation of the relevant agreements. The Court must look to "ordinary principles of contract law." *Id.* at 763 (cleaned up). As is the case "with any other contract, the parties' intentions control." *Tackett*, 574 U.S. at 435 (cleaned up). "When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further." *Reese*, 138 S. Ct. at 766 (cleaned up); *see also Tackett*, 574 U.S. at 435 ("Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." (cleaned up)).

**b.**

Applying the principles of *Tackett* and *Reese* here, the Court must consider whether Plaintiffs' benefits vested by looking to both the 2011 CBA and the Disability Plan.[11]

---

[11] The Court rejects Plaintiffs' contention that only the CBA is relevant. *See* Pls.' Opp'n at 42 n.19. Plaintiffs mainly rely on *Tackett* for this claim. But there, the Supreme Court referred to the CBA at issue, as well as the "Pension, Insurance, and Service Award Agreement (P & I agreement)"—the "agreement provid[ing] for retiree health care benefits" and "describ[ing] the health care benefits at issue"—and characterized the retirees' arguments as alleging that the defendants "breached both the [CBA] and the P & I agreement." *Tackett*, 574 U.S. at 431–32. More, it directed the lower court on remand "to review *the agreements* at issue under the correct

The 2011 CBA does not explicitly provide for vested T&P disability benefits.  To the contrary, the durational clause unambiguously states that the "Disability Plan will be continued and maintained in full force and effect during the term of this Agreement."  2011 CBA Art. 61, § 1.  Indeed, Plaintiffs concede that their benefits would have lapsed last month when the 2011 CBA expired.  *See* Am. Compl. ¶¶ 52, 135, 145.

In *Reese*, the Supreme Court considered an agreement in which a "group benefit plan was 'made part of' the [CBA] and 'r[an] concurrently' with it."  138 S. Ct. at 764.  The agreement also "contained a general durational clause stating that it would terminate in May 2004."  *Id.* The Court explained that "the only reasonable interpretation of the . . . agreement is that the health care benefits expired when the [CBA] expired in May 2004."  *Id.* at 766.

The durational clause here similarly ties the disability "benefits to the duration of the rest of the agreement" and provides an end date for both.  *Id.*  True, the CBA does not use the "r[an] concurrently" language from *Reese*.  *See* Am. Compl. ¶ 39.  But it says as much in other words, stating that it applies "during the term of" the CBA.  2011 CBA Art. 61, § 1.  Other courts have recognized that similar durational clauses nix lifetime vesting.  *See, e.g.*, *Blankenship v. Dominion Energy Transm., Inc.*, 818 F. App'x 121, 124–25 (3d Cir. 2020) (holding that a "Medical Plan derived its existence from the CBA" because language in the Medical Plan stating

legal principles."  *Id.* at 442 (emphasis added).  Other courts also have considered agreements governing benefits along with the CBAs when determining whether rights had vested.  *See, e.g.*, *Blankenship v. Dominion Energy Transm., Inc.*, 818 F. App'x 121, 124 (3d Cir. 2020) (explaining that "we ordinarily read [CBAs] and their related plans as a harmonious whole" and concluding that "neither the CBA nor the Medical Plan provided Retirees with a right to unalterable, lifetime medical benefits" (cleaned up)); *Kelly v. Honeywell Int'l, Inc.*, 233 F. Supp. 3d 302, 306, 312–14 (D. Conn. 2017) (considering the relevant CBA, as well as two other agreements that "governed" the plaintiffs' "rights to retiree health benefits" when addressing whether plaintiffs had vested benefits).  Here, the Disability Plan, like the CBA, governs Plaintiffs' benefits.  So the Court considers both.  But even were the Court to consider only the 2011 CBA, the outcome would not change.

"that it was 'maintained through the CBA'" meant, "[b]y its clear terms, [that] the CBA 'cause[d]' the Medical Plan 'to continue in being'" (cleaned up) (quoting *Maintain*, Oxford English Dictionary)); *Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 804 (8th Cir. 2014) ("It is well settled that a clause expressly limiting the duration of the retirement health benefits to the duration of the Master Agreement is inconsistent with an intent to vest health benefits for life." (cleaned up)).

Plaintiffs point to other provisions in the 2011 CBA, which they contend "provide additional insight and suggest the parties' intent to have those benefits continue after the 2011 CBA." Pls.' Opp'n at 42. *First*, they cite a provision that "[e]ffective September 1, 2011, the minimum benefit amounts shall be increased as set forth below, both for future applications and for players currently in pay status." *Id.* at 41 (citing 2011 CBA Art. 61, § 3). But this simply provides that the minimum amount of benefits would increase both for players who were "currently in pay status" and for those who submitted "future applications." Article 61 does not suggest that benefits would extend beyond the lifetime of the 2011 CBA. That an increase in benefits applied to "future applications" fits with the Disability Plan being maintained only during the term of the 2011 CBA.

*Second*, Plaintiffs rely on another provision providing that "*[a]fter* the term of the Agreement, the portion of the disability benefit that would have been paid under the Retirement Plan but for the changes made pursuant to this Article *shall continue to be paid* from the Disability Plan, provided that the player continues to qualify for the benefit." *Id.* at 41–42 (quoting 2011 CBA Art. 61, § 4). But the Court agrees with the Management Council that this language means only "that the portion of the disability benefit that would have been paid under the *Retirement Plan* prior to the 2011 CBA . . . will continue." Def. NFLMC's Reply in Supp. of

19

Mot. to Dismiss at 15, ECF No. 40.  It cannot be fairly read to vest *Disability Plan* benefits for life.

The Disability Plan also shows that Plaintiffs' T&P disability benefits did not vest. Plaintiffs point to a durational clause in the Plan stating that the benefits "will be payable until the earliest of (a) the cessation of the Player's total and permanent disability, (b) the termination of his benefits under Section 3.8 [listing requirements for the continuation of T&P disability benefits], or (c) the Player's death."  Disability Plan Doc. Art. 3.11; *see also id.* Art. 4.5 ("In the case of the death of an Article 4 Eligible Player, the last payment will be a full monthly payment for the month in which his death occurs.");  Am. Compl. ▶ 36 (citing these provisions).  But this provision contemplates that a player's benefits might be terminated when he is no longer disabled or fails to meet certain other requirements.  *See, e.g.*, Disability Plan Doc. Art. 3.8.  This cuts against any argument that the Disability Plan provides for lifetime vesting.  *Cf. Robinson v. Sheet Metal Workers' Nat'l Pension Fund, Plan A*, 515 F.3d 93, 99 (2d Cir. 2008) (explaining that "lifetime" language in a benefit plan "*cannot* be taken literally to mean that, once a participant begins to receive IRD benefits, he will necessarily remain entitled to them for the remainder of his life" because, for example, benefits "clearly end[ed] if the participant ceases to be disabled").

Importantly too, the Disability Plan contains a reservation-of-rights clause.  It provides that the bargaining parties may "amend[] or terminate[]" it "by joint action . . . while there is a [CBA] in effect."  Disability Plan Doc. Art. 10.1.  Even if the Plan's durational clause could be construed as promising a lifetime benefit, a reservation-of-rights clause can qualify more general lifetime promises.  *See, e.g.*, *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 179 (2d Cir. 2019) (considering first "whether the [bargaining agreement] contains language vesting retiree medical

benefits" and then "whether other contractual provisions—such as a reservation of rights clause—defeat vesting"); *Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 621 (6th Cir. 2018) (stating that "a reservation-of-rights clause" is "manifestly inconsistent with vesting" because "by definition, vested benefits may not be unilaterally terminated"); *In re Unisys Corp. Retiree Med. Ben. ERISA Litig.*, 58 F.3d 896, 904 (3d Cir. 1995) (joining "[o]ther courts" in "recognizing that an employer can qualify the provision of 'lifetime' benefits by reserving the right to terminate the plan under which those benefits are provided").

**c.**

Plaintiffs contend that even if the 2011 CBA did not explicitly provide for vesting, it "is silent on what happens to the Disability Plan at the expiration of the Agreement" and that "[t]his ambiguity" means that the Court should consider extrinsic evidence. Am. Compl. ¶ 39. Not so.

In *Reese*, the lower court had determined that the agreement "was 'silent' on whether health care benefits vested for life." *Reese*, 138 S. Ct. at 764 (quoting *Reese v. CNH Indus. N.V.*, 854 F.3d 877, 882 (6th Cir. 2017), *cert. granted, rev'd*, 138 S. Ct. 761 (2018)). Although the circuit acknowledged that it could not "infer vesting" after the Supreme Court's decision in *Tackett*, it explained that "[t]here is surely a difference between finding ambiguity from silence and finding vesting from silence." *Id.* at 765 (quoting *Reese*, 854 F.3d at 882).

The Supreme Court rejected the idea that silence on vesting suggested ambiguity. *See id.* The Court explained that "a contract is not ambiguous unless, after applying established rules of interpretation, it remains reasonably susceptible to at least two reasonable but conflicting meanings." *Id.* (cleaned up). The agreement at issue was therefore "not ambiguous unless it could reasonably be read as vesting health care benefits for life." *Id.* When a CBA "is merely

21

silent on the question of vesting," courts seldom find ambiguity and "would conclude that it does *not* vest benefits for life." *Id.* at 766.

So too here. That the 2011 CBA is silent on vesting does not mean that it is ambiguous. But even if the Court were to find ambiguity, extrinsic evidence would not change the outcome.

Besides the durational clause in the Disability Plan discussed above, Plaintiffs rely on "Income Verification statements" that they received, which stated that their monthly disability benefit "is payable for life or cessation of the disablement." Am. Compl. ⁋ 43 (cleaned up). But this language mirrors the Disability Plan's durational clause. *See* Disability Plan Doc. Art. 3.11 (providing that benefits "will be payable until the earliest of . . . the cessation of the Player's . . . disability" or "the Player's death"). As explained, that provision is limited by (and can co-exist with) the Disability Plan's reservation-of-rights provision. The income statements' "payable for life" language can likewise fit comfortably with the reservation-of-rights provision. *Cf. Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 857 (4th Cir. 1994) (concluding that "informal communications," which "referred to retirees' benefits as 'lifetime benefits,'" did "not nullify the company's right to modify").

There is also extrinsic evidence weighing *against* a finding that Plaintiffs' benefits vested. Consider the Disability Plan's Summary Plan Description ("SPD"), which provides players with "a quick summary" of the Plan "written in plain language."[12] Junk Decl. Ex. E

---

[12] The SPD is extrinsic evidence because, unlike CBAs or plan documents, SPDs are not binding or considered part of the relevant contract. Under ERISA, SPDs are a "*description of* any employee benefit plan," not part of the plan itself. 29 U.S.C. § 1022(a) (emphasis added); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 446 (2011) (Scalia, J., concurring in the judgment) ("It would be peculiar for a document meant to 'apprise' participants of their rights '*under the plan*' to be itself part of the 'plan.'" (quoting 29 U.S.C. § 1022(a))). Thus, "important as they are," SPDs "provide communication with beneficiaries *about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan." *CIGNA*, 563 U.S. at 438 (majority opinion).

("Disability Plan SPD") at 3, ECF No. 38-6.  In at least three places, the SPD states that T&P

disability benefits did not vest and can change or terminate at any time.  It explains that "[i]n

general . . . your T&P benefits will be paid monthly for life or until you cease being totally and

permanently disabled, subject to the Plan's continuation requirements" and that "[t]he duration

(and amount) of T&P benefits may also be impacted by the termination of the current CBA, Plan

amendment, or Plan termination."  *Id.* at 19 (cleaned up); *see also id.* at 43 ("Disability benefits

are not vested.  They can be changed or terminated at any time by amendment or termination of

the Plan."); *id.* at 48 ("The Disability Plan is maintained under [CBAs] between the NFLPA and

the NFLMC.  While there is a [CBA] in effect, the NFLPA and the NFLMC, when acting jointly,

may amend or terminate the Disability Plan.").  Plaintiffs acknowledge that "there is language in

the Disability Plan Summary Plan Description (SPD) to the effect that Disability benefits do not

vest."  Am. Compl. ⁋ 37.

The Court agrees with Plaintiffs that the Disability Plan could supersede the SPD.  *See*

*id.*; Pls.' Opp'n at 44 n.20.  But here, the SPD tracks the Plan.  In fact, the SPD's language

essentially re-states the Disability Plan's durational and reservation-of-rights clauses together,

reinforcing what the Court has already determined—that they can exist in harmony.  *Compare*

Disability Plan SPD at 19 (stating that "[i]n general . . . your T&P benefits will be paid monthly

for life or until you cease being totally and permanently disabled, subject to the Plan's

continuation requirements" and that "[t]he duration (and amount) of T&P benefits may also be

impacted by the termination of the current CBA, Plan amendment, or Plan termination"), *with*

Disability Plan Doc. Art. 3.11 (stating that benefits are "payable until . . . the cessation of the

Player's total and permanent disability," "the termination of his benefits" when he does not meet

certain requirements, or "the Player's death"), *and id.* Art. 10.1 (stating that the Plan can "be amended or terminated" by the bargaining parties).

So extrinsic evidence supports—not undermines—Defendants' interpretation of the relevant agreements.

*     *     *

In sum, the relevant agreements do not provide for vesting.  This is a rare case in which the parties to the contracts—the Players Association and the Management Council—*agree* on what the contracts' terms mean.  That makes this an easier case than *Tackett*, in which the plaintiffs and the union sued together arguing that plaintiffs' benefits had vested.  *See* 574 U.S. at 430.  Although the position of the bargaining parties is not dispositive, it does mean that Plaintiffs face an uphill battle in arguing that there is a hidden understanding or that the agreements mean something other than what they say.  *Cf. Voyageur Outward Bound Sch. v. United States*, 444 F. Supp. 3d 182, 200 (D.D.C. 2020) (considering only whether contracting parties' joint understanding of contract was "reasonable" in face of differing interpretation of third-party plaintiff).

Because Plaintiffs have not met that burden here and have failed to state a claim, the Court will dismiss Plaintiffs' challenges to the Social Security offset in Counts 1–4.

## B.

Counts 5–7 relate to Defendants' alleged misrepresentations or omissions about T&P disability benefits.  Plaintiffs bring each of these Counts under an ERISA provision, which (as relevant here) sets out requirements for plan fiduciaries.  *See* 29 U.S.C. § 1104(a)(1); Am. Compl. ¶¶ 166–67, 175–76, 185.

In Count 5, Plaintiffs claim that the Players Association "omitt[ed] material information" about the 2020 Amendments and "ignored requests by participants and their beneficiaries for clarification of their disability benefits." Am. Compl. ¶ 169. In Count 6, Plaintiffs argue that the Boards "knew that the NFLPA . . . was making incomplete and misleading statements," yet did not correct it. *Id.* ¶¶ 178–79. For both Counts, Plaintiffs allege that the omissions harmed them "by impeding the ability of Plaintiffs and members of the Class from mobilizing to influence the vote by the active Players against the proposed 2020 CBA." *Id.* ¶¶ 170, 180. They also contend that "[h]ad the truth about these T&P disability benefit changes been disclosed, the vote for ratification would not have been secured improperly, the ratification vote would have likely failed, and former Players would have been able to mobilize effectively against ratification of the 2020 CBA." *Id.* ¶¶ 171, 181.

Count 7 claims that the Players Association and Management Council breached their fiduciary duty by failing to monitor the Boards. Plaintiffs say that the bargaining parties' Board appointees "knew or should have known that the NFLPA representatives . . . were engaged in misrepresentations and omissions," yet "fail[ed] to take action to remedy that breach by informing their appointees to the Boards that they needed to correct those misstatements or failing that, removing the breaching fiduciary appointees from the Boards." *Id.* ¶¶ 186–87. The alleged harm in Count 7 is largely the same as that in Counts 5 and 6:

> Had the truth about these T&P disability benefit changes been known, the vote for ratification would not have been secured improperly, the ratification vote would have most likely failed, and former Players might have mobilized effectively, with current Players, against ratification of the 2020 CBA. As a result, a new CBA would have been negotiated with the NFL and ratified – without the Social Security offset and whole person evaluation process – and with other less draconian trade-offs being made between the parties.

*Id.* ¶ 187.

The second element of the "irreducible constitutional minimum of standing" is that "there must be a causal connection between the injury and the conduct complained of."  *Lujan*, 504 U.S. at 560.  Plaintiffs' injury in fact must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up).  The causation requirement "looks at the relationship between the alleged unlawful conduct and the injury."  *Mideast Sys. & China Civ. Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1176 (D.C. Cir. 1986).  When a plaintiff relies "on the anticipated action of unrelated third parties," it is "considerably harder to show the causation required to support standing."  *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015).

Applying these principles here, Counts 5–7 all suffer from the same flaw:  Any injury Plaintiffs will suffer from "receiving less disability benefits" as a result of the 2020 CBA, Pls.' Opp'n at 31, is not fairly traceable to the alleged misrepresentations/omissions and the later failure to correct them.

Plaintiffs' standing theory hinges on a tenuous "chain of events."  *Arpaio*, 797 F.3d at 19–20.  It goes something like this.  Had the Players Association disclosed the information (Count 5), had the Boards corrected the Players Association (Count 6), or had the Players Association and Management Council directed the Boards to correct the Players Association (Count 7), the following chain of events would have occurred: (1) retired players *might* have mobilized to lobby active players to vote against the 2020 CBA; (2) enough active players *might* have changed their votes to change the outcome; (3) the bargaining parties *might* have negotiated a different CBA that active players would ratify; and (4) the new CBA, even after other possible trade-offs, *might* have provided more favorable benefits.  *See* Am. Compl. ¶¶ 171, 181, 187.

Defendants' "alleged contribution to the harm"—whether that be the omissions, the failing to correct the omissions, or the failing to monitor the Boards that failed to correct the omissions—"is based on a chain of questionable inferences that concern how [the active players] would have acted differently." *Mideast*, 792 F.2d at 1177.  The role that the alleged omissions played in the ultimate harm—the decrease or loss of benefits—"was remote at best." *Id.*  It is insufficient for Plaintiffs to show that it is *possible* they would not have lost their benefits had the Players Association not misrepresented or omitted information. *Cf. id.* at 1178 ("[I]t is not enough for Mideast to show that it *could* have been awarded the Phase II contracts if the project was re-bid.").

As Plaintiffs contend, Defendants' "action need not be the very last step in the chain of causation." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 29 (D.D.C. 2020) (cleaned up); Pls.' Opp'n at 32.  But Defendants' alleged actions here are not even close to Plaintiffs' loss of benefits. *See* Pls.' Opp'n at 31.  Although Plaintiffs could "still establish causation by showing that the injury does not result from the independent action of some third party not before the court," *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 29 (cleaned up), they have not done so here.  The decision to ratify the 2020 CBA "could only be made by" the active players, "which means that [Plaintiffs'] relief depends on independent action of some third party not before the court." *Mideast*, 792 F.2d at 1178 (cleaned up).

Plaintiffs' counterarguments are unpersuasive.  They argue that their claims "are far from speculative or attenuated," Pls.' Opp'n at 32, and cite cases in which causation was found where the "third-party conduct" was "voluntary but reasonably predictable," *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 384 (D.C. Cir. 2020); *see also Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Respondents' theory of standing thus does not rest on mere speculation about the

decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties."). Plaintiffs point to "contemporaneous social media posts" to show that Defendants' alleged misrepresentations "caused players and their families not to understand the impact of the 2020 CBA." Pls.' Opp'n at 32 (citing Am. Compl. ¶¶ 104–06). And they say that the ratification vote was "followed by 'wide-spread dissatisfaction' on the part of players." *Id.* (quoting Am. Compl. ¶ 112).

Accepting all that as true, though, Plaintiffs admit that these allegations show only that the "omissions and misrepresentations of Defendants '*made it less likely* that Plaintiffs, members of the Class, or active Players would oppose ratification of the 2020 CBA.'" *Id.* (emphasis added) (quoting Am. Compl. ¶ 112). This is not enough to meet Article III's standing requirements. "[A]s the Supreme Court has made clear, the *mere possibility* that causation is present is not enough; the presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied." *Mideast*, 792 F.2d at 1178 (emphasis added).

Plaintiffs therefore lack standing to bring Counts 5–7.[13]

---

[13]  Because Plaintiffs have not shown they have standing, the Court does not reach Defendants' alternative arguments for dismissal. But that does not mean these arguments lack merit. For example, Defendants may be correct that the complaint lacks well-pled allegations that the Boards knew about the Players Association's alleged misrepresentations. *See, e.g.*, Am. Compl. ¶ 178 (stating only that "they knew"). And other allegations seem to support the opposite inference. *See, e.g., id.* ¶ 108 (alleging that the Players Association "should have forwarded the requests for information to the Retirement or Disability Board" but "did not, and instead acted themselves"). Plaintiffs recognize that they lack specific allegations. *See* Pls.' Opp'n at 59 (arguing for "the opportunity in discovery" to "show how Board Defendants specifically knew of the . . . misrepresentations"). More, the fiduciary responsibilities of the bargaining parties over the Board trustees might be narrower than Plaintiffs contend. *Cf. NLRB v. Amax Coal Co.*, 453 U.S. 322, 330 (1981) (explaining that "nothing in the language of § 302(c)(5) [of the LMRA] reveals any congressional intent . . . that an employer may direct or supervise the decisions of a trustee he has appointed").

# C.

Finally, Count 8.  Plaintiffs claim, under § 301 of the LMRA, that the Players

Association and Management Council breached the 2020 CBA.  *See* Am. Compl. ⁋ 191.  They

allege that the bargaining parties "impermissibly changed" it on March 15, 2020—ten days after

the active players had voted to ratify it—by making the Social Security offset apply to both

Article 3 and 4 Players, even though the ratified version had only covered Article 3 Players.  *Id.*

⁋⁋ 49, 55, 191.  Plaintiffs contend that this change violated a provision in the CBA stating that it

"may not be changed, altered, or amended other than by a written agreement signed by

authorized representatives of the parties," 2020 CBA Art. 67, § 9, because "the NFLPA,

according to its own Constitution, was not acting as an authorized representative of the Players

without the Players having voted on this substantial change," Am. Compl. ⁋ 198.

Plaintiffs concede that they "are not members of the NFLPA" but claim "they are

intended third-party beneficiaries under the March 2020 CBA and they therefore have standing

to maintain an action against [the bargaining parties] as if they were a party to the contract."  *Id.*

⁋ 194.  They contend that their injuries "could be readily redressed by requiring a re-vote on the

2020 CBA by Players with the full information now available to all impacted parties."  *Id.* ⁋ 207.

Plaintiffs assert that a re-vote would allow them "to see if Plaintiffs and members of the Class

could persuade active Players not to vote for the disability changes and keep their benefits in

place."  Pls.' Opp'n at 36.

Plaintiffs' proposed remedy poses a threshold problem for Count 8.  To have Article III

standing, Plaintiffs must allege that it is "likely, as opposed to merely speculative, that [their]

injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (cleaned up).

Plaintiffs' theory of harm "is that Plaintiffs are receiving less disability benefits because the

[bargaining parties] diminished their disability benefits through an unlawful and unauthorized method of modifying the 2020 CBA." Pls.' Opp'n at 35–36.

Whether a court-ordered re-vote would lead to the elimination of the provisions at issue is speculative at best. It hinges on the assumption that active players—third parties not before the Court—would not ratify the March 15 CBA. *Cf. Arpaio*, 797 F.3d at 20 (explaining that standing "is ordinarily substantially more difficult to establish" where "a case . . . turns on third-party conduct" (cleaned up)). Taking Plaintiffs' allegations as true, it seems just as likely that the active players would vote to ratify the CBA. Indeed, Plaintiffs' complaint anticipates this possibility, acknowledging that "[i]f the re-vote leads to ratification of the changes to Article 60 of the 2020 CBA, then the NFLPA would be duly authorized to enter into such an Agreement with the NFL Management Council, in conformance with Article 67 of the 2020 CBA." Am. Compl. ¶ 207.

Even if a re-vote were likely to redress Plaintiffs' injury, the Court doubts that this is an available remedy. Plaintiffs cite no authority for their proposition that the Court could order a re-vote on ratification of a CBA. Instead, they argue that ordering a re-vote would be no different from a "rerun election" in "the union organizing context." Pls.' Opp'n at 37.

The Court disagrees. The cases Plaintiffs cite deal with "the free exercise of employee rights under the" National Labor Relations Act ("NLRA"). *Pearson Educ., Inc. v. NLRB*, 373 F.3d 127, 131 (D.C. Cir. 2004). The NLRA gives employees the "right to an untrammeled choice" in electing a bargaining representative. *Serv. Corp. Int'l v. NLRB*, 495 F.3d 681, 685 (D.C. Cir. 2007). That is why the NLRB will order a new election when, for example, employers coerced employees to vote against union representation. *See Pearson*, 373 F.3d at

132 (agreeing with the NLRB "that the company's distribution of the leaflet was objectionable conduct independently sufficient to set aside the election" (cleaned up)).

A vote to ratify a CBA is different.  A bargaining agent pre-selected by employees negotiates CBAs.  And courts are wary of interfering with collective bargaining.  *See Am. Postal Workers Union, AFL-CIO, Headquarters Loc. 6885 v. Am. Postal Workers Union, AFL-CIO*, 665 F.2d 1096, 1110 (D.C. Cir. 1981) ("The courts are generally reluctant to disturb the results of bargaining and have apparently voided only those contract provisions that are on their face arbitrary or discriminatory."); *see also* Pls.' Opp'n at 36–37 (acknowledging that "the NLRA does not permit courts to set the terms of [CBAs]").  More, Plaintiffs' request for a re-vote makes little sense given their status as *retired* players.  No party involved in the ratification vote—in particular, active players—complains about it here.  It would be an extraordinary move for a court to vacate a union vote despite no quibbles with the outcome from the voters themselves.  This Court will not take such a step.

The Court will therefore dismiss Count 8 for lack of standing, as Plaintiffs have failed to properly allege that their injuries are redressable.

## IV.

In sum, Plaintiffs lack standing to challenge the whole-person evaluation process in Counts 1–4 because they have failed to show they will suffer an injury in fact.  They cannot challenge the Social Security offset in these Counts either because their disability benefits did not vest and thus they have failed to state a claim.  The Court will dismiss Counts 5–7 on standing grounds because Plaintiffs have not shown that any injury is fairly traceable to Defendants' alleged actions.  And lastly, Count 8 fails because a favorable ruling here is unlikely to redress Plaintiffs' injuries.

For these reasons, Plaintiffs' complaint will be dismissed.[14]  A separate Order will issue.


Dated: May 7, 2021                                    _____

                                                      TREVOR N. McFADDEN, U.S.D.J.

---

[14]  Defendants argue for dismissal with prejudice.  *See* NFLPA's Mot. at 14; NFLMC's Mot. at 43; Board Defs.' Mot. at 7.  But the Court finds that a dismissal without prejudice is more appropriate, given the high standard for the alternative.  *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("A dismissal *with prejudice* is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (cleaned up)); *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 131 (D.C. Cir. 2012) (explaining that "the standard for dismissing a complaint with prejudice is high" and that it "is the exception, not the rule, in federal practice" (cleaned up)).